1  CASTLE & NICHOLSON LLP
   Edward F. Quigley (State Bar No. 175228)
2  Susan S. Davis (State Bar No. 125854)
   2029 Century Park East, Suite 2100
3  Los Angeles, California  90067-3284
   Telephone: (310) 284-2200
4  Facsimile: (310) 284-2100
   Email: equigley@coxcastle.com;
5  sdavis@coxcastle.com

6  Attorneys for Defendant and Counterclaimant
   Montalvo Associates, LLC and
7  Defendant Affordable Housing Access, Inc.

8              UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10

11
   AMTAX HOLDINGS 279, LLC, an          Case No. 20CV2478 BEN AGS
12 Ohio limited liability company; and
   AMTAX HOLDINGS 123, LLC, an          **DEFENDANTS MONTALVO**
13 Ohio limited liability company,      **ASSOCIATES, LLC'S AND**
                                        **AFFORDABLE HOUSING**
14              Plaintiffs,             **ACCESS, INC.'S ANSWER TO**
                                        **COMPLAINT AND**
15       v.                            **COUNTERCLAIMANT**
                                        **MONTALVO ASSOCIATES,**
16 MONTALVO ASSOCIATES, LLC, a          **LLC'S COUNTERCLAIM**
   California limited liability company, and
17 AFFORDABLE HOUSING ACCESS,
   INC., a California corporation,
18                                      Trial Date:           NONE SET
                Defendant.
19                                      Complaint Filed: December 21, 2020

20 MONTALVO ASSOCIATES, LLC, a
   California limited liability company,
21
                Counterclaimant,
22
         v.
23
   AMTAX HOLDINGS 279, LLC,
24 AMTAX HOLDINGS 123, LLC, TAX
   CREDIT HOLDINGS III, LLC, a
25 Delaware limited liability company, and
   TCH II PLEDGE POOL, LLC, a
26 Delaware limited liability company,

27              Counter-Defendants.

28

Defendants MONTALVO ASSOCIATES, LLC ("Montalvo") and
AFFORDABLE HOUSING ACCESS, INC. ("AHA" and together with Montalvo,
collectively "Defendants") on behalf of themselves and no others, denying all
allegations not hereinafter specifically or expressly admitted and reserving all rights
to amend this pleading, hereby answer the Complaint filed by Plaintiffs AMTAX
HOLDINGS 279, LLC, an Ohio limited liability company ("AMTAX 279"); and
AMTAX HOLDINGS 123, LLC, an Ohio limited liability company ("AMTAX
123" and together with AMTAX 279, collectively "Plaintiffs") as follows:

1.     Answering paragraph 1 of the Complaint, Defendants admit that
AMTAX 279 is the Investor Limited Partner in Lucretia Avenue Partners, L.P.
("Lucretia"), Lucretia owns an affordable housing development in San Jose,
California known as "Villa Solera" (the "Villa Solera Project"), and AMTAX 279
contributed capital of more than five million dollars in exchange for receiving an
allocation of 99.99% of the tax credits and depreciation deductions from the Villa
Solera Project. Except as specifically admitted herein, Defendants deny the
allegations in paragraph 1.

2.     Answering paragraph 2 of the Complaint, Defendants admit that
AMTAX 123 is the Investor Limited Partner in Evans Lane Apartments, L.P.
("Evans Lane" and together with Lucretia, collectively "Partnerships"), Evans
Lane owns an affordable housing development in San Jose, California known as
"Las Ventanas" (the "Las Ventanas Project" and together with the Villa Solera
Project, collectively the "Projects"), and AMTAX 123 contributed capital of more
than sixteen million dollars in exchange for receiving an allocation of 99.99% of
the tax credits and depreciation deductions from the Las Ventanas Project. Except
as specifically admitted herein, Defendants deny the allegations in paragraph 2.

3.     Answering paragraph 3 of the Complaint, Defendants admit the
allegations in the first sentence of paragraph 3 and further admit that Montalvo
contributed capital of less than .01% of the initial capital and received an allocation

of less than .01% of the tax credits and depreciation deductions for the Projects. Montalvo is the general partner for each of the Partnerships and receives virtually all of the economics from the Projects including more than 90% of the operational cash flow and sale and refinancing proceeds from the Projects. Except as specifically admitted herein, Defendants deny the allegations in paragraph 3.

4.       Answering paragraph 4 of the Complaint, Defendants admit that a dispute has arisen between the parties and deny the remainder of the allegations in paragraph 4.

5.       Answering paragraph 5 of the Complaint, Defendants deny the allegations in paragraph 5.

6.       Answering paragraph 6 of the Complaint, Defendants lack sufficient information and belief to admit or deny the allegations in paragraph 6, and deny them on that basis. Defendants further deny that Plaintiffs are entitled to any relief whatsoever.

7.       Answering paragraph 7 of the Complaint, Defendants lack sufficient information and belief to admit or deny the allegations in paragraph 7, which relate to documents that are not attached to the Complaint, and deny them on that basis. Defendants further deny that Plaintiffs are entitled to any relief whatsoever.

8.       Answering paragraph 8 of the Complaint, Defendants admit that AMTAX 279 is an Ohio limited liability company, AMTAX 279 contributed capital of more than five million dollars in return for which it received an allocation of 99.99% of the tax credits and depreciation deductions from the Villa Solera Project. Defendants lack sufficient information and belief to admit or deny the remaining allegations in paragraph 8 and deny them on that basis.

9.       Answering paragraph 9 of the Complaint, Defendants admit that AMTAX 123 is an Ohio limited liability company, AMTAX 123 contributed capital of more than sixteen million dollars in return for which it received an allocation of 99.99% of the tax credits and depreciation deductions from the Las

Ventanas Project. Defendants lack sufficient information and belief to admit or deny the remaining allegations in paragraph 9 and deny them on that basis.

10.    Answering paragraph 10 of the Complaint, Defendants admit the allegations in paragraph 10.

11.    Answering paragraph 11 of the Complaint, Defendants admit the allegations in the first sentence of paragraph 11. Defendants lack sufficient information and belief to admit or deny the remaining allegations in paragraph 11 and deny them on that basis.

12.    Answering paragraph 12 of the Complaint, the first sentence of paragraph 12 is a legal conclusion which does not require a response. Defendants admit that Montalvo is a California limited liability company that is a citizen of California and AHA is a California nonprofit public benefit corporation that is a citizen of California. Defendants lack sufficient information and belief to admit or deny the remaining allegations in paragraph 12 and deny them on that basis.

13.    Answering paragraph 13 of the Complaint, to the extent that paragraph 13 is anything more than a legal conclusion which does not require a response, Defendant denies the allegations of paragraph 13.

14.    Answering paragraph 14 of the Complaint, to the extent that paragraph 14 is anything more than a legal conclusion which does not require a response, Defendant denies the allegations of paragraph 14.

15.    Answering paragraph 15 of the Complaint, to the extent that paragraph 15 is anything more than a legal conclusion which does not require a response, Defendant denies the allegations of paragraph 15.

16.    Answering paragraph 16 of the Complaint, to the extent that paragraph 16 is anything more than a legal conclusion which does not require a response, Defendant denies the allegations of paragraph 16.

17.    Answering paragraph 17 of the Complaint, to the extent that paragraph 17 is anything more than a legal conclusion which does not require a response,

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

087583\12373583v3

- 4 -

ANSWER AND COUNTERCLAIM

Defendant denies the allegations of paragraph 17.

18.    Answering paragraph 18 of the Complaint, Defendants admit the allegations in paragraph 18.

19.    Answering paragraph 19 of the Complaint, Defendants admit the allegations in paragraph 19.

20.    Answering paragraph 20 of the Complaint, Defendants admit the allegations in paragraph 20.

21.    Answering paragraph 21 of the Complaint, Defendants admit the allegations in paragraph 21.

22.    Answering paragraph 22 of the Complaint, Defendants admit that on or about December 9, 2002, AMTAX 279 was admitted as Lucretia's Investor Limited Partner and Montalvo was admitted as Lucretia's Administrative General Partner. Defendants further admit that AMTAX 123 was admitted as Evans Lane's Investor Limited Partner and Montalvo was admitted as Evans Lane's Administrative General Partner. Except as expressly admitted, Defendants deny the allegations in paragraph 22.

23.    Answering paragraph 23 of the Complaint, Defendants admit that AHA is the Managing General Partner for both Partnerships and the Partnership Agreements speak for themselves and not otherwise. Except as expressly admitted, Defendants deny the allegations in paragraph 23.

24.    Answering paragraph 24 of the Complaint, Defendants admit that the Special Limited Partners for Lucretia and Evans Lane are known as Tax Credit Holdings III, LLC and TCH II Pledge Pool, LLC. Except as expressly admitted, Defendants lack sufficient information and belief to admit or deny the remaining allegations in paragraph 24 and deny them on that basis.

25.    Answering paragraph 25 of the Complaint, Defendants admit that AMTAX 279 contributed capital of more than five million dollars in return for which it received an allocation of 99.99% of the tax credits and depreciation

deductions from the Villa Solera Project. Except as expressly admitted, Defendants deny the allegations of paragraph 25.

26.    Answering paragraph 26 of the Complaint, Defendants admit that AMTAX 123 contributed capital of more than sixteen million dollars in return for which it received an allocation of 99.99% of the tax credits and depreciation deductions from the Las Ventanas Project. Except as expressly admitted, Defendants deny the allegations of paragraph 26.

27.    Answering paragraph 27 of the Complaint, Defendants admit that Montalvo contributed initial capital of $228 to the Villa Solera Project and contributed initial capital of $1,000 to the Las Ventanas Project in return for which it received an allocation of less than .01% of the tax credits and depreciation deductions from the Projects. Montalvo receives virtually all of the economics including more than 90% of the operation cash flow and sale and refinancing proceeds from the Projects for its services. Except as expressly admitted, Defendants deny the allegations of paragraph 27.

28.    Answering paragraph 28 of the Complaint, Defendants admit the allegations of paragraph 28.

29.    Answering paragraph 29 of the Complaint, to the extent that paragraph 29 is anything more than a legal conclusion which does not require a response, Defendants deny the allegations of paragraph 29.

30.    Answering paragraph 30 of the Complaint, Defendants admit that a copy of the Amended and Restated Agreement of Limited Partnership dated as of December 9, 2002 ("Lucretia Partnership Agreement"), for Lucretia is attached as Exhibit "A" to the Complaint. This document speaks for itself, and not otherwise.

31.    Answering paragraph 31 of the Complaint, Defendants admit that a copy of the Amended and Restated Agreement of Limited Partnership dated as of October 1, 2002 ("Evans Lane Partnership Agreement" and together with the Lucretia Partnership Agreement, the "Partnership Agreements"), for Evans Lane is

attached as Exhibit "B" to the Complaint. This document speaks for itself, and not otherwise.

32.     Answering paragraph 32 of the Complaint, the Partnership Agreements speak for themselves and not otherwise. To the extent that paragraph 32 is anything more than a legal conclusion which does not require a response, Defendant denies the allegations of paragraph 32.

33.     Answering paragraph 33 of the Complaint, the Partnership Agreements speak for themselves and not otherwise. To the extent that paragraph 33 is anything more than a legal conclusion which does not require a response, Defendant denies the allegations of paragraph 33.

34.     Answering paragraph 34 of the Complaint, the Partnership Agreements speak for themselves and not otherwise. To the extent that paragraph 34 is anything more than a legal conclusion which does not require a response, Defendant denies the allegations of paragraph 34.

35.     Answering paragraph 35 of the Complaint, the Partnership Agreements speak for themselves and not otherwise. To the extent that paragraph 35 is anything more than a legal conclusion which does not require a response, Defendant denies the allegations of paragraph 35.

36.     Answering paragraph 36 of the Complaint, the Partnership Agreements speak for themselves and not otherwise. To the extent that paragraph 36 is anything more than a legal conclusion which does not require a response, Defendant denies the allegations of paragraph 36.

37.     Answering paragraph 37 of the Complaint, the Partnership Agreements speak for themselves and not otherwise. To the extent that paragraph 37 is anything more than a legal conclusion which does not require a response, Defendant denies the allegations of paragraph 37.

38.     Answering paragraph 38 of the Complaint, the Partnership Agreements speak for themselves and not otherwise. To the extent that paragraph 38 is anything

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

087583\12373583v3

- 7 -

ANSWER AND COUNTERCLAIM

more than a legal conclusion which does not require a response, Defendant denies the allegations of paragraph 38.

39.     Answering paragraph 39 of the Complaint, Defendants admit the allegations in paragraph 39.

40.     Answering paragraph 40 of the Complaint, Defendants respond that Montalvo provided written notice in July 2020 that it was exercising its purchase option under Section 7.4.J of the Lucretia Partnership Agreement. Except as expressly admitted, Defendants deny the allegations in paragraph 40.

41.     Answering paragraph 41 of the Complaint, Defendants respond that Montalvo provided written notice in July 2020 that it was exercising its purchase option under Section 7.4.J of the Evans Lane Partnership Agreement. Except as expressly admitted, Defendants deny the allegations in paragraph 41.

42.     Answering paragraph 42 of the Complaint, Defendants admit the allegations in paragraph 42.

43.     Answering paragraph 43 of the Complaint, Defendants deny the allegations in paragraph 43.

44.     Answering paragraph 44 of the Complaint, Defendants deny the allegations in paragraph 44.

45.     Answering paragraph 45 of the Complaint, Defendants deny the allegations in paragraph 45.

46.     Answering paragraph 46 of the Complaint, Defendants deny the allegations in paragraph 46.

47.     Answering paragraph 47 of the Complaint, Defendants admit that Plaintiffs sent letters to Defendants on or about November 25, 2020. Except as expressly admitted, Defendants lack sufficient information and belief to admit or deny the remaining allegations in paragraph 47, which relate to documents that are not attached to the Complaint, and therefore deny the remaining allegations in paragraph 47.

48. Answering paragraph 48 of the Complaint, Defendants admit that Defendants' legal counsel sent correspondence to Plaintiffs' legal counsel. Except as expressly admitted, Defendants lack sufficient information and belief to admit or deny the remaining allegations in paragraph 48, which relate to documents that are not attached to the Complaint, and therefore deny the remaining allegations in paragraph 48.

49. Answering paragraph 49 of the Complaint, Defendants deny the allegations in paragraph 49.

50. Answering paragraph 50 of the Complaint, Defendants admit that Montalvo filed lawsuits against Plaintiffs in the Superior Court for the County of Santa Clara, California on December 16, 2020. Except as expressly admitted, Defendants deny the remaining allegations in paragraph 50.

51. Answering paragraph 51 of the Complaint, Defendants deny the allegations in paragraph 51.

52. Answering paragraph 52 of the Complaint, Defendants deny the allegations in paragraph 52.

## CAUSES OF ACTION

### Count One (Declaratory Judgment)

### (By AMTAX 279 Against Defendants)

53. Answering paragraph 53 of the Complaint, Defendants incorporate herein by this reference as though set forth in full their prior responses to paragraphs 1-52 of the Complaint.

54. Answering paragraph 54 of the Complaint, Defendants admit the allegations in paragraph 54.

55. Answering paragraph 55 of the Complaint, Defendants admit that AMTAX 279 and Defendants are parties to the Lucretia Partnership Agreement, state that the document speaks for itself and not otherwise, and on that basis, deny

the remaining allegations in paragraph 55.

56.     Answering paragraph 56 of the Complaint, to the extent that this paragraph is anything more than a legal conclusion that does not require a response, Defendants state that the document speaks for itself and not otherwise, and on that basis, deny the allegations in paragraph 56.

57.     Answering paragraph 57 of the Complaint, Defendants deny the allegations in paragraph 57.

58.     Answering paragraph 58 of the Complaint, Defendants state that the document speaks for itself and not otherwise, and on that basis, deny the allegations in paragraph 58.

59.     Answering paragraph 59 of the Complaint, Defendants admit that Lucretia completed the fourteenth year of its Compliance Period. Except as expressly admitted, Defendants deny the allegations in paragraph 59.

60.     Answering paragraph 60 of the Complaint, Defendants admit that AMTAX 279 sent a letter to Defendants on or about November 25, 2020. Except as expressly admitted, Defendants lack sufficient information and belief to admit or deny the remaining allegations in paragraph 60 which relate to a document that is not attached to the Complaint, and on that basis, deny the remaining allegations in paragraph 60.

61.     Answering paragraph 61 of the Complaint, Defendants deny the allegations in paragraph 61.

62.     Answering paragraph 62 of the Complaint, the allegations in paragraph 62 are a legal conclusion to which no response is required.

63.     Answering paragraph 63 of the Complaint, Defendants deny the allegations in paragraph 63.

## **Count Two (Declaratory Judgment)**

### **(By AMTAX 123 Against Defendants)**

64.     Answering paragraph 64 of the Complaint, Defendants incorporate

1  herein by this reference as though set forth in full their prior responses to

2  paragraphs 1-63 of the Complaint.

3       65.    Answering paragraph 65 of the Complaint, Defendants admit the

4  allegations in paragraph 65.

5       66.    Answering paragraph 66 of the Complaint, Defendants admit that

6  AMTAX 123 and Defendants are parties to the Evans Lane Partnership Agreement,

7  state that the document speaks for itself and not otherwise, and on that basis, deny

8  the remaining allegations in paragraph 66.

9       67.    Answering paragraph 67 of the Complaint, to the extent that this

10  paragraph is anything more than a legal conclusion that does not require a response,

11  Defendants state that the document speaks for itself and not otherwise, and on that

12  basis, deny the allegations in paragraph 67.

13       68.    Answering paragraph 68 of the Complaint, Defendants deny the

14  allegations in paragraph 68.

15       69.    Answering paragraph 69 of the Complaint, Defendants state that the

16  document speaks for itself and not otherwise, and on that basis, deny the allegations

17  in paragraph 69.

18       70.    Answering paragraph 70 of the Complaint, Defendants admit that

19  Lucretia completed the fourteenth year of its Compliance Period. Except as

20  expressly admitted, Defendants deny the allegations in paragraph 70.

21       71.    Answering paragraph 71 of the Complaint, Defendants admit that

22  AMTAX 123 sent a letter to Defendants on or about November 25, 2020. Except as

23  expressly admitted, Defendants lack sufficient information and belief to admit or

24  deny the remaining allegations in paragraph 71, which relate to a document that is

25  not attached to the Complaint, and on that basis, deny the remaining allegations in

26  paragraph 71.

27       72.    Answering paragraph 72 of the Complaint, Defendants deny the

28  allegations in paragraph 72.

73.    Answering paragraph 73 of the Complaint, the allegations in paragraph 73 are a legal conclusion to which no response is required.

74.    Answering paragraph 74 of the Complaint, Defendants deny the allegations in paragraph 74.

## PRAYER FOR RELIEF

Answering the prayer for relief, Defendants deny that Plaintiffs are entitled to any relief whatsoever and state that Judgment should be entered in favor of Defendants and that Defendants should be awarded their costs of suit, including expert witness fees and attorneys' fees.

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim for Relief)

The Complaint, and each claim for relief or cause of action in it, fails to state facts sufficient to constitute any cause of action or claim for relief against the Defendants.

## SECOND AFFIRMATIVE DEFENSE

### (Unclean Hands)

The Complaint, and each claim for relief or cause of action in it, fails as to the Defendants based on upon the doctrine of unclean hands, which denies relief to a party guilty of misconduct directly related to the matter in which it seeks relief.

## THIRD AFFIRMATIVE DEFENSE

### (Failure to Comply with Contractual Provisions)

The Complaint, and each claim for relief or cause of action in it, is barred because Plaintiffs failed to comply with their obligations under the Partnership Agreements, and thus, Plaintiffs' claims are barred by their own prior breaches and failure to meet their obligations.

## FOURTH AFFIRMATIVE DEFENSE

### (Breach of the Covenant of Good Faith and Fair Dealing)

The Complaint, and each claim for relief or cause of action in it, is barred

because Plaintiffs breached the implied covenant of good faith and fair dealing failed to comply with their obligations under the Partnership Agreements, and thus, Plaintiffs' claims are barred by their own prior breaches and failure to meet their obligations.

## FIFTH AFFIRMATIVE DEFENSE

### (Prevention of Performance)

The Complaint, and each claim for relief or cause of action in it, is barred because Plaintiffs acted with bad faith concerning the matters alleged therein and breached obligations owing to Defendants, thereby preventing Defendants' performance and discharging any obligation on the part of Defendants.

## SIXTH AFFIRMATIVE DEFENSE

### (Unjust Enrichment)

The Complaint, and each claim for relief or cause of action in it, is barred because Plaintiffs would be unjustly enriched if Plaintiffs are granted any relief sought herein against Defendants.

## SEVENTH AFFIRMATIVE DEFENSE

### (Plaintiffs' Own Fault)

The Complaint, and each claim for relief or cause of action in it, is barred because if Plaintiffs suffered any damages, they were directly and proximately caused and contributed to by Plaintiffs' own fault or that of its agents. Therefore, Plaintiff is barred from any recovery against Defendants, or in the alternative, Plaintiffs' recovery should be proportionately reduced.

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

087583\12373583v3

- 13 -

ANSWER AND COUNTERCLAIM

## COUNTERCLAIM

Defendant and Cross-Complainant MONTALVO ASSOCIATES, LLC ("Montalvo" or "Counterclaimant") counterclaims against Plaintiffs and Counter-Defendants AMTAX HOLDINGS 279, LLC, an Ohio limited liability company ("AMTAX 279"); AMTAX HOLDINGS 123, LLC, an Ohio limited liability company ("AMTAX 123" and together with AMTAX 279, "AMTAX"), TCH II Pledge Pool LLC ("TCH II"); and Tax Credit Holdings III, LLC ("TCH III" and together with AMTAX and TCH II, "Counter-Defendants") as follows:

## THE PARTIES

1.      Montalvo is a limited liability company formed under the laws of the State of California with its principal place of business in San Jose, California. Montalvo is the Administrative General Partner of (i) the Lucretia Avenue Apartments, L.P. ("Lucretia"), as defined under the Amended and Restated Agreement of the Limited Partnership dated December 9, 2002 (as amended from time to time, the "Lucretia Partnership Agreement"), and (ii) the Evans Lane Apartments, L.P. ("Evans Lane" and together with the Lucretia, the "Partnerships"), as defined under the Amended and Restated Agreement of the Limited Partnership dated October 1, 2002 (as amended from time to time, the "Evans Lane Partnership Agreement" and together with the Lucretia Partnership Agreement, the "Partnership Agreements"). Copies of the Lucretia Partnership Agreement and the Evans Lane Partnership Agreement are attached to this Complaint as **Exhibits 1 and 2**, respectively.

2.      Montalvo is informed and believes, and on that basis alleges, that Counter-Defendant AMTAX 279 is a limited liability company formed under the laws of the State of Ohio with its principal place of business in Denver, Colorado. AMTAX 279 is the sole Investor Limited Partner of the Lucretia, as defined under the Lucretia Partnership Agreement.

3.      Montalvo is informed and believes, and on that basis alleges, that

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
LOS ANGELES, CA

087583\12373583v3

- 14 -

ANSWER AND COUNTERCLAIM

1  Counter-Defendant AMTAX 123 is a limited liability company formed under the
2  laws of the State of Ohio with its principal place of business in Denver, Colorado.
3  AMTAX 123 is the sole Investor Limited Partner of the Evans Lane, as defined
4  under the Evans Lane Partnership Agreement.

5      4.      Montalvo is informed and believes, and on that basis alleges, that
6  Counter-Defendant TCH II is a limited liability company formed under the laws of
7  the State of Delaware with its principal place of business in Denver, Colorado. TCH
8  II is the sole Special Limited Partner of the Lucretia, as defined under the Lucretia
9  Partnership Agreement. AMTAX 279 and TCH II will be referred to as "Lucretia
10 Limited Partners."

11     5.      Montalvo is informed and believes, and on that basis alleges, that
12 Counter-Defendant TCH III is a limited liability company formed under the laws of
13 the State of Delaware with its principal place of business in Denver, Colorado. TCH
14 III is the sole Special Limited Partner of the Evans Lane, as defined under the
15 Evans Lane Partnership Agreement. AMTAX 123 and TCH III will be referred to
16 as "Evans Lane Limited Partners" and together with the Lucretia Limited Partners,
17 the "Limited Partners."

18                          **JURISDICTION AND VENUE**

19     6.      This Court has subject matter jurisdiction over this action pursuant to
20 29 U.S.C. § 1332 because the matter is between citizens of different states and the
21 amount in controversy exceeds $75,000, exclusive of interest and costs. Defendant
22 and Counterclaimant Montalvo is a California limited liability company that is a
23 citizen of California. Plaintiffs and Counter-Defendants AMTAX 279 and AMTAX
24 123, and Counter-Defendants TCH II and TCH III are citizens of Colorado.

25     7.      Montalvo seeks declaratory relief pursuant to Rule 57 of the Federal
26 Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202, which grant this Court
27 authority to declare the rights and other legal relations surrounding questions of
28 actual controversy that exist between Counterclaimant and Counter-Defendants.

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because (i) Counter-Defendants are subject to this Court's personal jurisdiction with respect to this action, and (ii) this Court has found venue proper under a forum selection clause in the parties' partnership agreements in its Order Denying Motion to Dismiss entered on March 2, 2021, Dkt. 17.

## GENERAL ALLEGATIONS

9.      Lucretia owns and operates a 100-unit multifamily rental apartment project known as the Villa Solera Apartments on the real property located at 1385 Lucretia Avenue in the City of San Jose, County of Santa Clara, State of California (the "Villa Solera Project").

10.      Evans Lane owns and operates a 239-unit multifamily rental apartment project known as the Las Ventanas Apartments on the real property located at 1848 Evans Lane in the City of San Jose, County of Santa Clara, State of California (the "Las Ventanas Project" and together with the Villa Solera Project, the "Projects").

11.      The exclusive purpose of the Partnerships is to provide low income housing units for rent to persons of low and moderate income.

12.      The Projects are operated in order to qualify for low-income housing tax credits as provided in Section 42 of the Internal Revenue Code, with the tax credits distributed to the partners of the Partnerships according to their percentage equity interests.

13.      Montalvo is one of two general partners in each of the Partnerships and is generally responsible for operating the Projects. The other general partner is Affordable Housing Access, Inc., a California nonprofit public benefit corporation ("AHA" and together with Montalvo, "General Partners").

14.      The Limited Partners do not have any right to control the Partnerships, but AMTAX does have certain limited rights. Under the Partnership Agreements, AMTAX was admitted to the Partnerships in order to receive the tax benefits, primarily the low-income housing tax credit ("Tax Credit") under Section 42 of the

Internal Revenue Code of 1986. Accordingly, AMTAX received Tax Credits, interest deductions and the rights to the Partnerships' taxable losses. For the past fifteen years, AMTAX received substantially all the tax credits, interest deductions and the Partnerships' taxable losses and received a percentage of the net cash flow in accordance with Article 6 of the Partnership Agreements.

15.     The 15-year Tax Credit Compliance Period ("Compliance Period") expired for the Villa Solera Project on December 31, 2019, and for the Las Ventanas Project on December 31, 2020. After the expiration of the Compliance Period, the Partnerships no longer generate tax credits and no longer are subject to recapture of those credits.

16.     Once the Compliance Period is completed, the General Partners have the right to purchase AMTAX's Interest on the terms set out in Section 7.4.J of the Partnership Agreements for a period of twenty-four months.

17.     Section 7.4.J of the Partnership Agreements provides as follows:

> Subject to compliance with Section 42 of the Code and the rules of the Agency, upon completion of the Compliance Period, the General Partners shall have the option (the "Option") to purchase the interest of the Investor Limited Partner in the real estate, fixtures and personal property of the Partnership (the "Interest") for a period of twenty-four (24) months. The General Partner may exercise the Option upon written notice to the Investor Limited Partner at any time after the end of the Compliance Period (the "Option Period"). In the event the General Partners exercise the Option, their [sic] must pay to the Investor Limited Partner the Option Price (as defined herein) in cash. The Option Price shall equal the greater of (i) the fair market value of the Interest, without offset for any lack of control or inability to control management of the Investor Limited Partner, (fair market value shall be determined by two independent MAI appraisers: one selected by the General Partners and one by the Investor Limited Partner. If such appraisers are unable to agree on the value, they shall jointly appoint a third independent MAI appraiser whose determination shall be final and binding), or (ii) an amount determined by the Partnership Accountants, which is sufficient to pay (a) all outstanding indebtedness secured by the Project and (b) distribute to the Investor Limited Partner cash proceeds sufficient to enable the Investor Limited Partner to pay, on an after tax basis, any taxes projected to be

imposed on the Investor Limited Partner as a result of the sale pursuant to the Option. However, in no event shall the Option Price be at an amount less than the Exit Tax Distribution.

18.     Section 7.4.K of the Partnership Agreements also provide AMTAX with certain rights to request the sale of the Projects. Section 7.4K of the Partnership Agreements provide as follows:

Subject to the Option in Section 7.4J above, the Limited Partner shall have the option to force a sale of its interest in the real estate, fixtures and personal property comprising the Apartment Complex (the "Limited Partnership Option") for a period of twenty-four (24) months following the close of the Compliance Period as determined by the Code. Such sale shall be executed at fair market value, as determined under Section 7.4J. In the event that the Investor Limited Partner exercises the Limited Partnership Option, the General Partners shall have a "Right of First Refusal" to purchase the Partnership Interest.

19.     In a letter dated January 8, 2020, AMTAX 279 notified the General Partners that AMTAX 279 was exercising its option in Section 7.4.K of the Lucretia Partnership Agreement and requested the General Partners use their best efforts to obtain a buyer for the Villa Solera Project on the best terms available. A copy of the January 8, 2020 letter from AMTAX 279 is attached as **Exhibit 3.**

20.     In a letter dated March 30, 2020, AMTAX 279 reminded the General Partners of their obligations under Section 7.4.K of the Lucretia Partnership Agreement and requested that they contact AMTAX 279. A copy of the March 30, 2020 letter from AMTAX 279 is attached as **Exhibit 4.**

21.     On or about April 14, 2020, Alexis Grant, a representative of the Administrative General Partner, spoke with Erik Aukland, a representative of AMTAX 279, and informed him that Montalvo was not interested in selling the Projects and wanted to exercise its Option under Section 7.4.J. to purchase AMTAX 279's Interest. Montalvo also provided a copy of an appraisal to AMTAX 279.

22.     Montalvo subsequently informed AMTAX 279 that it wanted to

1  update the appraisal.

2      23.      In a letter dated May 29, 2020, AMTAX 279 requested that the

3  Administrative General Partner confirm that it would be exercising its Option under

4  Section 7.4.J of the Lucretia Partnership Agreement. A copy of the May 29, 2020

5  letter from AMTAX 279 is attached as **Exhibit 5.**

6      24.      In a call with Mr. Aukland and Adam Stein, another representative of

7  AMTAX 279, on or about June 25, 2020, Ms. Grant confirmed that the Montalvo

8  was exercising its Option under Section 7.4.J of the Lucretia Partnership

9  Agreement.

10      25.      In a letter dated July 10, 2020, AMTAX 279 acknowledged that the

11  Administrative General Partner had exercised its Option under Section 7.4.J of the

12  Lucretia Partnership Agreement and set out an arbitrary timeline to complete the

13  purchase of its Interest. A copy of the July 10, 2020 letter from AMTAX 279 is

14  attached as **Exhibit 6.**

15      26.      In a letter dated July 27, 2020, Montalvo provided written notification

16  to AMTAX 279 that Montalvo was exercising the Option under Section 7.4.J of the

17  Lucretia Partnership Agreement to purchase AMTAX 279's Interest in the Lucretia.

18  A copy of the July 27, 2020 letter from Montalvo to AMTAX 279 is attached as

19  **Exhibit 7**.

20      27.      In a letter dated July 27, 2020, Montalvo provided written notification

21  to AMTAX 123 that Montalvo was exercising the Option under Section 7.4.J of the

22  Evans Lane Partnership Agreement to purchase AMTAX 123's Interest in the

23  Evans Lane. A copy of the July 27, 2020 letter from Montalvo to AMTAX 123 is

24  attached as **Exhibit 8**.

25      28.      In a letter dated August 21, 2020, AMTAX acknowledged receipt of

26  the July 27, 2020 notices, delivered a copy of AMTAX 279's appraisal for the Villa

27  Solera Project, requested a copy of Montalvo's appraisal for the Villa Solera

28  Project, and requested that the parties agree on a timeline to complete the purchase

of AMTAX 279's Interest in the Lucretia. AMTAX also informed Montalvo that its exercise of the Option under Section 7.4.J of the Evans Lane Partnership Agreement was premature since the Compliance Period would not end until December 31, 2020. AMTAX further informed Montalvo that it was amenable to discussing the Partnerships with Montalvo as mentioned in prior discussions. A copy of the August 21, 2020 letter from AMTAX is attached as **Exhibit 9.**

29.     Montalvo subsequently provided AMTAX 279 with a copy of its updated appraisal on August 26, 2020. Montalvo's appraiser and AMTAX 279's appraiser did not agree on the fair market value of the Villa Solera Project and the parties began considering the selection of third independent MAI appraiser as provided in Section 7.4.J.

30.     In a letter dated October 30, 2020, AMTAX 279 informed the Montalvo that AMTAX 279 would have its appraiser contact Montalvo's appraiser directly if Montalvo did not respond by November 4, 2020.

31.     Rather than follow the appraisal process to its conclusion, in a letter dated November 25, 2020, AMTAX 279 suddenly accused Montalvo of deliberately delaying the buyout process even though only four months had passed since Montalvo formally exercised its Option under Section 7.4.J, the parties had exchanged appraisals during that time period and Montalvo understood that the appraisers were in the process of selecting a third appraiser. AMTAX 279 also notified Montalvo that it was electing to exercise its rights under Section 7.4.I of the Lucretia Partnership Agreement and demanded a sale of the Villa Solera Project. A copy of the November 25, 2020 letter from AMTAX 279 is attached as **Exhibit 10.**

32.     In a letter dated November 25, 2020, AMTAX 123 notified Montalvo that it also was electing to exercise its rights under Section 7.4.I of the Evans Lane Partnership Agreement to force a sale of the Las Ventanas Project. A copy of the November 25, 2020 letter from AMTAX 123 is attached as **Exhibit 11.**

33. Section 7.4.I of the Partnership Agreement provides as follows:

> If requested to do so by the Investor Limited Partner at any time after the completion of the fourteenth year of the compliance period (as defined in Section 42(i)(1) of the Code), the General Partner shall submit a written request to the Credit Agency to find a person to acquire the Partnership's interest in the low income portion of the Project and/or take such other action permitted or required by the code as the Investor Limited Partner may reasonably request to effect a sale of the Project or to terminate the extended use commitment of Section 42(h)(6)(B) of the Code to the extent such action is not violative of an restrictive covenants applicable to the Project.

34. In letters dated December 3, 2020, Montalvo reiterated its desire to complete the purchase of AMTAX's Interests and requested that AMTAX move toward accomplishing that goal by honoring its obligations under Section 7.4.J. Copies of the December 3, 2020 letters from Montalvo are attached as **Exhibits 12 and 13.**

35. In letters dated December 10, 2020, AMTAX insisted that Section 7.4.I of the Partnership Agreements gave Montalvo "no discretion" over whether to accommodate AMTAX's request to sell the Projects and demanded the Montalvo comply with AMTAX's "instruction to the General Partner to list the Project(s) for sale." Copies of the December 10, 2020 letters from AMTAX are attached as **Exhibits 14 and 15.**

36. Under the Partnership Agreements, a sale of the Projects would prevent the Partnerships from complying with its exclusive purpose of providing low income housing.

## <u>FIRST CLAIM FOR RELIEF</u>

### (Declaratory Relief Against AMTAX 123 and TCH III)

37. Montalvo incorporates by reference the allegations contained in Paragraphs 1 through 36, inclusive, as if they were fully pled in this cause of action.

38. An actual controversy has arisen between Montalvo and the Evans Lane Limited Partners regarding the rights and obligations of the partners under the

Evans Lane Partnership Agreement. Montalvo contends, and is informed and believes that the Evans Lane Limited Partners deny, that:

a.      Montalvo's right to purchase AMTAX 123's Interest for twenty-four months after the end of the Compliance Period was a fundamental right bargained for by the parties.

b.      Section 7.4.J of the Evans Lane Partnership Agreement gives Montalvo a period of twenty-four months after the end of the Compliance Period to exercise its right to buyout AMTAX 123's Interest.

c.      Section 7.4.K of the Evans Lane Partnership Agreement provides AMTAX 123 with certain rights to exit the Evans Lane, but does so subject to the General Partners 'Right of First Refusal' to purchase the Partnership Interest" pursuant to an Option Price determined pursuant to section 7.4.J.

d.      The Compliance Period expired on December 31, 2020.

e.      AMTAX 123 has known since July 27, 2020, that the Montalvo would be exercising its right to buyout AMTAX 123's interests.

f.      Under California law, "[t]o the extent practicable, the meaning of a contract must be derived from reading the whole of the contract, with individual provisions interpreted together, in order to give effect to all provisions and to avoid rendering some meaningless." *Zalkind v. Ceradyne, Inc.* (2011) 194 Cal. App. 4th 1010, 1027; *see* Civ. Code § 1641.

g.      AMTAX 123's attempt to exercise its right to force a sale of the Las Ventanas Project under Section 7.4.I without giving Montalvo the right to purchase the AMTAX 123's Interest at the Option Price set forth pursuant to the process set forth in 7.4.J is not reasonable and would effectively eviscerate Montalvo's rights under Sections 7.4.J and 7.4.K and renders those sections meaningless.

h.      AMTAX 123 is required to cooperate with Montalvo to complete the appraisal process of AMTAX 123's Interest as set forth in section 7.4.J, and to sell AMTAX 123's Interest to Montalvo at the Option Price so determined.

39.     This Court's declaration of the rights and obligations set forth in paragraph 38 is necessary to resolve the pending dispute between Montalvo, on the one hand, and the Evans Lane Limited Partners, on the other. Absent a decree, Montalvo will suffer irreparable and irreversible harm by the loss of the Las Ventana Project.

## SECOND CLAIM FOR RELIEF

### (Declaratory Relief Against AMTAX 279 and TCH II)

40.     Montalvo incorporates by reference the allegations contained in Paragraphs 1 through 39, inclusive, as if they were fully pled in this cause of action.

41.     An actual controversy has arisen between Montalvo and the Lucretia Limited Partners regarding the rights and obligations of the partners under the Lucretia Partnership Agreement. Montalvo contends, and is informed and believes that the Lucretia Limited Partners deny, that:

a.      Section 7.4.J of the Lucretia Partnership Agreement gives Montalvo a period of twenty-four months after the end of the Compliance Period to exercise its right to buyout AMTAX 279's Interest.

b.      Montalvo validly and timely exercised its right to buy out AMTAX 279's Interest under Section 7.4.J in writing on July 27, 2020.

c.      Once Montalvo exercised its buyout rights under Section 7.4.J, AMTAX 279 was obligated to fulfill all its obligations under that section, including but not limited to, proceeding with the selection of a neutral third-party appraiser, and selling the Interest to Montalvo at an Option Price set pursuant to section 7.4.J.

d.      AMTAX 279's subsequent attempt to exercise its right to force a sale of the Villa Solera Project under Section 7.4.I on November 25, 2020, does not eliminate Montalvo's right to complete its buyout of AMTAX 279's Interest under Section 7.4.J.

e.      AMTAX 279 is required to cooperate with Montalvo to complete the appraisal process of AMTAX 279's Interest as set forth in section 7.4.J, and to sell

1   AMTAX 279's Interest to Montalvo at the Option Price so determined.

2       42.    This Court's declaration of the rights and obligations set forth in

3   paragraph 41 is necessary to resolve the pending dispute between Montalvo, on the

4   one hand, and the Lucretia Investor Limited Partners, on the other. Absent a decree,

5   Montalvo will suffer irreparable and irreversible harm by the loss of the Villa

6   Solera Project.

7   <div align="center">**PRAYER**</div>

8       WHEREFORE, Counterclaimant prays for judgment against the Counter-

9   Defendants as follows:

10       1.    For a declaratory judgment in favor of Counterclaimant of the rights

11   and obligations of the parties pursuant to the Evans Lane Partnership Agreement, as

12   set forth in paragraph 38 above;

13       2.    For a declaratory judgment in favor of Counterclaimant of the rights

14   and obligations of the parties pursuant to the Lucretia Partnership Agreement, as set

15   forth in paragraph 41 above;

16       3.    For reasonable attorneys' fees to the extent permitted by law and costs

17   of suit incurred in this lawsuit; and

18       4.    For such further relief as is just and appropriate under the

19   circumstances to which Counterclaimant may be entitled at law or in equity.

20
21   DATED:    March 16, 2021    COX, CASTLE & NICHOLSON LLP

22

23   By:*/s  Susan S. Davis*
    Edward F. Quigley
24       Susan S. Davis
    Attorneys for Defendant and
25       Counterclaimant Montalvo
    Associates, LLC and Defendant
26       Affordable Housing Access, Inc.

27

28

**LAW OFFICES OF**
**COX, CASTLE &**
**NICHOLSON LLP**
LOS ANGELES, CA

087583\12373583v3

- 24 -

ANSWER AND COUNTERCLAIM

# EXHIBIT 1

# LUCRETIA AVENUE PARTNERS, L.P.

## A CALIFORNIA LIMITED PARTNERSHIP

### AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP

### DATED AS OF DECEMBER 9, 2002

TABLE OF CONTENTS

| | | Page |
|---|---|---|
| Preliminary Statement | | 1 |
| ARTICLE I | | 1 |
| Defined Terms | | 1 |
| ARTICLE II | | 18 |
| Continuation; Name; Purpose and Term | | 18 |
| Section 2.1 | Continuation | 18 |
| Section 2.2 | Name and Office; Agent for Service | 18 |
| Section 2.3 | Purpose | 18 |
| Section 2.4 | Authorized Acts | 18 |
| Section 2.5 | Term and Dissolution | 19 |
| ARTICLE III | | 20 |
| Financing and Disposition of Property | | 20 |
| ARTICLE IV | | 21 |
| Partners; Capital | | 21 |
| Section 4.1 | General Partners | 21 |
| Section 4.2 | Limited Partners | 21 |
| Section 4.3 | Partnership Capital and Capital Accounts | 22 |
| Section 4.4 | Liability of Limited Partners | 23 |
| Section 4.5 | Certain Rights of Investor Limited Partner | 23 |
| ARTICLE V | | 26 |
| Capital Contributions of Investor Limited Partner | | 26 |
| Section 5.1 | Installments of Capital Contributions | 26 |
| Section 5.2 | Adjustments to Capital Contributions | 27 |
| ARTICLE VI | | 29 |
| Distributions of Cash; Allocations of Profits, Losses and Tax Credits | | 29 |
| Section 6.1 | Profits and Losses and Tax Credits | 29 |
| Section 6.2 | Application and Distributions Prior to Dissolution | 30 |
| Section 6.3 | Liquidation | 32 |
| Section 6.4 | Special Distribution Provisions | 33 |
| Section 6.5 | Special Allocation Provisions | 33 |
| Section 6.6 | Order of Application | 37 |

ARTICLE VII .......................................................................................................... 37

Rights, Powers and Duties of the General Partners ............................................... 37
    Section 7.1    Restrictions on Authority ........................................... 37
    Section 7.2    Independent Activities ................................................ 39
    Section 7.3    Business Management and Control; Designation of Managing
                   General Partner ......................................................... 39
    Section 7.4    Duties and Obligations of the General Partners ........ 39
    Section 7.5    Representations and Warranties; Certain Indemnities ..... 43
    Section 7.6    Indemnification ......................................................... 46
    Section 7.7    Liability of General Partners to Limited Partners ..... 47
    Section 7.8    Reserves .................................................................... 47
    Section 7.9    Obligation To Provide for Project Expenses ............ 48
    Section 7.10   Certain Payments to the General Partners and Affiliates ..... 49
    Section 7.11   Several Obligations ................................................... 50
    Section 7.12   Grant of Security Interest......................................... 50
    Section 7.13   Tax Matters Partner .................................................. 50

ARTICLE VIII ....................................................................................................... 52

Withdrawal of a General Partner; New General Partners ...................................... 52
    Section 8.1    Voluntary Withdrawal .............................................. 52
    Section 8.2    Right To Continue ..................................................... 52
    Section 8.3    Successor General Partner ......................................... 52
    Section 8.4    Interest of Predecessor General Partner ................... 53
    Section 8.5    Designation of New General Partners ....................... 54
    Section 8.6    Amendment of Certificate; Approval of Certain Events ..... 54
    Section 8.7    Admission of a General Partner ................................ 55

ARTICLE IX .......................................................................................................... 55

Transfer of Limited Partner Interests; Additional Limited Partners ..................... 55
    Section 9.1    Right To Assign ........................................................ 55
    Section 9.2    Restrictions ............................................................... 55
    Section 9.3    Substitute Limited Partners ....................................... 55
    Section 9.4    Assignees .................................................................. 56
    Section 9.5    Additional Limited Partners ..................................... 57

ARTICLE X ........................................................................................................... 57

Loans  57

ARTICLE XI .......................................................................................................... 58

Management Agent ................................................................................................ 58

ARTICLE XII ............................................................................................... 59

Books and Reporting, Accounting, Tax Elections, Etc ............................ 59
      Section 12.1   Books, Records and Reporting ................................ 59
      Section 12.2   Bank Accounts ......................................................... 62
      Section 12.3   Elections ................................................................. 63
      Section 12.4   Special Adjustments ............................................... 63
      Section 12.5   Fiscal Year ............................................................. 63

ARTICLE XIII .............................................................................................. 63

General Provisions ....................................................................................... 63
      Section 13.1   Notices ..................................................................... 63
      Section 13.2   Word Meanings ....................................................... 64
      Section 13.3   Binding Provisions ................................................. 64
      Section 13.4   Applicable Law ....................................................... 64
      Section 13.5   Counterparts ........................................................... 64
      Section 13.6   Paragraph Titles ..................................................... 64
      Section 13.7   Separability of Provisions; Rights and Remedies ....... 64
      Section 13.8   Effective Date of Admission .................................. 65
      Section 13.9   Amendment Procedure ........................................... 65
      Section 13.10  Delivery of Certificate .......................................... 66
      Section 13.11  Requirements of the Lender and the Agency .......... 66
      Section 13.12  Requirements for Bonds ........................................ 67
      Section 13.12  Special Power of Attorney ..................................... 68

## LUCRETIA AVENUE PARTNERS, L.P.

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP OF LUCRETIA AVENUE PARTNERS, L P, as of December 9, 2002, among AFFORDABLE HOUSING ACCESS, INC. ("AHAI"), a California nonprofit public benefit corporation, as Co-Managing General Partner; COMMUNITY HOME BUILDERS AND ASSOCIATES ("CHBA"), a California nonprofit public benefit corporation as Co-Managing General Partner, MONTALVO ASSOCIATES LLC ("Montalvo"), a California limited liability company as Administrative General Partner; PROTECH 2002-D, LLC, an Ohio limited liability company ("Protech"), as Special Limited Partner, Builders Affordable Housing Development Company, LLC, a California limited liability company, as Original (and Withdrawing) Limited Partner and AMTAX HOLDINGS 279, LLC, an Ohio limited liability company ("AMTAX"), as Investor Limited Partner

### Preliminary Statement

WHEREAS, the Partnership was organized as a partnership in the laws of the State of California pursuant to a Certificate of Limited Partnership dated July 9, 2002 (the "Certificate"), the Certificate having been filed with the Secretary of State of California (the "Filing Office") on July 9, 2002  The Certificate is herein called the "Original Partnership Agreement"

WHEREAS, in furtherance of the Co-Managing General Partner's charitable purposes of providing low income housing to needy and distressed persons, the Co-Managing General Partners have entered into the Partnership to acquire, develop, construct, rehabilitate, own and maintain a 100-unit apartment complex intended for rental to persons of low and moderate income to be known as Kennedy Apartments and to be located in San Jose, California (the "Apartment Complex")  The Co-Managing General Partners have selected the Administrative General Partner, the Special Limited Partner and the Investor Limited Partner as the Partners with whom they wish to develop the Project, as described herein   In addition to the Administrative General Partner, the Special Limited Partner and the Investor Limited Partner, the Co-Managing General Partners on behalf of the Partnership have selected and approve and agree to oversee the Developer, the Accountants and the Property Management Agreement as part of the Partnership development and ongoing management team; and

WHEREAS the purposes of this amendment to, and restatement of, the Original Partnership Agreement are:  (i) to enable the Partnership to admit AHAI and CHBA as the Co-Managing General Partners, Montalvo as Administrative General Partner, Protech as Special Limited Partner and AMTAX as the Investor Limited Partner, (ii) to provide for the withdrawal of the Original Limited Partner as Limited Partner and (iii) to set out more fully the rights, obligations and duties of the Partners

NOW, THEREFORE, it is agreed and certified, and the Original Partnership Agreement is hereby amended and restated in its entirety, as follows:

## ARTICLE I

### Defined Terms

The defined terms used in this Agreement shall have the meanings specified below:

"Accountants" means Novagradac & Co., San Francisco, California or other firm of independent certified public accountants to be engaged by the Co-Managing General Partners with the Consent of the Limited Partner for the purpose of reviewing, preparing, and certifying various reports as required by this agreement or by applicable government agencies.

"Adjusted Capital Account Deficit" means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of a Partnership Fiscal Year, after giving effect to the following adjustments:

(i)     Such Capital Account shall be increased by the amount of any Deficit Restoration Obligation of such Partner.

(ii)    Such Capital Account shall be decreased by the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Allocation Regulations.

The foregoing definition of Adjusted Capital Account Deficit and the application of such term in the manner provided in Article IV hereof is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Allocation Regulations and shall be interpreted consistently therewith.

"Admission Date" means the date on which AMTAX is admitted to the Partnership as the Investor Limited Partner pursuant to Section 13.8.

"Affiliate" or "Affiliated Person" means, when used with reference to a specified Person: (i) any Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with the specified Person; (ii) any Person that is an officer of, partner in, or trustee of, or serves in a similar capacity with respect to the specified Person or of which the specified Person is an officer, partner, or trustee, or with respect to which the specified Person serves in a similar capacity; (iii) any Person that, directly or indirectly, is the beneficial owner of, or controls, 10% or more of any class of equity securities of, or otherwise has a substantial beneficial interest (10% or more) in, the specified Person, or of which the specified Person is directly or indirectly the owner of 10% or more of any class of equity securities, or in which the specified Person has a substantial beneficial interest (10% or more); and (iv) any relative or spouse of the specified Person. Affiliate or Affiliated Person of the Partnership or a General Partner does not include a Person who is a partner in a partnership or joint venture with the Partnership (or any other Affiliated Person) if that Person is not otherwise an Affiliate or Affiliated Person of the Partnership or General Partner.

"Agency" means, as applicable, the Authority and/or any other government agency having jurisdiction over the particular matter to which reference is being made.

"Agreement" means this Amended and Restated Agreement of Limited Partnership, as amended from time to time

"Allocation Regulations" means the Treasury Regulations issued under Sections 704(b) and 752 of the Code, as the same may be modified or amended from time to time. In the event that the Allocation Regulations are revised or amended subsequent to the date of this Agreement, references herein to sections or paragraphs of the Allocation Regulations shall be deemed to be references to the applicable sections or paragraphs of the Allocation Regulations as then in effect

"AMTAX" means AMTAX Holdings 279, LLC an Ohio limited liability company, and its successors.

"Apartment Complex" means the Buildings of the Project comprising the Improvements

"Approved Budget" means an annual operating budget that is to be approved by the Investor Limited Partner prior to the Admission Date

"Asset Management Fee" means the annual cumulative fee in an amount equal to $10,000 per year (as adjusted annually by the C.P.I.), payable by the Partnership to the Investment Partner Manager, or an affiliate thereof, for its services in monitoring Partnership activities  Such fee shall be payable from Cash Flow as set forth in Section 6.2  Any such fee not payable currently due to insufficient Cash Flow shall accrue and be payable from subsequent years' Cash Flow and Capital Proceeds as set forth in Section 6.2   Payment of the Asset Management Fee shall commence January 1, 2004.

"Assignment" shall mean any assignment, transfer or sale, and the words "assign," "assignee" and "assignor" shall have correlative meanings, except in each case where the sense of this Agreement requires a different construction

"Auditors" means a firm of independent certified accountants as may be engaged by the Co-Managing General Partners, for the purpose of reviewing, preparing, certifying various reports as required by this Agreement or by applicable government agencies

"Authority" means the California Tax Credit Allocation Committee

"Bonds" or "Bond Documents" means all documents relating to the tax-exempt City of San Jose Variable Rate Demand Multifamily Housing Revenue Bonds (Kennedy Apartment Homes) 2002 Series K in an amount not to exceed $9,775,000 with a minimum amortization of 30 years and a term of no less than 30 years and a "low floater" variable rate of interest

"Breakeven" means the date upon which the gross rental income from the operation of the Apartment Complex and all other income from the operation of the Partnership received on a cash basis (other than any governmental subsidies which shall be deemed received on the accrual basis), and all proceeds from business interruption or rental insurance, for a period of three (3) consecutive calendar months after the Completion Date, equals or exceeds all then payable and accrued operational costs (provided however that any expenses or costs of a seasonal nature which might reasonably be expected to be incurred unevenly shall be amortized on an annual

basis as determined by the Accountants) of the Apartment Complex, including but not limited to taxes, assessments, reserve fund deposits and debt service payments paid prior to amortization of the Permanent Mortgage Loan, then assuming service of such debt (but excluding all fees which by their nature are payable only out of net Cash Flow and all debt service on the City of San Jose Loan) for such period of three (3) consecutive calendar months with each month viewed individually against accrued operational costs on an annualized budget basis as approved by the Investor Limited Partner  The determination that Breakeven has occurred shall be prepared by the Partnership Accountant and subject to confirmation by the Investor Limited Partner pursuant to a physical inspection of the Property; provided, however, that in the event that the Investor Limited Partner does not make such physical inspection of the Property within fifteen (15) business days after having received the Accountants' determination letter, then the Investor Limited Partner will be deemed to have waived the physical inspection requirement and Breakeven shall be deemed to have occurred

"Builder" means JSM Enterprises

"Buildings" means the building or buildings located on the Land, which, in the aggregate, are to contain upon completion of rehabilitation 100-apartment dwelling units

"Business Days" means the days of the week, Monday through Friday, for which business is normally conducted in the United States  It does not include national holidays, but does include state and local holidays

"Capital Account" means, with respect to any Partner, the Capital Account maintained by the Partnership with respect to such Partner in accordance with the provisions of Section 4 3B

"Capital Contribution" means the total amount of cash and the Gross Asset Value of any property contributed or agreed to be contributed to the Partnership by each Partner as shown in the Schedule (minus any liabilities secured by such contributed property that the Partnership assumes or takes subject to).  Any reference in this Agreement to the Capital Contribution of a then Partner shall include a Capital Contribution previously made by any prior Partner in respect to the Partnership interest of such then Partner

"Capital Proceeds" means the gross proceeds resulting from any Capital Transaction less the expenses of the Partnership incident to such Capital Transaction, before any application or distribution of such proceeds pursuant to this Agreement

"Capital Transaction" means any transaction the proceeds of which are not includable in determining Cash Flow, including without limitation the sale, refinancing or other disposition of all or substantially all of the assets of the Partnership, but excluding loans to the Partnership (other than a refinancing of any Mortgage Loan) and contributions of capital to the Partnership by the Partners

"Capital Transaction Disposition Fee" shall have the meaning set forth in Section 7 10D(ii) herein.

"Cash Flow" means, with respect to any Fiscal Year or applicable period, (a) (i) all cash receipts of the Partnership from operations, subsidy payments or rental interruption insurance recoveries received by the Partnership during such period; (ii) Surplus Cash; (iii) any amounts from construction or lease up savings realized prior to Breakeven that are not used to pay any deferred Developer Fees; plus (b) any interest or like earnings of the Partnership and any amounts which the General Partners release upon approval of Investment Partner from any Partnership reserve as being no longer necessary to hold as part of such reserve, less (i) cash funds used to pay Project Expenses of the Partnership during the period, including any fees and expenses paid to the Investment Partner Manager or the General Partners (excluding all fees which by their nature are payable only out of Net Cash Flow), (ii) all cash payments during such period to discharge Mortgage Loans (including all payments of a residual nature which shall be calculated prior to the determination of Cash Flow) or other Partnership indebtedness (other than Subordinated Loans), and (iii) any amounts added to Partnership reserves (other than Operating Reserves) during such period; provided, however, that any amounts payable only by reference to positive cash flow or surplus cash shall be ignored for such determination of expense

"Certificate" means the certificate of limited partnership of the Partnership as amended from time to time in accordance with the terms hereof.

"Change of Control" means, in any one or series of transactions: (i) in the case of a corporation, a sale, transfer, assignment or other disposition of fifty percent (50%) or more of the voting stock of the corporation or a change in the majority of directors of the board of directors of the corporation; (ii) in the case of a partnership, a sale, transfer, assignment or other disposition of a general partner's interest in the partnership or, in addition, in the case of a corporate general partner, a sale, transfer, assignment or other disposition as set out in (i) herein; (iii) in the case of a limited liability company, a sale, transfer, assignment or other disposition of the managing member's interest in the limited liability company, or, in addition, in the case of a corporate managing member, a sale, transfer, assignment or other disposition as set out in (i) herein, or, in the case of more than one managing member (or if all members share management or non-member managers), any change in the majority of members; or (iv) in the case of any other entity, a change substantially in effect as set forth in (i) through (iii) herein, to the extent applicable.

"City of San Jose Loan" means the construction loan in the amount of $7,548,482 bearing 3% interest and shall be interest only during construction.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and the Treasury Regulations promulgated thereunder at the time of reference thereto.

"Commitments" means and includes, collectively, the Mortgage Loan Commitments, and any documents and other instruments delivered to or required by the Lender or the Agency by or from the Partnership in connection with any of such Commitments, the Mortgage Loan[s] or the Project, as amended from time to time.

"Completion Date" means the date as of which the Inspecting Architect and each governmental agency having jurisdiction, if any, certifies that the work to be performed by the Builder under the Construction Contract with regard to 100% of all dwelling units   is

substantially complete in conformity with any existing building code requirements, receipt of an "as built" survey and receipt of a Final Title Policy. Any representation by a General Partner under this Agreement that the Completion Date has occurred shall be subject to confirmation by the Investor Limited Partner pursuant to a physical inspection of the Property; provided, however, that in the event that the Investor Limited Partner does not make such physical inspection of the Property within 15 business days after having received any such General Partners' representation, then the Investor Limited Partner will be deemed to have waived the physical inspection requirement.

"Consent of the Investor Limited Partner" means the prior written consent or approval of the Investment Limited Partner, or, if at any time there is more than one Investor Limited Partner, the prior written consent or approval of at least 51% in interest of the Investor Limited Partners.

"Construction Contract" means the construction contract between the Partnership and the Builder providing for the construction of the Improvements in accordance with the Commitments, as amended from time to time.

"Construction Loan" means (i) the loan provided by utilizing AAA-rated tax-exempt bonds in an amount equal to $13,640,000 with a "low floater" variable interest rate, a thirty (3) month term and payments of interest for thirty (30) months. The Construction Lender will enhance a total bond amount of $14,000,000. However, $360,000 will be held back and not funded during construction and (ii) the soft second construction loan provided by the City of San Jose in the amount of $7,548,482, bearing interest of 3% and shall be interest only during construction.

"Consumer Price Index or C.P.I." means the Consumer Price Index for All Urban Consumers, All Cities, for All Items (base 1982-84 = 100) published by the United States Bureau of Labor Statistics. In the event such index is not in existence when any determination relying on such index under this Agreement is to be made, the most comparable governmental index published in lieu thereof shall be substituted therefor.

"Cost Certification" means the date upon which the Investment Limited Partner has received a certification by the General Partners of the construction and development costs of the Apartment Complex and the Eligible Basis of the Apartment Complex for purposes of Tax Credits, together with a report thereon issued by the Auditors in a form and substance as approved by Investment Partner.

"Credit Agency" means the Authority.

"Credit Deficiency" shall mean for each calendar year the difference between the Projected Credit (or adjusted Projected Credit if a Credit Shortfall that occurred previously has already been accounted for) and the amount of the Tax Credit actually available to the Investor Limited Partner for the calendar year. Tax Credits actually available for any such year shall not offset or reduce the Credit Deficiency for any prior or subsequent year.

"Credit Period" means the period of ten (10) years beginning with the taxable year in which the Project is placed in service or, if an election has been made pursuant to Section 42(f)(1) of the Code to defer the commencement of the Credit Period, and the Consent of the Investor Limited Partner obtained, the succeeding taxable year.

"Credit Recovery Loan" has the meaning set forth in Section 5.2D.

"Credit Shortfall" is defined in Section 5.2A

"Debt Coverage Date" means the first day following a period of three (3) consecutive calendar months during each of which, as determined by the Accountant, the Project has produced income (as computed under the definition of Breakeven) after payment of all cash requirements other than debt service on the City of San Jose Loan and Permanent Mortgage Loan and satisfaction of all reserve requirements (in each case as described under the definition of Breakeven) at least equal to 1.15 times the amount of the required monthly debt service, determined as though the Permanent Mortgage Loan had commenced, including mortgage insurance premiums, if any.

"Deficit Restoration Obligation" means, for each Partner, the sum of (i) any amounts which such Partner is obligated to restore to the Partnership in accordance with the provisions of Sections 1.704-1(b)(2)(ii)(c), 1.704-1(b)(2)(ii)(h) or any other applicable provisions of the Allocation Regulations, (ii) such Partner's Share of Partnership Minimum Gain if any, and (iii) such Partner's Share of Partner Nonrecourse Debt Minimum Gain, if any.

"Depreciation" means, for the Fiscal Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis

"Developer" means JSM Enterprises, Inc., as the developer of the Project

"Developer Fee" or "Development Fee" means the fees payable by the Partnership to the Developer under the terms of the Development Agreement and Section 7.10A of this Agreement

"Development Agreement" means the Development Agreement of even date herewith between the Partnership and the Developer

"Development Advances" has the meaning set forth in the Development Agreement

"Development Amount" has the meaning set forth in the Development Agreement.

"Eligible Basis" shall mean the adjusted basis of the Project as determined under Section 42(d) of the Code

"Entity" means any general partnership, limited partnership, corporation, limited liability company, joint venture, trust, business trust, cooperative or association

"Event of Bankruptcy" means, as to a specified Person:

      (i)     The entry of a decree or order for relief by a court having jurisdiction in the premises in respect of such Person in an involuntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of such Person or for any substantial part of his property, or ordering the winding-up or liquidation of his affairs and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days; or

      (ii)     The commencement by such Person of a voluntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or any other applicable federal or state bankruptcy, insolvency or other similar law, or the consent by him to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or similar official) of such Person or for any substantial part of his property, or the making by him of any assignment for the benefit of creditors, or the failure of such Person generally to pay his debts as such debts become due, or the taking of action by such Person in furtherance of any of the foregoing

"Extended Use Agreement" means the Extended Low-Income Housing Covenant for Low-Income Housing Tax Credits required pursuant to Section 42(h) of the Code to be executed by the Partnership and delivered to the Agency setting forth certain terms and conditions under which the Apartment Complex is to be operated

"Facility" shall have the meaning given to it in the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U S C  Sec 9601 et seq , as amended, and shall also include any meaning given to analogous property under other Hazardous Waste Laws

"Federal Housing Tax Credit" means the low-income housing tax credit authorized by Section 42 of the Code

"Filing Office" has the meaning given it in the Preliminary Statement of this Agreement

"Final Closing" means the date upon which all of the following events have occurred: (i) Permanent Mortgage Commencement (including Conversion of any Construction Loan), (ii) the Project's being free of any mechanics' or other liens (except for the Mortgage[s] and liens either bonded against in such a manner as to preclude the holder thereof from having any recourse to the Project or the Partnership for payment of any debt secured thereby or affirmatively insured against (in such manner as precludes recourse to the Partnership for any loss incurred by the insurer) by the Title Policy or by another policy of title insurance issued to the Partnership by a reputable title insurance company in an amount satisfactory to Investment Partner  Tax Counsel (or by an endorsement of either such title policy), (iii) the disbursement of proceeds under the Permanent Mortgage Loans has been made in the full amount permitted by

the Agency, other than any potential earn-out, and (iv) all amounts due in connection with the construction of the Project have been paid or provided for

"General Partner" or "General Partners" means the Administrative General Partner and the Co-Managing General Partners and any Person or Persons designated as a General Partner in the Schedule or any Person who becomes a General Partner as provided herein, in such Person's capacity as a General Partner of the Partnership  If at any time the Partnership shall have a sole General Partner, the term "General Partners" shall be construed as singular

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)     The initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset, as determined by the contributing Partner and the Partnership;

(ii)    The Gross Asset Values of all Partnership assets shall be adjusted to equal their respective gross fair market values, as determined by the General Partner, as of the following times: (a) the acquisition of an additional interest in the Partnership by any new or existing Partner in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Partnership to a Partner of more than a de minimis amount of Partnership property as consideration for an interest in the Partnership; and (c) the liquidation of the Partnership within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Allocation Regulations; provided, however, that the adjustments pursuant to clauses (a) and (b) above shall be made only if the General Partner reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership;

(iii)   The Gross Asset Value of any Partnership asset distributed to any Partner shall be the gross fair market value of such asset on the date of distribution; and

(iv)    The Gross Asset Values of Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1 704-1(b)(2)(iv)(m) of the Allocation Regulations and Section 3 04 hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this clause (iv) to the extent the General Partners determine that an adjustment pursuant to clause (ii) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv)

If the Gross Asset Value of an asset has been determined or adjusted pursuant to Section (i), (ii) or (iv) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits or Losses

"Gross Revenues" means total income, revenue (including gross rental income of the Project prior to any reduction or payments for fees, costs and reimbursements to Management Agent), profit, and gain, proceeds from a sale or refinancing of the Property (all as adjusted by

refunds and amounts held in escrow, but not by amounts held or placed in reserves) from all sources, including interest, royalties and dividends, whether taxable, nontaxable or exempt form taxation.

"Hazardous Material" shall have the collective meanings given to the terms "hazardous material," "hazardous substances," "hazardous wastes," "toxic substances" and analogous terms in the Hazardous Waste Laws. In addition, the term "Hazardous Material" shall also include oil and any other substance known to be hazardous.

"Hazardous Waste Laws" means and includes the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980; the Resource Conservation and Recovery Act; the Toxic Substances Control Act and any other federal, state or local statutes, ordinances, regulations or by-laws dealing with Hazardous Material, as the same may be amended from time to time and including any regulations promulgated thereunder.

"Improvements" means the Buildings and any related facilities to be rehabilitated in accordance with the Commitments.

"Initial Closing" means the date upon which the Construction Loan was closed and the first proceeds are available for disbursement of the Construction Loan to the Partnership.

"Initial 90% Occupancy Date" means the first date upon which not less than 90% of the 78 Low-Income Units in the Apartment Complex are leased to and occupied by Qualified Tenants.

"Initial 95% Occupancy Date" means the first date upon which not less than 95% of the 78 Low-Income Units in the Apartment Complex are leased to and occupied by Qualified Tenants.

"Installment" means the First, Second or Third Installment, or any subsequent Installment, as the context may require, of Capital Contributions of the Investor Limited Partner as described in Section 5.1A.

"Interest" means all the interest of a Partner in Cash Flow, Capital Proceeds and other distributions, capital, Profits or Losses, Tax Credits, and otherwise in the Partnership, including all allocations and distributions and all rights under this Agreement, and also shall include such interests and rights of such Partner in any successor partnership formed pursuant to this Agreement.

"Invested Amount" means (i) as to AMTAX, an amount equal to the Capital Contribution of AMTAX paid pursuant to Section 5.1 hereof divided by .865 and reduced by any distributions of Cash Flow and/or other Capital Proceeds and/or other distributions and other returns of capital (including Section 5.2 payments), and (ii) as to any other Partner, an amount equal to its Capital Contribution actually paid, reduced by any distributions or any returns of capital (including Section 5.2 payments).

10

"Investment Agreement" means that certain Investment Agreement between the Partnership, and Paramount Financial Group, Inc., dated November 15, 2002, as amended from time to time

"Investment Closing" means the date of execution and delivery of this Agreement

"Investment Partner" means AMTAX

"Investment Operating Agreement" means the Operating Agreement of AMTAX as amended from time to time

"Investment Partner Manager" means Paramount Properties, Inc. its successors or assigns as the manager of the Investment Partner.

"Investor Limited Partner" means, initially, AMTAX and shall include any other Persons admitted as Investor Limited Partners and their successors in such capacity

"Land" means the approximately 3 42 acre parcel of land on which the Improvements known as Kennedy Apartments are located at 1385 Lucretia Avenue in the City of San Jose, County of Santa Clara, California.

"Lender" means the Construction Lender and Permanent Lender

"Limited Partner" or "Limited Partners" mean any or all of those Persons designated as Limited Partners in the Schedule, any Person admitted as a Limited Partner pursuant to Section 9 5, or any Person who becomes a Substitute Limited Partner as provided herein, in each such Person's capacity as a Limited Partner of the Partnership.

"Low-Income Unit" means any of the 78 out of 100 dwelling units in the Project (which also include one (1) unrestricted Manager's units) and which are to be held for occupancy by the Partnership in such manner as to qualify such units as qualified low-income housing units under Section 42(i)(3) of the Code.

"Management Agent" means California Real Estate Management Company, or any successor thereto as the management agent for the Project.

"Management Agreement" means the management contract or agreement by and between the Partnership and the Management Agent which has received all Requisite Approvals.

"Management Fee" means the amount payable from time to time by the Partnership to the Management Agent for management services in accordance with the Management Agreement, which shall be subject to any Requisite Approvals

"Maximum Annual Credit" shall mean $571,858 per year, for the Partnership for the total Credit Period, as provided in the Tax Credit Reservation.

"Minimum Set-Aside Test" means the set aside test selected by the Partnership pursuant to Section 42(g) of the Code whereby at least 40% of the units in the Apartment Complex must

be occupied by individuals with incomes equal to 60% or less of area median income, as adjusted for family size

"Mortgage" means any mortgage indebtedness of the Partnership evidenced by any Note and secured by any mortgage on the Property from the Partnership to any Lender; and, where the context admits, "Mortgage" shall mean and include any of the mortgages securing said indebtedness and any other documents pertaining to said indebtedness which were required by the Lender as a condition to making such Mortgage Loan. In case any Mortgage is replaced by any subsequent mortgage or mortgages, such term shall refer to any such subsequent mortgage or mortgages. The term "mortgage" means any mortgage, mortgage deed, deed of trust, deed to secure debt or any similar security instrument, and "foreclose" and words of like import include the exercise of a power of sale under a mortgage or comparable remedies.

"Mortgage Loan" means a loan made pursuant to a Mortgage Loan Commitment and secured by a Mortgage.

"Mortgage Loan Commitments" means and includes the commitment of the Permanent Lender to make the Permanent Mortgage Loan utilizing the Bonds.

"Note" means and includes any Note from the Partnership to a Lender evidencing a Mortgage Loan, and shall also mean and include any note supplemental to said original note issued to a Lender or any note issued to a Lender in substitution for any such original note.

"Operating Deficit Management Fee" shall have the meaning set forth in Section 7.10E, herein.

"Original Partnership Agreement" has the meaning specified in the Preliminary Statement.

"Partner" means any General Partner or Limited Partner.

"Partner Nonrecourse Debt" has the meaning set forth in Section 1.704-2(b)(4) of the Allocation Regulations.

"Partner Nonrecourse Debt Minimum Gain" has the meaning set forth in Sections 1.704-2(i)(2) and (3) of the Allocation Regulations.

"Partner Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(i)(1) of the Allocation Regulations.

"Partnership" means the Limited Partnership governed by this Agreement as said limited partnership may from time to time be constituted.

"Partnership Agreement" means this Amended and Restated Agreement of Limited Partnership.

"Partnership Counsel" means the Law Office of the Thomas C. Dashiell, or such other counsel as the Co-Managing General Partners, with the consent of the Administrative General Partner, may designate from time to time as counsel for the Partnership.

"Partnership Management Fee" shall have the meaning set forth in Section 7.10C, herein.

"Partnership Minimum Gain" has the meaning set forth in Section 1.704-2(d) of the Allocation Regulations.

"Payment Certificate" has the meaning given it in Section 5.1B(i).

"Penalty Payment" has the meaning set forth in Section 5.2(c).

"Permanent Lender" means the maker of the permanent Mortgage Loan, together with its successors and assigns in such capacity.

"Permanent Mortgage Commencement" means the date that the Permanent Mortgage Loan has been closed and the Permanent Lender has notified the Partnership of Conversion (as that term is used in the Mortgage Loan Documents) of the Permanent Mortgage Loan or such other evidence as the General Partners shall provide indicating such conversion.

"Permanent Mortgage Loan" means the Permanent Mortgage Loan utilizing the bonds in the amount of $9,415,000 with a minimum amortization of 30 years, a term of no less than 30 years, with a "low floater" variable interest rate. The Lender will provide for an earn-out of additional permanent loan proceeds up to a maximum Permanent Mortgage Loan amount of $360,000. The General Partners shall purchase five-year interest rate caps pursuant to FNMA requirements such that the debt will have an interest rate cap for the full compliance period. Based on current rates, the projected interest rate would be 4.66% per annum (which includes the "low floater" fees). After Conversion the City of San Jose Loan will also be a permanent mortgage loan. The City of San Jose Loan will be reduced to $6,960,000 at stabilization. The City of San Jose Loan will bear interest at 4.0% with a term of 40 years and will be payable from 70% of net cash flow, as specified therein. Any additional Permanent Mortgage Loan proceeds funded by the earn-out shall be used to reduce the amount of this permanent City of San Jose Loan. The Permanent Mortgage Loan and the City of San Jose Loan will be non-recourse to the Partners.

"Person" means any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person where the context so admits.

"Profits or Losses" means, for each Fiscal Year or other period, an amount equal to the Partnership's taxable income or loss for such Fiscal Year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(i)     Any items described in Sections 705(a)(1)(B) and 705(a)(1)(C) of the Code which are not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss.

(ii) Any expenditures of the Partnership described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures pursuant to Section 1 704-1(b)(2)(iv)(i) of the Allocation Regulations, and not otherwise taken into account in computing Profits or Losses, shall be subtracted from such taxable income or loss

(iii) Gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value

(iv) In the event of a distribution of Partnership assets to a Partner (whether in connection with a liquidation or otherwise), or in the event the Gross Asset Value of any Partnership asset is adjusted upon the acquisition of an additional interest in the Partnership, unrealized income, gain, loss and deduction inherent in such distributed or adjusted assets (not previously reflected in Capital Accounts) shall be allocated pursuant to Section 6 1 hereof as if there had been a taxable disposition of such distributed or adjusted assets at fair market value.

(v) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition of "Depreciation" set forth herein

(vi) Notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 6.5 hereof shall be taken into account in computing Profits or Losses only if the Accountants determine that such items should be so reflected.

"Profits or Losses from a Capital Transaction" means the Profits or Losses, if any, recognized by the Partnership as a result of a Capital Transaction, as determined for federal income tax purposes by the Accountants, but without regard to any adjustments to basis pursuant to Section 734 and 743 of the Code.

"Project" or "Property" means the Land and the Improvements

"Project Documents" means and includes the Construction Contract, the Mortgages, the Regulatory Agreement, the Commitments, the Management Agreement and all other documents relating to the Project, which are required by, or have been executed in connection with, any of the foregoing documents.

"Project Expenses" means (i) up to and including the Completion Date, those expenses, properly accruable through such date which may be properly charged as operating expenses of the Project under standard accounting procedures and which are allocable, in accordance with generally accepted accounting principles, to apartment units for which all requisite approvals for occupancy have been obtained; such operating expenses may include real estate taxes and debt service and mortgage insurance premiums with respect to the Mortgage Loans (to the extent such operating expenses are not funded out of Capital Contributions or Mortgage Loan proceeds), but

shall not include any costs required to be capitalized in accordance with generally accepted accounting principles; and (ii) after the Completion Date, all the costs and expenses of any type incurred incidental to the ownership and operation of the Project, including, without limitation, taxes, capital improvements reasonably deemed necessary by the General Partners and not funded out of any reserves for such, mortgage and bond insurance premiums and the cost of operations, debt service, maintenance and repairs, and the funding of any reserves required to be maintained by the Lender and the Agency and this Agreement, but shall not include (i) repayments of Subordinated Loans or (ii) distributions to Partners pursuant to Article VI

"Projected Credit" means Federal Housing Tax Credits on a year-by-year basis that are projected to be available to the Investor Limited Partner, which Projected Credits are projected to be in the amount of $373,384 for 2004, $571,801 per year for each of the years 2005 through 2013, and $198,417 for year 2014. The Projected Credits constitute ninety-nine point ninety-nine (99.99%) percent of the Tax Credits in the aggregate amount of $5,718,580 which are projected to be available to the Partnership   The Projected Credits will be allocated to the Investment Partner by the Partnership.  Such Projected Credit will be adjusted to reflect any upward or downward adjustments caused by Section 5 2

"Purchase Agreement" means the Purchase Agreement of even date herewith pursuant to which the Purchaser has agreed, among other things, to purchase the Interest of the Investor Limited Partner under specified circumstances

"Purchase Obligation" has the meaning given that term in the Purchase Agreement

"Purchaser" means the General Partners, as purchasers under the Purchase Agreement

"Qualified Tenant" means a tenant (i) with income not exceeding the percentage of area gross median income set forth in Section 42(g)(1)(A) or (B) of the Code (whichever is applicable) who leases an apartment unit in the Project under a lease having an original term of not less than twelve months at a rent not in excess of that specified in Section 42(g)(2) of the Code, and (ii) complying with any other requirements imposed by the Project Documents

"Recapture Amount" means the "credit recapture amount" as defined in Section 42(j)(2) of the Code

"Recapture Event" means when there has been a "recapture" of Federal Housing Tax Credits pursuant to Section 42(j) of the Code

"Regulations" means the rules and regulations of any Agency which are applicable to the Project or the Partnership

"Regulatory Allocations" means the allocations set forth in Sections 6 5A through 6 5G hereof.

"Related Agreements" means the Development Agreement, the Purchase Agreement and each other agreement (other than this Agreement) constituting an exhibit thereto or executed in connection therewith

"Related Person" has the meaning set forth in Section 1 752-4(b) of the Allocation Regulations

"Rent Restriction Test" means the test pursuant to Section 42 of the Code whereby the gross rent charged to tenants of the low-income units in the Apartment Complex may not exceed thirty percent (30%) of the qualifying income levels

"Requisite Approvals" means any required approvals of the Lender or any Agency to an action proposed to be taken by the Partnership.

"Schedule" means the schedule of partners annexed hereto as Schedule A as amended from time to time and as so amended at the time of reference thereto

"Service" means the Internal Revenue Service

"Share of Partner Nonrecourse Debt Minimum Gain" means, for each Partner, an amount equal to such Partner's "share of partner nonrecourse debt minimum gain," determined in accordance with the provisions of Section 1 704-2(i)(5) of the Allocation Regulations

"Share of Partnership Minimum Gain" means, for each Partner, an amount equal to such Partner's "share of partnership minimum gain," determined in accordance with the provisions of Section 1 704-2(g) of the Allocation Regulations

"Special Investment Partner Tax Counsel" means Bronson & Migliaccio, LLP or other counsel acceptable to the Investment Partner.

"Special Limited Partner" means Protech 2002-D, LLC, an Ohio limited liability company

"State" means the State of California

"Subordinated Loan" means a loan by a General Partner pursuant to Sections, 7.4, 7 8 and 7 9

"Substitute Limited Partner" means any Person who is admitted to the Partnership as a Limited Partner under the provisions of Section 9 3

"Supervisory and Incentive Management Fee" means the fee payable by the Partnership to the Administrative General Partner as provided in Section 7 10D

"Surplus Cash" means any unrestricted cash remaining on hand after (1) the payment of (a) all sums due or currently required to be paid under the terms of any Mortgage or Note; (b) all amounts required to be deposited in the reserve fund for replacement; and (c) all obligations of the Partnership other than the Mortgage Loan unless funds for payment are set aside; and (2) the segregation and recording of (a) an amount equal to the aggregate of all special funds to be maintained by the Partnership under the Project Documents or this Agreement, including full funding of all mortgage insurance premium, real estate tax, insurance, and other escrows; (b) all tenant security deposits or prepaid rents held; and (c) all accounts and accrued items payable

Notwithstanding the foregoing, Surplus Cash as of a given date shall also include rental assistance payments properly accrued but not received through such date but received thereafter

"Tax Credit" means the Federal Housing Tax Credit

"Tax Credit Reservation" means the receipt by the Partnership of a credit reservation from the Credit Agency or conditional commitment therefor in the annual amount of at least $571,858

"Tax Matters Partner" means the Partner designated as the Tax Matters Partner of the Partnership by the General Partners pursuant to the provisions of Section 7 13

"Terminating Capital Transaction" means a Capital Transaction resulting in or involving the termination and winding up of the business of the Partnership or any other event resulting in the "liquidation" of the Partnership within the meaning of Section 1 704-1(b)(2)(ii)(g) of the Allocation Regulations.

"Terminating Event" means the death or permanent disability of, or an adjudication of insanity or incompetence as to, an individual General Partner (unless the Consent of the Investor Limited Partner to a substitute General Partner is received, and such substitute General Partner is admitted to the Partnership by the first to occur of (i) the sixtieth day following such event or (ii) such earlier date as is necessary to prevent a dissolution of the Partnership under the Act), an Event of Bankruptcy as to or dissolution of a General Partner, the transfer of its Partnership Interest by a General Partner, removal of a General Partner, or the voluntary or involuntary withdrawal of a General Partner from the Partnership For purposes of the foregoing, an individual General Partner shall be deemed to be permanently disabled if he or she becomes disabled during the term of this Agreement through any illness, injury, accident or condition of either a physical or psychological nature and, as a result, is unable to perform substantially all of his or her duties and responsibilities hereunder for 120 days during any period of 365 consecutive calendar days. Involuntary withdrawal shall occur whenever a General Partner may no longer continue as a General Partner by law or pursuant to any terms of this Agreement   In the case of a General Partner, which is an Entity, a transfer of a majority of the voting stock (or other beneficial interest) of the General Partner to a Person who is not an Affiliate of the General Partner shall be deemed to be a transfer by the General Partner of its Partnership Interest.

"Title Policy" means the ALTA owner's policy of title insurance issued to the Partnership by Chicago Title Company as endorsed to increase the amount thereof to an amount equal to the appraised value of the Project, but in no event less than the sum of all Permanent Mortgage Loans and Capital Contributions of the Partners, and to update such policy to a date not earlier than ten (10) days prior to the date of the Investment Closing

"Uniform Act" means the California Revised Limited Partnership Act as in effect under the laws of the State, as amended from time to time.

"Vessel" shall have the meaning given to it in the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U S C Sec 9601 et seq, as amended, and shall also include any meaning given to analogous property under other Hazardous Waste Laws.

17

## ARTICLE II

### Continuation; Name; Purpose and Term

Section 2.1    Continuation

The parties hereto hereby agree to continue the limited partnership known as LUCRETIA AVENUE PARTNERS, L.P., formed pursuant to the provisions of the Uniform Act.

Section 2.2    Name and Office; Agent for Service

A       The Partnership shall continue to be conducted under the name and style set forth in Section 2.1. The principal office of the Partnership shall be at c/o Montalvo Associates LLC, 1600 West Campbell, Suite 201, San Jose, California 95008   The General Partners may at any time change the location of such principal office and shall give due notice of any such change to the Limited Partners.

The name and address of the agent for service of process required to be maintained under the Uniform Act shall be:

> Richard A. DeFabio
> c/o Montalvo Associates LLC
> 1600 West Campbell, Suite 201
> San Jose, CA 95008

Section 2.3    Purpose

The Partnership has been organized exclusively for the charitable purpose of providing low income housing to poor and distressed persons by acquiring the Land and the Apartment Complex and developing, financing, constructing, rehabilitating, owning, maintaining, operating and selling or otherwise disposing of the Apartment Complex in accordance and compliance with the Regulatory Agreement and consistent with the charitable purposes of the Co-Managing General Partners. To the extent not inconsistent with such purpose, the Partnership shall operate in a business like manner and in a manner to operate the Apartment Complex so as to generate a positive cash flow from operations. The Partnership shall not engage in any other business or activity.

Section 2.4    Authorized Acts

In furtherance of its purposes, but subject to all other provisions of this Agreement including, but not limited to, Article VII, the Partnership is hereby authorized:

(i)      To acquire by purchase, lease or otherwise any real or personal property which may be necessary, convenient or incidental to the accomplishment of the purposes of the Partnership.

(ii)     To acquire, construct, operate, maintain, finance and improve, and to own, sell, convey, assign, mortgage or lease any real estate and any personal property

18

necessary, convenient or incidental to the accomplishment of the purposes of the Partnership

    (iii)    To borrow money and issue evidences of indebtedness in furtherance of any or all of the purposes of the Partnership and to secure the same by mortgage, pledge or other lien on the Property or any other assets of the Partnership, to the extent permitted by the Commitments

    (iv)    To prepay in whole or in part, refinance, recast, increase, modify or extend any Mortgage and in connection therewith to execute any extensions, renewals, or modifications of such Mortgage.

    (v)    To employ any Person, including any Affiliate, to perform services for, or to sell goods to, the Partnership (including without limitation management services) and to pay for such goods and services; provided that (except with respect to any contract specifically authorized by this Agreement) the terms of any such transaction with an Affiliate shall not be less favorable to the Partnership than would be arrived at by unaffiliated parties dealing at arms' length.

    (vi)    To execute any and all Bond Documents and any and all notes, mortgages and security agreements in order to secure loans from the Lender and any and all other documents, including but not limited to the Project Documents, required by the Lender or any Agency in connection with each Mortgage and Mortgage Loan and the acquisition, construction, rehabilitation, repair, development, improvement, maintenance and operation of the Property, or otherwise required by the Lender or any Agency in connection with the Property

    (vii)    To execute contracts with any Agency.

    (viii)    To execute leases of some or all of the apartment units of the Project

    (ix)    To modify or amend the terms of any agreement or contract which the General Partners are authorized to enter into on behalf of the Partnership; provided, however, that such terms as amended shall not (a) materially adversely affect the Partnership or the Limited Partners or (b) be in contravention of any of the terms or conditions of this Agreement

    (x)    To enter into any kind of activity and to perform and carry out contracts of any kind necessary to, or in connection with, or incidental to, the accomplishment of the purposes of the Partnership, so long as said activities and contracts may be lawfully carried on or performed by a partnership under the laws of the State.

    (xi)    To execute the Related Agreements and any notices, documents or instruments permitted or required to be executed or delivered in connection therewith or pursuant thereto

Section 2 5     Term and Dissolution

A       The Partnership shall continue in full force and effect until December 31, 2057, except that the Partnership shall be dissolved prior to such date upon the happening of any of the following events:

(i)      The sale or other disposition of all or substantially all the assets of the Partnership;

(ii)     A Terminating Event with respect to each of the General Partners unless the business of the Partnership is continued pursuant to Article VIII;

(iii)    The election to dissolve the Partnership made in writing by the General Partners with the Consent of the Investor Limited Partner and any Requisite Approvals or by the Investor Limited Partner pursuant to Section 4 5; or

(iv)     The entry of a final decree of dissolution of the Partnership by a court of competent jurisdiction

B.      Upon dissolution of the Partnership (unless the business of the Partnership is continued pursuant to Article VIII), the General Partners (or for purposes of this paragraph their trustee, receiver, successor or legal representative) shall cause the cancellation of the Certificate and liquidate the Partnership assets and apply and distribute the proceeds thereof in accordance with Section 6.3   Notwithstanding the foregoing, in the event such liquidating General Partners shall determine that an immediate sale of part or all of the Partnership's assets would cause undue loss to the Partners, the liquidating General Partners may, in order to avoid such loss, defer liquidation of, and withhold from distribution for a reasonable time, any assets of the Partnership except those necessary to satisfy the Partnership debts and obligations (other than Subordinated Loans)

## ARTICLE III

### Financing and Disposition of Property

A.      The Partnership is authorized to obtain the Construction Loan and the Permanent Mortgage Loan to finance the acquisition, development and construction of the Property and (to the extent permitted by the Lender) to meet the initial expenses of operating the Project and to secure the same by the Mortgage   As of Final Closing, each Permanent Mortgage shall provide that no Partner or Related Person shall bear the economic risk of loss for all or any part of such Permanent Mortgage Loan

The General Partners are specifically authorized, for and on behalf of the Partnership, to execute the Project Documents and any permitted amendments thereto and, subject to the limitations set forth herein, such other documents as they deem necessary or appropriate in connection with the acquisition, development, operation and financing of the Property

B       Each General Partner shall be bound by the terms of the Project Documents   Any incoming General Partner shall as a condition of receiving any interest in the Property agree to

20

be bound by the Project Documents to the same extent and on the same terms as the other General Partners. Upon any dissolution of the Partnership or any transfer of the Property while any Mortgage is held by any Lender, no title or right to the possession and control of the Property and no right to collect the rents therefrom shall pass to any Person who is not, or does not become, bound in a manner satisfactory to the Lender and the Agency to the Project Documents and the provisions of this Agreement. The Project Documents shall be binding upon and shall govern the rights and obligations of the Partners, their heirs, executors, administrators, successors and assigns as long as the corresponding Mortgage Loan shall be outstanding.

C. The Partnership may increase the amount of the Mortgage Loan or refinance any Mortgage, i ncluding a ny r equired t ransfer o r c onveyance o f P artnership a ssets for se curity o r mortgage purposes, and may sell, lease, exchange or otherwise transfer or convey all or substantially all the assets of the Partnership; provided, however, that the terms of any such increase, refinancing, sale, exchange or other transfer or conveyance effected after the Admission Date must receive the Consent of the Investor Limited Partner before such transaction shall be binding on the P artnership. Notwithstanding the foregoing, no such Consent shall be required for the leasing of apartments to tenants in the normal course of operations; provided, however, unless such Consent is obtained the Partnership shall lease the Project in such a manner as to qualify as a "qualified low-income housing project" under Section 42(g)(1) of the Code, and shall lease all of the Low Income Units in the Project to Qualified Tenants

D Upon the sale of the Property by the Partnership, no Person may pay to any Person real estate commissions in excess of that which is reasonable, customary, and competitive with those paid in similar transactions in the same geographic area

### ARTICLE IV

### Partners; Capital

Section 4.1    General Partners

The General Partners of the Partnership are Community Home Builders and Associates, Affordable Housing Access, Inc. and Montalvo Associates LLC. Their addresses and Capital Contributions are set forth in Schedule A.

Section 4.2    Limited Partners

A. AMTAX is hereby admitted as the Investor Limited Partner, and Protech is admitted as Special Limited Partner  Their addresses and Capital Contributions are set forth in the Schedule  The payment of Capital Contributions is governed by Section 5.1

B The Original Limited Partner is Builders Affordable Housing Development Company, LLC, a California limited liability company. By its execution of this Agreement, the Original Limited Partner hereby withdraws as Limited Partner and acknowledges and agrees that the Original Limited Partner, as such, shall have no further rights or obligations with respect to the Partnership as of the Admission Date

Section 4 3    Partnership Capital and Capital Accounts

A.      The capital of the Partnership shall be the aggregate amount of the cash and the Gross Asset Value of property contributed by the General Partners and by the Limited Partners as set forth in Schedule A  Notwithstanding anything else contained herein, the Co-Managing General Partners shall have no obligation to make additional Capital Contributions for any reason  Except as specifically set forth herein, no Partner shall have any right to make voluntary Capital Contributions to the Partnership  No interest shall be paid by the Partnership on any Capital Contribution to the Partnership   Schedule A shall be amended from time to time to reflect the withdrawal or admission of Partners, any changes in the Partnership Interests held by a Partner arising from the transfer of a Partnership Interest to or by such Partner and any change in the amounts to be contributed or agreed to be contributed by any Partner

B      An individual Capital Account shall be established and maintained for each Partner, including any additional or substituted Partner who shall hereafter receive an interest in the Partnership.  The Capital Account of each Partner shall be maintained in accordance with the following provisions:

(i)      To each Partner's Capital Account there shall be credited such Partner's Capital Contributions, such Partner's distributive share of Profits, and any items in the nature of income or gain that are specially allocated pursuant to Section 6 5 hereof, and the amount of any Partnership liabilities that are assumed by such Partner or that are secured by any Partnership Property distributed to such Partner;

(ii)      To each Partner's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Partnership Property distributed to such Partner pursuant to any provision of this Agreement, such Partner's distributive share of Losses, and any items in the nature of expenses or losses that are specially allocated pursuant to Section 6 5 hereof, and the amount of any liabilities of such Partner that are assumed by the Partnership or that are secured by any property contributed by such Partner to the Partnership

In the event that the Gross Asset Values of Partnership assets are adjusted pursuant to this Agreement, the Capital Accounts of all Partners shall be adjusted simultaneously to reflect the aggregate net adjustment as if the Partnership recognized gain or loss equal to the amount of such aggregate net adjustment.

C      The original Capital Account established for any substituted Partner shall be in the same amount as, and shall replace, the adjusted Capital Account of the Partner which such substituted Partner succeeds, and, for the purposes of the Agreement, such substituted Partner shall be deemed to have made the Capital Contribution, to the extent actually paid in, of the Partner which such substituted Partner succeeds.  The term "substituted Partner," as used in this paragraph, shall mean a Person who shall become entitled to receive a share of the Profits or Losses, Tax Credits and distributions of the Partnership by reason of such Person succeeding to the Partnership Interest of a Partner by assignment of all or any part of a Partnership Interest  To the extent a substituted Partner receives less than 100% of the Partnership Interest of a Partner, its Capital Account and Capital Contribution shall be in proportion to the Partnership Interest it

receives, and the Capital Account and Capital Contribution of the Partner who retains a partial interest in the Partnership shall continue, and not be replaced, in proportion to the Partnership Interest it retains.

        D.      The foregoing provisions and the other provisions of this Agreement relating to the maintenance of the Capital Accounts are intended to comply with the Allocation Regulations and shall be interpreted and applied in a manner consistent with such Allocation Regulations. In the event the General Partners shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with the Allocation Regulations, the General Partners may make such modification, subject to the provisions of Section 6.3D. The General Partners shall adjust the amounts debited or credited to Capital Accounts with respect to (i) any property contributed to the Partnership or distributed to the Partners, and (ii) any liabilities that are secured by such contributed or distributed property that are assumed by the Partnership or the Partners, in the event the General Partners shall determine such adjustments are necessary or appropriate pursuant to Section 1.704-1(b)(2)(iv) of the Allocation Regulations. Subject to the provisions of Section 6.3D, the General Partners also shall make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with the Allocation Regulations.

        E.      The Partnership shall not redeem or repurchase any Partnership Interest, and no Partner shall have the right to withdraw, or receive any return of, its Capital Contribution, except as specifically provided herein. The General Partners shall have no personal liability for the repayment of the Capital Contribution of any Limited Partner. Nothing in this Section 4.3 shall alter the limitation on liability of a General Partner or its Affiliates pursuant to Section 7.7.

Section 4.4    Liability of Limited Partners

        No Limited Partner shall be liable for any debts, liabilities, contracts, or obligations of the Partnership. A Limited Partner shall be liable only to make payments of its Capital Contribution as and when due hereunder. After its Capital Contribution shall be fully paid, no Limited Partner shall, except as otherwise required by the Uniform Act, be required to make any further capital contributions or payments or lend any funds to the Partnership.

Section 4.5    Certain Rights of Investor Limited Partner

        A      Subject to the provisions hereinafter set forth in this Section 4.5, and to the Regulations, in addition to the other rights provided for in this Agreement, the Investor Limited Partner shall have the right:

        (i)      To amend this Agreement, upon the reasonable consent of all Partners, subject to the provisions of Section 13.9 solely to conform this Agreement to the agreement and understanding of he parties; and provided that prior to acting to effect such amendment, the Investor Limited Partner shall provide the General Partners with written notice explaining in reasonable detail the need for such amendment and provided further that such amendment (a) shall not in any manner allow the Limited Partners to take any action which would constitute their taking part in the control of the Partnership's business within the meaning of the Uniform Act, and (b) shall not in any manner, without

the consent of any General Partner affected, except in the case of a removal pursuant to Section 4.5A(iv), alter the authority, rights, powers, obligations, duties, liability, standard of care, or indemnification of the affected General Partner or alter or affect its interest in the Profits and Losses of the Partnership, Tax Credits, Cash Flow, Capital Proceeds or distributions or alter any of the provisions of Section 4.5B, (c) shall not in any manner, without the consent of the General Partners, grant to, expand or increase the Limited Partners' voting rights, authority or power, and (d) the Limited Partner shall provide the General Partner with written notice explaining in reasonable detail the reasons for such amendment and (e) shall not decrease the Limited Partner's capital contributions, unless specifically authorized to do so under this Agreement

(ii)     To dissolve the Partnership upon the consent of the Co-Managing General Partners and Administrative General Partner, which consent may not unreasonably be withheld;

(iii)    To approve or disapprove, with the consent of the Co-Managing General Partners and the Administrative General Partner, the sale of all or substantially all of the assets of the Partnership; and

(iv)    To remove a General Partner and elect one or more new General Partners upon the occurrence of any of the following with respect to the affected General Partner:

(1)     In the event of any willful misconduct or pattern of repeated incompetence, repeated reckless disregard for the Partnership's welfare, or repeated dereliction of duty, with respect to any material matter in the discharge of its duties and obligations as General Partner which could result in material impairment or hardship upon the Project, where the affected General Partner has received prior written notification of the misconduct or failure and has been given an opportunity to cure within a time reasonable time (but not more than 60 days) in light of the nature of the alleged misconduct or failure;

(2)     The General Partner shall have violated any material provisions of or the Loan Agreement, or the Extended Use Agreement, or any material provisions of any other Project Document or Bond Documents, or any material provisions of the Lender and/or Agency regulations applicable to the Apartment Complex, in each case upon written notice after disclosure to the Limited Partner by a General Partner of such event, or discovery without such disclosure, and failure to cure within thirty (30) days of such notice; or failure to disclose to the Limited Partner of a known material violation hereunder within thirty (30) days of actual knowledge of such material violation by the General Partner; or an event sufficient for a Purchase Obligation to arise under the Purchase Agreement shall have occurred (other than Lender or Agency disapproval); or

(3)     The General Partners, or any of them, shall have violated any material rights, powers, duties, representations or warranties as set forth in Article VII herein or shall have violated any material provision of this Agreement, defaulted on a guarantee herein or the timely payment of an Adjustment Payment

or violated any material provision of applicable law, in each case upon written notice after disclosure to the Limited Partner by a General Partner of such event, or the discovery without such disclosure, and failure to cure within thirty (30) days of such notice or failure to disclose to the Limited Partner of a known violation hereunder within thirty (30) days of knowledge of such violation by the General Partner; or

(4)     The General Partners, or any of them, shall have caused the Construction Loan or the Permanent Mortgage Loan to go into default and shall have failed to cure prior to the initiation of foreclosure or collection actions; or

(5)     The General Partners, or any of them, shall have conducted their own affairs or the affairs of the Partnership in such manner as would cause the termination of the Partnership for federal income tax purposes; or cause the Partnership to be treated for federal income tax purposes as an association, taxable as a corporation or shall have effected a Change of Control in the Partnership without the Consent of the Investment Partner Manager;

(6)     After Permanent Mortgage Commencement, failure to maintain a debt coverage ratio (as calculated in the definition of Debt Coverage Date) of at least 1.00 over any consecutive six (6) month period (exclusive of deferred Development Fees, Asset Management Fee, and all other fees payable to the General Partners); or

(7)     Repeated failure to furnish reports as required in Section 12.1, and failure to cure within thirty (30) days after notice is given from the Investor Limited Partner; or

(8)     Any penalty or amount assessed against the Partnership or the General Partners for the benefit of the Investor Limited Partner, or any amount otherwise due the Investor Limited Partner from the General Partners or the Partnership, is not paid within thirty (30) days after notice, or any operating deficits are not funded and paid by the General Partners within the earlier or thirty (30) days when due or when necessary for the continuation of the Project without delay; or

(9)     After the first nine (9) months following the Initial 95% Occupancy Date the occupancy of the Project for any three (3) consecutive months, and/or the average occupancy for any calendar year, falls below 85% unless such occupancy level is related to a condition or event occurring at the property which is beyond the control of the General Partners or the Property Manager (special situations such as fire damage, or other catastrophes to be considered);

(10)     After the Initial 95% Occupancy Date, the qualified Low Income Units of the Project fall below ninety percent (90%) of the total Low Income Units;

provided however that any removal under this Section 4.5(iv) shall only be exercisable by the Investor Limited Partner by giving a written notice of removal ("Notice of Removal") to the affected General Partner which states in reasonable detail the nature of the alleged events giving rise to the removal (including any required prior notices and opportunity to cure) and the proposed effective date for the removal. Within ten (10) business days of receipt of the Notice of Removal, the affected General Partner shall have the right to contest any proposed removal if it in good faith believes that such removal is not warranted. The right to contest shall be exercised by the affected General Partner by giving written notice ("Contest Notice") of such contest to the Investor Limited Partner within ten (10) Business Days of the General Partner's receipt of the Notice of Removal. In such event the affected General Partner shall, within fifteen (15) business days of the date of the Contest Notice, institute an action to resolve said dispute through the arbitration procedures provided for in this Agreement. Failure to timely commence an arbitration proceeding shall result in the affected General Partner being removed without any further act of any Partner upon the expiration of said fifteen (15) business days. The removal of the affected General Partner shall not be effective, if at all, until there has been a final decision or adjudication in any such arbitration action.

B.      The Interest of any General Partner removed pursuant to this Section 4.5 shall be valued and sold pursuant to Section 8.4.

C.      Upon written request to the Co-Managing General Partners and to the Administrative General Partner by the Investor Limited Partner, the Co-Managing General Partners shall call a meeting of the Partners for any matters for which the Partners may vote, as set forth herein. Upon receipt of a written request either in person or by certified mail stating the purpose(s) of the meeting, the Co-Managing General Partners shall provide all Partners within ten days after receipt of said request, written notice (either in person or by certified mail) of a meeting and the purpose of such meeting to be held on a date not less than fifteen (15) nor more than sixty (60) days after receipt of said request, at a time and place convenient to the Partners.

D.      In the event a General Partner is validly removed pursuant to this Section 4.5, and despite the validity of such removal which is known, or should have reasonably been known, to such General Partner, opposes such removal after a reasonable period of time to effect the removal, substantial cost and expense will be incurred by the Partnership in effecting the removal, arranging for a suitable replacement and completing the orderly transfer of records and management. It is understood and agreed by, between and among the parties that in view of the reasons for removal as set forth in subparagraph (A)(iv) therein, the validly removed General Partner, and not the Partnership nor the Investor Limited Partner, should be charged with these costs and expenses. The parties agree that in the event the removal is valid, and despite its validity the General Partner does not voluntarily remove within fifteen (15) Business Days of the Contest Notice, then liquidated damages for these costs and expenses (only and not in lieu of other amounts owed by such General Partner nor other losses incurred due to such General Partner) in the amount of $25,000 shall be paid by such removed General Partner to the Partnership upon such removal and that the Partnership shall be entitled to immediately collect, offset or otherwise initiate any actions authorized under the law to recover such liquidated damages from such removed General Partner or its assets and receivables. The General Partner shall be free to contest the validity of these liquidated damages in any forum in which the removal itself is, or would have been contested.

## ARTICLE V

### Capital Contributions of Investor Limited Partner

Section 5 1    Installments of Capital Contributions

A     The Investor Limited Partner shall contribute as its Capital Contribution the sum of $5,057,008 payable in the following installments:

(1)     $104 upon the latest to occur of (i) Tax Credit Reservation or equivalent Code Section 42(m)(2)(D) determination or valid commitment letter to issue the 42(m)(2)(D) commitment or, (ii) the closing of Construction Loan, with the proceeds of this installment to be placed into a construction escrow account held by the Bond Trustee or by the Construction Lender and disbursed pursuant to standard AIA documents G702 for draw requests or such other procedures as are reasonably acceptable to the Construction Lender and the Investor Limited Partner. The Investor Limited Partner shall also receive all draw requests submitted and invoices, lien waivers and certification by an inspecting architect approved by the Investment Partner, or (iii) receipt of a commitment acceptable to the Investment Partner for the Permanent Mortgage Loan, (iv) Admission, or (v) January 1, 2004 (the "First Installment").

(2)     $5,056,904 on the latest to occur of (i) the Completion Date, (ii) Cost Certification, (iii) Initial 90% Occupancy Date and 100% of the 78 Low Income units are tax credit qualified, (iv) receipt of Forms 8609 for all buildings in the Project, (v) the occurrence of Breakeven, (vi) all of the financial criteria necessary to achieve Final Closing have been met, (vii) attestation by Partnership Accountant providing a detailed analysis of the depreciable assets including personal property, land improvement, and the building, (viii) arriving at the Debt Coverage Date, or (ix) satisfaction of all of the conditions to the payment of the First Installment (the "Second Installment")

B     The obligation of the Investor Limited Partner to make each Installment (except as otherwise provided) is subject to each of the following conditions:

(i)     The Co-Managing General Partners shall have executed and delivered to the Investor Limited Partner a certificate (the "Payment Certificate"), in the form attached hereto as Exhibit 1, dated the date such Installment is to be paid to the Partnership and attaching the Title Policy endorsement referred to therein

(ii)     In the case of the First Installment, all Requisite Approvals to the admission of AMTAX as Investor Limited Partner pursuant to this Agreement shall have been obtained

(iii)     Each of the material representations and warranties set forth in Section 7 5 which are capable of being satisfied as of such time shall in all material respects be true and correct

(iv)     No event shall have occurred which would permit AMTAX to give an Election Notice under the Purchase Agreement

27

C    Notwithstanding the foregoing, if an Installment has not become due because of a failure to satisfy any condition to the payment thereof, but such condition can be satisfied by the payment of money, then in the discretion of the Investor Limited Partner such Installment may be collected notwithstanding the failure to satisfy such condition, provided that when such Installment is paid (1) the amount required to satisfy such condition is disbursed directly to the requisite parties for the purpose of satisfying such condition, and (2) any acceleration of maturity of indebtedness and any other default and any action or proceeding which was the basis of the failure to satisfy such condition or which resulted from such failure has been effectively waived and, in the case of any such action or proceeding, terminated with prejudice

D    Security Agreement

a    The Investor Limited Partner hereby pledges to the Partnership and grants the Partnership a security interest in its Partnership Interest as further security for its obligation to make Capital Contributions hereunder and agrees that the Partnership shall have, in addition to the rights provided for herein, all of the rights and remedies of secured party under the Uniform Commercial Code of the Project State with respect to the Partnership Interest in the event of the failure of the Limited Partner to make its Capital Contributions when and as provided herein, in whole or in part.  In furtherance of the foregoing pledge, the Investor Limited Partner shall execute and deliver to the Partnership one or more Uniform Commercial Code Financing Statements, to be filed in the State of California and, if requested by the Managing General Partner, the Project State

b    Upon failure by the Limited Partner to make its Capital Contributions when validly due, in whole or in part, after fifteen (15) days of written notice of default and opportunity to cure, the Partnership may, but shall not be required to, realize upon such collateral by disposing of the Partnership Interest of such defaulting Limited Partner at a public or private sale, at which the Partnership, any Partner, including the Investor Limited Partner, or any third party may appear and bid   The Investor Limited Partner shall be entitled to no less than ten (10) days prior written notice of any public or private sale

c    The proceeds of any sale shall be applied in the following order of priority:

(i)    to the payment of reasonable out-of-pocket costs and expenses of such sale, or resale of the Partnership Interest if the Partnership was successful bidder at such sale, and of admission of the purchaser to the Partnership;

(ii)    to the payment of the Capital Contribution in respect to which the default occurred and any other past-due obligations of the defaulting Limited Partner to the Partnership which have either been admitted in writing by the Investor Limited Partner or which are evidenced by a written opinion of the Partnership's Accountants; and

(iii)    to the defaulting Limited Partner as to any excess

d    In the event the Investor Limited Partner disputes the payment of an Installment of Capital Contribution, or any part of a Capital Contribution, it may seek Arbitration

in accordance with Section 13.14 herein, upon the depositing of the Installment or Installments of Capital Contribution in dispute in an escrow account. The Arbitrator shall be given power and authority over the escrow funds to act in accordance with Section 13.14 herein and to rule direct, or order as to their disposition.

    e.  The defaulting Limited Partner shall not obtain any interest in the profits or losses, cash flow, proceeds of capital transactions, or other operating or capital items of the Partnership after the foreclosure sale of the Interest by virtue of any of any subsequent payments made to the Partnership, as aforesaid.

    Section 5.2  Adjustments to Capital Contributions

    The Capital Contribution of the Investor Limited Partner shall be subject to increase or decrease in the manner provided in this Section 5.2.

    A.  If, as of the Completion Date and based upon the Cost Certification, it is determined that the amount of Tax Credits for which the Project will be eligible (as evidenced by applicable documentation including Forms 8609) is less than the Maximum Annual Credit, such difference being hereinafter referred to as a "Credit Shortfall", then there shall be a reduction in the Investor Limited Partner's Capital Contribution in an amount equal to the product of (i) the Credit Shortfall and (ii) 8.84 (referred to as the "Credit Shortfall Adjustment"). Such reduction shall be applied by decreasing the amount of the next Installment due, and, if necessary, further Installments (reducing the earlier ones first) by the amount of the Credit Shortfall Adjustment. If all Installments of Capital Contribution have been paid at the time of a Credit Shortfall, or the aggregate amount of Installments remaining at the time of the Credit Shortfall is less than the amount of the Credit Shortfall Adjustment, then the Credit Shortfall Adjustment, or any balance of the Credit Shortfall Adjustment over the amount of the remaining Installments, as the case may be, shall be immediately distributed, in cash, to the Investor Limited Partner.

    In the event that the amount of Tax Credit for which the Project will be eligible is more than the Maximum Annual Credit, then the Investor Limited Partner's Capital Contribution shall be increased at a rate of $.884 per each additional $1.00 of Tax Credits provided that there is the same ratio of additional Tax Credits to additional losses set forth on Schedule B, hereto. Such additional amount shall be payable at the time of the Second Installment.

    B.  In the event there is Credit Deficiency or any Recapture Event, within sixty (60) months after the Completion Date, then the Investor Limited Partner shall be entitled to an adjustment payment from the General Partners (the "Adjustment Payment"). For these purposes, any event which causes a Credit Deficiency during the first sixty (60) months that also results in or creates a Credit Deficiency that extends into the last sixty (60) months, will be penalized and adjustments made as if the Credit Deficiency had occurred entirely during the first sixty (60) months. The Adjustment Payment will be in a total amount equal to the sum of: (i) the product of (a) the total of the Credit Deficiency for each of the years of Projected Credit and (b) 1.023 and (ii) and any additional interest and/or penalty that may be assessed by the Service for any year as a result of the Recapture Event. The amount of Credit Deficiency in this Section 5.2B will be reduced by the fair market value of any Tax Credits deferred beyond the dates of Projected Credit as set forth in Article I. Fair market value is to be determined using a discount

rate of 8 0%   The Adjustment Payment shall be paid by the General Partners to the Investor Limited Partner within thirty (30) days of written notice from the Investor Limited Partner   The General Partners shall pledge their Partnership Interest to secure such payment  In the event the General Partners fails to fund any Adjustment Payment when due, the Investor Limited Partner may, at its sole discretion, pursue one or more remedies including any of the following remedies: (i) attach o r o therwise se ize a ny a mount o therwise d istributable t o t he General P artners f rom Cash Flow of the Partnership; (ii) recover the funds from the General Partners; (iii) assert its rights under the Uniform Commercial Code or other applicable law either against the General Partner's Partnership Interest or other assets of the General Partners; and (iv) remove the General Partners pursuant to Section 4.5.

C.    If an event which causes a Credit Deficiency or a Recapture Event initially occurs at any time after the fifth anniversary of completion of construction, except as set forth in subparagraph B above, then the Investor Limited Partner shall be deemed to have made a loan (a "Credit Recovery Loan") to the Partnership in an amount equal to the sum of (i) the product of (a) the Credit Deficiency and (b) 1 023, and (ii) any additional interest and/or penalty that may be assessed by the Service for any year as a result of the Recapture Event   Credit Recovery Loans shall bear simple interest at 9% per annum and shall be repaid only as provided in Section 6 2. The General Partners and the Developer shall pledge and collaterally assign their interest and all their Partnership distributions, all amounts due to them for Subordinated Loan repayments, and all fees due to them to secure payment of such Credit Recovery Loans.

D.    Attached as Schedule B is a schedule of Specified Tax Benefits that were calculated based upon projections provided by the General Partners and which constitute a substantial p ortion o f t he Investor Limited P artner's e xpected r eturn   If, p rior t o f unding t he First Installment and once again prior to funding the Second Installment, the Investor Limited Partner determines that the Specified Tax Benefits are not achievable due to inaccuracies contained within or modifications to the underlying assumptions contained within the projections provided by the General Partners, the parties to this Agreement agree to amend the Investor Limited Partner's Capital Contribution to provide the Investor Limited Partner with a return that is consistent with the return contemplated by the Specified Tax Benefits

E.    After admission of the Investor Limited Partner, the General Partners shall be entitled to a return of capital in an amount equal to their respective capital contributions made prior to Admission, subject to the General Partners maintaining an aggregate Capital Contribution of no more than 1% of the Capital Contributions of all Partners. This return of capital will be funded from the proceeds of the Investor Limited Partner's Capital Contribution

F.    In the event that there is a reallocation of losses and credits in the first two (2) years, if losses are available prior to the scheduled capital contributions, then the Investor Limited Partner agrees to contribute capital in an amount equal to the extent of losses previously allocated to it at a date no later than December 31, 2006

## ARTICLE VI

### Distributions of Cash; Allocations of Profits, Losses and Tax Credits

Section 6 1    Profits and Losses and Tax Credits

A       After giving effect to the special allocation provisions of Section 6 4, Profits or Losses and Tax Credits for any Partnership Fiscal Year shall be allocated 0045% to the Co-Managing General Partners, 0045% to the Administrative General Partner, 001% to Protech and 99 99% to the Investor Limited Partner.

B       After giving effect to the special allocation provisions of Section 6 4, Profits or Losses from a Capital Transaction in any Partnership Fiscal Year shall be allocated to and among the Partners as follows:

As to Profits:

First, an amount of Profits equal to the aggregate negative balances (if any) in the Capital Accounts of all Partners having negative balance Capital Accounts shall be allocated to such Partners in proportion to their negative Capital Account balances until all such Capital Accounts have zero balances; and

Second, an amount of Profits shall be allocated to each of the Partners until the positive balance in the Capital Account of each Partner equals the amount of cash which would be distributed to such Partner in accordance with the provisions of Clauses Ninth through Eleventh of Section 6 2B(ii)

As to Losses:

First, an amount of Losses equal to the aggregate positive balances (if any) in the Capital Accounts of all Partners having positive balance Capital Accounts shall be allocated to such Partners in proportion to their positive Capital Account balances until all such Capital Accounts have zero balances; provided, however, that if the amount of Losses so to be allocated is less than the sum of the positive balances in the Capital Accounts of those Partners having positive balances in their Capital Accounts, then such Losses shall be allocated to the Partners in such proportions and in such amounts so that the Capital Account balances of each Partner shall equal, as nearly as possible, the amount of cash such Partner would receive if an amount equal to the excess of (i) the sum of all Partner's balances in their Capital Accounts computed prior to the allocation of Losses under this Clause First or (ii) the aggregate amount of Losses to be allocated to the Partners pursuant to this Clause First were distributed to the Partners in accordance with the provisions of Clauses Ninth through Eleventh of Section 6 2B(ii); and

Second, the balance, if any, of such Losses shall be allocated 0045% to the Co-Managing General Partners and 0045% to Administrative General Partner, 001% to Protech and 99 99% to the Investor Limited Partner.

Section 6.2   Application and Distributions Prior to Dissolution

Notwithstanding any other provision of this Agreement, Distributions shall at all times comply with the requirements and conditions and limitations of the Permanent Mortgage Loan

A   Application and Distribution of Cash Flow

(i)   Except as otherwise provided below, the General Partners shall determine, as of the end of each calendar quarter, the amount of Cash Flow that is available as of the end of such period to be applied as provided in Section 6 2A(ii)   Cash Flow that is so determined as available for distribution as of the end of any period shall be deemed Cash Flow for such period even if distributed after such period.

(ii)   The amount of Cash Flow shall be distributed as follows:

First, to the maintenance of Operating Reserves as set forth in Section 7 8B herein;

Second, to the payment to the Investor Limited Partner of any current and accrued Asset Management Fee;

Third, to the payment of the Deferred Developer Fee;

Fourth, to the repayment of any Subordinated Loans of the General Partners;

Fifth, to the payment of any current and accrued the Partnership Management Fee;

Sixth, to the payment of the Supervisory and Incentive Management Fee to the Administrative General Partner as set forth in Section 7.10;

Seventh, a priority distribution to the Investor Limited Partner in an amount equal to 10% of the remaining balance;

Eighth, to the payment of any current and accrued Operating Deficit Management Fee to the General Partners, as set forth in Section 7 10;

Ninth, the balance, 99 99% to the Investor Limited Partner  0045% to the Co-Managing General Partners, and  0045% to the Administrative General Partner and  001% to Protech.

(iii)   Cash flow shall be applied as provided in Section 6 2A(ii) within thirty (30) days of the end of each calendar quarter.

B.    Distributions of Capital Proceeds

(i)    The General Partners shall determine, within forty-five (45) days after the Partnership's receipt thereof, the amount of Capital Proceeds available to be applied as provided in Section 6.2B(ii).

(ii)    Subject to the provisions of Section 5.2 with respect to any Credit Deficiency or Recapture Amount or other amounts due the Investor Limited Partner, including Adjustment Payments, and further subject to the provisions of Section 6.3 below, any Capital Proceeds shall be distributed to and among the Partners in the following amounts and order of priority:

First, to the payment of all debts and liabilities of the Partnership, but excluding liabilities owed to Partners, and to the establishment of any required reserves;

Second, to the payment of the Asset Management Fee of such year and for previous year as to which the Asset Management fee has not been paid in full;

Third, to the repayment of any Credit Recovery Loans of the Investor Limited Partner, and any interest thereon;

Fourth, in the event of a sale of the Project, a priority distribution to the Investor Limited Partner (the "Exit Tax Distribution") equal to its net tax liability incurred by the sale and subsequent liquidation, plus the amount of any tax liability incurred by the Exit Tax Distribution with net tax liability determined by taking into account losses as well as income or gain;

Fifth, to the payment of any portion of the Deferred Developer Fee owing under Section 7.10;

Sixth, to the repayment of any Subordinated Loans of the General Partners;

Seventh, to the General Partners payment of any current or accrued Partnership Management Fee;

Eighth, except in the case of a refinancing, to each Partner in an amount equal to the positive balance in its capital account, after all prior distributions;

Ninth, a priority distribution to the Investor Limited Partner in an amount equal to 10% of the remaining balance;

Tenth, to the payment of any current and accrued Operating Deficit Management Fee to the General Partners, as set forth in Section 7.10;

Eleventh, the balance, 99 99% to the Investor Limited Partner, 001% to Protech, 0045% to the Co-Managing General Partners and 0045% to the Administrative General Partner

### Section 6 3    Liquidation

A    Upon the liquidation and dissolution of the Partnership, unless the business of the Partnership is continued pursuant to the provisions of Sections 8 2 or 8 3 hereof, the General Partners shall liquidate the assets of the Partnership and cause the business of the Partnership to be wound up in accordance with the Uniform Act and cause the Certificate to be cancelled in accordance with the provisions of Section 2 5B

B    Subject to the provisions of Section 6 3C below, any Capital Proceeds from a Terminating Capital Transaction remaining after payment of, or adequate provision for, the debts and obligations of the Partnership shall be distributed to those Partners with positive Capital Account balances (after first taking into account all Capital Account adjustments including under Section 6 1 B, for the Partnership taxable year) in proportion to said Capital Account balances

C.    Except to the extent of his or its Share of Partnership Minimum Gain or Partner Nonrecourse Debt Minimum Gain, if any, no Partner shall have a Deficit Restoration Obligation nor shall any Partner otherwise be required to restore any deficit balance in his or its Capital Account at any time

D    The parties intend that, as a result of the application of the allocation and distribution provisions contained in this Article VI, any Capital Proceeds from a Terminating Capital Transaction under Section 6 3B will be distributed in the same manner as Capital Proceeds are distributed under the provisions of Section 6.2B If the Partnership is advised at any time by the Accountants or counsel that an actual distribution of Capital Proceeds at the end of any Fiscal Year in accordance with the provisions of Section 6 3B would not result in each Partner receiving the amount that it would have received if Section 6 2B rather than Section 6 3B applied to such distribution, the General Partner shall so notify the Limited Partners and, with the Consent of the Investor Limited Partner, are authorized and empowered to amend the provisions of this Article VI relating to the allocation of Profits or Losses (other than the Regulatory Allocations) for such Fiscal Year (and for subsequent Fiscal Years if necessary) to cure such defect consistent with the principles set forth in the first sentence of this Section 6 3(d)

### Section 6 4    Special Allocation Provisions

Notwithstanding anything to the contrary contained herein:

A    Nonrecourse Deductions shall be allocated 99 99% to the Investor Limited Partner, 001% to the Special Limited Partner, 0045% to the Co-Managing General Partners and 0045% to the Administrative General Partner

B    Partner Nonrecourse Deductions shall be allocated to and among the Partners in the manner provided in the Allocation Regulations.

C.    Subject to the provisions of Section 6.4P, if there is a net decrease in Partnership Minimum Gain for a Partnership Fiscal Year, the Partners shall be allocated items of Partnership income and gain in accordance with the provisions of Section 1.704-2(f) of the Allocation Regulations.

D.    Subject to the provisions of Section 6.4P, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain for a Partnership Fiscal Year, then any Partner with a Share of such Partner Nonrecourse Debt Minimum Gain shall be allocated items of Partnership income and gain in accordance with the provisions of Section 1.704-2(i)(4) of the Allocation Regulations.

E.    Subject to the provisions of Sections 6.4A through 6.4D above, in the event that any Partner unexpectedly receives any adjustments, allocations or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Allocation Regulations, items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Allocation Regulations, the Adjusted Capital Account Deficit of such Partner as quickly as possible.   This Section 6.4E is intended to constitute a "qualified income offset" provision within the meaning of the Allocation Regulations and shall be interpreted consistently therewith.

F.    Subject to the provisions of Sections 6.4A through 6.4E above, in no event shall any Limited Partner be allocated Losses that would cause it to have an Adjusted Capital Account Deficit as of the end of any Partnership Fiscal Year.   Any Losses that are not allocated to a Limited Partner by reason of the application of the provisions of this Section 6.4F shall be allocated to the Administrative General Partner.

G.    Subject to the provisions of Sections 6.4A through 6.4F above, in the event that any Limited Partner (who is not also a General Partner) has an Adjusted Capital Account Deficit at the end of any Partnership Fiscal Year, items of Partnership income and gain shall be specially allocated to each such Limited Partner in the amount of such Adjusted Capital Account Deficit as quickly as possible.

H.    Without limiting the generality of Section 6.4B above, (i) if the Partnership incurs recourse obligations to fund the payment of deductible items which are not anticipated to be paid in the ordinary course of business or (ii) if the Partnership incurs losses from extraordinary events which are not recovered from insurance or otherwise and which are not anticipated to be paid in the ordinary course of business (the obligations and losses under clauses (i) and (ii) being referred to herein collectively as "Excess Expenses") in respect of any Fiscal Year, then the calculation and allocation of Losses shall be adjusted as follows: first, an amount of deductions equal to such Excess Expenses for the Fiscal Year in question shall be allocated to the Administrative General Partner; and second, the balance of such deductions and all gross income shall be allocated as provided in Section 6.1A.  For purposes of this Section 6.4H, extraordinary events include casualty losses, losses resulting from liability to third parties for tortious injury, losses resulting from a breach of a legal duty by the Partnership or by the General Partners, and deductions resulting from other liabilities which are not incurred in the ordinary course of business.   Nothing in this Section 6.4H shall prevent the Partnership from recovering an extraordinary loss from a General Partner who is liable therefor by law or under this Agreement.

If any Excess Expenses shall be repaid from Cash Flow generated in respect of any Fiscal Year, then the allocation of Profits and Losses under Section 6.1A for such Fiscal Year shall be adjusted as follows: first, the General Partner shall be allocated an amount of the gross income of the Partnership equal to the amount of the Excess Expenses repaid in such Fiscal Year; and second, the balance of such gross income and all deductions shall be allocated as provided in Section 6.1(a)

I. In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its initial Gross Asset Value. In the event that the Gross Asset Value of any Partnership Property is adjusted pursuant to the terms of this Agreement, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder. Any elections or other decisions relating to such allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 6.4I are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

J. Syndication expenses, if any, for any Fiscal Year or other period shall be specially allocated to the Investor Limited Partner.

K. For purposes of determining the Profits, Losses, Tax Credits or any other items allocable to any period, Profits, Losses, Tax Credits and any such other items shall be determined on a daily, monthly, or other basis, as determined by the General Partners using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

L. To the extent that interest on loans (or other advances which are deemed to be loans) made by any General Partner to the Partnership is determined to be deductible by the Partnership in excess of the amount of interest actually paid by the Partnership, such additional interest deduction(s) shall be allocated solely to such General Partner.

M. If the Service successfully disallows the deduction of all or any part of any fee paid by the Partnership to either General Partner or its Affiliates by recharacterizing such fee as a distribution to such General Partner, there shall be, to the extent permitted by the Code, a special allocation of gross income to such Administrative General Partner for the Fiscal Year with respect to which such disallowed deduction was claimed by the Partnership in the amount of such disallowed deduction.

N. For purposes of determining each Partner's proportionate share of the excess Nonrecourse Liabilities of the Partnership pursuant to Section 1.752-3(a)(3) of the Allocation Regulations, the Investor Limited Partner shall be deemed to have a 99.99% interest in Profits, the Special Limited Partner shall be deemed to have a .001% interest in Profits, the Co-

Managing General Partners shall be deemed to have a .0045% interest in Profits, and the Administrative General Partner shall be deemed to have a .045% interest in Profits.

O       In accordance with Treasury Regulation Section 1.704-1(b)(4)(ii), all expenditures giving rise to the allowance of any Tax Credits, including credits under Section 42, shall be allocated .0045% to the Co-Managing General Partners, .0045% to the Administrative General Partner, .001% to the Special Limited Partner, and 99.99% to the Investor Limited Partner for the relevant taxable year, It being the intention that Federal Housing Tax Credits be allocated .0045% to the Co-Managing General Partners, .0045% to the Administrative General Partner, .001% to the Special Limited Partner, and 99.90% to the Investor Limited Partner.

P       Any recapture of any Tax Credits shall be allocated among the Limited Partners, as a class, and the General Partners, as a class, in the same manner in which such classes shared the Tax Credits.

Q       If for any Fiscal Year the application of the minimum gain chargeback provisions of Section 6.4C or Section 6.4D would cause a distortion in the economic arrangement among the Partners and it is not expected that the Partnership will have sufficient other income to correct that distortion, the General Partners may request a waiver from the Commissioner of the Service of the application in whole or in part of Section 6.4C or Section 6.4D in accordance with Section 1.704-2(f)(4) of the Allocation Regulations. Furthermore, if additional exceptions to the minimum gain chargeback requirements of the Allocation Regulations have been provided through revenue rulings or other Service pronouncements, the General Partners are authorized to cause the Partnership to take advantage of such exceptions if to do so would be in the best interest of a majority in interest of the Partners.

R       In the event that the loss or deduction associated with a fee payable to any Partner under Section 7.10 is disallowed, there shall be specially allocated to such Partner an amount of gross income equal to the amount of the disallowed loss or deduction provided however that any such special allocation that would otherwise be made to the Co-Managing General Partners shall instead be made to the Administrative General Partner.

S.       In no event shall the Co-Managing General Partners receive an allocation of Profits and Losses other than .0045%.

T       All interest income of the Partnership prior to the Completion Date shall be allocated to the Administrative General Partner.

Section 6.5     Order of Application

The provisions of this Article VI shall be applied in the order required by the applicable provisions of the Allocation Regulations or if no such order is specified, in the manner determined by the Accountants.

ARTICLE VII

Rights, Powers and Duties of the Managing General Partners

Section 7 1     Restrictions on Authority

A.     Notwithstanding any other provisions of this Agreement, the General Partners shall have no authority to perform any act in respect of the Partnership or the Project in violation of (i) any applicable law or regulation, or (ii) any agreement between the Partnership and any Lender or Agency

B.     The General Partners shall not have any authority to do any of the following acts, without the Consent of the Investor Limited Partner and any Requisite Approvals:

(i)     incur indebtedness for money borrowed on the general credit of the Partnership, except as specifically permitted by Article III or Article X, or

(ii)     Following completion of construction of and rehabilitation of the Improvements, to construct any new capital improvements, or to replace any existing capital improvements if construction or replacement would substantially alter the use of the Property, or

(iii)     To acquire any real property in addition to the Property (other than easements or similar rights necessary or convenient for the operation of the Project), or

(iv)     To bear, or cause or permit any Related Person to bear, the economic risk of loss with respect to all or any portion of any Permanent Mortgage Loan or the indebtedness secured thereby, or

(v)     To cause the Partnership to make any loan or advance to any Person (for purposes of this clause 7 1B(v), accounts receivable in the ordinary course of business from Persons other than the General Partners or their Affiliates shall not be deemed to be advances or loans), or

(vi)     To lease any Low Income Unit in the Project to other than Qualified Tenants or otherwise operate the Project in such a manner or take any action which could cause any Low Income Unit in the Project to fail to be treated as a qualified low-income housing unit under Section 42(i)(3) of the Code or which would cause a Recapture Event, or

(vii)     To amend any Project Document, or to permit any party thereunder to waive any provision thereof, to the extent that the effect of such amendment or waiver would be to eliminate, diminish or defer any obligation or undertaking of the Partnership, the General Partners or their Affiliates which accrues, directly or indirectly, to the benefit of, or provides additional security or protection to, the Investor Limited Partner (notwithstanding that the Investor Limited Partner is neither a party to nor express beneficiary of such provision or was not a Partner when such provision became effective), or

(viii)  To increase or refinance any Mortgage or to sell or convey the Property, except as provided in Article IIIC, and except that the General Partners may cause the Partnership to grant easements and similar rights affecting the Land to obtain utility services for the Project or for other purposes necessary or convenient for the operation of the Project, or

(ix)  To cause the Partnership to commence a proceeding seeking any decree, relief, order or appointment in respect to the Partnership under the federal bankruptcy laws, as now or hereafter constituted, or under any other federal or state bankruptcy, insolvency or similar law, or the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) for the Partnership or for any substantial part of the Partnership's business or property, or to cause the Partnership to consent to any such decree, relief, order or appointment initiated by any Person other than the Partnership, or

(x)  To pledge or assign any of the Capital Contribution of the Investor Limited Partner or the proceeds thereof, except as may be required by the Construction Lender in connection with Construction Loan; or

(xi)  To amend any of the Related Agreements; or

(xii)  To approve any changes to the plans and specifications for the Project which would result, either individually or in the aggregate, in an overall development cost increase in excess of $25,000.00 or to make material modifications to the Approved Tax Credit Application (provided, however, that any Consent of the Investor Limited Partner required under this clause (xii) shall not be unreasonably withheld.).

C.  The General Partners shall not (a) cause the Partnership to utilize Cash Flow to acquire interests in other Limited Partnership's or (b) cause the Partnership to invest or reinvest the proceeds of any sale or refinancing of the Project.

Section 7.2    Independent Activities

Any Partner may engage independently or with others in other business ventures of every nature and description including, without limitation, the ownership, operation, management, and development of real estate, regardless of whether such real estate directly competes with the Project, and neither the Partnership nor any Partner shall have any rights by reason of this Agreement in and to such independent ventures or the income or profits derived therefrom.

Section 7.3    Business Management and Control; Designation of Managing General Partner

A.  Except as otherwise set forth in this Agreement, the Co-Managing General Partners, within the authority granted to it under this Agreement, shall have full, complete and exclusive discretion to manage and control the business of the Partnership for the purposes stated in Article III, shall make all decisions affecting the business of the Partnership and shall manage and control the affairs of the Partnership to the best of its ability and use best efforts to carry out the purpose of the Partnership. In so doing, the Co-Managing General Partners shall take all

actions necessary or appropriate to protect the interests of the Limited Partners and of the Partnership   The Co-Managing General Partners shall devote such time as is necessary to the affairs of the Partnership   The Co-Managing General Partners may, in the proper and reasonable exercise of its management authority, delegate certain of it powers, rights and obligations hereunder and may appoint, employ, contract or otherwise deal with any person for the transaction of business of the Partnership, which person may under the supervision of the Co-Managing General Partners perform any acts or services for the Partnership which the Co-Managing General Partners may approve, provided however, that such delegation shall not excuse the Co-Managing General Partners from overseeing and supervisory on an ongoing basis the activities delegated

B      Except as otherwise set forth in this Agreement and subject to the applicable Lender and/or Agency rules and regulations and the provisions of the Project Documents, as to those matters not reserved to the Co-Managing General Partners under this Agreement, the General Partners acting unanimously (acting for and on behalf of the Partnership), in extension and not in limitation of the rights and powers given by law or by the other provisions of this Agreement, shall, in their sole discretion, have the full and entire right, power and authority in the management of the Partnership business to do any and all acts and things necessary, proper, convenient or advisable to effectuate the purpose of the Partnership. In furtherance and not in limitation of the foregoing provisions, any one of the General Partners are specifically authorized and empowered to execute and deliver, on behalf of the Partnership, any reimbursement agreement, multifamily note, acknowledgment, acceptance and agreement to intercreditor agreement, agreement to amend or comply, assignment of management agreement, exceptions to nonrecourse guaranty, amended and restated financing agreement, interest rate hedge assignment and security agreement, interest rate hedge reserve agreement, pledge, security and custody agreement, regulatory agreement and declaration of restrictive covenants, amended and restated remarketing agreement, multifamily deed of trust, assignment of rents, security agreement and fixture filing (California), extended use agreement, special rider to security instrument, UCC-1 financing statement, environmental indemnity agreement, letter agreements/confirmations re interest rate cap/ISDA master agreements, tax certificate, reliance certificate, borrower certificate(s), and any and all other agreements, certificates, documents and instruments to be executed, acknowledged or delivered by the Partnership relating to the Bonds, the Extended Use Agreement, the Mortgage, and the other Project Documents, and to execute any and all other instruments and documents, and amendments thereto, as shall be required in connection with the Construction Loan and the Mortgage Loan, including, but not limited to, executing any mortgage, note, contract, building loan agreement, bank resolution and signature card, release, discharge, or any other document or instrument in any way related thereto or necessary or appropriate in connection therewith, and to execute all contracts, conveyances of title, loan documents, deeds of trust, agreements and any or all other matters and documents affecting or relating to the business of the Partnership, all without the signature of the other General Partner(s), so long as all required approvals of the General Partners are obtained prior to execution of said documents. Except as otherwise set forth in this Agreement, all decisions made for and on behalf of the Partnership by the General Partners acting unanimously shall be binding upon the Partnership   No person dealing with the General Partners shall be required to determine its or their authority to make any undertaking on behalf of the Partnership, nor to determine any facts or circumstances bearing upon the existence of such authority Notwithstanding anything to the contrary herein, in the event that at any time there is appointed a

Substitute General Partner such Person shall have the right, acting alone and without the Consent or approval of any other General Partner, to take any action or make any decision authorized under this Agreement to be taken or made by a General Partner and no other General Partner shall have any power or right to act alone

C.   The Co-Managing General Partners shall provide regular, continuous and substantial services to the Partnership and shall materially participate (within the meaning of Section 469 of the Code) in the development of the Apartment Complex and the operations of the Partnership. In addition to any other duties and obligations specifically assigned or reserved to the Co-Managing General Partners under this Agreement, the Co-Managing General Partners shall perform the following services on behalf of the Partnership; (i) determine the particular requirements of low-income families and the manner in which the Apartment Complex can be developed in a cost-effective manner best to serve such needs including sizes and configurations of apartment units, furnishings and appliances, recreational needs, security, rules and regulations essential to the development of the Apartment Complex; (ii) coordinate the development and operation of the Apartment Complex; (iii) coordinate with local service agencies, including housing authorities, welfare and social services department, churches and other organizations operating for the purpose of assisting the needy, regarding the availability of the Apartment Complex as desirable housing for low-income families, and facilitate the referral of potential tenants to the Apartment Complex; (iv) oversee and supervise the Management Agent; (v) select the services which will be provided to such tenants by the Partnership; (vi) select, coordinate, and implement social and educational services from the community which will be provided to tenants at the Apartment Complex; (vii) use its best efforts to effect and monitor compliance of the Partnership and the Apartment Complex with all governmental regulations applicable thereto (including without limitation making appropriate administrative filings); (viii) inspect the Apartment Complex to determine if the Apartment Complex is being properly maintained and that necessary repairs are being made thereto and if such repairs are needed, authorize such repairs; and (ix) obtain information from and interface with low-income tenants regarding their needs and the services to be provided by the Partnership. In addition, the Co-Managing General Partners shall be responsible for ensuring that the Apartment Complex and the operation thereof at all times comply and are in conformance with Section 4(b) and 5 of Article XIII of the Constitution of the State of California and Sections 214, 254.5 and 259.5 of the California Revenue and Taxation Code, as amended.

D.   CTCAC Matters   The Co-Managing General Partners shall cause to be prepared and processed the Tax Credit application with the Agency and shall supervise and conduct all activities reasonably necessary to secure Tax Credits for the Apartment Complex

E.   Governmental Compliance   The Co-Managing General Partners shall effect and monitor the compliance of the Partnership and the Apartment Complex with the governmental regulations applicable thereto.  Those efforts shall include making appropriate administrative filings and monitoring the income and other qualifications of tenants

F.   Property Management   The Co-Managing General Partners on behalf of the Partnership will diligently enforce all of the obligations of the Management Agreement   The day-to-day operational management of the Property shall be carried out by the Management Agent supervised by the Co-Managing General Partners and approved by the Partnership

41

G.     Rehabilitation   Subject to the continued oversight and supervision of the Co-Managing General Partners, the Administrative General Partner shall be responsible for the rehabilitation of the Project and for its timely completion, and shall be responsible for overseeing the Contractor pursuant to the Construction Contract

H.     Limit on Liability of Co-Managing General Partners   Notwithstanding anything to the contrary set forth in this Agreement or any related or ancillary agreements between the parties, written or oral, the liability of a Co-Managing General Partner to the Partners, the Partnership or to any third person, in all instances hereunder, shall be limited solely to the interest of the Co-Managing General Partner in the Partnership including any interest that the Co-Managing General Partner may now have or in the future may have or any right to payment (now or in the future) of any fees, distributions or any other items of compensation under this Agreement or the Property Documents (the "Co-Managing General Partner Interest")   The liability of a Co-Managing General Partner hereunder shall not, in any event, extend to, or be enforceable against, any other assets of the Co-Managing General Partner or any other officers, directors, employees, or representative of the Co-Managing General Partner   To the full extent allowed under applicable law, no Co-Managing General Partner shall be either jointly or severally liable for the acts or omissions at any other Co-Managing General Partner or any other Partner.

Section 7.4   Duties and Obligations of the General Partners

A.     The General Partners shall use their best efforts to carry out the purposes, business and objectives of the Partnership referred to in Section 2.3, and shall devote to Partnership business such time and effort as may be necessary to subject to the provisions of Section 7.3 above, (i) supervise the activities of the Management Agent, (ii) make inspections of the Project to determine if the Project is being properly maintained and that necessary repairs are being made thereto, (iii) prepare or cause to be prepared all reports of operations which are to be furnished to the Partners or which are required by any Lender or Agency, (iv) elect to defer the commencement of the Credit Period for all or any portion of the Federal Housing Tax Credit allowable to the Partners under Section 42(g) of the Code, to the extent that any such deferral may be in the best economic interest of the Investor Limited Partner or shall otherwise be requested by the Investor Limited Partner, (however, such deferral shall not serve to reduce any Credit Deficiency) (v) cause the Project to be insured against fire and other risks covered by such insurance in the maximum amount required by any Lender and/or the Agency or, following termination of the Regulatory Agreement, good management practices, in any event in an amount equal to the full replacement value of the Improvements, (vi) obtain and keep in force during the term of the Partnership adequate business or rental interruption and workmen's compensation insurance satisfactory to each Lender and Agency, (vii) obtain and keep in force during the term of the Partnership public liability insurance for the benefit of the Partnership and its Partners in amounts from time to time reasonably acceptable to the Agency and the Lenders, (viii) enforce all contracts entered into for the benefit of the Partnership, (ix) rehabilitate and operate the Property in compliance with all applicable Hazardous Waste Laws, and (x) do all other things which may be reasonably necessary to manage the affairs and business of the Partnership   Further, in the event of any casualty and provided that the insurance proceeds shall be made available therefor, the General Partners shall repair any damage to the Project which was caused by such event, so as to restore the Project (as nearly as possible) to the condition and

status thereof immediately prior to such occurrence. All of the insurance policies required by this Section 7.4A shall (a) be written by insurance companies rated A or better by Best's, (b) include AMTAX as a named insured, and (c) include a provision requiring the insurance company to notify AMTAX in writing thirty (30) days prior to the cancellation of any such policy. In addition, the General Partners shall promptly provide AMTAX or its representatives with copies of such insurance policies upon request from time to time. The General Partners shall review regularly all of the Partnership and Project insurance coverage to insure that it is adequate. In particular, the General Partners shall review at least annually the insurance coverage required by Section 7.4A(v) to insure that it is in an amount at least equal to the then current full replacement value of the Improvements.

B.     Subject to the purposes of the Partnership in Section 2.3 the terms of the Project Documents and to the requirements of Section 42 of the Code, the General Partners shall use reasonable efforts consistent with sound management practice to cause the Project to maximize income produced by the Project, including, if necessary, seeking any necessary approvals of, and implementing, appropriate adjustments in the rent schedule of the Property.

C.     The General Partners shall hold for occupancy such percentage of the apartments in the Project in such a manner as to qualify the apartment units comprising the Project as a "qualified low income housing project" under Section 42(g) of the Code as interpreted from time to time in regulations and rulings promulgated thereunder. The General Partners shall not take any action which would cause the termination or discontinuance of the qualification of the Project as a "qualified low income housing project" under Section 42(g) of the Code or which would cause the recapture of any Federal Housing Tax Credit without the Consent of the Investor Limited Partner.

D.     The Co-Managing General Partners shall prepare and submit, or cause to be prepared and submitted, to the Secretary of the Treasury (or any other Agency designated for such purpose), on a timely basis, any and all annual reports, information returns and other certifications and information and shall take any and all other action required (i) to insure that the Partnership (and its Partners) will continue to qualify for the Federal Housing Tax Credit for all Low Income Units in the Project and (ii) unless the Consent of the Investor Limited Partner is received to act otherwise in a particular instance, to avoid a Recapture Event.

E.     The General Partners agree that, except as provided in or contemplated by the Commitments, neither they nor any Related Person will at any time bear the economic risk of loss for payment of any Permanent Mortgage Loan. The General Partners agree that they will not cause any Limited Partner at any time to be personally liable for payment or performance under any Note or Mortgage; provided, however, that the Limited Partners shall be liable for the performance of their obligations set forth in this Agreement. Each Limited Partner agrees not to take any action which would cause it to bear the economic risk of loss for payment of any Mortgage Loan.

F.     The General Partners shall have fiduciary responsibility for the safekeeping and use of all funds and assets of the Partnership, whether or not in their immediate possession or control. The General Partners shall not employ, or permit another to employ, such funds or assets in any manner except for the exclusive benefit of the Partnership. In addition, the Co-

Managing General Partners will insure that adequate insurance coverage is maintained at all times including liability insurance of not less than $3,000,000.00 per occurrence including fire, theft, hazard and liability insurance for replacement costs, all such policies shall have the Investor Limited Partner named as an additional Insured. The Investor Limited Partner may require earthquake insurance pending review of a seismic report with a PML rating based upon a 10% probability of exceedance during a 50-year time interval. If required, the policy shall cover at least 22% of the replacement cost of the Apartment Complex and shall have a maximum deductible equal to five percent (5%) of the policy. The General Partners further guarantee to keep a policy acceptable to the Investor Limited Partner in place during the entire Compliance Period as defined by the Code. Failure to do so may be grounds for removal of the General Partners. The General Partners shall purchase and maintain an insurance policy reasonably acceptable to the Investor Limited Partner covering acts of terrorism, provided that: (a) terrorism insurance c overage i s r easonably a vailable for t he P roject, a nd ( b) t he c ost o f s uch i nsurance policy is commercially reasonable. If terrorism insurance meets these criteria, the terrorism insurance policy shall be obtained by the General Partners on behalf of the Partnership, and shall remain in place throughout the Compliance Period (as defined by the Code) as long as its continues to meet these criteria. The General Partners shall make inquiry no less than once per calendar year as to the commercially reasonable cost and availability of such terrorism insurance. The failure of the General Partners to obtain and maintain terrorism insurance in accordance with this paragraph, shall be deemed by the parties as sufficient grounds for removal pursuant to Section 4.5(iv).

G. No General Partner shall contract away the fiduciary duty owed at common law to the Limited Partners.

H. The General Partners shall (i) not knowingly store (except in compliance with applicable Hazardous Waste Laws) or dispose of any Hazardous Material at the Project; (ii) neither directly nor indirectly knowingly transport or arrange for the transport of any Hazardous Material (except in compliance with applicable Hazardous Waste Laws); (iii) provide the Limited Partners with written notice (x) upon any General Partner's obtaining knowledge of any potential or known release, or threat of release, of any Hazardous Material at or from the Project or any other Facility or Vessel owned, occupied, or operated by any General Partner, any Affiliate of a General Partner or any Person for whose conduct any General Partner or Affiliate of a General Partner is or was responsible or whose liability may result in a lien on the Project; (y) upon any General Partner's receipt of any notice to such effect from any Federal, state, or other governmental authority; and (z) upon any General Partner's obtaining knowledge of any incurrence of any expense or loss by any such governmental authority in connection with the assessment, containment, or removal of any Hazardous Material for which expense or loss any General Partner may be liable or for which expense or loss a lien may be imposed on the Project only to the extent such action does not violate any restriction covenants applicable to the Project.

I. If requested to do so by the Investor Limited Partner at any time after the completion of the fourteenth year of the compliance period (as defined in Section 42(i)(1) of the Code), the General Partner shall submit a written request to the Credit Agency to find a Person to acquire the Partnership's interest in the low-income portion of the Project and/or take such other action permitted or required by the Code as the Investor Limited Partner may reasonably request to effect a sale of the Project or to terminate the extended use commitment of

44

Section 42(h)(6)(B) of the Code to the extent such action is not violative of any restrictive covenants applicable to the Project

J.     Subject to compliance with Section 42 of the Code and the rules of the Agency, upon completion of the Compliance Period, the General Partners shall have the option (the "Option") to purchase the interest of the Investor Limited Partner in the real estate, fixtures and personal property of the Partnership (the "Interest") for a period of twenty-four (24) months The General Partner may exercise the Option upon written notice to the Investor Limited Partner at any time after the end of the Compliance Period (the "Option Period")   In the event the General Partners exercise the Option, their must pay to the Investor Limited Partner the Option Price (as defined herein) in cash   The Option Price shall equal the greater of (i) the fair market value of the Interest, without offset for any lack of control or inability to control management of the Investor Limited Partner, (fair market value shall be determined by two independent MAI appraisers: one selected by the General Partners and one by the Investor Limited Partner  If such appraisers are unable to agree on the value, they shall jointly appoint a third independent MAI appraiser whose determination shall be final and binding), or (ii) an amount determined by the Partnership Accountants, which is sufficient to pay (a) all outstanding indebtedness secured by the Apartment Complex and (b) distribute to the Investor Limited Partner cash proceeds sufficient to enable the Investor Limited Partner to pay, on an after tax basis, any taxes projected to be imposed on the Investor Limited Partner as a result of the sale pursuant to the Option. However, in no event shall the Option Price be at an amount less than the Exit Tax Distribution

K.     Subject to the Option in Section 7 4J above, the Limited Partner shall have the option to force a sale of its interest in the real estate, fixtures and personal property comprising the Apartment Complex (the "Limited Partnership Option") for a period of twenty-four (24) months following the close of the Compliance Period as determined by the Code   Such sale shall be executed at fair market value, as determined under Section 7 4J   In the event that the Investor Limited Partner exercises the Limited Partnership Option, the General Partners shall have a "Right of First Refusal" to purchase the Partnership Interest.

Section 7.5     Representations and Warranties; Certain Indemnities

A.     The Co-Managing General Partners, to the extent of their actual knowledge, and Administrative General Partner hereby, severally but not jointly, represent and warrant to the Investor Limited Partner that the following are true as of the date hereof and will be true on the due date for each Installment:

(i)     The Partnership is a duly organized limited partnership validly existing under the laws of the State and has complied with all recording requirements with each proper governmental authority necessary to establish the limited liability of the Limited Partners as provided herein.

(ii)     Except as may have been previously disclosed in writing to the Investor Limited Partner, no litigation or proceeding against the Partnership, any General Partner, the Builder or the Developer, nor any other litigation or proceeding directly affecting the Project, is to its knowledge pending before any court, administrative agency or other governmental authority which would, if adversely determined, have a material adverse

effect on the Partnership, any General Partner, the Builder, the Developer or their respective businesses or operations, except for such matters as to which the likelihood of such a determination adverse to the Partnership is, in the opinion of Partnership Counsel or other counsel acceptable to the Investor Limited Partner, remote.

(iii)   (a)   No default by any General Partner, any Affiliate thereof having any relationship with the Project, or the Partnership, in any material respect has occurred or is continuing (nor has there occurred any continuing event which, with the giving of notice or the passage of time or both, would constitute such a default in any material respect) under any of the Project Documents.

(b)   The Project Documents are in full force and effect (except to the extent fully performed in accordance with their respective terms).

(c)   All operating and replacement reserves are fully funded to the extent required by the Project Documents and this Agreement.

(d)   No default under the Bond Documents has occurred or is continuing.

(iv)   No Partner or Related Person bears the economic risk of loss with respect to the indebtedness evidenced by any Note secured by any Permanent Mortgage Loan, except as permitted by Article IIIA.

(v)   All building, zoning and other applicable certificates, permits and licenses necessary to permit the construction, rehabilitation, repair, use, occupancy and operation of the Project have been obtained (other than prior to construction commencement or completion of the Project or a specified portion thereof, such as will be issued only after the commencement of construction or completion of the Project or such specified portion thereof) and neither the Partnership nor the General Partners have received any notice or has any knowledge of any violation with respect to the Project of any law, rule, regulation, order or decree of any governmental authority having jurisdiction which would have a material adverse effect on the Project or the construction, rehabilitation, use or occupancy thereof, except for violations which have been, or will be, cured and notices or citations which have been withdrawn or set aside by the issuing agency or by an order of a court of competent jurisdiction. It is specifically acknowledged that as of the date of this Agreement that construction of the Project has not commenced, and working drawings are in process.

(vi)   The Partnership will as of the commencement of the Construction Mortgage Loan, own the fee simple interest in the Property and have good and marketable title thereto, free and clear of any liens, charges or encumbrances other than the Mortgage[s], matters set forth in the Title Policy delivered at Investment Closing, encumbrances the Partnership is permitted to create under Sections 2.4 and 7.1, and mechanics' or other liens which have been bonded or insured or reserved against in such a manner as to preclude the holder of such lien or such surety or insurer from having any recourse to the Property or the Partnership for payment of any debt secured thereby.

None of the liens, charges, encumbrances or exceptions set forth in the Title Policy delivered at Investment Closing has or will have a material adverse effect upon the construction or operation of the Project.

(vii)    The execution and delivery of all instruments and the performance of all acts heretofore or hereafter made or taken or to be made or taken, pertaining to the Partnership or the Property by any General Partner or Affiliate thereof which is a corporation have been or will be duly authorized by all necessary corporate or other action, and the consummation of any such transactions with or on behalf of the Partnership will not constitute a breach or violation of, or a default under, the charter or by-laws of any such corporation or any agreement by which any such corporation or any of its properties is bound, nor constitute a violation of any law, administrative regulation or court decree. Each such corporation is duly organized and validly existing under the law of the state of its incorporation.

(viii)    Neither the Co-Managing General Partners nor Administrative General Partner is in default in any material respect in the observance or performance of any provision of this Agreement to be observed or performed by such General Partner.

(ix)    The Related Agreements are in full force and effect and no default by any party thereto (other than AMTAX or its Affiliates) has occurred or is continuing thereunder (nor has there occurred any event which, with the giving of notice or the passage of time, or both, would constitute such a default in any material respect thereunder).

(x)    No Event of Bankruptcy has occurred and is continuing with respect to the Partnership, any General Partner, its Affiliates, the Developer or its Affiliates or the Purchaser.

(xi)    The entire Project will qualify, or on and after the Completion Date qualifies, as a "qualified low-income housing project" under Section 42(g) of the Code and all Units in the Project will qualify as Low-Income Units as defined under Section 42 of the Code.

(xii)    The General Partners are not insolvent as defined in the Uniform Fraudulent Transfer Act or such other fraudulent conveyance law as may be applicable under the laws of the State.

(xiii)    All tax returns, financial statements, Schedules K-1 and reports due under Article XII have been properly filed and/or transmitted, as applicable.

(xiv)    The General Partners have not: (i) knowingly stored (except in compliance with applicable Hazardous Waste Laws) or disposed of any Hazardous Material at the Project; (ii) directly nor indirectly knowingly transported or arranged for the transport of any Hazardous Material (except in compliance with applicable Hazardous Waste Laws).

(xv)    To the best of the General Partners' knowledge, no Hazardous Material was ever or is now stored on, transported or disposed of on the Land (except to the extent

any such storage, transport or disposition was at all times in compliance with all Hazardous Waste Laws)

(xvi)   To the best of the General Partners' present knowledge, and subject to the final allocation, Cost Certification and compliance with Section 42 of the Code, the amount of the Maximum Annual Credit to the Partnership is anticipated to be approximately $571,858

(xvii)   Bonds will as of the bond issuance date have been properly issued for the benefit of the Project in accordance with Section 142 (d) of the Code and the Project is or will be financed in accordance with Section 42(h)(4) of the Code   The Partnership will comply with the requirements of the Bond Documents, including owning and operating the Project as a "qualified residential rental project" within the meaning of Section 142(d) of the Code for the required period

(xviii)   At least 50% or more of the sum of (i) the aggregate basis of the land and (ii) the aggregate basis of the building is financed with tax-exempt bond proceeds, and the entire project is eligible for Credits under Section 42(h)(4)(B)

B     The Administrative General Partner agrees to promptly indemnify, defend and hold harmless the Partnership and the Limited Partners from and against any and all claims, losses, damages and liabilities (as well as from and against any and all attorneys' fees and other costs and expenses incurred in connection therewith) which the Partnership and the Limited Partners may incur by reason of any liabilities to which either the Partnership or the Project is subject at the Admission Date; provided, however, that the foregoing indemnification shall not apply to any Mortgage, necessary contractual obligations normally incurred pursuant to the Commitments in connection with the operation of the Property, or to acts for which the General Partners are entitled to indemnification under Section 7.6

C     The Administrative General Partner agrees promptly to indemnify, defend, and hold harmless the Partnership and the Limited Partners from and against any claim, loss, damage or liability (as well as from and against any and all attorneys' fees and other costs and expenses incurred in connection therewith) on account of the presence or escape of any Hazardous Material at or from the Property (or at any other location)   Any claim, loss, damage or liability described in the immediately preceding sentence may be defended, compromised, settled, or pursued by the Limited Partners with counsel of the Limited Partners' selection, but at the expense of the Administrative General Partner   Notwithstanding anything else set forth in this Agreement, this indemnification shall survive the withdrawal of any Administrative General Partner and/or the termination of this Agreement

Section 7 6     Indemnification

Each General Partner (including any Co-Managing General Partner or Retired General Partner) shall be indemnified by the Partnership against any losses, judgments, liabilities, costs and expenses (including reasonable attorneys' fees)and amounts paid in settlement of any claims sustained by him or it in connection with the Partnership from parties other than the Partnership or the Investor Limited Partner, provided that the same were not the result of: (x) willful

misconduct, (y) reckless disregard for the Partnership's welfare, (z) or gross dereliction of duty, on the part of the General Partner or any of its "Designated Affiliates" (as such term is defined in Section 7.7B ) and were the result of a course of conduct which the General Partner, in good faith, believed to be in the best interest of the Partnership   The Partnership shall advance costs, and expenses (including reasonable attorneys' fees) to be incurred in defending any such action upon receipt of an undertaking by such General Partner to reply such amount if it is ultimately determined that such General Partner is not entitled to indemnification by the Partnership.  Any indemnity under this Section 7 6 shall be provided out of and to the extent of Partnership assets only, and no Limited Partner shall have any personal liability on account thereof; provided, however, that no indemnification shall be provided for any losses, liabilities or expenses arising from or out of any alleged violation of federal or state securities laws unless (1) there has been a successful adjudication on the merits of each count involving alleged securities law violations as to the particular indemnitee and the court approves indemnification of litigation costs; (2) such claims have been dismissed with prejudice on the merits by a court of competent jurisdiction as to the particular indemnitee and the court approves indemnification of litigation costs; or (3) a court of competent jurisdiction approves a settlement of the claims against a particular indemnitee and finds that indemnification of the settlement and related costs should be made  In any claim for indemnification in connection with a settlement which was so approved, the party seeking indemnification shall place before the court the position of the Securities and Exchange Commission and the relevant State Securities Commission and any state securities administrator whose rules or published policies require such disclosure with respect to the issue of indemnification for securities law violations.

The Partnership shall not incur the cost of that portion of any insurance which insures any party against any liability as to which such party is herein prohibited from being indemnified.

### Section 7 7   Liability of General Partners to Limited Partners

A     No General Partner or Designated Affiliate (as defined in Section 7 7B) shall be liable, responsible or accountable for damages or otherwise to the Partnership or to any Limited Partner for any loss suffered by the Partnership which arises out of any action or inaction of such General Partner or Designated Affiliate if that General Partner or Designated Affiliate, in good faith, believed that such course of conduct was in the best interests of the Partnership and such course of conduct did not constitute willful misconduct, reckless disregard for the Partnership's welfare or gross dereliction of duty on the part of that General Partner or Designated Affiliate

B     As used in Sections 7.6 and 7 7, a "Designated Affiliate" is any Person performing services on behalf of the Partnership who: (1) directly or indirectly controls, is controlled by, or is under common control with any General Partner, (2) owns or controls 10% or more of the outstanding voting securities of any General Partner, (3) is an officer, director, partner or trustee of any General Partner, or (4) if any General Partner is an officer, director, partner or trustee, of any company for which the General Partner acts in any such capacity

### Section 7 8   Reserves

A     The General Partner shall establish all reserves required by any of the Project Documents and maintain them in accordance with the terms thereof

49

B.      Additionally, the General Partner shall establish an initial operating reserve account (at a date no later than that of the Second Installment as set forth in Section 5.1A) in the amount of $90,000, to provide for operating deficits. In the event that the General Partner must fund any amount of this reserve, the amount funded by the General Partner is to be treated as a "Subordinated Loan", except that any maximum annual repayment amount may not exceed 25% of the initial amount funded with the Subordinate Loan and repayment will not begin until after tax returns and audits for one full year of operations are completed. The initial amount must be maintained annually with the minimum balance to be funded by operations cash flow or additional "Subordinated Loans" if necessary.  If the Permanent Lender requires additional operating and/or debt service reserves, the required Operating Reserve Account may be used to fund all or part of lenders requirements only upon the Investment Limited Partner's reasonable approval.  The required amount of Operating Reserves will be reduced by one-half (50%) of the initial reserve amount upon three (3) consecutive calendar years of the Property operating at a 1.15 debt coverage ratio.  The released amount will be applied towards Cash Flow.  Upon the Property obtaining an average of 1.15 debt coverage ratio for one (1) additional year thereafter, the balance of Operating Reserves may be released towards Cash Flow and an Operating Reserve shall no longer be required.

C.      Additionally, the General Partners shall establish a reserve account for capital replacements, which account shall be funded by annual deposits of $200 per apartment, and which shall be funded on a monthly basis beginning at the time of the Second Installment as set forth in Section 5.1A increasing to $250 per apartment unit in year six and to $300 per apartment unit in year eleven, or as otherwise required by the Permanent Lender.  Withdrawals from such reserve shall be utilized solely to fund capital repairs and improvements, or scheduled maintenance or turnover costs, deemed necessary by the Co-Managing General Partners and, except in the case of withdrawals of $5,000 or less, may be made only with the Consent of the Investor Limited Partner, which such Consent or ratification shall not unreasonably be withheld. All withdrawals must be disclosed in writing to the Investor Limited Partner within fourteen (14) days thereof.  Such withdrawals may be expensed or capitalized as determined by the General Partners in consultation with the Investor Limited Partner.

D.      In addition, the General Partners shall establish a lease-up reserve (the "Lease-Up Reserve") in the amount of $135,000, which shall be funded at a date no later than that of the First Installment.  The Lease-Up Reserve may be used for operating deficits during the lease-up period and any remaining amount may be released to Cash Flow upon the Property obtaining three (3) consecutive months of 1.15 debt coverage ratio.

Section 7.9     Obligation To Provide for Project Expenses

A.      The General Partners agree that if the Partnership requires funds beyond that available from Cash Flow or any amounts released from reserves under Section 7.8, to (i) discharge Project Expenses (other than to make payments to Partners, debt service on the City of San Jose Loan, payments of any outstanding Subordinated Loans or other obligations herein provided to be payable solely out of Cash Flow or distributions of Capital Proceeds) during or in respect of the period commencing on the Admission Date or to comply with Tax Credit rules or regulations, (ii) pay the Asset Management Fee or (iii) assure maintenance by the Partnership of Surplus Cash of at least $1.00 at all times during such period (other than for the payment of

items prohibited in (i) above), the General Partners shall furnish to the Partnership the funds required (items (i) through (iii) above are collectively referred to as the "Expense Obligations"). The General Partners shall not be obligated to fund operating deficits in excess of an aggregate amount equal to $250,000 in three (3) years of operations immediately following the Second Installment of Capital Contributions of the Investor Limited Partner   The obligation to fund operating deficits for the next three year period after such initial three year period shall be capped at an aggregate maximum amount of $120,000   For each consecutive three year period thereafter, the maximum aggregate operating deficit obligation shall be reduced by $40,000 per subsequent three year period   Amounts so furnished shall constitute Subordinated Loans   Any such Subordinated Loan shall not be interest-bearing and shall be repayable only as provided in Article VI   Failure to timely pay any Expense Obligations, at any time, shall be ground for removal of the General Partners from the Partnership   However, if the removal is initiated against General Partners after the termination of the funding periods stated above (the "Release Date") for failure to timely pay any Expense Obligations, the General Partners shall not be liable for any accrued but unpaid Expense Obligations initially arising after the Release Date, such subsequent amount to be forgiven upon the uncontested removal of the General Partner from the Partnership.

Section 7.10   Certain Payments to the General Partners and Affiliates

A       For its services in connection with the development of the Property and the supervision to completion of the construction of the Improvements and as reimbursement for Development Advances, the Developer shall be entitled to receive the amounts set forth in the Development Agreement

B       All of the Partnership's expenses shall be billed directly to, and paid by, the Partnership to the extent practicable   Subject to the terms of this Agreement, reimbursements to a General Partner or any of its Affiliates by the Partnership shall be made subject to the following conditions:

(i)       such goods or services must be necessary for the prudent formation, development, organization or operation of the Partnership;

(ii)      reimbursement for goods or services provided by Persons who are not affiliated with a General Partner shall not exceed the cost to a General Partner or its Affiliates of obtaining such goods or services; and

(iii)     reimbursement for goods and services obtained directly from a General Partner or its Affiliates shall not exceed the amount the Partnership would be required to pay independent parties for comparable goods and services in the same geographic location.

C       The Partnership shall pay to the Investment Partner Manager a cumulative Asset Management Fee in an amount equal to $10,000 (as adjusted annually by the C P I) commencing January 1, 2004   The Asset Management Fee shall be payable from Cash Flow or Capital Proceeds as provided in Section 6 2

D       The Partnership shall pay to Affordable Housing Access, Inc. a cumulative Partnership Management Fee in an amount equal to $14,000, adjusted annually for actual rent increases, from Cash Flow or Capital Proceeds as provided in Section 6.2

E       The Partnership shall pay:

(i)       A non-cumulative annual Supervisory and Incentive Management Fee to the General Partners from "Distributions of Cash Flow" in an amount equal to 6.5% of the total Gross Revenues of the Partnership. The Supervisory and Incentive Management Fee shall be payable solely from Cash Flow as provided in Section 6.2A.

(ii)      An Operating Deficit Management Fee to the General Partners from Distributions of Cash Flow and Distributions of Capital Proceeds in an amount equal to 25% of the total Gross Revenues of the Partnership, as provided in Sections 6.2A and 6.2B

F       Neither the General Partners nor any of their Affiliates shall be entitled to any other compensation, fees or profits from the Partnership in connection with the acquisition, construction, development or rent-up of the Land or Improvements or for the administration of the P artnership's b usiness o r o therwise, except f or ( i) payments p rovided f or o r referred t o i n Sections 2.4(v) o r 7 .10, (ii) payments o f the M anagement Fee r eferred t o i n A rticle XI o r t he Supervisory and Incentive Management Fee and Development Fee set forth in the Development Agreement, (iii) fees and distributions under Article VI and (iv) such other fees and distributions as otherwise stated herein, or as negotiated with the Limited Partner or as may be permitted to be paid by the Lenders or the Agency out of the proceeds of any Mortgage Loan.

Section 7.11   [INTENTIONALLY OMITTED]

Section 7.12   Grant of Security Interest

In order to secure the performance by the General Partners and the Developer of their obligations t o t he Investor Limited P artner u nder t his A greement a nd a ll o ther a greements o r instruments delivered concurrently herewith, the General Partners and the Developer hereby collaterally assign to the Investor Limited Partner all amounts otherwise payable to the General Partners and the Developer under this Agreement and the Development Agreement (as fees, distributions or otherwise), which assignment shall be deemed a grant of a security interest. The General Partners and the Developer hereby represent and warrant to the Investor Limited Partner that the security interest granted hereunder is and shall remain a perfected first security interest in the collateral herein described subject and subordinate, if applicable, to the Bond Documents, the Construction Loan and the Permanent Mortgage Loan. At the request of the Investor Limited Partner, the General Partners and the Developer shall execute such documents and take such other actions as may be necessary or appropriate in the discretion of the Investor Limited Partner to further evidence and perfect the security interest granted hereby.

Notwithstanding any of the foregoing, unless and until there occurs an event of default of a material obligation of the General Partners, or Developer hereunder which remains uncured after expiration o f t he a pplicable c ure p eriod, t he Investor Limited P artner a grees t o f orebear exercising its right to Developer Fees payable to Developer or the General Partners, and the

Developer or the General Partners shall have the right to receive all Developer Fees and retain and enjoy the same not otherwise needed to complete the development of the project.

### Section 7.13   Tax Matters Partner

A.   The Tax Matters Partner ("TMP") for the Partnership shall be the Administrative General Partner serving in such capacity from time to time.

B   The TMP shall have the right to resign as the TMP by giving thirty (30) days written notice to each Partner, provided there is another General Partner willing to serve in such capacity  Upon the resignation, death, legal incompetency or Event of Bankruptcy of the Person serving as the TMP, any successor to the interest of the TMP pursuant to the applicable provisions of this Section 7.9 shall be designated as the successor TMP, but such designee shall not become the TMP until the designation of such Person has been approved by the Consent of the Investor Limited Partner, which consent shall not be unreasonably withheld or delayed.

C   The TMP shall employ experienced tax counsel to represent the Partnership in connection with any audit or investigation of the Partnership by the Service, and in connection with all subsequent administrative and judicial proceedings arising out of such audit  The fees and expenses of such counsel shall be a Partnership expense and shall be paid by the Partnership  Such counsel shall be responsible for representing the Partnership; it shall be the responsibility of the General Partners and of the Investor Limited Partner, at their expense, to employ tax counsel to represent their respective separate interests.

D.   The TMP shall keep the Partners informed of all administrative and judicial proceedings, as required by Section 6623(g) of the Code, and shall furnish to each Partner who so requests in writing, a copy of each notice or other communication received by the TMP from the Service (except such notices or communications as are sent directly to such requesting Partner by the Service).  All third party costs and expenses incurred by the TMP in serving as the TMP shall be Partnership expenses and shall be paid by the Partnership.

E.   The TMP shall not have the authority, unless such action has been approved by the Consent of the Investor Limited Partner, to do all or any of the following:

(i)   To enter into a settlement agreement with the Service which purports to bind partners other than the TMP,

(ii)   To file a petition as contemplated in Section 6226(a) or 6228 of the Code,

(iii)   To intervene in any action as contemplated in Section 6226(b) of the Code,

(iv)   To file any request contemplated in Section 6227(b) of the Code, or,

(v)   To enter into an agreement extending the period of limitations as contemplated in Section 6229(b)(1)(B) of the Code

F.     The relationship of the TMP to the Investor Limited Partner is that of a fiduciary, and the TMP has a fiduciary obligation to perform its duties in such manner as will serve the best interests of the Partnership and the Investor Limited Partner.

G.     The Partnership shall indemnify the TMP (including the officers and directors of a corporate TMP) from and against judgments, fines, amounts paid in settlement, and expenses (including attorneys' fees) reasonably incurred by them in any civil, criminal or investigative proceeding in which they are involved or threatened to be involved by reason of being the TMP, provided that the TMP acted in good faith, within what is reasonably believed to be the scope of its authority and for a purpose which it reasonably believed to be in the best interests of the Partnership or the Partners. The TMP shall not be indemnified under this provision against any liability to the Partnership or its Partners to any greater extent than the indemnification allowed by Section 7.6 of this Agreement. The indemnification provided hereunder shall not be deemed to be exclusive of any other rights to which those indemnified may be entitled under any applicable statute, agreement, vote of the Partners, or otherwise.

Section 7.14    Special Limited Partner

Unless the General Partners are lawfully and validly removed in accordance with the provisions of Section 4.5, the Special Limited Partner shall have no right or authority to act in any capacity on behalf of the Partnership or to represent or bind the Partnership in any capacity or in any manner.    A Co-Managing General Partner shall become unable to serve as Co-Managing General Partners or if there is a Change in Control of the Co-Managing General Partners, Protech, or a non-profit entity designated by Protech, shall be admitted to the Partnership as a General Partner and designated as the Co-Managing General Partners subject to the consent of the Investment Partner Manager. If the Administrative General Partner  shall become unable to serve as Administrative General Partner or if there is a Change in Control of the Administrative General Partner, Protech shall be admitted as the Administrative General Partner subject to the consent of the Investment Partner Manager.

<div align="center">

ARTICLE VIII
Withdrawal of a General Partner; New General Partners

</div>

Section 8.1    Voluntary Withdrawal

A.     No General Partner shall have the right to withdraw or retire voluntarily from the Partnership or sell, assign or encumber his or its Interest without the Consent of the Investor Limited Partner and, if required, any Requisite Approvals, provided, that subject to any necessary consent by the Authority and the Lenders, CHBA may withdraw prior to the Completion Date, in which event AHAI shall be the Sole Managing General Partner.

B.     Notwithstanding the foregoing, a General Partner may at any time propose to the Investor Limited Partner a Person to serve as his or its successor, or if at such time there be more than one General Partner, to serve as a successor to one or more of the General Partners desiring to withdraw. If the Consent of the Investor Limited Partner is obtained, and all Requisite Approvals are obtained to such withdrawal and the admission of such successor, all Partners

hereby agree that this Agreement and the Certificate shall be appropriately amended to effect such withdrawal and admission

Section 8.2    Right To Continue

In the event of the occurrence of a Terminating Event with respect to any General Partner, the remaining General Partners, if any, and any successor General Partner, shall have the right to elect to continue the business of the Partnership employing its assets and name, all as contemplated by the laws of the State   Within ten (10) days after the occurrence of such Terminating Event, the remaining General Partners, if any, shall notify the Investor Limited Partner thereof and of their decision whether or not to continue the business of the Partnership

Section 8.3    Successor General Partner

A     Upon the occurrence of any Terminating Event referred to in Section 8.2, the remaining General Partners may (but are not required to) designate a Person to become a successor General Partner to the General Partner as to whom such event shall have occurred Any Person so designated, subject to the Consent of the Investor Limited Partner (and, if required by the Act or any other applicable law, the consent of any other Partner so required), shall become a successor General Partner upon its written agreement to be bound by the Project Documents and by the provisions of this Agreement

B     If any Terminating Event referred to in Section 8.2 shall occur at a time when there is no remaining General Partner and no successor becomes a successor General Partner pursuant to the preceding provisions of this Section 8.3 or if the remaining General Partners do not elect to continue the business of the Partnership (in which case such Partners shall also be considered "Retired General Partners" for purposes of this Article VIII), then the Investor Limited Partner shall have the right to designate a Person to become a successor General Partner upon his or its written agreement to be bound by the Project Documents and by the provisions of this Agreement

C.     If the Investor Limited Partner elects to reconstitute the Partnership pursuant to this Section 8.3 and admit a successor General Partner pursuant to this Section 8.3, the relationship of the parties in the reconstituted Partnership shall be governed by this Agreement

Section 8.4    Interest of Predecessor General Partner

A     Except as provided in Section 8.3, no assignee or transferee of all or any part of the Partnership Interest of a General Partner shall have any automatic right to become a General Partner   Upon the designation of a successor General Partner (if any) pursuant to Section 8.3, such Partner shall have the option to acquire the predecessor General Partner's Partnership Interest by paying to such General Partner or its representatives the fair market value of such Partnership Interest (provided that if the predecessor General Partner is in violation of any of the covenants or undertakings contained in this Agreement, or has violated any representation or warranty contained herein, the designated successor General Partner may pay such amount into escrow until such violation has been corrected)  Any dispute as to such fair market value or as to the final disposition of such amount shall be settled by Arbitration

B      If no successor General Partner is designated or if the designated successor General Partner of the predecessor General Partner does not desire to purchase the Partnership Interest of the predecessor General Partner, such Partnership Interest of the predecessor General Partner shall be deemed to be that of a Special Class Limited Partner and the holder thereof shall be entitled only to such rights as the assignee of a Limited Partnership Interest may have as such under the provisions of Section 9 4 hereof, the Uniform Act and other applicable laws of the State.

C      Upon the occurrence of a Terminating Event as to any General Partner (other than the initial withdrawal of CHBA prior to the Completion Date), such General Partner (the "Retired General Partner") shall be deemed to have automatically transferred to the remaining General Partners, in proportion to their respective General Partnership interests, or, if there shall be no remaining General Partners, then to the Partnership for the benefit of the remaining Partners, all or such portion of the General Partnership Interest of such Retired General Partner which, when aggregated with the existing General Partnership Interests of all such remaining General Partners, if any, will be sufficient to assure such remaining General Partners and any successor General Partner a .0045% interest in all Profits, Losses, Tax Credits and distributions of the Partnership under Article VI hereof. No documentation shall be necessary to effectuate such transfer, which shall be automatic   That portion of the General Partnership Interest of the Retired General Partner which shall not have been transferred pursuant to this Section 8 4C shall be retained by such Retired General Partner (or pass to legal representatives of a deceased General Partner) who or which shall have the status of a Special Limited Partner, with no right to receive a share of the Profits, Losses, Tax Credits, and distributions of the Partnership to which the Retired General Partner as such, would have been entitled had such Terminating Event not occurred, and such Retired General Partner (or his legal representatives in the case of a deceased General Partner) shall not be considered to be a Limited Partner for the purpose of sharing the benefits allocated to the Limited Partners under Article VI hereof and shall not participate in the votes or consents of the Limited Partners hereunder  No consideration shall be paid to such Retired General Partner by the remaining General Partners or the Partnership in the event of a Transfer pursuant to this Section 8 4C

D      For the purposes of Article VI hereof, the effective date of the transfer pursuant to the provisions of Section 8.4C of the General Partnership Interest of a Retired General Partner shall be deemed to be the date on which such Terminating Event occurs

E.      Anything herein contained to the contrary notwithstanding, any General Partner who withdraws voluntarily in violation of Section 8.1 or is removed shall remain liable for all of its obligations under this Agreement, for its obligations under the Related Agreements and the Project Documents, for all its other obligations and liabilities hereunder incurred or accrued prior to the date of its withdrawal and for any loss or damage which the Partnership or any of its Partners may incur as a result of such withdrawal, except for any loss or damage attributable to the activities of the remaining and/or successor General Partners subsequent to such withdrawal or removal  Notwithstanding anything herein to the contrary, the Co-Managing General Partner's liability on withdrawal or removal is limited to the loss of its Partnership interest.

F      The estate (which term, for purposes of this Section 8 4F, shall include the heirs, distributees, estate, executors, administrators, guardian, committee, trustee or other personal

representative) of a General Partner who is a natural person as to whom a Terminating Event has occurred shall be and remain liable for all his liabilities and obligations hereunder, except as provided in this Section 8.4F   In the event of the death, insanity or incompetency of a General Partner who is a natural person, his estate shall remain liable for all his obligations and liabilities hereunder incurred or accrued prior to the date of such event, and for any damages arising out of any breach of this Agreement by him, but his estate shall not have any obligation or liability on account of the business of the Partnership or the activities of the other General Partners after his death, insanity or incompetency unless it elects to become a General Partner pursuant to Section 8.3A

Section 8.5     Designation of New General Partners

A     A General Partner may, with the written consent of all Partners, at any time designate one or more new General Partners with such General Partnership Interest(s) as the General Partner may specify

B     Any new General Partner shall, as a condition of receiving any interest in Partnership Property, agree to comply with the terms of the Project Documents and by the provisions of this Agreement to the same extent and on the same terms as any other General Partner

Section 8.6     Amendment of Certificate; Approval of Certain Events

A     Upon the admission of a new General Partner, pursuant to the preceding provisions of this Article VIII, the Schedule shall be amended to reflect such admission and an amendment to the Certificate, also reflecting such admission, shall be filed in the manner and to the extent required by the Uniform Act

B     Each Partner hereby consents to and authorizes any admission or substitution of a General Partner or any other transaction, including, without limitation, the continuation of the Partnership business, which has been authorized by the requisite percentage of Partners under the provisions of this Agreement, subject to the provisions of Section 8.7, and hereby ratifies and confirms each amendment of this Agreement and/or the Certificate necessary or appropriate to give effect to any such transaction

Section 8.7     Admission of a General Partner

Notwithstanding any other provisions of this Agreement, no Person shall be admitted as an additional or successor General Partner without the written approval of all Partners and, unless prior to consummation of such transaction, the Limited Partners shall have received an opinion of Special Counsel to the effect that the consummation of such transaction will not cause (i) the Partnership to be treated as an "association" for federal income tax purposes, or (ii) the Limited Partners to be deemed to be taking part in the control of the business of the Partnership within the meaning of the Uniform Act

## ARTICLE IX

### Transfer of Limited Partner Interests; Additional Limited Partners

Section 9.1    Right To Assign

The Investor Limited Partner may not make a voluntary assignment of the whole or any portion of its Partnership Interest without the written consent of the General Partners, which said consent may be withheld with respect to any assignment by the Investor Limited Partner in the reasonable discretion of the General Partners. Consent to assignments of the Investor Limited Partner Interest shall be withheld to the extent necessary to preserve the Partnership's tax status and attributes and to comply with securities laws. Notwithstanding the foregoing, in no event shall any assignee of a Limited Partner have any right to become a Substitute Limited Partner without compliance with all applicable provisions of this Article IX.

Section 9.2    Restrictions

A.    No sale or exchange of the Interest of any Person as a Limited Partner shall be made if such sale or exchange would violate the Regulations, except a sale pursuant to the Purchase Agreement.

B.    In no event shall all or any part of a Limited Partner's Interest be assigned or transferred to a minor or to an incompetent.

C.    The General Partners may require as a condition of any assignment of any Interest that the assignor assume all costs incurred by the Partnership in connection therewith.

D.    Any assignment in contravention of any of the provisions of Section 9.1 or this Section 9.2 shall be void and ineffectual and shall not bind, or be recognized by, the Partnership.

Section 9.3    Substitute Limited Partners

A    No Limited Partner shall have the right to substitute an assignee as a Limited Partner in his place. The General Partners, however, shall in their reasonable discretion permit any such assignee to become a Substitute Limited Partner and any such permission by the General Partners shall be binding and conclusive without the consent or approval of any other Person, except, if required, any Requisite Approvals. Any Substitute Limited Partner shall, as a condition of receiving any interest in the Partnership assets, agree to be bound (to the same extent as his assignor was bound) by the Project Documents and by the provisions of this Agreement.

B    Upon the admission of a Substitute Limited Partner, the Schedule shall be amended to reflect the name and address of such Substitute Limited Partner and to eliminate the name and address of his assignor and, if necessary, an amendment to the Certificate reflecting such admission shall be filed in accordance with the Uniform Act at least once each calendar quarter during which a Substitute Limited Partner is admitted, in order to effect the substitution thereof. Each Substitute Limited Partner shall execute such instrument or instruments as shall be

required by the General Partners to signify its agreement to be bound by all the provisions of this Agreement.

Section 9.4     Assignees

A.     In the event of the death or incapacity or dissolution of any Limited Partner, his or its legal representatives shall have such rights as are afforded them by the Uniform Act. The death or dissolution of a Limited Partner shall not dissolve the Partnership.

B.     An assignee of a Limited Partner who does not become a Substitute Limited Partner in accordance with Section 9.3 shall, if such assignment is in compliance with the terms of this Agreement, have the right to receive the same share of profits, losses and distributions of the Partnership to which the assigning Limited Partner would have been entitled if no such assignment had been made by such Limited Partner.

C.     Any Limited Partner who shall assign all its Interest shall cease to be a Limited Partner of the Partnership, and shall no longer have any rights or privileges or obligations of a Limited Partner except that, unless and until the assignee of such Limited Partner is admitted to the Partnership as a Substitute Limited Partner in accordance with Section 9.3, said assigning Limited Partner shall retain the statutory rights and be subject to the statutory obligations of an assignor limited partner under the Uniform Act as well as the obligation to make the Capital Contributions attributable to the Interest in question, if any portion thereof remains unpaid.

D.     In the event of any assignment of a Limited Partner's Interest as a Limited Partner, there shall be filed with the Partnership a duly executed and acknowledged counterpart of the instrument making such assignment; such instrument must evidence the written acceptance of the assignee to all the terms and provisions of this Agreement; and if such an instrument is not so filed, the Partnership need not recognize any such assignment for any purpose.

E.     In the case of any assignment of a Limited Partner's Interest as a Limited Partner, where the assignee does not become a Substitute Limited Partner, the Partnership shall recognize the assignment not later than the last day of the calendar month following receipt of notice of assignment and required documentation.

F.     An assignee of a Limited Partner's Interest as a Limited Partner who does not become a Substitute Limited Partner as provided in Section 9.3 and who desires to make a further assignment of his Interest shall be subject to the provisions of this Article IX to the same extent and in the same manner as any Limited Partner desiring to make an assignment of its Interest.

G.     Notwithstanding any other provisions in this Partnership Agreement, Administrative General Partner may, with the consent of the Investor Limited Partner (such consent not to be unreasonably withheld) remove the Co-Managing General Partners for any of the following reasons upon prior written notice to the Co-Managing General Partners of the Administrative General Partner's election to remove the Co-Managing General Partners pursuant to this section and a reasonable opportunity to cure (not to exceed thirty days):

(1)     for any intentional misconduct or failure to exercise reasonable care by the Co-Managing General Partners with respect to any material matter in the discharge of its duties and obligations as Co-Managing General Partners (provided that such violation results in, or is likely to result in, a material detriment to or an impairment of the Property or assets of the Partnership):

(2)     the Co-Managing General Partners shall have violated any material provisions of any agreements binding on or applicable to the Property or the Partnership or any applicable laws;

(3)     the Co-Managing General Partners shall have conducted its own affairs or the affairs of the Partnership in such manner as would be likely, in the opinion of counsel to the Partnership to: (a) cause the termination of the Partnership for federal income tax purposes; or (b) cause the Partnership to be treated for federal income tax purposes as an association, taxable as a corporation; or (c) an Event of Insolvency has occurred with respect to such Co-Managing General Partners;

(4)     the Co-Managing General Partners has ceased to qualify as an eligible nonprofit corporation under Section 214(g) of the California Revenue and Taxation Code or the Internal Revenue Service has determined that Co-Managing General Partners is no longer exempt from federal income taxation under Sections 501(c)(3) or 501(c)(4) of the Code and the loss of the real estate tax exemption creates an Operating Deficit;

A copy of any such notice delivered to the Co-Managing General Partners shall be delivered concurrently to the Limited Partner. Upon such removal, the interest of the Co-Managing General Partners shall be purchased by the Partnership, or, at the election of the Administrative General Partner, be purchased by the Administrative General Partner or its designee. The purchase price of the Co-Managing General Partner's interest shall be its Capital Account balance at such time. Upon the purchase of its interest pursuant to this section, and without further action, the Co-Managing General Partners shall cease to have any rights or obligations under this Partnership Agreement.

Section 9 5    Additional Limited Partners

A     The General Partners may admit additional Limited Partners only with the Consent of the Investor Limited Partner

B     Any incoming Limited Partner shall, by his or its execution of this Agreement and as a condition to receiving any interest in the Partnership property, agree to be bound by the Project Documents to the same extent and in the same terms as the other Limited Partners

C     Upon the admission of any additional Limited Partners, an amendment to this Agreement and, if necessary or appropriate, the Certificate reflecting such admission shall be filed with each appropriate governmental authority  Such amendment shall amend the Schedule to reflect the names, addresses and Capital Contributions of such additional Limited Partners, and shall set forth the agreement of such additional Limited Partners to be bound by all the provisions of this Agreement

## ARTICLE X

### Loans

A.      All Partnership borrowings shall be subject to the restrictions of Section 7 1, this Article, the Project Documents and the Regulations   To the extent borrowings are permitted, they may be made from any source, including Partners and Affiliates   The Partnership may issue instruments evidencing Subordinated Loans pursuant to Section 7 9

B      If any Partner shall lend any monies to the Partnership, such loan shall be unsecured and the amount of any such loan shall not be an increase of its Capital Contribution  Until such time as the General Partners and the Developer shall have performed fully their obligations to furnish funds pursuant to Section 7 9 hereof and pursuant to the Development Agreement, any l oan from a G eneral P artner o r an A ffiliate o f a G eneral P artner s hall b e a n obligation of the Partnership to the Partner or Affiliate only if it constitutes a borrowing permitted by Section 7.9 or pursuant to the Development Agreement and shall be repayable as therein provided   Subject to the preceding, any loans to the Partnership by a General Partner or an Affiliate of a General Partner may be made on such terms and conditions as may be agreed on by the Partnership, consistent with good business practices

## ARTICLE XI

### Management Agent

A.      Subject to the consent of the Investment Partner Manager, the General Partners shall have responsibility for obtaining a Management Agent acceptable to each Lender and Agency to manage the Project in accordance with the requirements of each Lender and Agency  The General Partners shall cause the Partnership to enter into the Management Agreement with the Management Agent, which may be an Affiliate of a General Partner   Subject to the Regulations, the Management Agent shall be entitled to receive a r easonable and c ompetitive Management Fee (determined by reference to arm's-length property management arrangements for comparable properties in force in the general locality of the Project) not to exceed the lesser of 5% of net rental income or the maximum amount permitted by each Agency or Lender

B      If at any time after the Completion Date:

(i)      The Project shall be subject to a substantial building code violation or violations which shall not have been cured within 90 days after notice from the applicable governmental agency or department or unless such violation(s) is (are) being validly contested by the General Partner by proceedings which operate to prevent any fines or criminal penalties from being levied against the Partnership or unless in the case of any such violation not susceptible of cure within such 90-day period, the General Partners is diligently making reasonable efforts to cure the same,

(ii)      Operating revenues of the Project in respect of any period of 24 consecutive calendar months after the Completion Date shall be insufficient to permit the

Partnership to pay when due on a current basis all Partnership obligations in respect of such 24-month period,

(iii)     The representation and warranty set forth in Section 7.5A(xi) cannot be accurately made or a Recapture Event shall have occurred,

(iv)     The Management Agent or its agents or employees have demonstrated incompetence or malfeasance in the management of the Project,

(v)     The Management Agent shall fail to provide the required information to the General Partners in a timely manner to permit the General Partners to make all reports required by Article XII when due,

(vi)     An Event of Bankruptcy shall occur with respect to the Management Agent,

(vii)     The Management Agent shall take any action or omit to take any action which violates in any material respect the terms of the Project Documents or any local, state or federal law applicable to the Project, or

(viii)     The Management Agent is an Affiliate of a General Partner and the General Partner is removed as such under the terms of this Agreement

then, in any such event, the General Partners shall forthwith give to the Partners notice of such event, and thereafter the Partnership shall, subject to any Requisite Approvals, forthwith terminate its management agreement with the Management Agent, unless the approval of the Investor Limited Partner is obtained to the retention of the Management Agent as the manager of the Property. If such approval is not so obtained, the General Partners shall immediately proceed to select a qualified Person (which, in the event the terminated Management Agent was an Affiliate of the General Partners, shall be unaffiliated with any General Partner) as the new Management Agent for the Property, which selection shall be subject to any Requisite Approvals including approval of the Investment Partner Manager; and, after such selection, no Management Fee shall be payable to any Person which is an Affiliate of a General Partner unless the management contract with any such Person shall provide for the right of the Partnership to terminate the same upon the occurrence of the circumstance described in this Article XI

## ARTICLE XII

### Books and Reporting, Accounting, Tax Elections, Etc.

Section 12 1     Books, Records and Reporting

A.     The General Partners shall keep or cause to be kept:

(i)     A complete and accurate set of books and supporting documentation of transactions with respect to the conduct of the Partnership's business  The books of the Partnership shall be kept on the accrual basis  The books and records of the Partnership (including all records required to be maintained under the Uniform Act) shall at all times

be maintained at the principal office of the Partnership. Each of the Partners and their duly authorized representatives shall have the right to examine the books of the Partnership and all other records and information concerning the operation of the Property at reasonable times.

(ii)     Prior to Final Closing, and within five (5) days of submission to the Lender, the General Partners shall cause to be distributed to the Limited Partner copies of the monthly draws of the Construction Loan along with copies of all change orders prior to each such draw, copy of the Certificate of Occupancy, if any is required to be obtained by the governmental authority having jurisdiction, copy of the Architect's Certificate of Compliance and a copy of an Insurance Binder listing the Limited Partner as an additional party to be notified as to any changes to the policy. Within fifteen (15) days of the closing thereto, the Co-Managing General Partners shall also provide to the Investor Limited Partner copies of all documents for the Permanent Mortgage Loan.

B.     The General Partners shall cause to be prepared and distributed to all persons who were Partners at any time during a fiscal year of the Partnership:

(i)     Within thirty (30) days of the Completion Date, a credit basis worksheet for each building of the Apartment Complex, in a form as specified by the Investment Partner Manager.

(ii)     By March 15 of each calendar year, and with respect to the previous fiscal year of the Partnership an audited financial statement that includes (A) a balance sheet as of the end of such fiscal year and statements of income, Partners' equity, and changes in financial position and a Cash Flow statement, for the year then ended, all of which, shall be prepared in accordance with generally accepted accounting principles and accompanied by an auditor's report containing an opinion of the Accountants (however, no audit shall be necessary if there is less than one quarter in which the Project has occupancy for such year), and (B) a report of the activities of the Partnership during the period covered by the report. Such report shall set forth distributions to Limited Partners for the period covered thereby and shall separately identify distributions from: (1) Cash Flow from operations during the periods, (2) Cash Flow from operations during a prior period which had been held as reserves, (3) proceeds from disposition of the Apartment Complex or any other investments of the Partnership, (4) lease payments on net leases with builders and sellers, (5) costs reimbursed to any General Partner and its Affiliates verified by an accountant's review of time records and the specific nature of the work, (6) reserves, (7) borrowed monies, loans and additional contributions and (8) transactions outside of the ordinary course of business with a description thereof.

(iii)     By February 15 of each calendar year, and with respect to the previous fiscal year of the Partnership, (A) all information necessary for the preparation of the Limited Partners' federal income tax returns, (B) a qualifying occupancy summary in a format acceptable to the Investment Partner Manager.

(iv)     Within fifteen (15) days of the end of each month for the first year and each quarter thereafter, low income housing credit monitoring form, rent rolls, statement

of income and expenses, operating statement and occupancy/rental report, all in the form specified or approved by the Investment Partner Manager. Copies of the bank statements for all Reserve and Escrow accounts are also to be provided at these times.

(v)     Within thirty (30) days after the end of each quarter of each fiscal year of the Partnership, a report containing:

(1)     A balance sheet, which may be unaudited;

(2)     A statement of income for the quarter then ended, which may be unaudited;

(3)     A statement of cash flows, which may be unaudited;

(4)     The certification by the General Partners that the Apartment Complex and all tenants thereof are in compliance with all requirements and regulations applicable to Federal Housing Tax Credits. This certification shall be made on a monthly basis for the first twelve (12) months and quarterly thereafter; and

(5)     Other pertinent information regarding the Partnership and its activities during the quarter covered by the report.

(vi)     By November 1 of each calendar year, an annual operating budget incorporating all replacement and capital expenditures for the upcoming fiscal year of the Partnership, in the form reasonably specified by the Investor Limited Partner.

(vii)     Immediately upon being informed thereof, written notice of any IRS, Tax Credit Agency, or local municipality audits, investigations, official inquiries, or notices relating to, or arising from, alleged non-compliance or alleged violations of law, regulations, rules or codes.

(viii)     As soon as practicable, copies of all correspondence between the General Partners, and/or Management Company, and either the Agency or the Service, with regard to this Project.

C.     Within sixty (60) days after the end of each fiscal year of the Partnership the General Partners shall cause to be provided to the Investment Partner :

(i)     A statement by the General Partners, to the best of their knowledge, that (A) all Construction Loan and/or Mortgage Loan payments and taxes and insurance payments with respect to the Apartment Complex are current as of the date thereof, or if there is any default, a description thereof, and (B) there is no building, health or fire code violation or similar violation of a governmental law, ordinance or regulation against the Apartment Complex or of which the General Partners have received notice or have actual knowledge, if there is any violation received, a description thereof;

(ii)     [Intentionally Omitted];

(iii)     A descriptive statement of all material transactions during the fiscal year between the Partnership and each General Partner and/or any Affiliate, including the nature of the transaction and the payments involved; and

(iv)     A copy of the annual report to be filed with the United States Treasury concerning the status of the Apartment Complex as low-income housing and, if required, a certificate to the Credit Agency concerning the same

D.     Upon the reasonable written request of the Investment Partner for further information with respect to any matter covered in items B or C above, the General Partners shall cause to be furnished such reasonable information within thirty (30) days of receipt of such request   The General Partners, on behalf of the Partnership, shall cause to be sent to the Investment Partner, copies of complete first year tenant files within thirty (30) days of each tenant's initial occupancy date or within thirty (30) days from the placed-in-service date in the case of an occupied unit with rehabilitated property and on each anniversary date, 20% of all tenant files randomly identified by the Investor Limited Partner.   The General Partners shall provide the Investment Partner with current photographs and/or slides of the apartment complex upon request   The General Partners shall provide the Investor Limited Partner with such other reports as may be required by federal or state agencies or by the Investor Limited Partner.

E.     The General Partners, on behalf of the Partnership, shall case to be sent to the Investment Partner , on or before July 31 in each year, a report which shall state:

(i)     The then occupancy level of the Apartment Complex;

(ii)     If there are any operating deficits or anticipated operating deficits, the manner in which such deficits will be funded; and

(iii)     Such other matters as shall be material to the operation of the Partnership, including, without limitation, any building, health governmental law, ordinance or regulation by the Apartment Complex of which the General Partners, or any of them, is (are) aware.

F     Prior to November 15 of each year, the General Partners, on behalf of the Partnership, shall cause to be sent to the Investment Partner, a current nine (9) month balance sheet, an estimate of the Investment Partner's share of the Tax Credits by each building of the Property, estimate of total Tax Credits, and estimates of Profits and Losses for tax purposes of the fiscal year in a form as specified by the Investment Partner Manager   Such estimate shall be prepared by the General Partners and the Accountants.

G     Within fifteen (15) days after the end of any calendar quarter during which:

(i)     There is a material default by the Partnership under the Project Documents or in payment of any mortgage, taxes, interest or other obligation on secured or unsecured debt,

(ii)    Any reserve (to the extent required under Section 7 8) has been reduced or terminated by application of funds therein for purposes materially different from those for which such reserves was established,

(iii)    The General Partners, or any of them, has (have) received any notice of a material fact which may substantially affect further distributions, or

(iv)    Any Partner has pledged or collateralized his or its Interest in the Partnership,

then, the General Partners shall cause to be sent the Investment Partner a detailed report of such event

H    After the Admission Date, the General Partners, on behalf of the Partnership, shall send to the Investment Partner a copy of all applicable periodic reports covering the status of project operations from the previous period, as may be required by any Lender and/or Agency, as applicable.

I    Failure to provide the reports required under Section 12 1 within the time requirements set forth therein shall result in the assessment of a $100 per day penalty due and payable to the Investor Limited Partner until the tax information and/or reports are received These penalties (the "Report Penalties") will be waived if the required information is received within three (3) business days after receipt of a written notice of demand from the Investor Limited Partner (including a notice sent by facsimile)

J    Special Report  Unless otherwise fully reported to the Investment Limited Partner pursuant to this Section 12 1, a special report must be issued within sixty (60) days after the end of each quarter for real property acquisitions  The report shall contain a description of properties acquired, the present or proposed use of such properties, lease terms, financing terms, title insurance and bonding information.

K.    Every Limited Partner shall at all times have access to the records of the Partnership and may inspect and copy any of them   A list of the names and addresses of all of the Limited Partners shall be maintained as part of the books and records of the Partnership and shall be mailed to any Limited Partner upon request  A reasonable charge for copy work may be charged by the Partnership

Section 12 2    Bank Accounts

The bank accounts of the Partnership shall be maintained in such banking institutions as the General Partners shall determine with the approval of each Lender and Agency, and withdrawals shall be made only in the regular course of Partnership business on such signature or signatures as the General Partners shall determine

Section 12 3    Elections

Subject to the provisions of Section 12 4, all elections required or permitted to be made by the Partnership under the Code shall be made by the Co-Managing General Partners in such

manner as it considers to be most advantageous to the Limited Partners. [Notwithstanding the foregoing, however, unless the Consent of the Investor Limited Partner is obtained permitting a different cost recovery schedule, the Partnership shall depreciate its personal and real property utilizing the alternative depreciation system of Section 168(g)(2) of the Code].

Section 12.4    Special Adjustments

In the event of a transfer of all or any part of the interest of any Partner or in the event an election pursuant to Section 754 of the Code (or corresponding provisions of succeeding law) is made by the Investment Partner, the Partnership shall elect, if requested by the transferee or by the Investment Partner   (as the case may be), pursuant to Section 754 of the Code (or corresponding provisions of succeeding law) to adjust the basis of Partnership assets Notwithstanding anything to the contrary contained in Article X, any adjustments made pursuant to said Section 754 shall affect only the successor in interest to the transferring Partner. Each Partner will furnish the Partnership with all information necessary to give effect to such election.

Section 12.5    Fiscal Year

The Fiscal Year of the Partnership shall be the calendar year unless some other year is required by the Code

## ARTICLE XIII

### General Provisions

Section 13.1    Notices

Except as otherwise specifically provided herein, all notices, demands or other communications hereunder shall be in writing and shall be deemed to have been given when the same are (i) deposited in the United States mail and sent by certified or registered mail, postage prepaid, (ii) deposited with Federal Express or similar overnight delivery service, (iii) transmitted by telecopier or other facsimile transmission, answerback requested, or (iv) delivered personally, in each case, to the parties at the addresses set forth below or at such other addresses as such parties may designate by notice to the Partnership:

A.    If to the Partnership, at the principal office of the Partnership set forth in Section 2.2

B.    If to a Partner, at his or its address set forth in the Schedule.

Section 13.2    Word Meanings

The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires. Any references to "Sections" or "Articles" are to Sections or Articles of this Agreement, unless reference is expressly made to a different document.

Section 13.3   Binding Provisions

The covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the heirs, legal representatives, successors and assignees of the respective parties hereto, except in each case as expressly provided to the contrary in this Agreement.

Section 13.4   Applicable Law

This Agreement shall be construed and enforced in accordance with the internal laws of the State.

Section 13.5   Counterparts

This Agreement may be executed in several counterparts and all so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties have not signed the original or the same counterpart.

Section 13.6   Paragraph Titles

Paragraph titles and any table of contents herein are for descriptive purposes only, and shall not control or alter the meaning of this Agreement as set forth in the text.

Section 13.7   Separability of Provisions; Rights and Remedies

A.   Each provision of this Agreement shall be considered separable and (i) if for any reason any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid, or (ii) if for any reason any provision or provisions herein would cause the Limited Partners to be bound by the obligations of the Partnership under the laws of the State as the same may now or hereafter exist, such provision or provisions shall be deemed void and of no effect.

B.   Each of the parties hereto irrevocably waives during the term of the Partnership (including any periods during which the business of the Partnership is continued under Article VIII) any right (i) that such party may have to maintain any action for partition with respect to the property of the Partnership, and (ii) any right to commence an action seeking dissolution of the Partnership (unless the Consent of the Investor Limited Partner has been obtained).

C.   The rights and remedies of any of the parties hereunder shall not be mutually exclusive, and the exercise of one or more of the provisions hereof shall not preclude the exercise of any other provisions hereof. Each of the parties confirms that damages at law may be an inadequate remedy for breach or threat of breach of any provisions hereof. The respective rights and obligations hereunder shall be enforceable by specific performance, injunction, or other equitable remedy, but nothing herein contained is intended to limit or affect any rights at law or by statute or otherwise of any party aggrieved as against the other parties for a breach or threat of breach of any provision hereof, it being the intention by this paragraph to make clear

that under this Agreement the respective rights and obligations of the Partners shall be enforceable in equity as well as at law or otherwise.

D       Each Partner irrevocably:

(i)      Agrees that any suit, action or other legal proceeding arising out of this Agreement, any of the Related Agreements or any of the transactions contemplated hereby or thereby shall be brought in the courts of record of Los Angeles County of the State of California or the courts of the United States located in the Southern District of California;

(ii)     Consents to the jurisdiction of each such court in any such suit, action or proceeding; and

(iii)    Waives any objection, which he or it may have to the laying of venue of any such suit, action or proceeding in any of such courts.

Section 13.8   Effective Date of Admission

Any Partner admitted to the Partnership during any calendar month shall be deemed to have been admitted as of the first day of such calendar month for all purposes of this Agreement including the allocation of Profits, Losses and Tax Credits under Article VI; provided, however, that if regulations are issued by the Service or an amendment to the Code is adopted which would require, in the opinion of the Accountants, that a Partner be deemed admitted on a date other than as of the first day of such month, then the General Partners shall select a permitted admission date which is most favorable to the Partner.

Section 13.9   Amendment Procedure

This Agreement may be amended by the written consent of each of the General Partners, and with the Consent of the Investor Limited Partner or in the manner provided in Section 4.5, subject to the following:

(i)      The term of the Partnership shall not be extended beyond December 31, 2057 without the written approval of all Partners.

(ii)     This Section 13.9 shall not be amended without the written approval of all Partners.

(iii)    This Agreement shall not be modified or amended in such a manner as to increase the amount of Capital Contributions or reduce the interest of any Partner in Profits, Losses, Tax Credits, Cash Flow or Capital Proceeds of the Partnership or otherwise increase the liability of any Partner without the written approval of each Partner affected thereby.

(iv)     Without the written approval of all Partners, no amendment hereof may reduce the percentage in interest of Partners required hereunder for the taking or omission of any action or for the consent to any action proposed to be taken or omitted.

(v)     Notwithstanding any agreement to the contrary contained in this Agreement, no amendment will be made to this Agreement which will affect the rights of any Lender or Agency under the terms of any Project Document without the prior written approval of such Lender or Agency

Section 13.10  Delivery of Certificate

Promptly upon the filing of the Certificate and each amendment thereto in the Filing Office, the General Partners shall deliver or mail a copy thereof to each Limited Partner.

Section 13.11  Requirements of the Lender and the Agency

A      For as long as any Mortgage from the Partnership held by the Lender shall be outstanding:

(i)     Each of the provisions of this Agreement shall be subject to, and the General Partners covenant to act in accordance with the Regulations and the Commitments, but in no event shall any Partner be personally liable for the performance of this covenant;

(ii)     The Regulations and the Commitments shall be binding upon and shall govern the rights and obligations of the Partners, their heirs, executors, administrators, successors and assigns, but only to the extent expressly provided therein;

(iii)     Any Partner hereafter shall, as a condition of receiving an interest in the Partnership property, agree to be bound by the Commitments and other documents required in connection with the Mortgage Loan to the same extent and on the same terms as the other parties;

(iv)     Upon any dissolution of the Partnership or any transfer of the Property, no title to or right to the possession and control of the Property, and no right to collect the rent therefrom shall pass to any Person who is not or does not become bound by the Commitments (including, without limitation, the Regulatory Agreement) in a manner satisfactory to the Lender;

(v)     No amendment of this Agreement which would affect the rights of the Lenders under any of the documents referred to in this Section 13.11 shall be made without the prior written consent of the Lender;

(vi)     Any other provisions of this Agreement to the contrary notwithstanding, if any provisions of this Agreement shall be in conflict with any provisions of the Commitments (including, without limitation, the Regulatory Agreement), the provisions of the Commitments shall control;

(vii)     No distributions (as that term is defined in the Regulatory Agreement) shall be made except as permitted by the terms of the Regulatory Agreement;

(viii)   The Partnership shall not be voluntarily dissolved without the prior written consent of the Lender; and

B.   In the event the Partnership elects to (a) pay off any loan that has been insured or coinsured and (b) refinance the Property with the proceeds of a new loan from a lender to be insured or coinsured, this provision shall remain operative unless modified at the request of said secretary or such lender.

Section 13.12   Entire Agreement

This Agreement, and the Related Agreements referred to herein sets forth all (and is intended by all parties to be an integration of all) of the representations, warranties, promises, agreements, and understandings of the parties hereto with respect to the Partnership, its Partners, its business and its properties; and there are no representations, warranties, promises, agreements or understandings, oral or written, express or implied, among them other than as set forth or incorporated by reference herein.

Section 13.13   Partition

No Partner nor any successor or assignee of any Partner has the right to partition the Project or any part thereof or interest therein, or file a complaint or institute an action or proceeding at law or in equity to partition the Project or any part thereof or interest therein. Each Partner for itself and its successor and assigns waives any such rights. The Partners intend that during the term of this Agreement, the rights of the Partners and their successors in interest, as among themselves, are governed solely by the Agreement and the Uniform Act.

Section 13.14   Arbitration

A.   General; Appointment of Arbitrators; and Discovery.

(i)   Except as otherwise specifically provided in this sub-paragraph (i), if any controversy or dispute between the parties hereto arises under, out of, or in relation to any of the provisions hereof, and this Agreement expressly provides for the arbitration of said controversy or dispute, which cannot be settled by the parties within fifteen (15) days after a party hereto gives written notice of the existence of such dispute, either party, within thirty (30) days of the expiration of the foregoing fifteen (15) day period, may submit such controversy or dispute for arbitration to, and in accordance with the Rules of Practice and Procedure for the Arbitration of Judicial Disputes of Judicial Arbitration & Mediation Services, Inc. ("J.A.M.S.") (J.A.M.S. and its agents are referred to herein as the "Arbitrators"), as then in effect, except as otherwise provided by the provisions of this Paragraph 13.14A(i).

(ii)   The provisions of this Paragraph 13.14A(ii) shall not be construed to deny any party the right to seek provisional remedies available to said party before a court of law. For the purposes of this Agreement, the parties, by submitting the controversy or dispute to the Arbitrators, do not waive or relinquish their rights to seek provisional remedies before a court of law and said parties expressly agree that each party shall have the right to seek provisional remedies before a court of law.

(iii)    If neither party elects to submit a controversy to arbitration within the aforesaid thirty (30) day period, then either party shall have the right to commence legal proceedings to resolve the controversy; provided, however, such party must first give written notice to the other party of its intent to commence litigation and the party receiving such notice shall have fifteen (15) days following the date of receipt of such notice to submit the controversy to arbitration in accordance with the foregoing provisions of this Paragraph 13.15A(iii)  If the party, after receiving such notice, does not submit the controversy to arbitration within such fifteen (15) day period, the right to arbitrate such noticed dispute shall be waived and then the party giving the notice shall have the right to commence legal proceedings to resolve the controversy without further notice or further obligation to comply with the provisions of this Paragraph 13.14A(iii) with respect to that particular controversy  For the purposes of this Agreement, the time within which any arbitration proceedings can be instituted with respect to any matter or dispute shall be deemed to have elapsed only upon the expiration of the aforesaid fifteen (15) day period following the receipt of such a notice of intent to commence legal proceedings.  If either party refuses to submit to arbitration after duly given notice of the other parties exercise of his/her right to arbitrate, the other party shall be entitled to an order from the appropriate court compelling arbitration  If either party commences legal proceedings (and the other party does not successfully compel arbitration) to resolve the controversy as specifically provided in this Paragraph 13.14A(iii), the parties hereto shall stipulate immediately upon the setting of a trial date, pursuant to California Rule of Court 244, or any successor amended statute or law containing similar provisions, that the proceeding be tried by a temporary judge.

(iv)    The provisions of California Code of Civil Procedure governing discovery in civil litigation, or any successor amended statute or law containing similar provisions, are incorporated by reference herein and shall apply in any such arbitration; specifically, the parties shall have the right to engage in all pre-hearing discovery as that which would be permitted in a civil litigation action to resolve their dispute.  The Arbitrator shall rule upon motions to compel or limit discovery and shall have the authority to impose sanctions, including attorneys' fees and costs, to the same extent as a court of law, should the Arbitrator determine that discovery was sought without substantial justification or that discovery was refused or objected to without substantial justification  The parties shall have a certified court reporter make a record of the hearing  The arbitration shall proceed in accordance with the laws relating to arbitration then in effect in the State of California, including, but not limited to Sections 1280 through 1294.2 of the California Code of Civil Procedure, as the same may be amended or superseded from time to time.

B.    Final Judgment, Findings of Fact and Conclusions.

(i)    The Arbitrator shall apply California law as though he/she was bound by applicable statutes and precedents and case law, including the admissibility of evidence and shall endeavor to decide the controversy as though he/she were a judge in a California court of law  The Arbitrator shall have the power to issue any award, judgment, decree or order of relief that a court of law or equity could issue under California law, including, but not limited to, money damages, specific performance, or injunctive relief; and for such purposes, it is hereby expressly acknowledged and agreed that damages at law will be an

inadequate remedy for a breach or threatened breach of any provision of this Agreement, it being the intention of this sentence to make clear the agreement of the parties that the respective rights and obligations of the parties hereunder shall be enforceable in any arbitration proceedings in accordance with principles of equity as well as law.

(ii)     The Arbitrator shall prepare a written decision that shall be supported by written findings of fact and conclusions which adequately set forth the basis of his/her decision and which cite the statutes and precedents applied and relied upon in reaching his/her decision  The award, judgment, decree or order, and the findings of the Arbitrator shall be final, conclusive and binding upon the parties, and judgment upon the award and enforcement of any other judgment, decree or order of relief granted by the Arbitrator may be entered or obtained in any court of competent jurisdiction upon the application of any party  This agreement to arbitrate shall be self-executing without the necessity of filing any action in any court and shall be specifically enforceable under the prevailing arbitration law.

C.     Costs and Expenses.  Except as otherwise provided in Paragraph 13 14A(iv) in the provisions related to discovery, all costs and expenses of any arbitration proceeding hereunder, excluding attorneys' fees, shall be shared equally by the parties  Each party shall bear its own attorneys' fees  Notwithstanding the foregoing, however, in the event the Arbitrator shall determine that a party acted without substantial justification in submitting to a dispute to arbitration, the party who is so determined to be acting without substantial justification shall bear all costs and expenses of the other party in the proceeding including, but not limited to, the reasonable attorneys' fees of such other party.  The parties hereto expressly agree that the provisions of California Code of Civil Procedure, including, but not limited to, Section 998 et seq , as the same may be amended or superseded from time to time, governing offers by a party to compromise shall not apply to any arbitration proceeding hereunder

Section 13 15 Requirements for Bonds.

A.     Notwithstanding any other provision of this Agreement to the contrary, so long as any Bonds shall be outstanding, the Partnership shall not, and the General Partners shall have no authority in respect of the Partnership or the Project to, perform any act or permit any act to be taken on its behalf which:

(i)     Is contrary to or would result in a breach or violation of or a default under any requirement, covenant or other obligation of the Partnership set forth in any Bond document or;

(ii)     Would adversely affect the exemption from taxation under the Code of the interest paid on the Bonds

B.     Not withstanding any other provision in the Agreement to the contrary, for so long as any Bonds shall be outstanding:

(i)     Each of the provisions of this Agreement shall be subject to, and the General Partners covenant to act in accordance with, the Bond Documents but in no event shall any Partner be personally liable for the performance of this covenant

(ii)     No amendment of this Agreement which would materially and adversely affect the rights of any party to any Bond Document (other than the Partnership) shall be made without the prior written consent of such party and without prior compliance with the conditions for amending such Bond Document;

(iii)     If any provision if this Agreement shall be in conflict with any provision of any Bond Document, such conflicting provision of this Agreement shall be suspended and the provisions of the Bond Document shall control;

(iv)     No part of the Project will be sold or otherwise disposed of or leased and no change in the use of the Project shall be made, except in accordance with the terms and conditions of the Bond Documents;

(v)     The Partnership shall not change or permit any change in its identity or ownership (except for admitting additional limited partners), undertake any other obligations, directly or indirectly, or take or permit any other actions which would impair or prevent performance of its obligations, except as permitted thereby, without obtaining the requisite approvals under the Bond Documents;

(vi)     To the extent reasonably possible, the Partners shall take all actions necessary to amend this Agreement to comply with any amendments to the Code or the Treasury Regulations effective retroactive to the date of such changes that are applicable to the exemptions of federal taxation under the Code of the interest paid on the Bonds; and

Section 13 16 <u>Special Power of Attorney</u>.

Solely for the purpose of effecting the admission of the Special Limited Partner as a General Partner, if the General Partners are validly and lawfully removed under Section 4 5 of this Agreement, the General Partners constitute and appoint the Manager of the Investor Limited Partner as their true and lawful attorney-in-fact, with full power and authority to act in its name, place and stead, to make, execute, sign, certify, acknowledge, deliver, file and record on its behalf any certificate, document or instrument, necessary or helpful, to effect the admission of the Special Limited Partner as a General Partner and as Co-Managing General Partner, if authorized in accordance with Section 7 14 herein

Section 13 17 <u>Counterparts</u>.

This Agreement may be executed in any number of counterparts, each of which for all purposes shall be deemed an original, with the same effect as if the signatures were upon the same instrument

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

NewD\Lucretia\LP 5

DEC-10-2002  18:34      PARAMOUNT FINANCIAL            17405872596    P 05/06

## LUCRETIA AVENUE PARTNERS, L.P.

### AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP SIGNATURE PAGE

IN WIINESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**CO-MANAGING GENERAL PARTNERS:**
Community Home Builders and Associates,
a California non profit public benefit corporation

By:_____
Name: Mark D. Lazzarini, its President

Affordable Housing Access, Inc , a California
non profit corporation
By:_____
     Print Name:_____
     Title:_____

**SPECIAL LIMITED PARTNER:**
PROTECH 2002-D LLC,
an Ohio limited liability company

By:    Protech Development Corp,
    its Manager

By:_____
    Michael A  Buckley
    President

**ADMINISTRATIVE GENERAL PARTNER:**
Montalvo Associates LLC
a California limited liability Company

By:_____
    James S  Morley, its Manager

**INVESTOR LIMITED PARTNER:**
AMTAX HOLDINGS 279, LLC
an Ohio limited liability company

By:    Paramount Properties, Inc, its manager

    By:_____
    Name: Michael A  Buckley
    Its:    President

**ORIGINAL (AND WITHDRAWING) LIMITED PARTNER:**
BUILDERS AFFORDABLE HOUSING DEVELOPMENT COMPANY, LLC

By:    Community Home Builders & Associates, Member Manager

    By:_____
    Mark D. Lazzarini, President

**LUCRETIA AVENUE PARTNERS, L.P.**

**AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP SIGNATURE PAGE**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**CO-MANAGING GENERAL PARTNERS:**
Community Home Builders and Associates,
a California non profit public benefit corporation

By:____________________
Name: Mark D. Lazzarini, its President

Affordable Housing Access, Inc., a California non profit corporation
By: [signature]
Print Name: William W. Hirsch
Title: President

**SPECIAL LIMITED PARTNER:**
PROTECH 2002-D LLC,
an Ohio limited liability company

By: Protech Development Corp.
its Manager
By: [signature]
Michael A. Buckley
President

**ADMINISTRATIVE GENERAL PARTNER:**
Montalvo Associates LLC
a California limited liability Company

By: [signature]
James S. Morley, its Manager

**INVESTOR LIMITED PARTNER:**
AMTAX HOLDINGS 279, LLC
an Ohio limited liability company

By: Paramount Properties, Inc., its manager
By: [signature]
Name: Michael A. Buckley
Its: President

**ORIGINAL (AND WITHDRAWING) LIMITED PARTNER:**
BUILDERS AFFORDABLE HOUSING DEVELOPMENT COMPANY, LLC

By: Community Home Builders & Associates, Member-Manager

By:____________________
Mark D. Lazzarini, President

## LUCRETIA AVENUE PARTNERS, L.P.

### SCHEDULE A

| Name and Business Address | | Original<br>Initial Capital<br>Contributions | Percentage<br>Interests |
|---|---|---|---|
| GENERAL PARTNERS: | | | |
| Community Home Builders and Associates<br>657 N. 1st Street, Suite 610<br>San Jose, CA 95112 | $ | 114[1] | 00225% |
| Affordable Housing Access, Inc.<br>4029 Westerly Place Suite 101<br>Newport Beach, CA 92660 | $ | 114[1] | 00225% |
| Montalvo Associates, LLC<br>1600 West Campbell, Suite, 201<br>San Jose, CA 95008 | $ | 228[1] | .0045% |
| SPECIAL LIMITED PARTNER<br>Protech 2002-D, LLC<br>4009 Columbus Rd., S.W<br>Granville, OH 18423 | $ | 50 | 001% |
| INVESTOR LIMITED PARTNER: | | | |
| AMTAX Holdings 279, LLC<br>4009 Columbus Rd., S W<br>Granville, OH 43023 | | $ 5,057,008[2] | 99.99% |
| TOTAL | $ | 5,057,514 | 100% |

---

[1]    In the event any deferred portion of the Developer Fee is still outstanding prior to the end of ten (10) years of the placed-in-service of the first building in the Project, the General Partners shall make an additional Capital Contribution to the Partnership in an amount equal to such outstanding amount, prior to the end of such tenth year Such additional Capital Contribution shall be used solely to pay the outstanding deferred Developer Fee Such Capital Contribution shall be returned to the General Partners out of Distributions of Cash Flow or proceeds from a Sale or Refinancing in the same priority, but prior to, the repayment of Subordinated Loans of the General Partners

[2]    $104 has been paid in as of the date of the Investment Closing; An additional $5,056,904 to be paid pursuant to Article V, subject to an adjustment and conditions to payments provided herein

## LUCRETIA AVENUE PARTNERS, L.P.

### Exhibit B
### Schedule of annual (Tax Losses)
### to the Investor Limited Partner

| | YEAR | ANNUAL TAX CREDITS | ANNUAL TAX LOSSES |
|---|---|---|---|
| 1 | 2003 | 0 | 0 |
| 2 | 2004 | 373,384 | (1,769,470) |
| 3 | 2005 | 571,801 | (752,271) |
| 4 | 2006 | 571,801 | (631,327) |
| 5 | 2007 | 571,801 | (584,335) |
| 6 | 2008 | 571,801 | (554,157) |
| 7 | 2009 | 571,801 | (595,261) |
| 8 | 2010 | 571,801 | (617,472) |
| 9 | 2011 | 571,801 | (581,249) |
| 10 | 2012 | 571,801 | (551,455) |
| 11 | 2013 | 571,801 | (531,115) |
| 12 | 2014 | 198,417 | (529,374) |
| 13 | 2015 | | (519,384) |
| 14 | 2016 | | (479,762) |
| 15 | 2017 | | (446,181) |
| 16 | 2018 | | (422,185) |

## LUCRETIA AVENUE PARTNERS, L.P.

### AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP SIGNATURE PAGE

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**CO-MANAGING GENERAL PARTNERS:**
Community Home Builders and Associates,
a California non profit public benefit corporation

By: _____
Name: Mark D. Lazzarini, its President

Affordable Housing Access, Inc., a California
non profit corporation
By: _____
    Print Name: _____
    Title: _____

**SPECIAL LIMITED PARTNER:**
PROTECH 2002-D LLC,
an Ohio limited liability company

By:   Protech Development Corp.,
    its Manager

By: _____
    Michael A. Buckley
    President

**ADMINISTRATIVE GENERAL PARTNER:**
Montalvo Associates LLC
a California limited liability Company

By: _____
    James S Morley, its Manager

**INVESTOR LIMITED PARTNER:**
AMTAX HOLDINGS 279, LLC
an Ohio limited liability company

By:   Paramount Properties, Inc. its manager

By: _____
Name: Michael A. Buckley
Its:    President

**ORIGINAL (AND WITHDRAWING) LIMITED PARTNER:**
BUILDERS AFFORDABLE HOUSING DEVELOPMENT COMPANY, LLC

By:   Community Home Builders & Associates, Member-Manager

By: _____
    Mark D. Lazzarini, President

## LUCRETIA AVENUE PARTNERS, L.P.

### AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP SIGNATURE PAGE

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written

**CO-MANAGING GENERAL PARTNERS:**
Community Home Builders and Associates,
a California non profit public benefit corporation

By:_____
Name: Mark D. Lazzarini, its President

Affordable Housing Access, Inc., a California
non profit corporation
By:_____
        Print Name:_____
        Title:_____

**SPECIAL LIMITED PARTNER:**
PROTECH 2002-D LLC,
an Ohio limited liability company

By:     Protech Development Corp.
        its Manager

        By:_____
            Michael A. Buckley
            President

**ADMINISTRATIVE GENERAL PARTNER:**
Montalvo Associates LLC
a California limited liability Company

By:_____
        James S. Morley, its Manager

**INVESTOR LIMITED PARTNER:**
AMTAX HOLDINGS 279, LLC
an Ohio limited liability company

By:     Paramount Properties, Inc. its manager

        By:_____
        Name: Michael A. Buckley
        Its:    President

**ORIGINAL (AND WITHDRAWING) LIMITED PARTNER:**
BUILDERS AFFORDABLE HOUSING DEVELOPMENT COMPANY, LLC

By:     Community Home Builders & Associates, Member-Manager

        By:_____
            Mark D. Lazzarini, President

**LUCRETIA AVENUE PARTNERS, L.P.**

**AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP SIGNATURE PAGE**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**CO-MANAGING GENERAL PARTNERS:**
Community Home Builders and Associates,
a California non profit public benefit corporation

By:________________________
Name: Mark D. Lazzarini, its President

Affordable Housing Access, Inc., a California non profit corporation
By: [signature]
Print Name: WILLIAM W HIRSCH
Title: PRESIDENT

**SPECIAL LIMITED PARTNER:**
PROTECH 2002-D LLC,
an Ohio limited liability company

By: Protech Development Corp.
its Manager

By: [signature]
Michael A. Buckley
President

**ADMINISTRATIVE GENERAL PARTNER:**
Montalvo Associates LLC
a California limited liability Company

By: [signature]
James S. Morley, its Manager

**INVESTOR LIMITED PARTNER:**
AMTAX HOLDINGS 279, LLC
an Ohio limited liability company

By: Paramount Properties, Inc. its manager

By: [signature]
Name: Michael A. Buckley
Its: President

**ORIGINAL (AND WITHDRAWING) LIMITED PARTNER:**
BUILDERS AFFORDABLE HOUSING DEVELOPMENT COMPANY, LLC

By: Community Home Builders & Associates, Member-Manager

By:________________________
Mark D. Lazzarini, President

## FIRST AMENDMENT TO AMENDED AND RESTATED AGREEMENT OF

## LIMITED PARTNERSHIP OF LUCRETIA AVENUE PARTNERS, L.P.

The Amended and Restated Agreement of Limited Partnership (the Agreement) of Lucretia Avenue Partners, L.P. (the Partnership), and any other agreements between the partners that pertain to the management of the partnership (the ancillary agreements) are hereby amended and modified effective December 11, 2002.

### RECITAL

The Partners have executed this Amendment in order to clarify and more accurately describe the various duties, responsibilities and obligations of the General Partners. The Partners acknowledge and agree that the Agreement, and any ancillary agreements, did not fully and accurately describe the duties, responsibilities and obligations of the respective General Partners.

NOW THEREFORE, the parties to the Agreement hereby amend and modify the Agreement and any ancillary agreements in the following particulars only:

1.      Management of Partnership.

(a)      Management by Co-Managing General Partners.  Notwithstanding any language to the contrary in the Agreement or prior amendments thereto or in any ancillary agreements, the Partnership shall be managed by the Co-Managing General Partners, who shall exercise full and exclusive control over the business, assets and affairs of the Partnership and shall have all rights, powers and authority conferred by law.  The Co-Managing General Partners shall manage the day-to-day operations of the Partnership and shall participate in all major management decision of the Partnership.

(b)      Additional Management Duties of the Managing General Partner.  The Co-Managing General Partners' separate and specific management duties shall include two or more of the following specified partnership management duties:  (i) execute and deliver all partnership documents on behalf of the Partnership; (ii) function as the federal and state Tax Matters Partner; (iii) monitor compliance with all government regulations and file or supervise the filing of all required documents with governmental entities; (iv) prepare and/or supervise preparation of all reports required by the lender; (v) prepare or cause to be prepared all reports to be provided to the Partners; (vi) coordinate all present and future development, construction or rehabilitation of the Project; (vii) maintain the partnership books and records; (viii) maintain the partnership bank account; (ix) prepare the annual Partnership budget; (x) obtain and maintain all required insurance coverage; (xi) establish and maintain all required reserves; (xii) enforce all contracts, including any agreements with property management firms; and (xiii) employ all persons necessary for operation of the partnership business, including the property management agent, auditors, attorneys and other professionals rendering service to the Partnership.

2.    <u>Delegation of Authority</u>.

The Co-Managing General Partners may, in the proper and reasonable exercise of their management authority, delegate certain of Co-Managing General Partners' powers, rights and obligations to persons, who may, under the Co-Managing General Partner's supervision, perform such acts or services for the Partnership as the Co-Managing General Partners may approve; provided, however, that such delegation shall not excuse the Co-Managing General Partners from overseeing and supervising on an ongoing basis the activities being delegated.

3.    <u>Miscellaneous</u>.

(a)    <u>Full Force and Effect</u>.  Except as otherwise expressly and specifically set forth in this Amendment, the Agreement and any ancillary agreements shall remain unmodified and in full force and effect.

(b)    <u>Inconsistencies</u>.  In the event of any inconsistency between the terms of this Amendment and the terms of the Agreement or any ancillary agreements, the terms of this Amendment shall control.

(c)    <u>Successors</u>.  This Amendment is binging upon and is enforceable by and against the parties hereto, their heirs, executors, administrators, successors and assigns.

(d)    <u>Amendments</u>.  This Amendment shall not be modified except in a written amendment signed by all the parties hereto.

*(Signature page follows immediately.)*

**CO-MANAGING GENERAL PARTNERS**:
Community Home Builders and Associates, a
California non profit public benefit corporation

By: _____
Name: Mark D. Lazzarini, its President

Affordable Housing Access, Inc., a California
non profit corporation

By: _____
William W. Hirsh, its President

**ADMINISTRATIVE GENERAL PARTNER**:
Montalvo Associates LLC
a California limited liability Company

By: _____
James S. Morley, its Manager

**INVESTOR LIMITED PARTNER**:
AMTAX HOLDINGS 123, LLC
an Ohio limited liability company

By: Paramount Properties, Inc., its manager

By: _____
Name: Michael A. Buckley
Its: President

**SPECIAL LIMITED PARTNER**:
PROTECH 2002-D LLC,
an Ohio limited liability company

By: Protech Development Corp.
its Manager

By: _____
Its: President

**ORIGINAL (AND WITHDRAWING) LIMITED PARTNER:**
BUILDERS AFFORDABLE HOUSING DEVELOPMENT COMPANY, LLC

By:     Community Home Builders & Associates, Member-Manager

By: _____
        Mark D. Lazzarini, President

**SECOND AMENDMENT**
TO
**AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**Lucretia Avenue Partners, L.P.**
**(a California limited partnership)**

The undersigned, COMMUNITY HOME BUILDERS AND ASSOCIATES, a Co-Managing General Partner, AFFORDABLE HOUSING ACCESS, INC., a Co-Managing General Partner, MONTALVO ASSOCIATES LLC, the Administrative General Partner, PROTECH 2002-D, LLC, as Special Limited Partner, and AMTAX HOLDINGS 279, LLC, as Investor Limited Partner being all the Partners, hereby amend the Amended and Restated Agreement of Limited Partnership of Lucretia Avenue Partners, L.P., a California limited partnership, dated as of December 9, 2002, as amended from time to time (the "Partnership Agreement"), and state as follows:

**W I T N E S S E T H**

**WHEREAS,** Lucretia Avenue Partners, L.P. (the "Partnership"), a California limited partnership, was created and evidenced by a Certificate of Limited Partnership filed with the Secretary of State of the State of California on July, 9, 2002 and by an Agreement of Limited Partnership executed shortly thereafter; and amended by an Amended and Restated Agreement of Limited Partnership among COMMUNITY HOME BUILDERS AND ASSOCIATES, as a Co-Managing General Partner ("CHBA"), AFFORDABLE HOUSING ACCESS, INC., as a Co-Managing General Partner ("Affordable"), MONTALVO ASSOCIATES LLC, as the Administrative General Partner ("Montalvo"), PROTECH 2002-D, LLC, as Special Limited Partner ("Protech"), and AMTAX HOLDINGS 279, LLC, as Investor Limited Partner ("AMTAX") (hereinafter collectively referred to as the "Partners"), dated as of December 9, 2002; and further Amended by the First Amendment to Amended and Restated Agreement of Limited Partnership December 11, 2002  (the "First Amendment");

**WHEREAS,** CHBA as a- Co-Managing General Partner is the owner of a 0.0025% ownership interest in the Partnership and is hereby assigning and conveying to Affordable, pursuant to an Assignment of Partnership Interest and Other Rights of even date herewith (the "Assignment") all of said ownership interest in the Partnership together with all right, title and interest in and to the business, properties and assets of the Partnership represented by such ownership interest in the Partnership; and

**WHEREAS,** pursuant to the JOINDER OF GUARANTOR of the Assignment (the "Joinder"), James S. Morley (the "Guarantor")  joined in the Assignment for the purpose of (i) acknowledging and consenting to the Assignment, and (ii) ratifying and confirming

that notwithstanding such assignment, his Guaranty dated December 9, 2002 remains in full force and effect.

NOW THEREFORE, in consideration of the mutual promises of the undersigned, and for other good and valuable consideration, **IT IS AGREED THAT:**

1.      Pursuant to Section 13.9 of the Partnership Agreement, this Amendment changes, amends and modifies the Partnership Agreement as of the date hereof as set forth herein and incorporates all prior changes to the terms, conditions and provisions of the Partnership Agreement.   Terms used herein that were previously defined in the Partnership Agreement shall have the meaning stated therein, unless otherwise indicated herein. All other provisions of the Partnership Agreement not changed herein, remain the same.

2.      In accordance with Article VIII of the Partnership Agreement, CHBA hereby withdraws as a Co-Managing General Partner of the Partnership and Affordable acknowledges that it is the sole Managing General Partner.

3.      All references to Co-Managing General Partner in the Partnership Agreement henceforth shall be deemed to refer solely to Affordable.

4.      Schedule A, "Name and Business Address", is amended to delete CHBA, and reflect the transfer of CHBA's Interest to Affordable.  Schedule A is amended in its entirety.  The amended Schedule A is attached hereto and made part hereof.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

**Lucretia Avenue Partners, L.P.**

**SECOND AMENDMENT**
**SIGNATURE PAGES**

**IN WITNESS WHEREOF**, the parties hereto have executed this Amendment to the Partnership Agreement of Lucretia Avenue Partners, L.P. to be effective as of the _13th_ day of December, 2005.

**CHBA**:
Community Home Builders and Associates.
    a California non-profit public benefit corporation

By: _____
      Name: Ralph Walker
      Title: President

**AFFORDABLE:**
Affordable Housing Access, Inc. a California nonprofit benefit corporation

By: _____
      Name: William H. Hirsch
      Title: President

**MONTALVO:**
Montalvo Associates LLC
a California limited liability company

By: _____
      Name: James S. Morley,
      Title: Manager

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

3

**Lucretia Avenue Partners, L.P.**

**SECOND AMENDMENT**
**SIGNATURE PAGES**

     **IN WITNESS WHEREOF,** the parties hereto have executed this Amendment to the Partnership Agreement of Lucretia Avenue Partners, L.P. to be effective as of the _____ day of December, 2005.

**CHBA:**
Community Home Builders and Associates.
    a California non-profit public benefit corporation

By:_____
    Name: Ralph Walker
    Title: President

**AFFORDABLE:**
Affordable Housing Access, Inc. a California nonprofit benefit corporation

By: _____
    Name: Jonathan B. Webb
    Title: Executive Director

**MONTALVO:**
Montalvo Associates LLC
a California limited liability company

By: _____
    Name: James S. Morley,
    Title: Manager

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

**Lucretia Avenue Partners, L.P.**

### SECOND AMENDMENT
### SIGNATURE PAGES

**IN WITNESS WHEREOF**, the parties hereto have executed this Amendment to the Partnership Agreement of Lucretia Avenue Partners, L.P. to be effective as of the 12th day of December, 2005.

**CHBA:**
Community Home Builders and Associates.
  a California non-profit public benefit corporation


By:_____
    Name: Ralph Walker
    Title: President


**AFFORDABLE:**
Affordable Housing Access, Inc. a California nonprofit benefit corporation


By: _____
    Name: William H. Hirsch
    Title: President


**MONTALVO:**
Montalvo Associates LLC
a California limited liability company

By:_____
    Name: James S. Morley,
    Title: Manager


***[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]***

**PROTECH:**
PROTECH 2002-D LLC, an Ohio limited liability company

By: Protech Development Corp., a Tennessee corporation, its Manager

By: _____
    Name: Dain C. Akin
    Title: Senior Vice President & General Counsel

**AMTAX:**
AMTAX HOLDINGS 279, LLC
an Ohio limited liability company

By: Paramount Properties, Inc., its Manager

By: _____
    Name: Dain C. Akin
    Title: Senior Vice President & General Counsel

*[REMAINER OF PAGE INTENTIONALLY LEFT BLANK]*

4

## LACRETIA AVENUE PARTNERS, L.P.

### Amended
### SCHEDULE A

| Name and Business Address | Original Initial Capital Contributions | Percentage Interests |
|---|---|---|
| **ADMINISTRATIVE GENERAL PARTNER:** Montalvo Associates, LLC 1600 West Campbell, Suite 211 San Jose, CA 95008 | $228[1] | .0045% |
| **MANAGING GENERAL PARTNER:** AFFORDABLE HOUSING ACCESS, INC. 4029 Westerly Place, Suite 101 Newport Beach, CA 92660 | $228[1] | .0045% |
| **SPECIAL LIMITED PARTNER:** PROTECH 2002-D LLC 4009 Columbus Road, S.W. Granville, OH 43023 | $ 50 | .001% |
| **INVESTOR LIMITED PARTNER:** AMTAX HOLDINGS 279, LLC 4009 Columbus Road, S.W. Granville, OH 43023 | $5,057,008[2] | 99.99% |
| TOTAL | $5,057,514 | 100.00% |

[1] In the event any deferred portion of the Developer Fee is still outstanding prior to the end of ten (10) years of the Placed in Service Date of the first building in the Project, the General Partners shall make an additional Capital Contribution to the Partnership in an amount equal to such outstanding amount, prior to the end of such tenth (10th) year. Such additional Capital Contribution shall be used solely to pay the outstanding deferred Developer Fee. Such Capital Contribution shall be returned to the General Partners out of Distributions of Cash Flow or proceeds from a Sale or Refinancing in the same priority, but prior to, the repayment of Subordinated Loans of the General Partners.

[2] $104 has been paid in as of the date of the Investment Closing; An additional $5,064,904 is to be paid in pursuant to Article V, subject to adjustment and conditions to payment as provided herein.

## ASSIGNMENT OF PARTNERSHIP INTEREST AND OTHER RIGHTS
### (Lucretia Avenue Partners, L.P.
### d/b/a Villa Solera)

This Assignment of Partnership Interest and Other Rights (this "Assignment") is made and entered into as of the _12th_ day of December, 2005 (the "Effective Date") by and between Community Home Builders and Associates, a California non-profit public benefit corporation ("Assignor"), and Affordable Housing Access, Inc., a California nonprofit public benefit corporation ("Assignee") and is acknowledged and agreed to by JSM Enterprises, Inc., a California corporation ("JSM").

### RECITALS AND REFERENCES:

**WHEREAS**, Lucretia Avenue Partners, L.P. (the "Partnership"), a California limited partnership, was created and evidenced by a Certificate of Limited Partnership filed with the Secretary of State of the State of California on July 9, 2002 and by an Agreement of Limited Partnership executed shortly thereafter; and amended by an Amended and Restated Agreement of Limited Partnership among Assignor, as a Co-Managing General Partner, Assignee, as a Co-Managing General Partner. MONTALVO ASSOCIATES LLC, the Administrative General Partner, PROTECH 2002-D, LLC, as Special Limited Partner, and AMTAX HOLDINGS 279, LLC, as Investor Limited Partner (hereinafter collectively referred to as the "Partners"), dated as of December 9, 2002; and further Amended by the First Amendment to Amended and Restated Agreement of Limited Partnership on December 11, 2002;

**WHEREAS,** Assignor is a co-managing general partner of the Partnership;

**WHEREAS,** pursuant to the Purchase and Sale Agreement between Assignor and JSM effective as of October 11, 2005 (the "PSA"), Assignor agreed (subject to all of the terms and conditions of the PSA) to assign its interest in the Partnership to JSM or its designee;

**WHEREAS,** Assignee is JSM's designee within the meaning of Section 2.2 of the PSA; and

**WHEREAS,** Assignor is the owner of a 0.0025% ownership interest in the Partnership and is hereby assigning and conveying to Assignee all of said ownership interest in the Partnership.

NOW, THEREFORE, for and in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration paid by Assignee to Assignor, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee do hereby agree as follows:

Assignment of Partnership Interest and Other Rights Ver 3

1

1.      Assignment.  Assignor does hereby GIVE, ASSIGN, TRANSFER, SET OVER and DELIVER to Assignee, its successors and assigns, all of its ownership interest in the Partnership, together with all right, title and interest in and to the business, properties and assets of the Partnership represented by such ownership interest in the Partnership, including, but not limited to, the capital, assets, profits and losses of the Partnership; and Assignor hereby grants to Assignee, its successors and assigns, full power and authority to collect, receive and give acquittance of any sum or sums due or to become due to him by virtue of the interest in the Partnership hereby assigned.

2.      Assumption of Obligations.  Assignee hereby assumes all obligations, if any, of Assignor under the Partnership Agreement with respect to the Co-Managing General Partner interest assigned pursuant to Section 1, accruing after the Effective Date, if any.

3.      Distributions.  All distributions made by the Partnership to Assignor with respect to its interests in the Partnership as hereinabove described from and after the Effective Date shall be distributed by Assignor to Assignee.

4.      Future Cooperation on Subsequent Documents.  Assignor and Assignee agree to cooperate at all times from and after the date hereof with respect to the supplying of any information requested by the other regarding any of the matters described in this Assignment, and agree to execute such further bills of sale, assignments, partnership agreement amendments, releases or other documents as may be reasonably requested for the purpose of giving effect to, evidencing or giving notice of the transaction described herein.

5.      Successors and Assigns.  This Assignment shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective heirs, successors and assigns.

6.      Counterparts.  This Assignment may be executed by the parties in one or more counterparts, including facsimile counterparts, each of which shall constitute one document, binding on all parties, even though all parties are not signatory to the same counterpart.

Executed to be effective as of the Effective Date.

ASSIGNOR:                          COMMUNITY HOME BUILDERS AND ASSOCIATES,
                                   a California non-profit public benefit corporation

                                   By:      _____
                                            Ralph Walker, President

Assignment of Partnership Interest and Other Rights Ver 3

2

ASSIGNEE:

Affordable Housing Access, Inc. a California nonprofit public benefit corporation

By: _____
Jonathan B. Webb, Executive Director

JSM:

JSM Enterprises, Inc., a California corporation

By: _____
James S. Morley, President

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

Assignment of Partnership Interest and Other Rights Ver 3

3

ASSIGNEE:                      Affordable Housing Access, Inc. a California nonprofit
                               public benefit corporation

                               By: _____
                                   William W. Hirsch, President

JSM:                           JSM Enterprises, Inc., a California corporation

                               By: _____
                                   James S. Morley, President


*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

*signature page to Consent of the Special Limited Partner and of the Investor Limited Partner*

**SPECIAL LIMITED PARTNER:**

PROTECH 2002-D, LLC, an Ohio limited liability
company

By: Protech Development Corp., a Tennessee
corporation, its Manager

By: _____
Name:  Dain C. Akin
Title:  Senior Vice President and General Counsel

**INVESTOR LIMITED PARTNER:**

AMTAX HOLDINGS 279, LLC, an Ohio limited liability
company

By: Paramount Properties, Inc., its Manager

By: _____
Name:  Dain C. Akin
Title:  Senior Vice President and General Counsel

2

Consent SLP & ILP2

## JOINDER OF GUARANTOR

Intending to be legally bound hereby, the undersigned, James S. Morley ("Guarantor") hereby joins in this Assignment for the purpose of (i) acknowledging and consenting to the assignment by Assignor of its ownership interest in the Partnership to Assignee, and Assignee's assumption of all obligations, if any, of Assignor under the Partnership Agreement with respect to a Co-Managing General Partner interest being assigned (.0025%), and (ii) ratifying and confirming that notwithstanding such assignment, his Guaranty dated December 9, 2002 remains in full force and effect.

_____
James S. Morley

**LUCRETIA AVENUE PARTNERS, L.P.**

THIRD AMENDMENT TO THE
AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP

This amendment is dated July__, 2006 and is among AFFORDABLE HOUSING ACCESS, INC., a California nonprofit public benefit corporation (the "**Managing General Partner**"); MONTALVO ASSOCIATES LLC, a California limited liability company (the "**Administrative General Partner**"); PROTECH 2002-D, LLC, an Ohio limited liability company (the "**Special Limited Partner**"); and AMTAX HOLDINGS 279, LLC, an Ohio limited liability company (the "**Investor Limited Partner**").

The Managing General Partner, the Administrative Partner, the Special Limited Partner and the Investor Limited Partner as parties to the Amended and Restated Agreement of Limited Partnership dated as of December 9, 2002 as amended by that certain First Amendment to the Amended and Restated Agreement of Limited Partnership dated as of December 11, 2002 and by that certain Second Amendment to the Amended and Restated Agreement of Limited Partnership dated as of December 12, 2005 (as amended, the "**Partnership Agreement**") of Lucretia Avenue Partners, L.P., a California limited partnership (the "**Partnership**") seek to (i) revise the terms of certain provisions of the Partnership Agreement based the Investor Limited Partner's receipt of Forms 8609, pursuant to Section 5.2 of the Partnership Agreement and (ii) acknowledge and reaffirm all other provisions of the Partnership Agreement.

NOW THEREFORE, in consideration of the mutual promises of the undersigned, and for other good and valuable consideration, IT IS AGREED THAT:

1.    Defined Terms: Defined terms used but not defined in this agreement are defined in the Partnership Agreement:

"Maximum Annual Credit" shall mean $681,189 per year, for the Partnership for the total Credit Period, as provided in the Tax Credit Reservation.

"Projected Credit" means Federal Housing Tax Credits on a year-by-year basis that are projected to be available to the Investor Limited Partner, which Projected Credits are projected to be in the amount of $134,754 for 2004, $614,488 for 2005, $681,121 per year for each of the years 2006 through 2013 and $613,000 for 2014. The Projected Credits constitute ninety-nine point ninety-nine (99.99%) percent of the total Tax Credits in the aggregate amount of $6,811,210 which are projected to be available to the Partnership. The Projected Credits will be allocated to the Investment Partner by the Partnership.  Such Projected Credit will be adjusted to reflect any upward or downward adjustments caused by Section 5.2.

# 3925543_v2

2.      Amendments to Article 5.   Article 5 of the Partnership Agreement is hereby amended as follows:

(1)      by replacing "$5,057,008" in Section 5.1(A) with "$5,800,972".

(2)      by replacing "$5,056,904" in Section 5.1(A)(2) with "$5,800,868."

(3)      By deleting Section 5.2(D) in its entirety and replacing it with "[Intentionally Omitted]".

2.      **Schedule A** is amended in its entirety.   The amended Schedule A is attached hereto and made part hereof.

3.      **Exhibit B**, is deleted in its entirety.

4.      Except as otherwise specifically provided above, in all other respects the Partnership Agreement shall remain in full force and effect. This amendment may be executed in several counterparts and all so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties have not signed the original or the same counterpart.

IN WITNESS WHEREOF, the undersigned have executed this amendment to the Amended and Restated Partnership Agreement, dated as of this _____ day of July, 2006.

MANAGING GENERAL PARTNER:

AFFORDABLE HOUSING ACCESS, INC., a California nonprofit public corporation

By: _____
Name: _____Jonathan B. Webb_____
Title: _____Executive Director_____

ADMINISTRATIVE GENERAL PARTNER

MONTALVO ASSOCIATES LLC, a California limited liability company

By: _____
Name: _____James E. Morton_____
Title: _____G.P._____

INVESTOR LIMITED PARTNER:

AMTAX HOLDINGS 279, LLC, an Ohio limited liability company, by its Managing Member, Paramount Properties, Inc. (n.k.a., Capmark Affordable Properties, Inc.)

By: _____
Name: _____Kevin Kleen_____
Title: _____Vice President_____

SPECIAL LIMITED PARTNER:

PROTECH 2002-D, LLC, an Ohio limited liability company, by its Manager, Protech Development Corporation

By: _____
Name: _____Kevin Kleen_____
Title: _____Vice President_____

3

IN WITNESS WHEREOF, the undersigned have executed this amendment to the Amended and Restated Partnership Agreement, dated as of this _____ day of July, 2006.

MANAGING GENERAL PARTNER:            AFFORDABLE HOUSING ACCESS, INC., a California nonprofit public corporation

By: _____

Name: _____

Title: _____

ADMINISTRATIVE GENERAL PARTNER            MONTALVO ASSOCIATES LLC, a California limited liability company

By: _____

Name: _____

Title: _____

INVESTOR LIMITED PARTNER:            AMTAX HOLDINGS 279, LLC, an Ohio limited liability company, by its Managing Member, Paramount Properties, Inc. (n.k.a., Capmark Affordable Properties, Inc.)

By: _____

Name:  Kevin Kleen

Title:   Vice President

SPECIAL LIMITED PARTNER:            PROTECH 2002-D, LLC, an Ohio limited liability company, by its Manager, Protech Development Corporation

By: _____

Name: Kevin Kleen

Title:  Vice President

# 3925543_v2                                                3

## LUCRETIA AVENUE PARTNERS, L.P.

### Amended
### SCHEDULE A

| Name and Business Address | Capital Contributions | Percentage Interests |
|---|---|---|
| **MANAGING GENERAL PARTNER:** | | |
| Affordable Housing Access, Inc.<br>4029 Westerly Place, Suite 101<br>Newport Beach, CA 92660 | $228[1] | 0.0045% |
| **ADMINISTRATIVE GENERAL PARTNER:** | | |
| Montalvo Associates, LLC<br>1600 West Campbell, Suite 211<br>San Jose, CA 95008 | $228[1] | 0.0045% |
| **SPECIAL LIMITED PARTNER:** | | |
| Protech 2002-D, LLC<br>1801 California Street, Suite 3700<br>Denver, Colorado 80202<br>Attention: Legal Department | $50 | 0.001% |
| **INVESTOR LIMITED PARTNER:** | | |
| AMTAX HOLDINGS 279, LLC<br>1801 California Street, Suite 3700<br>Denver, Colorado 80202<br>Attention: Legal Department | $5,800,972[2] | 99.99% |

---

[1]In the event any deferred portion of the Developer Fee is still outstanding prior to the end of ten (10) years of the Placed in Service Date of the first building of the Project, the General Partners shall make an additional Capital Contribution to the Partnership in an amount equal to such outstanding amount, prior to the end of such tenth (10th) year. Such additional Capital Contribution shall be used solely to pay for the outstanding deferred Developer Fee. Such Capital Contribution shall be returned to the General Partners out of Distributions of Cash Flow or proceeds from a Sale or Refinancing in the same priority, but prior to, the repayment of Subordinated Loans of the General Partners.

[2]$4,225,000 has been paid as of the date hereof; An additional $1,575,972 to be paid pursuant to Article V, subject to an adjustment and conditions to payments provided herein.

## LUCRETIA AVENUE PARTNERS, L.P.
(a California limited partnership)

## FOURTH AMENDMENT TO THE AMENDED AND RESTATED
## AGREEMENT OF LIMITED PARTNERSHIP

effective as of December 29, 2006

This FOURTH AMENDMENT TO THE AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP (this "**Amendment**") is effective as of the date first set forth above by and among AFFORDABLE HOUSING ACCESS, INC., a California non-profit public benefit corporation, as managing general partner (the "**Managing General Partner**"), MONTALVO ASSOCIATES LLC, a California limited liability company, as the administrative general partner (the "**Administrative General Partner**"), PROTECH 2002-D, LLC, an Ohio limited liability company, as the special limited partner (the "**Special Limited Partner**"), and AMTAX HOLDINGS 279, LLC, an Ohio limited liability company, as the investor limited partner (the "**Investor Limited Partner**") (collectively the "**Partners**").

WHEREAS, the Partners are the sole partners of Lucretia Avenue Partners, L.P., a California limited partnership (the "**Partnership**") and are parties to that certain Amended and Restated Limited Partnership Agreement dated as of December 9, 2002 (as amended prior to the date of this Amendment, the "**Partnership Agreement**").

WHEREAS, the Partners have determined to amend the Partnership Agreement in accordance with Section 13.9 of the Partnership Agreement in order to remain in compliance with the regulations governing the Partnership's eligibility for the welfare exemption from property taxation provided for in Section 214 of the California Revenue and Taxation Code (the "**Property Tax Exemption**").

NOW THEREFORE, in consideration of the mutual promises of the undersigned, and for other good and valuable consideration, IT IS HEREBY AGREED THAT:

1.      Definitions.  Capitalized terms that are used and not defined in this Amendment shall have the respective meanings given such terms in the Partnership Agreement.  Following are the definitions of certain other capitalized terms that are used in this Amendment and hereby incorporated by reference into the Partnership Agreement:

"**Annual Claim Form**" means, collectively, the claim forms required to be submitted annually to the County Assessor by which the Managing General Partner certifies (and, with respect to Form BOE-267-L1, the Managing General Partner and the Administrative General Partner certify) that the use of the Project meets all of the applicable requirements to qualify for the Property Tax Exemption, which forms, at the current time, include, but may not be limited to, Forms (i) BOE-267-A, (ii) BOE-267-L and (iii) BOE-267-L1.

"**BOE**" means the California Board of Equalization.

"**BOE Forms**" means the forms prescribed by the BOE, as amended and supplemented from time to time.

"**BOE Regulations**" means the Property Tax Rules of the BOE, as amended and supplemented from time to time.

"**County Assessor**" means the county assessor for the county in which the Project is located.

"**Major Decision**" means any act of the Partnership that requires a vote of a majority in interest of the general partners of the Partnership, as defined in BOE Regulation 140.1.

"**Material Participation**" or "**Materially Participate**" means, pursuant to the BOE Regulations, that the Managing General Partner (i) has a right to vote in all Major Decisions of the Partnership, (ii) performs Substantial Management Duties as set forth in this Amendment, (iii) directly, or indirectly under its supervision, manages the Partnership, (iv) annually conducts a physical inspection of the low-income housing property to ensure that the property is being used as low-income housing and meets all of the requirements of the BOE Regulations and (v) submits the Annual Claim Form for each real estate tax year, which form constitutes a certification to the County Assessor that the Project meets all of the requirements set forth in the BOE Regulations.

"**Organizational Clearance Certificate**" means the certificate issued by the BOE pursuant to which the BOE indicates that the Managing General Partner is an organization eligible for the Property Tax Exemption (currently, Form BOE-277-OC).

"**Periodic Filing Form**" means, collectively, the claim forms required to be submitted on a three-year cycle to the BOE by which the Managing General Partner demonstrates continued eligibility for its Organizational Clearance Certificate and the General Partners demonstrate that the Project continues to be eligible for its Supplemental Clearance Certificate, which forms, at the current time, include, but may not be limited to, Forms (i) BOE-277-P, and (ii) BOE-277-L1.

"**RT Code**" means the California Revenue and Taxation Code, as amended and supplemented from time to time.

"**Substantial Management Duties**" means the duties the Managing General Partner is obligated to perform pursuant to Section 6 of this Amendment.

"**Supplemental Clearance Certificate**" means the certificate issued by the BOE pursuant to which the BOE indicates that the Project meets the requirements of the RT Code and BOE Regulations for the Property Tax Exemption (currently, Form BOE-277-SCC).

2.    **NEW SECTION 2.6.**  The following new Section 2.6 is hereby added to the Partnership Agreement:

2.6.   **Use of Property Tax Savings**.   The parties acknowledge that the savings ("**Property Tax Savings**") contemplated by the Property Tax Exemption, are necessary in order for the Partnership to meet its debt underwriting and financing assumptions, and therefore to keep the Project affordable to low-income tenants.   The parties further acknowledge that the Partners would not undertake to develop the Project and provide the affordable housing created by the Project unless the Property Tax Savings were available to help underwrite the Mortgage Loans.   The Partners shall use their best efforts to maintain the Property Tax Exemption during the life of the Partnership.

3.   **AMENDMENTS TO SECTION 4.5**.   The following new clause (11) is hereby added to Section 4.5A(iv) of the Partnership Agreement:

(11)   If the Managing General Partner (1) no longer qualifies as a charitable organization under Section 501(c)(3) of the Code or under the laws of the State of California, or (2) causes the Partnership to fail to obtain or maintain the Property Tax Exemption for the Project during the Compliance Period (as defined in Section 42 of the Code) due to the Managing General Partner's gross negligence, willful misconduct or breach of this Agreement, then the other General Partner, prior to the Limited Partners exercising such rights, or the Limited Partners may effectuate the removal of the Managing General Partner as a Partner of the Partnership.

4.   **AMENDMENTS TO SECTION 7.3**.   The following clauses I, J, and K are hereby added to Section 7.3 of the Partnership Agreement:

I.   Notwithstanding any provision to the contrary in the Agreement, including, without limitation, Sections 7.3A and 7.3C, the Managing General Partner shall provide regular, continuous and substantial services to the Partnership and shall be the "managing general partner" of the Partnership, as such term is used in the BOE Regulations, specifically, BOE Property Tax Rule 140.1(a)(6).   Except as otherwise set forth in this Agreement, the Managing General Partner, within the authority granted to it under this Agreement, shall Materially Participate (as such term is defined in this Agreement, as the same may be amended from time to time) in the control, management and direction of the Partnership's business for the purposes stated in Article I, and shall manage and control the affairs of the Partnership to the best of its ability and use its best efforts to carry out the purpose of the Partnership.   In so doing, the Managing General Partner shall take all actions necessary or appropriate to protect the interests of the Partners and of the Partnership. The Managing General Partner shall devote such of its time as is reasonable to the affairs of the Partnership.

J.   Notwithstanding any provision to the contrary in the Agreement, including, without limitation, Sections 7.3A and 7.3C, the Managing General Partner shall undertake the following substantial management duties ("**Substantial Management Duties**") on behalf of the Partnership:

(i)   rent, maintain and repair the low-income housing property, or if such duties are delegated to a property management agent, participate (together with

the Administrative General Partner) in hiring and overseeing the work of the property management agent;

(ii)     participate (together with the Administrative General Partner) in hiring and overseeing the work of all persons necessary to provide services for the management and operation of the limited partnership business;

(iii)    execute and enforce all contracts executed by the Partnership;

(iv)    execute and deliver all partnership documents on behalf of the Partnership;

(v)     prepare or cause to be prepared all reports to be provided to the Partners or the Lenders on a monthly, quarterly, or annual basis consistent with the requirements of the Partnership Agreement;

In addition to the Substantial Management Duties of the Managing General Partner specifically set forth in Section 7.3J above, to the extent not already designated as duties of the Managing General Partner in the Partnership Agreement, the Managing General Partner upon the written consent of the Administrative General Partner, may also undertake any or all of the following specific management duties:

(vi)    coordinate all present and future development, construction, or rehabilitation of low-income housing property that is the subject of the Partnership Agreement;

(vii)   monitor compliance with all government regulations and filing or supervise the filing of all required documents with government agencies;

(viii)  acquire, hold, assign or dispose of property or any interest in property;

(ix)    borrow money on behalf of the Partnership, encumber Partnership assets, place title in the name of a nominee to obtain financing, prepay in whole or in part, refinance, increase, modify or extend any obligation;

(x)     pay organizational expenses incurred in the creation of the Partnership and all operational expenses;

(xi)    determine the amount and timing of distributions to Partners and establish and maintain all required reserves; and

(xii)   ensure that charitable services or benefits, such as vocational training, educational programs, childcare and after-school programs, cultural activities, family counseling, transportation, meals, and linkages to health and/or social services are provided or information regarding charitable services or benefits are made available to the low-income housing tenants.

In addition to its Substantial Management Duties (and any additional specific management duties that the Managing General Partner may undertake pursuant to the foregoing), the Managing General Partner shall also (A) ensure that the Project and the operation thereof at all times comply and are in conformance with Section 4(b) and 5 of Article XIII of the Constitution of the State of California and Section 214, 254 and 259.5 of the RT Code; and (B) apply for, use best efforts to obtain and maintain the Property Tax Exemption, and any savings to the Partnership and the Project attributable to the Tax Exemption shall be used in accordance with Section 214 of the RT Code, and this Agreement.

K.      Delegation of Authority.

In accordance with the BOE Regulations, the Managing General Partner may delegate all or any of its powers, rights and obligations hereunder to the Administrative General Partner, and may appoint, employ, contract or otherwise deal with the Administrative General Partner for the transaction of the business of the Partnership.  The Administrative General Partner may, under supervision of the Managing General Partner, perform any acts or services for the Partnership as the Managing General Partner may approve; provided, however, such delegation does not excuse the Managing General Partner from overseeing and supervising on an ongoing basis the activities delegated.  The Managing General Partner may not delegate any of its powers, rights and obligations hereunder to a party other than the Administrative General Partner without the prior written consent of the Administrative General Partner.  If the Managing General Partner elects to delegate one or more of its Substantial Management Duties, the Managing General Partner shall retain such records as are reasonably required to demonstrate that it is actually supervising the performance of the delegated duties.  Such delegation shall fully authorize the Administrative General Partner to act alone without requirement of any other act or signature of the delegating Managing General Partner, to take any action of any type and to do anything and everything which the delegating Managing General Partner may be authorized to take or do hereunder except that any such delegation shall not relieve the delegating Managing General Partner of its obligations or liabilities under this Agreement.

5.      **AMENDMENTS TO SECTION 7.5.**  The following clauses D and E are hereby added to Section 7.5 of the Partnership Agreement:

D.      Property Tax Exemption.  The Managing General Partner shall obtain and maintain the Property Tax Exemption for so long as the Project and the Partnership are eligible for such Property Tax Exemption.  Any savings to the Partnership and Project attributable to the Property Tax Exemption shall be used to maintain the affordability of, or reduce rents otherwise necessary for, the units occupied by lower income individuals or otherwise be passed onto the low income tenants of the Project in accordance with all applicable provisions of Section 214 of the RT Code.

As provided in the RT Code, the BOE Regulations, BOE Forms and elsewhere, in order to obtain and maintain the Property Tax Exemption for the Project, the Managing General Partner must file with the BOE and the County Assessor certain documents containing certifications under penalty of perjury. Among other things, the Managing General Partner will or may have to certify that: (i) the Agreement provides (subject to the rights of the other Partners) that the Managing General Partner has full and exclusive control over the business, assets and affairs of the Partnership, manages day to day operations and participates in Major Decisions; (ii) the Agreement provides that the Managing General Partner has a certain number of Substantial Management Duties; and (iii) the Managing General Partner, the Partnership and the Project meet other requirements of the BOE Regulations. The Managing General Partner shall file such certifications and related documentation in compliance with applicable procedures, for so long as the Managing General Partner deems that it has sufficient factual basis to do so.

E.     The Managing General Partner hereby represents and warrants that the officers and directors of the for-profit general partners, for-profit limited partners, or any of its for-profit affiliates, do not as individuals or collectively, have a controlling vote or majority interest in the Managing General Partner.

6.     **AMENDMENT TO SECTION 7.10.**     Section 7.10D of the Partnership Agreement is hereby deleted in its entirety and replaced with the following:

D.     **Managing General Partner Fee.**

(i)     For its services in managing the Partnership, the Managing General Partner shall receive from the Partnership, beginning January 1, 2007, an annual fee in the amount of $20,000 (the "**MGP Fee**"), which MGP Fee shall be pro-rated and paid monthly in the amount of $1,667, subject to a three percent (3%) increase annually of the then current amount.

(ii)     In the event there is insufficient Cash Flow in any year to pay the MGP Fee to the Managing General Partner, the Administrative general partner will make a loan necessary to pay such MGP Fee. Any such loan made pursuant to this Section 7.10D shall constitute a Subordinated Loan, shall not bear interest, and shall be repayable as provided in Article 6.

7.     **AMENDMENTS TO SECTION 12.1A.**     The following clause (iii) is hereby added to Section 12.1A of the Partnership Agreement:

(iii)     In accordance with the BOE Regulations, the Managing General Partner will maintain records and documents evidencing the duties performed by the Managing General Partner ("**Management Documents**"). Such records and documents may include, but are not necessarily limited to (1) accounting books and records; (2) tax returns; (3) budgets and financial reports; (4) reports required by Lenders; (5) documents related to the construction or rehabilitation of the Project; (6) legal documents such as

contracts, deeds, notes, leases and deeds of trust; (7) documents related to complying with government regulations and filings; (8) documents related to property inspections; (9) documents related to charitable services or benefits provided or the information provided regarding such services or benefits; (10) reports prepared for the Partners; (11) bank account records; (12) audited annual financial statement of the Partnership; and (13) the Management Agreement.

To the extent that any such Management Documents are not within the control or possession of the Managing General Partner, the Administrative General Partner agrees to provide or cause to be provided copies of such documents to the Managing General Partner upon written request from the Managing General Partner. The Administrative General Partner and the Limited Partners shall have the right upon two (2) business days notice, during reasonable business hours, to inspect all records and documents maintained by the Managing General Partner.

8.     **AMENDMENTS TO SECTION 12.1**. The following clause L is hereby added to Section 12.1 of the Partnership Agreement:

L.     Property Tax Exemption Reports. The Managing General Partner shall (i) on an annual basis, within fifteen days of submission thereof, provide the other Partners a copy of the Annual Claim Form (as defined in this Agreement, as the same may be amended from time to time), (ii) every three years, within fifteen days of submission thereof, provide the other Partners a copy of the Periodic Filing Form (as defined in this Agreement, as the same may be amended from time to time) and (iii) provide the other Partners immediate notice if the Managing General Partner no longer meets the definition of "managing general partner" under the BOE Regulations.

9.     **CHANGE IN BUSINESS ADDRESSES**.   The business addresses for the Investor Limited Partner and the Special Limited Partner and references thereto are hereby deleted in their entirety and replaced with the following:

> c/o Capmark Affordable Equity Inc.
> 1801 California Street, Suite 3700
> Denver, CO  80202
> Attn:  Legal Department
> Fax No.:  303-296-6804

10.     **MISCELLANEOUS PROVISIONS**.

(i)     The Administrative General Partner represents and warrants to the Investor Limited Partner that all Requisite Approvals to the execution of this Amendment have been obtained.

(ii)     In the event that the BOE revises the BOE Regulations in a manner that requires another amendment to the Agreement, or the BOE or another government agency notifies the Partnership that this Amendment does not comply with any requirement for obtaining or maintaining the Property Tax Exemption, then the Partners

shall act in good faith to amend the Agreement to the extent necessary in order to obtain or maintain the Property Tax Exemption.

(iii)   Except to the extent specifically provided herein, this Amendment is not intended nor does it modify, amend or revise in any way any of the provisions of the Partnership Agreement and such Partnership Agreement remains in full force and effect as of the date hereof. Specifically, the rights, including but not limited to the voting rights of the Limited Partners, privileges and obligations of the Partners as set forth in the Partnership Agreement remain in full force and effect.

(iv)   The Managing General Partner hereby acknowledges and agrees that this Amendment does not modify the management duties of the Managing General Partner set forth in the Partnership Agreement in such a way as to cause the Managing General Partner to be unable to make the representations necessary to execute the Annual Claim Form under penalty of perjury.

(v)   This Amendment may be executed in several counterparts all of which shall constitute one amendment, binding on all parties hereto, notwithstanding that all of the parties are not signatories to the same counterpart.

(vi)   This Amendment and the rights of the Partners hereunder shall be interpreted in accordance with the laws of the State of California.

(vii)   Except as and to the extent expressly set forth in this Amendment, and any prior amendment to the Partnership Agreement, the Partners hereby affirm the terms and provisions of the Partnership Agreement.

[signatures to follow]

IN WITNESS WHEREOF, each of the parties hereto has executed this Amendment as of the date first written above.

**MANAGING GENERAL PARTNER**:

AFFORDABLE HOUSING ACCESS, INC., a California non-profit public benefit corporation

By: _____
Name: _____
Title: _____

**SPECIAL LIMITED PARTNER**:

PROTECH 2002-D, LLC, an Ohio limited liability company

By: Protech Development Corporation, a Tennessee corporation, its Manager

    By: _____
      Alisa Burns
      Vice President

**ADMINISTRATIVE GENERAL PARTNER**:

MONTALVO ASSOCIATES LLC, a California limited liability company

By: _____
Name: _____
Title: _____

**INVESTOR LIMITED PARTNER**:

AMTAX HOLDINGS 279, LLC, an Ohio limited liability company

By: Capmark Affordable Properties Inc., a Delaware corporation (formerly known as Paramount Properties, Inc.), its Managing Member

    By: _____
      Alisa Burns
      Vice President

IN WITNESS WHEREOF, each of the parties hereto has executed this Amendment as of the date first written above.

**MANAGING GENERAL PARTNER**:

AFFORDABLE HOUSING ACCESS, INC., a California non-profit public benefit corporation

By:_____
Name:_____
Title:_____

**SPECIAL LIMITED PARTNER**:

PROTECH 2002-D, LLC, an Ohio limited liability company

By: Protech Development Corporation, a
    Tennessee corporation, its Manager

    By:_____
      Alisa Burns
      Vice President

**ADMINISTRATIVE GENERAL PARTNER**:

MONTALVO ASSOCIATES LLC, a California limited liability company

By: _____
Name: _____ James S. Morly _____
Title: _____ Manager _____

**INVESTOR LIMITED PARTNER**:

AMTAX HOLDINGS 279, LLC, an Ohio limited liability company

By: Capmark Affordable Properties Inc., a
    Delaware corporation (formerly known as
    Paramount Properties, Inc.), its Managing
    Member

    By:_____
      Alisa Burns
      Vice President

IN WITNESS WHEREOF, each of the parties hereto has executed this Amendment as of the date first written above.

**MANAGING GENERAL PARTNER**:

AFFORDABLE HOUSING ACCESS, INC., a California non-profit public benefit corporation

By:_____
Name:_____
Title:_____

**SPECIAL LIMITED PARTNER**:

PROTECH 2002-D, LLC, an Ohio limited liability company

By:  Protech Development Corporation, a
     Tennessee corporation, its Manager

By:_____
     Alisa Burns
     Vice President

**ADMINISTRATIVE GENERAL PARTNER**:

MONTALVO ASSOCIATES LLC, a California limited liability company

By: _____
Name: _____
Title: _____

**INVESTOR LIMITED PARTNER**:

AMTAX HOLDINGS 279, LLC, an Ohio limited liability company

By:  Capmark Affordable Properties Inc., a
     Delaware corporation (formerly known as
     Paramount Properties, Inc.), its Managing
     Member

By:_____
     Alisa Burns
     Vice President

## RATIFICATION OF GUARANTY AGREEMENT

By his signature below, the undersigned (the "**Guarantor**"), hereby consents to the execution of this Amendment and acknowledges that to the extent, and only to the extent, that the Guaranty dated as of December 9, 2002 (the "**Guaranty**") continues to apply pursuant to its terms, the Guarantor's obligations remain valid and in full force and effect in accordance with the terms of the Guaranty, and that for purposes of such Guaranty, the term "Partnership Agreement" shall include all of the terms and conditions of this Amendment.  Nothing herein amends, expands or otherwise alters the terms of the Guaranty.

**GUARANTOR:**

By: _____

James S. Morley, an individual

**LUCRETIA AVENUE PARTNERS, L.P.**
**A CALIFORNIA LIMITED PARTNERSHIP**

**FIFTH AMENDMENT TO THE**
**AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP**

THIS FIFTH AMENDMENT TO THE AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP (this "**Amendment**") of **LUCRETIA AVENUE PARTNERS, L.P.**, a California limited partnership (the "**Partnership**"), is made effective as of March 29, 2011, by and among Affordable Housing Access, Inc., a California nonprofit public benefit corporation (the "**Managing General Partner**"), Montalvo Associates LLC, a California limited liability company (the "**Administrative General Partner**"), AMTAX Holdings 279, LLC, an Ohio limited liability company (the "**Investor Limited Partner**"), Protech 2002-D, LLC, an Ohio limited liability company, as withdrawing Special Limited Partner, ("**Protech**") and TCH II Pledge Pool, LLC, a Delaware limited liability company, as the successor Special Limited Partner ("**TCH II**").

**Recitals:**

A.  The Managing General Partner, the Administrative General Partner, the Investor Limited Partner and Protech have entered into that certain Amended and Restated Agreement of Limited Partnership of the Partnership, dated as of December 9, 2002, as amended by that certain First Amendment to Amended and Restated Agreement of Limited Partnership, dated as of December 11, 2002, that certain Second Amendment to Amended and Restated Agreement of Limited Partnership, dated as of December 12, 2005, that certain Third Amendment to Amended and Restated Agreement of Limited Partnership, dated as of July 27, 2006, and that certain Fourth Amendment to Amended and Restated Agreement of Limited Partnership, dated as of December 29, 2006(the "**Agreement**");

B.  As of the date hereof, Protech has assigned all of its right, title and interest in the Agreement to TCH II.

C.  The purposes of this Amendment are (i) to effectuate the withdrawal of Protech as the Special Limited Partner of the Partnership; and (ii) to admit TCH II as the successor Special Limited Partner of the Partnership.  Unless otherwise defined herein, terms used herein with initial capital letters shall have the same meanings assigned to such terms in the Agreement.

**Agreement:**

In consideration of the foregoing and the mutual promises and covenants hereinafter contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Amendment, intending to be legally bound, hereby agree as follows:

1.      Protech hereby withdraws as the Special Limited Partner of the Partnership and shall have no further rights or obligations with respect to the Partnership from and after the date hereof. By its execution of this Amendment, and in accordance with Sections 9.2 and 9.3 of the Agreement, the General Partners hereby consents to (i) the withdrawal of Protech as the Special Limited Partner of the Partnership and (ii) the admission and appointment of TCH II as the successor Special Limited Partner of the Partnership. TCH II shall have, from and after the date of this Amendment, solely and exclusively, all of the rights and obligations as Special Limited Partner under the Agreement. Upon execution of this Amendment, any references to the "Special Limited Partner" of the Partnership in the Agreement shall mean and refer solely to TCH II and shall specifically exclude Protech.

2.      The Agreement is hereby amended by replacing Protech with TCH II in Schedule A of the Agreement and TCH II shall succeed to the Capital Contributions made by Protech.

3.      All the provisions of this Amendment shall be deemed to be incorporated in, and made part of, the Agreement, as further amended by this Amendment, and the Agreement and this Amendment shall be read, taken and construed as one and the same instrument. Except as expressly set forth herein, this Amendment shall not by implication or otherwise limit, impair, constitute a waiver of, or otherwise affect the rights and remedies of any of the parties hereto under the Agreement, nor alter, modify, amend or in any way affect the terms, conditions, covenants or agreements contained in the Agreement, all of which are hereby ratified and affirmed in all respects by each of the parties hereto and shall continue in full force and effect. This Amendment shall apply and be effective only with respect to the provisions of the Agreement specifically referred to herein and any references in the Agreement to the provisions of the Agreement specifically referred to herein shall be to such provisions as amended by this Amendment.

4.      Each of the parties covenants that it will execute all documents and take such other actions as may be reasonably required or appropriate to effect the withdrawal of Protech as Special Limited Partner of the Partnership and the admission of TCH II as the successor Special Limited Partner, and to otherwise carry out the intent and purposes of this Amendment.

5.      This Amendment may be executed by the parties hereto in separate counterparts and any single counterpart or set of counterparts executed and delivered by all the parties shall together constitute one and the same instrument. The parties hereto may execute this Amendment by signing any such counterpart and any such signed counterpart of this Amendment may be delivered by telecopy with the same force and effect as if it were physically delivered.

**[THE REMAINDER OF THIS PAGE INTENTIONALLY BLANK]**

**IN WITNESS WHEREOF**, the parties have duly executed this Amendment as of the day and year set forth above.

**MANAGING GENERAL PARTNER:**

AFFORDABLE HOUSING ACCESS, INC.

By: _____
     Name:
     Title:

**ADMINISTRATIVE GENERAL PARTNER:**

MONTALVO ASSOCIATES, LLC

By: _____
     Name:
     Title:

**PROTECH:**

PROTECH 2002-D, LLC
By: Protech Development Corporation, its Manager

By: _____
     Name:
     Title:

**TCH II:**

TCH II PLEDGE POOL, LLC
By:  Tax Credit Holdings II, LLC, its Sole Member

By: Capmark Affordable Equity Inc., Debtor and
Debtor in Possession, its Managing Member

By: _____
     Name:
     Title:

**INVESTOR LIMITED PARTNER:**

AMTAX HOLDINGS 279, LLC
By: TCH II Pledge Pool, LLC, its Manager

By:  Tax Credit Holdings II, LLC, its Sole Member

By: Capmark Affordable Equity Inc., Debtor and
Debtor in Possession, its Managing Member

By: _____
     Name:
     Title:

# EXHIBIT 2

**EVANS LANE APARTMENTS L.P.**

**A CALIFORNIA LIMITED PARTNERSHIP**

**AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP**

**DATED AS OF OCTOBER 1, 2002**

# TABLE OF CONTENTS

Page

Preliminary Statement.................................................................................................1

ARTICLE I ...................................................................................................................1

Defined Terms ...........................................................................................................1

ARTICLE II .................................................................................................................18

Continuation; Name; Purpose and Term...................................................................18
    Section 2.1    Continuation.............................................................................18
    Section 2.2    Name and Office; Agent for Service ......................................18
    Section 2.3    Purpose...................................................................................19
    Section 2.4    Authorized Acts .....................................................................19
    Section 2.5    Term and Dissolution.............................................................20

ARTICLE III.................................................................................................................21

Financing and Disposition of Property .....................................................................21

ARTICLE IV ...............................................................................................................22

Partners; Capital........................................................................................................22
    Section 4.1    General Partners....................................................................22
    Section 4.2    Limited Partners.....................................................................22
    Section 4.3    Partnership Capital and Capital Accounts ............................22
    Section 4.4    Liability of Limited Partners..................................................24
    Section 4.5    Certain Rights of Investor Limited Partner.............................24

ARTICLE V .................................................................................................................26

Capital Contributions of Investor Limited Partner ....................................................26
    Section 5.1    Installments of Capital Contributions.....................................26
    Section 5.2    Adjustments to Capital Contributions.....................................28

ARTICLE VI ................................................................................................................29

Distributions of Cash; Allocations of Profits, Losses and Tax Credits .....................29
    Section 6.1    Profits and Losses and Tax Credits........................................29
    Section 6.2    Application and Distributions Prior to Dissolution .................30
    Section 6.3    Liquidation.............................................................................32
    Section 6.4    Special Distribution Provisions..............................................33
    Section 6.5    Special Allocation Provisions................................................33
    Section 6.6    Order of Application ..............................................................37

ARTICLE VII ...........................................................................................................37

Rights, Powers and Duties of the General Partners .........................................................37
    Section 7.1    Restrictions on Authority.............................................................37
    Section 7.2    Independent Activities ................................................................39
    Section 7.3    Business Management and Control; Designation of Managing
                 General Partner .........................................................................39
    Section 7.4    Duties and Obligations of the General Partners...........................40
    Section 7.5    Representations and Warranties; Certain Indemnities..............................42
    Section 7.6    Indemnification .........................................................................45
    Section 7.7    Liability of General Partners to Limited Partners.......................46
    Section 7.8    Reserves ....................................................................................46
    Section 7.9    Obligation To Provide for Project Expenses ..............................47
    Section 7.10   Certain Payments to the General Partners and Affiliates.............47
    Section 7.11   Joint and Several Obligations ....................................................48
    Section 7.12   Grant of Security Interest...........................................................48
    Section 7.13   Tax Matters Partner...................................................................49

ARTICLE VIII ........................................................................................................50

Withdrawal of a General Partner; New General Partners.................................................50
    Section 8.1    Voluntary Withdrawal ...............................................................50
    Section 8.2    Right To Continue.....................................................................51
    Section 8.3    Successor General Partner .........................................................51
    Section 8.4    Interest of Predecessor General Partner .....................................51
    Section 8.5    Designation of New General Partners.........................................53
    Section 8.6    Amendment of Certificate; Approval of Certain Events .............53
    Section 8.7    Admission of a General Partner .................................................53

ARTICLE IX .........................................................................................................54

Transfer of Limited Partner Interests; Additional Limited Partners.................................54
    Section 9.1    Right To Assign ........................................................................54
    Section 9.2    Restrictions ...............................................................................54
    Section 9.3    Substitute Limited Partners........................................................54
    Section 9.4    Assignees ..................................................................................55
    Section 9.5    Additional Limited Partners.......................................................55

ARTICLE X............................................................................................................56

Loans  56

ARTICLE XI ..........................................................................................................56

Management Agent...........................................................................................................56

ARTICLE XII .................................................................................................58

Books and Reporting, Accounting, Tax Elections, Etc. .................................58
    Section 12.1   Books, Records and Reporting ....................................58
    Section 12.2   Bank Accounts ...........................................................62
    Section 12.3   Elections.....................................................................62
    Section 12.4   Special Adjustments....................................................62
    Section 12.5   Fiscal Year .................................................................62

ARTICLE XIII................................................................................................63

General Provisions ........................................................................................63
    Section 13.1   Notices .......................................................................63
    Section 13.2   Word Meanings...........................................................63
    Section 13.3   Binding Provisions .....................................................63
    Section 13.4   Applicable Law ..........................................................63
    Section 13.5   Counterparts ...............................................................63
    Section 13.6   Paragraph Titles .........................................................64
    Section 13.7   Separability of Provisions; Rights and Remedies....................64
    Section 13.8   Effective Date of Admission........................................65
    Section 13.9   Amendment Procedure.................................................65
    Section 13.10  Delivery of Certificate ................................................66
    Section 13.11  Requirements of the Lender and the Agency..................66
    Section 13.12  Requirements for Bonds ……………...…………………………66
    Section 13.13  Special Power of Attorney ...........................................71

## EVANS LANE APARTMENTS LP

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP OF EVANS LANE APARTMENTS L.P., as of October 1, 2002, among AFFORDABLE HOUSING ACCESS, INC. ("AHAI"), a California nonprofit public benefit corporation, as Co-Managing General Partner; COMMUNITY HOME BUILDERS and ASSOCIATES ("CHBA"), a California nonprofit public benefit corporation as Co-Managing General Partner, MONTALVO ASSOCIATES LLC ("Montalvo"), a California limited liability company as Administrative General Partner; PROTECH 2002-C, LLC, an Ohio limited liability company ("PROTECH"), as Special Limited Partner, Builders Affordable Housing Development Company, LLC a California limited liability company, as Original (and Withdrawing) Limited Partner and AMTAX HOLDINGS 123, LLC an Ohio limited liability company ("AMTAX"), as Investor Limited Partner.

### Preliminary Statement

WHEREAS the Partnership was organized as a partnership in the laws of the State of California pursuant to a Certificate of Limited Partnership dated February 7, 2002 (the "Certificate"), the Certificate having been filed with the Secretary of State of California (the "Filing Office") on February 19, 2002. The Certificate is herein called the "Original Partnership Agreement."

WHEREAS, in furtherance of the Co-Managing General Partner's charitable purposes of providing low income housing to needy and distressed persons, the Co-Managing General Partners have entered into the Partnership to acquire, develop, construct, rehabilitate, own and maintain a 239 unit apartment complex intended for rental to persons of low and moderate income to be known as EVANS LANE APARTMENTS and to be located in San Jose, California (the "Apartment Complex").    The Co-Managing General Partners have selected the Administrative General Partner, the Special Limited Partner and the Investor Limited Partner as the Partners with whom they wish to develop the Project, as described herein.  In addition to the Administrative General Partner, the Special Limited Partner and the Investor Limited Partner, the Co-Managing General Partners on behalf of the Partnership have selected and approve and agree to oversee the Developer, the Accountants and the Property Management Agreement as part of the Partnership development and ongoing management team; and

WHEREAS the purposes of this amendment to, and restatement of, the Original Partnership Agreement are (i) to enable the Partnership to admit AHAI and CHBA as the Co-Managing General Partners, Montalvo as Administrative General Partner, Protech as Special Limited Partner and AMTAX as the Investor Limited Partner, (ii) to provide for the withdrawal of the Original Limited Partner as Limited Partner and (iii) to set out more fully the rights, obligations and duties of the Partners.

NOW, THEREFORE, it is agreed and certified, and the Original Partnership Agreement is hereby amended and restated in its entirety, as follows:

ARTICLE 1

Defined Terms

The defined terms used in this Agreement shall have the meanings specified below:

"Accountants" means Novagradac & Co., San Francisco, California or other firm of independent certified public accountants to be engaged by the Co-Managing General Partners with the Consent of the Limited Partner for the purpose of reviewing, preparing, and certifying various reports as required by this agreement or by applicable government agencies.

"Adjusted Capital Account Deficit" means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of a Partnership Fiscal Year, after giving effect to the following adjustments:

(i)     Such Capital Account shall be increased by the amount of any Deficit Restoration Obligation of such Partner.

(ii)    Such Capital Account shall be decreased by the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Allocation Regulations.

The foregoing definition of Adjusted Capital Account Deficit and the application of such term in the manner provided in Article IV hereof is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Allocation Regulations and shall be interpreted consistently therewith.

"Admission Date" means the date on which AMTAX is admitted to the Partnership as the Investor Limited Partner pursuant to Section 13.8.

"Affiliate" or "Affiliated Person" means, when used with reference to a specified Person: (i) any Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with the specified Person; (ii) any Person that is an officer of, partner in, or trustee of, or serves in a similar capacity with respect to the specified Person or of which the specified Person is an officer, partner, or trustee, or with respect to which the specified Person serves in a similar capacity; (iii) any Person that, directly or indirectly, is the beneficial owner of, or controls, 10% or more of any class of equity securities of, or otherwise has a substantial beneficial interest (10% or more) in, the specified Person, or of which the specified Person is directly or indirectly the owner of 10% or more of any class of equity securities, or in which the specified Person has a substantial beneficial interest (10% or more); and (iv) any relative or spouse of the specified Person. Affiliate or Affiliated Person of the Partnership or a General Partner does not include a Person who is a partner in a partnership or joint venture with the Partnership (or any other Affiliated Person) if that Person is not otherwise an Affiliate or Affiliated Person of the Partnership or General Partner.

"Agency" means, as applicable, the Authority and/or any other government agency having jurisdiction over the particular matter to which reference is being made.

"Agreement" means this Amended and Restated Agreement of Limited Partnership, as amended from time to time.

"Allocation Regulations" means the Treasury Regulations issued under Sections 704(b) and 752 of the Code, as the same may be modified or amended from time to time. In the event that the Allocation Regulations are revised or amended subsequent to the date of this Agreement, references herein to sections or paragraphs of the Allocation Regulations shall be deemed to be references to the applicable sections or paragraphs of the Allocation Regulations as then in effect.

"AMTAX" means AMTAX Holdings 123, LLC an Ohio limited liability company, and its successors.

"Apartment Complex" means the Buildings of the Project comprising the Improvements.

"Approved Budget" means an annual operating budget that is to be approved by the Investor Limited Partner prior to the Admission Date.

"Asset Management Fee" means the annual cumulative fee in an amount equal to $15,000 per year (as adjusted annually by the C.P.I.), payable by the Partnership to the Investment Partner Manager, or an affiliate thereof, for its services in monitoring Partnership activities. Such fee shall be payable from Cash Flow as set forth in Section 6.2. Any such fee not payable currently due to insufficient Cash Flow shall accrue and be payable from subsequent years' Cash Flow and Capital Proceeds as set forth in Section 6.2. Payment of the Asset Management Fee in the first year will be prorated from the date of 75% construction completion.

"Assignment" shall mean any assignment, transfer or sale, and the words "assign," "assignee" and "assignor" shall have correlative meanings, except in each case where the sense of this Agreement requires a different construction.

"Auditors" means a firm of independent certified accountants as may be engaged by the Co-Managing General Partners, for the purpose of reviewing, preparing, certifying various reports as required by this Agreement or by applicable government agencies.

"Authority" means the California Tax Credit Allocation Committee.

"Bonds" or "Bond Documents" means all documents relating to the tax-exempt City of San Jose Variable Rate Demand Multifamily Housing Revenue Bonds (Evans Lane Apartments) 2002 Series H in an amount not to exceed $31,000,000 with a minimum amortization of 30 years and a term of no less than 30 years and a "low floater" variable rate of interest.

"Breakeven" means the date upon which the gross rental income from the operation of the Apartment Complex and all other income from the operation of the Partnership received on a cash basis (other than any governmental subsidies which shall be deemed received on the accrual basis), and all proceeds from business interruption or rental insurance, for a period of three (3) consecutive calendar months after the Completion Date, equals or exceeds all then payable and accrued operational costs (provided however that any expenses or costs of a seasonal nature which might reasonably be expected to be incurred unevenly shall be amortized on an annual

basis as determined by the Accountants) of the Apartment Complex, including but not limited to taxes, assessments, reserve fund deposits and debt service payments paid prior to amortization of the Permanent Mortgage Loan, then assuming service of such debt (but excluding all fees which by their nature are payable only out of net Cash Flow and all debt service on the City of San Jose Loan) for such period of three (3) consecutive calendar months with each month viewed individually against accrued operational costs on an annualized budget basis as approved by the Investor Limited Partner. The determination that Breakeven has occurred shall be subject to confirmation by the Investor Limited Partner pursuant to a physical inspection of the Property; provided, however, that in the event that the Investor Limited Partner does not make such physical inspection of the Property within fifteen (15) business days after having received the Accountants' determination letter, then the Investor Limited Partner will be deemed to have waived the physical inspection requirement and Breakeven shall be deemed to have occurred.

"Builder" means JSM Enterprises.

"Buildings" means the building or buildings located on the Land, which, in the aggregate, are to contain upon completion of rehabilitation 239 apartment dwelling units.

"Business Days" means the days of the week, Monday through Friday, for which business is normally conducted in the United States. It does not include national holidays, but does include state and local holidays.

"Capital Account" means, with respect to any Partner, the Capital Account maintained by the Partnership with respect to such Partner in accordance with the provisions of Section 4.3B.

"Capital Contribution" means the total amount of cash and the Gross Asset Value of any property contributed or agreed to be contributed to the Partnership by each Partner as shown in the Schedule (minus any liabilities secured by such contributed property that the Partnership assumes or takes subject to). Any reference in this Agreement to the Capital Contribution of a then Partner shall include a Capital Contribution previously made by any prior Partner in respect to the Partnership interest of such then Partner.

"Capital Proceeds" means the gross proceeds resulting from any Capital Transaction less the expenses of the Partnership incident to such Capital Transaction, before any application or distribution of such proceeds pursuant to this Agreement.

"Capital Transaction" means any transaction the proceeds of which are not includable in determining Cash Flow, including without limitation the sale, refinancing or other disposition of all or substantially all of the assets of the Partnership, but excluding loans to the Partnership (other than a refinancing of any Mortgage Loan) and contributions of capital to the Partnership by the Partners.

"Capital Transaction Disposition Fee" shall have the meaning set forth in Section 7.10D(ii) herein.

"Cash Flow" means, with respect to any Fiscal Year or applicable period, (a) (i) all cash receipts of the Partnership from operations, subsidy payments or rental interruption insurance recoveries received by the Partnership during such period; (ii) Surplus Cash; (iii) any amounts from construction or lease up savings realized prior to Breakeven that are not used to pay any deferred Developer Fees; plus (b) any interest or like earnings of the Partnership and any amounts which the General Partners release upon approval of Investment Partner from any Partnership reserve as being no longer necessary to hold as part of such reserve, less (i) cash funds used to pay Project Expenses of the Partnership during the period, including any fees and expenses paid to the Investment Partner Manager or the General Partners (excluding all fees which by their nature are payable only out of Net Cash Flow), (ii) all cash payments during such period to discharge Mortgage Loans (including all payments of a residual nature which shall be calculated prior to the determination of Cash Flow) or other Partnership indebtedness (other than Subordinated Loans), and (iii) any amounts added to Partnership reserves (other than Operating Reserves) during such period; provided, however, that any amounts payable only by reference to positive cash flow or surplus cash shall be ignored for such determination of expense.

"Certificate" means the certificate of limited partnership of the Partnership as amended from time to time in accordance with the terms hereof.

"Change of Control" means, in any one or series of transactions: (i) in the case of a corporation, a sale, transfer, assignment or other disposition of fifty percent (50%) or more of the voting stock of the corporation or a change in the majority of directors of the board of directors of the corporation; (ii) in the case of a partnership, a sale, transfer, assignment or other disposition of a general partner's interest in the partnership or, in addition, in the case of a corporate general partner, a sale, transfer, assignment or other disposition as set out in (i) herein; (iii) in the case of a limited liability company, a sale, transfer, assignment or other disposition of the managing member's interest in the limited liability company, or, in addition, in the case of a corporate managing member, a sale, transfer, assignment or other disposition as set out in (i) herein, or, in the case of more than one managing member (or if all members share management or non-member managers), any change in the majority of members; or (iv) in the case of any other entity, a change substantially in effect as set forth in (i) through (iii) herein, to the extent applicable.

"City of San Jose Loan" means the Construction Loan.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and the Treasury Regulations promulgated thereunder at the time of reference thereto.

"Commitments" means and includes, collectively, the Mortgage Loan Commitments, and any documents and other instruments delivered to or required by the Lender or the Agency by or from the Partnership in connection with any of such Commitments, the Mortgage Loan[s] or the Project, as amended from time to time.

"Completion Date" means the date as of which the Inspecting Architect and each governmental agency having jurisdiction, if any, certifies that the work to be performed by the Builder under the Construction Contract with regard to 100% of all dwelling units   is substantially complete in conformity with any existing building code requirements, receipt of an

"as built" survey and receipt of a Final Title Policy. Any representation by a General Partner under this Agreement that the Completion Date has occurred shall be subject to confirmation by the Investor Limited Partner pursuant to a physical inspection of the Property; provided, however, that in the event that the Investor Limited Partner does not make such physical inspection of the Property within 15 business days after having received any such General Partners' representation, then the Investor Limited Partner will be deemed to have waived the physical inspection requirement.

"Consent of the Investor Limited Partner" means the prior written consent or approval of the Investment Limited Partner, or, if at any time there is more than one Investor Limited Partner, the prior written consent or approval of at least 51% in interest of the Investor Limited Partners.

"Construction Contract" means the construction contract between the Partnership and the Builder providing for the construction of the Improvements in accordance with the Commitments, as amended from time to time.

"Construction Loan" The City of San Jose is making a loan to the Partnership in the amount of up to NINETEEN MILLION THREE HUNDRED NINETY-FIVE THOUSAND NINE HUNDRED FORTY-NINE AND NO/100 Dollars ($19,395,949.00) of 20% Tax Increment Funds for development and construction costs associated with the Project located on the Property to be converted into a permanent loan (the "Conversion") in the amount of up to FIFTEEN FIVE HUNDRED FORTH-FIVE THOUSAND SIX HUNDRED SIXTY-FIVE AND NO/100 Dollars ($15,545,665.00). The Construction Loan will have with a thirty-six (36) month term and a fixed interest rate of 2.5%. After Conversion, the remaining balance will bear interest at 4.00%

"Consumer Price Index or C.P.I." means the Consumer Price Index for All Urban Consumers, All Cities, for All Items (base 1982-84 = 100) published by the United States Bureau of Labor Statistics. In the event such index is not in existence when any determination relying on such index under this Agreement is to be made, the most comparable governmental index published in lieu thereof shall be substituted therefor.

"Cost Certification" means the date upon which the Investment Limited Partner has received a certification by the General Partners of the construction and development costs of the Apartment Complex and the Eligible Basis of the Apartment Complex for purposes of Tax Credits, together with a report thereon issued by the Auditors in a form and substance as approved by Investment Partner.

"Credit Agency" means the Authority.

"Credit Deficiency" shall mean for each calendar year the difference between the Projected Credit (or adjusted Projected Credit if a Credit Shortfall that occurred previously has already been accounted for) and the amount of the Tax Credit actually available to the Investor Limited Partner for the calendar year. Tax Credits actually available for any such year shall not offset or reduce the Credit Deficiency for any prior or subsequent year.

6

"Credit Period" means the period of ten ( 10) years beginning with the taxable y ear in which the Project is placed in service or, if an election has been made pursuant to Section 42(f)(1) of the Code to defer the commencement of the Credit Period, and the Consent of the Investor Limited Partner obtained, the succeeding taxable year.

"Credit Recovery Loan" has the meaning set forth in Section 5.2D.

"Credit Shortfall" is defined in Section 5.2A

"Debt Coverage Date" m eans the first day f ollowing a period of three (3) consecutive calendar months commencing on or after Final Closing during each of which, as determined by the Accountant, the Project has produced income (as computed under the definition of Breakeven) after payment of all cash requirements other than debt service on the City of San Jose Loan and Permanent Mortgage Loan and satisfaction of all reserve requirements (in each case as described under the definition of Breakeven) at least equal to 1.15 times the amount of the required monthly debt service, including mortgage insurance premiums, if any.

"Deficit Restoration Obligation" means, for each Partner, the sum of (i) any amounts which such Partner is obligated to restore to the Partnership in accordance with the provisions of Sections 1.704-1(b)(2)(ii)(c), 1.704-1(b)(2)(ii)(h) or any other applicable provisions of the Allocation Regulations, (ii) such Partner's Share of Partnership Minimum Gain if any, and (iii) such Partner's Share of Partner Nonrecourse Debt Minimum Gain, if any.

"Depreciation" means, for the Fiscal Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted b asis f or f ederal i ncome t ax p urposes a t t he b eginning o f s uch year o r o ther p eriod, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis.

"Developer" means AHAI, CHBA and Montalvo, collectively as the developer of the Project.

"Developer Fee" or "Development Fee" means the fees payable by the Partnership to the Developer under the terms of the Development Agreement and Section 7.10A of this Agreement.

"Development Agreement" means the Development Agreement of even date herewith between the Partnership and the Developer.

"Development Advances" has the meaning set forth in the Development Agreement.

"Development Amount" has the meaning set forth in the Development Agreement.

"Eligible Basis" shall mean the adjusted basis of the Project as determined under Section 42(d) of the Code.

"Entity" means any general partnership, limited partnership, corporation, limited liability company, joint venture, trust, business trust, cooperative or association.

"Event of Bankruptcy" means, as to a specified Person:

(i)     The entry of a decree or order for relief by a court having jurisdiction in the premises in respect of such Person in an involuntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of such Person or for any substantial part of his property, or ordering the winding-up or liquidation of his affairs and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days; or

(ii)    The commencement by such Person of a voluntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or any other applicable federal or state bankruptcy, insolvency or other similar law, or the consent by him to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or similar official) of such Person or for any substantial part of his property, or the making by him of any assignment for the benefit of creditors, or the failure of such Person generally to pay his debts as such debts become due, or the taking of action by such Person in furtherance of any of the foregoing.

"Extended Use Agreement" means the Extended Low-Income Housing Covenant for Low-Income Housing Tax Credits required pursuant to Section 42(h) of the Code to be executed by the Partnership and delivered to the Agency setting forth certain terms and conditions under which the Apartment Complex is to be operated.

"Facility" shall have the meaning given to it in the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sec. 9601 et seq., as amended, and shall also include any meaning given to analogous property under other Hazardous Waste Laws.

"Federal Housing Tax Credit" means the low-income housing tax credit authorized by Section 42 of the Code.

"Filing Office" has the meaning given it in the Preliminary Statement of this Agreement.

"Final Closing" means the date upon which all of the following events have occurred: (i) Permanent Mortgage Commencement (including Conversion of any Construction Loan), (ii) the Project's being free of any mechanics' or other liens (except for the Mortgage[s] and liens either bonded against in such a manner as to preclude the holder thereof from having any recourse to the Project or the Partnership for payment of any debt secured thereby or affirmatively insured against (in such manner as precludes recourse to the Partnership for any loss incurred by the insurer) by the Title Policy or by another policy of title insurance issued to the Partnership by a reputable title insurance company in an amount satisfactory to Investment Partner Tax Counsel (or by an endorsement of either such title policy), (iii) the disbursement of proceeds under the Permanent Mortgage Loans has been made in the full amount permitted by

8

the Agency, other than any potential earn-out, and (iv) all amounts due in connection with the construction of the Project have been paid or provided for.

"General Partner" or "General Partners" means the Administrative General Partner and the Co-Co-Managing General Partners and any Person or Persons designated as a General Partner in the Schedule or any Person who becomes a General Partner as provided herein, in such Person's capacity as a General Partner of the Partnership.  If at any time the Partnership shall have a sole General Partner, the term "General Partners" shall be construed as singular.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)     The initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset, as determined by the contributing Partner and the Partnership;

(ii)    The Gross Asset Values of all Partnership assets shall be adjusted to equal their respective gross fair market values, as determined by the General Partner, as of the following times: (a) the acquisition of an additional interest in the Partnership by any new or existing Partner in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Partnership to a Partner of more than a de minimis amount of Partnership property as consideration for an interest in the Partnership; and (c) the liquidation of the Partnership within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Allocation Regulations; provided, however, that the adjustments pursuant to clauses (a) and (b) above shall be made only if the General Partner reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership;

(iii)   The Gross Asset Value of any Partnership asset distributed to any Partner shall be the gross fair market value of such asset on the date of distribution; and

(iv)    The Gross Asset Values of Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Allocation Regulations and Section 3.04 hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this clause (iv) to the extent the General Partners determine that an adjustment pursuant to clause (ii) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to Section (i), (ii) or (iv) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits or Losses.

"Gross Revenues" means total income, revenue (including gross rental income of the Project prior to any reduction or payments for fees, costs and reimbursements to Management Agent), profit, and gain, proceeds from a sale or refinancing of the Property (all as adjusted by refunds and amounts held in escrow, but not by amounts held or placed in reserves) from all sources, including interest, royalties and dividends, whether taxable, nontaxable or exempt form taxation.

"Hazardous Material" shall have the collective meanings given to the terms "hazardous material," "hazardous substances," "hazardous wastes," "toxic substances" and analogous terms in the Hazardous Waste Laws. In addition, the term "Hazardous Material" shall also include oil and any other substance known to be hazardous.

"Hazardous Waste Laws" means and includes the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980; the Resource Conservation and Recovery Act; the Toxic Substances Control Act and any other federal, state or local statutes, ordinances, regulations or by-laws dealing with Hazardous Material, as the same may be amended from time to time and including any regulations promulgated thereunder.

"Improvements" means the Buildings and any related facilities to be rehabilitated in accordance with the Commitments.

"Supervisory and Incentive Management Fee" means the fee payable by the Partnership to the Administrative General Partner as provided in Section 7.10D.

"Initial Closing" means the date upon which the Construction Loan was closed and the first proceeds are available for disbursement of the Construction Loan to the Partnership.

"Initial 90% Occupancy Date" means the first date upon which not less than 90% of the units in the Apartment Complex are leased to and occupied by Qualified Tenants

"Initial 95% Occupancy Date" means the first date upon which not less than 95% of the units in the Apartment Complex are leased to and occupied by Qualified Tenants.

"Installment" means the First, Second or Third Installment, or any subsequent Installment, as the context may require, of Capital Contributions of the Investor Limited Partner as described in Section 5.1A.

"Interest" means all the interest of a Partner in Cash Flow, Capital Proceeds and other distributions, capital, Profits or Losses, Tax Credits, and otherwise in the Partnership, including all allocations and distributions and all rights under this Agreement, and also shall include such interests and rights of such Partner in any successor partnership formed pursuant to this Agreement.

"Invested Amount" means (i) as to AMTAX, an amount equal to the Capital Contribution of AMTAX paid pursuant to Section 5.1 hereof divided by .865 and reduced by any distributions of Cash Flow and/or other Capital Proceeds and/or other distributions and other returns of capital (including Section 5.2 payments), and (ii) as to any other Partner, an amount equal to its Capital

Contribution actually paid, reduced by any distributions or any returns of capital (including Section 5.2 payments).

"Investment Agreement" means that certain Investment Agreement between the Partnership, and Paramount Financial Group, Inc., dated September 13, 2002, as amended from time to time.

"Investment Closing" means the date of execution and delivery of this Agreement.

"Investment Partner" means AMTAX.

"Investment Operating Agreement" means the Operating Agreement of AMTAX as amended from time to time.

"Investment Partner Manager" means Paramount Properties, Inc. its successors or assigns as the manager of the Investment Partner.

"Investor Limited Partner" means, initially, AMTAX and shall include any other Persons admitted as Investor Limited Partners and their successors in such capacity.

"Land" means the approximately 6.21 acre parcel of land on which the Improvements known as Evans Lane Apartments are located at 1848 Evans Lane in the City of San Jose, County of Santa Clara, California.

"Lender" means the Construction Lender and Permanent Lender.

"Limited Partner" or "Limited Partners" mean any or all of those Persons designated as Limited Partners in the Schedule, any Person admitted as a Limited Partner pursuant to Section 9.5, or any Person who becomes a Substitute Limited Partner as provided herein, in each such Person's capacity as a Limited Partner of the Partnership.

"Low-Income Unit" means any of the 239 dwelling units in the Project (which also include three (3) unrestricted Manager's units) and which are to be held for occupancy by the Partnership in such manner as to qualify such units as qualified low-income housing units under Section 42(i)(3) of the Code.

"Management Agent" means California Real Estate Management, Inc. or any successor thereto as the management agent for the Project.

"Management Agreement" means the management contract or agreement by and between the Partnership and the Management Agent which has received all Requisite Approvals.

"Management Fee" means the amount payable from time to time by the Partnership to the Management Agent for management services in accordance with the Management Agreement, which shall be subject to any Requisite Approvals.

"Maximum Annual Credit" shall mean $1,908,190 per year, for the Partnership for the total Credit Period, as provided in the Tax Credit Reservation.

"Minimum Set-Aside Test" means the set aside test selected by the Partnership pursuant to Section 42(g) of the Code whereby at least 40% of the units in the Apartment Complex must be occupied by individuals with incomes equal to 60% or less of area median income, as adjusted for family size.

"Mortgage" means any mortgage indebtedness of the Partnership evidenced by any Note and secured by any mortgage on the Property from the Partnership to any Lender; and, where the context admits, "Mortgage" shall mean and include any of the mortgages securing said indebtedness and any other documents pertaining to said indebtedness which were required by the Lender as a condition to making such Mortgage Loan.  In case any Mortgage is replaced by any subsequent mortgage or mortgages, such term shall refer to any such subsequent mortgage or mortgages.  The term "mortgage" means any mortgage, mortgage deed, deed of trust, deed to secure debt or any similar security instrument, and "foreclose" and words of like import include the exercise of a power of sale under a mortgage or comparable remedies.

"Mortgage Loan" means a loan made pursuant to a Mortgage Loan Commitment and secured by a Mortgage.

"Mortgage Loan Commitments" means and includes the commitment of the Permanent Lender to make the Permanent Mortgage Loan utilizing the Bonds.

"Note" means and includes any Note from the Partnership to a Lender evidencing a Mortgage Loan, and shall also mean and include any note supplemental to said original note issued to a Lender or any note issued to a Lender in substitution for any such original note.

"Operating Deficit Management Fee" - shall have the meaning set forth in Section 7.10E, herein.

"Original Partnership Agreement" has the meaning specified in the Preliminary Statement.

"Partner" means any General Partner or Limited Partner.

"Partner Nonrecourse Debt" has the meaning set forth in Section 1.704-2(b)(4) of the Allocation Regulations.

"Partner Nonrecourse Debt Minimum Gain" has the meaning set forth in Sections 1.704-2(i)(2) and (3) of the Allocation Regulations.

"Partner Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(i)(1) of the Allocation Regulations.

"Partnership" means the Limited Partnership governed by this Agreement as said limited partnership may from time to time be constituted.

"Partnership Agreement" means this Amended and Restated Agreement of Limited Partnership.

"Partnership Counsel" means the Law Office of the Thomas C. Dashiell, or such other counsel as the Co-Managing General Partners, with the consent of the Administrative General Partner, may designate from time to time as counsel for the Partnership.

"Partnership Management Fee" shall have the meaning set forth in Section 7.10C, herein.

"Partnership Minimum Gain" has the meaning set forth in Section 1.704-2(d) of the Allocation Regulations.

"Payment Certificate" has the meaning given it in Section 5.1B(i).

"Penalty Payment" has the meaning set forth in Section 5.2(c).

"Permanent Lender" means the maker of the permanent Mortgage Loan, together with its successors and assigns in such capacity.

"Permanent Mortgage Commencement" means the date that the Permanent Mortgage Loan has been closed and the Permanent Lender has notified the Partnership of Conversion (as that term is used in the Mortgage Loan Documents) of the Permanent Mortgage Loan or such other evidence as the General Partners shall provide indicating such conversion.

"Permanent Mortgage Loan" means the Permanent Mortgage Loan utilizing the bonds in the amount of $31,000,000 with a minimum amortization of 30 years, a term of no less than 30 years, with a "low floater" variable interest rate. The Lender will provide for an earn-out of additional permanent loan proceeds up to a maximum Permanent Mortgage Loan amount of $25,200,000. The General Partners shall purchase five-year interest rate cap pursuant to FNMA requirements such that the debt will have an interest rate cap for the full compliance period. Based on current rates, the projected interest rate would be 4.655% per annum (which includes the "low floater" fees). After Conversion the City of San Jose Loan will also be a permanent mortgage loan. The City of San Jose Loan will be reduced to $15,545,665 at stabilization. The City of San Jose Loan will bear interest at 4.0% with a term of 40 years and will be payable from net cash flow, as specified therein. CHBA will provide a loan which may also be used to pay development costs in the principal amount of $4,025,000 which will be serviced by Cash Flow after payment of management fees, but only after the Completion Date (the "CHBA Loan"). The Permanent Mortgage Loan, the City of San Jose Loan and, after Completion Date the CHBA Loan, will be non-recourse to the Partners.

"Person" means any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person where the context so admits.

"Profits or Losses" means, for each Fiscal Year or other period, an amount equal to the Partnership's taxable income or loss for such Fiscal Year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(i)     Any items described in Sections 705(a)(1)(B) and 705(a)(1)(C) of the Code which are not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss.

(ii)     Any expenditures of the Partnership described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Allocation Regulations, and not otherwise taken into account in computing Profits or Losses, shall be subtracted from such taxable income or loss.

(iii)     Gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value.

(iv)     In the event of a distribution of Partnership assets to a Partner (whether in connection with a liquidation or otherwise), or in the event the Gross Asset Value of any Partnership asset is adjusted upon the acquisition of an additional interest in the Partnership, unrealized income, gain, loss and deduction inherent in such distributed or adjusted assets (not previously reflected in Capital Accounts) shall be allocated pursuant to Section 6.1 hereof as if there had been a taxable disposition of such distributed or adjusted assets at fair market value.

(v)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition of "Depreciation" set forth herein.

(vi)     Notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 6.5 hereof shall be taken into account in computing Profits or Losses only if the Accountants determine that such items should be so reflected.

"Profits or Losses from a Capital Transaction" means the Profits or Losses, if any, recognized by the Partnership as a result of a Capital Transaction, as determined for federal income tax purposes by the Accountants, but without regard to any adjustments to basis pursuant to Section 734 and 743 of the Code.

"Project" or "Property" means the Land and the Improvements.

"Project Documents" means and includes the Construction Contract, the Mortgages, the Regulatory Agreement, the Commitments, the Management Agreement and all other documents relating to the Project, which are required by, or have been executed in connection with, any of the foregoing documents.

"Project Expenses" means (i) up to and including the Completion Date, those expenses, properly accruable through such date which may be properly charged as operating expenses of the Project under standard accounting procedures and which are allocable, in accordance with generally accepted accounting principles, to apartment units for which all requisite approvals for occupancy have been obtained; such operating expenses may include real estate taxes and debt service and mortgage insurance premiums with respect to the Mortgage Loans (to the extent such operating expenses are not funded out of Capital Contributions or Mortgage Loan proceeds), but shall not include any costs required to be capitalized in accordance with generally accepted accounting principles; and (ii) after the Completion Date, all the costs and expenses of any type incurred incidental to the ownership and operation of the Project, including, without limitation, taxes, capital improvements reasonably deemed necessary by the General Partners and not funded out of any reserves for such, mortgage and bond insurance premiums and the cost of operations, debt service, maintenance and repairs, and the funding of any reserves required to be maintained by the Lender and the Agency and this Agreement, but shall not include (i) repayments of Subordinated Loans or (ii) distributions to Partners pursuant to Article VI.

"Projected Credit" means Federal Housing Tax Credits on a year-by-year basis that are projected to be available to the Investor Limited Partner, which Projected Credits are projected to be in the amount of $95,799 for 2004, $1,329,213 for 2005, $1,907,999 per year for each of the years 2006 through 2013, $1,812,200 for 2014 and $578,786 for year 2015. The Projected Credits constitute ninety-nine point ninety-nine (99.99%) percent of the Tax Credits in the aggregate amount of $19,081,900 which are projected to be available to the Partnership. The Projected Credits will be allocated to the Investment Partner by the Partnership. Such Projected Credit will be adjusted to reflect any upward or downward adjustments caused by Section 5.2.

"Purchase Agreement" means the Purchase Agreement of even date herewith pursuant to which the Purchaser has agreed, among other things, to purchase the Interest of the Investor Limited Partner under specified circumstances.

"Purchase Obligation" has the meaning given that term in the Purchase Agreement.

"Purchaser" means the General Partners, as purchasers under the Purchase Agreement.

"Qualified Tenant" means a tenant (i) with income not exceeding the percentage of area gross median income set forth in Section 42(g)(1)(A) or (B) of the Code (whichever is applicable) who leases an apartment unit in the Project under a lease having an original term of not less than twelve months at a rent not in excess of that specified in Section 42(g)(2) of the Code, and (ii) complying with any other requirements imposed by the Project Documents.

"Recapture Amount" means the "credit recapture amount" as defined in Section 42(j)(2) of the Code.

"Recapture Event" means when there has been a "recapture" of Federal Housing Tax Credits pursuant to Section 42(j) of the Code.

"Regulations" means the rules and regulations of any Agency which are applicable to the Project or the Partnership.

"Regulatory Allocations" means the allocations set forth in Sections 6.5A through 6.5G hereof.

"Related Agreements" means the Development Agreement, the Purchase Agreement and each other agreement (other than this Agreement) constituting an exhibit thereto or executed in connection therewith.

"Related Person" has the meaning set forth in Section 1.752-4(b) of the Allocation Regulations.

"Rent Restriction Test" means the test pursuant to Section 42 of the Code whereby the gross rent charged to tenants of the low-income units in the Apartment Complex may not exceed thirty percent (30%) of the qualifying income levels.

"Requisite Approvals" means any required approvals of the Lender or any Agency to an action proposed to be taken by the Partnership.

"Schedule" means the schedule of partners annexed hereto as Schedule A as amended from time to time and as so amended at the time of reference thereto.

"Service" means the Internal Revenue Service.

"Share of Partner Nonrecourse Debt Minimum Gain" means, for each Partner, an amount equal to such Partner's "share of partner nonrecourse debt minimum gain," determined in accordance with the provisions of Section 1.704-2(i)(5) of the Allocation Regulations.

"Share of Partnership Minimum Gain" means, for each Partner, an amount equal to such Partner's "share of partnership minimum gain," determined in accordance with the provisions of Section 1.704-2(g) of the Allocation Regulations.

"Special Investment Partner Tax Counsel" means Bronson & Migliaccio, LLP or other counsel acceptable to the Investment Partner.

"Special Limited Partner" means Protech 2002-C, LLC, an Ohio limited liability company.

"State" means the State of California.

"Subordinated Loan" means a loan by a General Partner pursuant to Sections, 7.4, 7.8 and 7.9.

"Substitute Limited Partner" means any Person who is admitted to the Partnership as a Limited Partner under the provisions of Section 9.3.

"Supervisory and Incentive Management Fee" means the fee payable by the Partnership to the General Partners as provided in Section 7.10E.

"Surplus Cash" means any unrestricted cash remaining on hand after (1) the payment of (a) all sums due or currently required to be paid under the terms of any Mortgage or Note; (b) all amounts required to be deposited in the reserve fund for replacement; and (c) all obligations of the Partnership other than the Mortgage Loan unless funds for payment are set aside; and (2) the segregation and recording of (a) an amount equal to the aggregate of all special funds to be maintained by the Partnership under the Project Documents or this Agreement, including full funding of all mortgage insurance premium, real estate tax, insurance, and other escrows; (b) all tenant security deposits or prepaid rents held; and (c) all accounts and accrued items payable. Notwithstanding the foregoing, Surplus Cash as of a given date shall also include rental assistance payments properly accrued but not received through such date but received thereafter.

"Tax Credit" means the Federal Housing Tax Credit.

"Tax Credit Reservation" means the receipt by the Partnership of a credit reservation from the Credit Agency or conditional commitment therefor in the annual amount of at least $1,908,190.

"Tax Matters Partner" means the Partner designated as the Tax Matters Partner of the Partnership by the General Partners pursuant to the provisions of Section 7.13.

"Terminating Capital Transaction" means a Capital Transaction resulting in or involving the termination and winding up of the business of the Partnership or any other event resulting in the "liquidation" of the Partnership within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Allocation Regulations.

"Terminating Event" means the death or permanent disability of, or an adjudication of insanity or incompetence as to, an individual General Partner (unless the Consent of the Investor Limited Partner to a substitute General Partner is received, and such substitute General Partner is admitted to the Partnership by the first to occur of (i) the sixtieth day following such event or (ii) such earlier date as is necessary to prevent a dissolution of the Partnership under the Act), an Event of Bankruptcy as to or dissolution of a General Partner, the transfer of its Partnership Interest by a General Partner, removal of a General Partner, or the voluntary or involuntary withdrawal of a General Partner from the Partnership. For purposes of the foregoing, an individual General Partner shall be deemed to be permanently disabled if he or she becomes disabled during the term of this Agreement through any illness, injury, accident or condition of either a physical or psychological nature and, as a result, is unable to perform substantially all of his or her duties and responsibilities hereunder for 120 days during any period of 365 consecutive calendar days. Involuntary withdrawal shall occur whenever a General Partner may no longer continue as a General Partner by law or pursuant to any terms of this Agreement. In the case of a General Partner, which is an Entity, a transfer of a majority of the voting stock (or other beneficial interest) of the General Partner to a Person who is not an Affiliate of the General Partner shall be deemed to be a transfer by the General Partner of its Partnership Interest.

"Title Policy" means the owner's policy of title insurance issued to the Partnership by _____ as endorsed to increase the amount thereof to an amount equal to the appraised value of the Project, but in no event less than the sum of all Permanent Mortgage

Loans and Capital Contributions of the Partners, and to update such policy to a date not earlier than 10 days prior to the date of the Investment Closing.

"Uniform Act" means the California Revised Limited Partnership Act as in effect under the laws of the State, as amended from time to time.

"Vessel" shall have the meaning given to it in the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sec. 9601 et seq., as amended, and shall also include any meaning given to analogous property under other Hazardous Waste Laws.

<div align="center">

ARTICLE 2

Continuation; Name; Purpose and Term

</div>

Section 2.1     Continuation

The parties hereto hereby agree to continue the limited partnership known as EVANS LANE APARTMENTS L.P., formed pursuant to the provisions of the Uniform Act.

Section 2.2     Name and Office; Agent for Service

A.     The Partnership shall continue to be conducted under the name and style set forth in Section 2.1. The principal office of the Partnership shall be at c/o Montalvo Associates LLC, 1777 Saratoga Ave, Suite 210, California 95129. The General Partners may at any time change the location of such principal office and shall give due notice of any such change to the Limited Partners.

The name and address of the agent for service of process required to be maintained under the Uniform Act shall be:

> Richard A. DeFabio
> c/o Montalvo Associates LLC
> 1777 Saratoga Ave, Suite 210
> San Jose, CA 95129

Section 2.3     Purpose

The Partnership has been organized exclusively for the charitable purpose of providing low income housing to poor and distressed persons by acquiring the Land and the Apartment Complex and developing, financing, constructing, rehabilitating, owning, maintaining, operating and selling or otherwise disposing of the Apartment Complex in accordance and compliance with the Regulatory Agreement and consistent with the charitable purposes of the Co-Managing General Partners. To the extent not inconsistent with such purpose, the Partnership shall operate in a business like manner and in a manner to operate the Apartment Complex so as to generate a positive cash flow from operations. The Partnership shall not engage in any other business or activity.

Section 2.4    Authorized Acts

In furtherance of its purposes, but subject to all other provisions of this Agreement including, but not limited to, Article VII, the Partnership is hereby authorized:

(i)    To acquire by purchase, lease or otherwise any real or personal property which may be necessary, convenient or incidental to the accomplishment of the purposes of the Partnership.

(ii)    To acquire, construct, operate, maintain, finance and improve, and to own, sell, convey, assign, mortgage or lease any real estate and any personal property necessary, convenient or incidental to the accomplishment of the purposes of the Partnership.

(iii)    To borrow money and issue evidences of indebtedness in furtherance of any or all of the purposes of the Partnership and to secure the same by mortgage, pledge or other lien on the Property or any other assets of the Partnership, to the extent permitted by the Commitments.

(iv)    To prepay in whole or in part, refinance, recast, increase, modify or extend any Mortgage and in connection therewith to execute any extensions, renewals, or modifications of such Mortgage.

(v)    To employ any Person, including any Affiliate, to perform services for, or to sell goods to, the Partnership (including without limitation management services) and to pay for such goods and services; provided that (except with respect to any contract specifically authorized by this Agreement) the terms of any such transaction with an Affiliate shall not be less favorable to the Partnership than would be arrived at by unaffiliated parties dealing at arms' length.

(vi)    To execute any and all Bond Documents and any and all notes, mortgages and security agreements in order to secure loans from the Lender and any and all other documents, including but not limited to the Project Documents, required by the Lender or any Agency in connection with each Mortgage and Mortgage Loan and the acquisition, construction, rehabilitation, repair, development, improvement, maintenance and operation of the Property, or otherwise required by the Lender or any Agency in connection with the Property.

(vii)    To execute contracts with any Agency.

(viii)    To execute leases of some or all of the apartment units of the Project.

(ix)    To modify or amend the terms of any agreement or contract which the General Partners are authorized to enter into on behalf of the Partnership; provided, however, that such terms as amended shall not (a) materially adversely affect the Partnership or the Limited Partners or (b) be in contravention of any of the terms or conditions of this Agreement.

       (x)     To enter into any kind of activity and to perform and carry out contracts of any kind necessary to, or in connection with, or incidental to, the accomplishment of the purposes of the Partnership, so long as said activities and contracts may be lawfully carried on or performed by a partnership under the laws of the State.

       (xi)    To execute the Related Agreements and any notices, documents or instruments permitted or required to be executed or delivered in connection therewith or pursuant thereto.

Section 2.5    <u>Term and Dissolution</u>

A.    The Partnership shall continue in full force and effect until December 31, 2057, except that the Partnership shall be dissolved prior to such date upon the happening of any of the following events:

       (i)     The sale or other disposition of all or substantially all the assets of the Partnership;

       (ii)    A Terminating Event with respect to each of the General Partners unless the business of the Partnership is continued pursuant to Article VIII;

       (iii)   The election to dissolve the Partnership made in writing by the General Partners with the Consent of the Investor Limited Partner and any Requisite Approvals or by the Investor Limited Partner pursuant to Section 4.5; or

       (iv)   The entry of a final decree of dissolution of the Partnership by a court of competent jurisdiction.

B.    Upon dissolution of the Partnership (unless the business of the Partnership is continued pursuant to Article VIII), the General Partners (or for purposes of this paragraph their trustee, receiver, successor or legal representative) shall cause the cancellation of the Certificate and liquidate the Partnership assets and apply and distribute the proceeds thereof in accordance with Section 6.3. Notwithstanding the foregoing, in the event such liquidating General Partners shall determine that an immediate sale of part or all of the Partnership's assets would cause undue loss to the Partners, the liquidating General Partners may, in order to avoid such loss, defer liquidation of, and withhold from distribution for a reasonable time, any assets of the Partnership except those necessary to satisfy the Partnership debts and obligations (other than Subordinated Loans).

<u>ARTICLE 3</u>

<u>Financing and Disposition of Property</u>

A.    The Partnership is authorized to obtain the Construction Loan and the Permanent Mortgage Loan to finance the acquisition, development and construction of the Property and (to the extent permitted by the Lender) to meet the initial expenses of operating the Project and to secure the same by the Mortgage. As of Final Closing, each Permanent Mortgage shall provide

that no Partner or Related Person shall bear the economic risk of loss for all or any part of such Permanent Mortgage Loan.

The General Partners are specifically authorized, for and on behalf of the Partnership, to execute the Project Documents and any permitted amendments thereto and, subject to the limitations set forth herein, such other documents as they deem necessary or appropriate in connection with the acquisition, development, operation and financing of the Property.

B.      Each General Partner shall be bound by the terms of the Project Documents. Any incoming General Partner shall as a condition of receiving any interest in the Property agree to be bound by the Project Documents to the same extent and on the same terms as the other General Partners. Upon any dissolution of the Partnership or any transfer of the Property while any Mortgage is held by any Lender, no title or right to the possession and control of the Property and no right to collect the rents therefrom shall pass to any Person who is not, or does not become, bound in a manner satisfactory to the Lender and the Agency to the Project Documents and the provisions of this Agreement. The Project Documents shall be binding upon and shall govern the rights and obligations of the Partners, their heirs, executors, administrators, successors and assigns as long as the corresponding Mortgage Loan shall be outstanding.

C.      The Partnership may increase the amount of the Mortgage Loan or refinance any Mortgage, i ncluding a ny r equired t ransfer o r c onveyance o f P artnership a ssets f or se curity o r mortgage purposes, and may sell, lease, exchange or otherwise transfer or convey all or substantially all the assets of the Partnership; provided, however, that the terms of any such increase, refinancing, sale, exchange or other transfer or conveyance effected after the Admission Date must receive the Consent of the Investor Limited Partner before such transaction shall be binding on the P artnership. Notwithstanding the foregoing, no such Consent shall be required for the leasing of apartments to tenants in the normal course of operations; provided, however, unless such Consent is obtained the Partnership shall lease the Project in such a manner as to qualify as a "qualified low-income housing project" under Section 42(g)(1) of the Code, and shall lease all of the Low Income Units in the Project to Qualified Tenants.

D.      Upon the sale of the Property by the Partnership, no Person may pay to any Person real estate commissions in excess of that which is reasonable, customary, and competitive with those paid in similar transactions in the same geographic area.

ARTICLE 4

Partners; Capital

Section 4.1      General Partner

The General Partners of the Partnership are Community Home Builders and Associates, Affordable Housing Access, Inc. and Montalvo Associates LLC. Their addresses and Capital Contributions are set forth in Schedule A.

Section 4.2    Limited Partners

A.    AMTAX is hereby admitted as the Investor Limited Partner, and Protech is admitted as Special Limited Partner. Their addresses and Capital Contributions are set forth in the Schedule. The payment of Capital Contributions is governed by Section 5.1.

B.    The Original Limited Partner is Builders Affordable Housing Development Company, LLC, a California limited liability company. By its execution of this Agreement, the Original Limited Partner hereby withdraws as Limited Partner and acknowledges and agrees that the Original Limited Partner, as such, shall have no further rights or obligations with respect to the Partnership as of the Admission Date.

Section 4.3    Partnership Capital and Capital Accounts

A.    The capital of the Partnership shall be the aggregate amount of the cash and the Gross Asset Value of property contributed by the General Partners and by the Limited Partners as set forth in Schedule A. Notwithstanding anything else contained herein, the Co-Managing General Partners shall have no obligation to make additional Capital Contributions for any reason. Except as specifically set forth herein, no Partner shall have any right to make voluntary Capital Contributions to the Partnership. No interest shall be paid by the Partnership on any Capital Contribution to the Partnership. Schedule A shall be amended from time to time to reflect the withdrawal or admission of Partners, any changes in the Partnership Interests held by a Partner arising from the transfer of a Partnership Interest to or by such Partner and any change in the amounts to be contributed or agreed to be contributed by any Partner.

B.    An individual Capital Account shall be established and maintained for each Partner, including any additional or substituted Partner who shall hereafter receive an interest in the Partnership. The Capital Account of each Partner shall be maintained in accordance with the following provisions:

(i)    To each Partner's Capital Account there shall be credited such Partner's Capital Contributions, such Partner's distributive share of Profits, and any items in the nature of income or gain that are specially allocated pursuant to Section 6.5 hereof, and the amount of any Partnership liabilities that are assumed by such Partner or that are secured by any Partnership Property distributed to such Partner;

(ii)    To each Partner's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Partnership Property distributed to such Partner pursuant to any provision of this Agreement, such Partner's distributive share of Losses, and any items in the nature of expenses or losses that are specially allocated pursuant to Section 6.5 hereof, and the amount of any liabilities of such Partner that are assumed by the Partnership or that are secured by any property contributed by such Partner to the Partnership.

In the event that the Gross Asset Values of Partnership assets are adjusted pursuant to this Agreement, the Capital Accounts of all Partners shall be adjusted simultaneously to reflect the aggregate net adjustment as if the Partnership recognized gain or loss equal to the amount of such aggregate net adjustment.

C.    The original Capital Account established for any substituted Partner shall be in the same amount as, and shall replace, the adjusted Capital Account of the Partner which such substituted Partner succeeds, and, for the purposes of the Agreement, such substituted Partner shall b e d eemed t o h ave m ade t he C apital C ontribution, t o t he e xtent a ctually p aid i n, o f t he Partner which such substituted Partner succeeds. The term "substituted Partner," as used in this paragraph, shall mean a Person who shall become entitled to receive a share of the Profits or Losses, Tax Credits and distributions of the Partnership by reason of such Person succeeding to the Partnership Interest of a Partner by assignment of all or any part of a Partnership Interest. To the extent a substituted Partner receives less than 100% of the Partnership Interest of a Partner, its Capital Account and Capital Contribution shall be in proportion to the Partnership Interest it receives, and the Capital Account and Capital Contribution of the Partner who retains a partial interest in the Partnership shall continue, and not be replaced, in proportion to the Partnership Interest it retains.

D.    The foregoing provisions and the other provisions of this Agreement relating to the maintenance of the Capital Accounts are intended to comply with the Allocation Regulations and shall be interpreted and applied in a manner consistent with such Allocation Regulations. In the event the General Partners shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with the Allocation Regulations, the General Partners may make such modification, subject to the provisions of Section 6.3D. The General Partners shall adjust the amounts debited or credited to Capital Accounts with respect to (i) any property contributed to the Partnership or distributed to the Partners, and (ii) any liabilities that are secured by such contributed or distributed property that are assumed by the Partnership or the Partners, in the event the General Partners shall determine such adjustments are necessary or appropriate pursuant to Section 1.704-1(b)(2)(iv) of the Allocation Regulations. Subject to the provisions of Section 6.3D, the General Partners also shall make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with the Allocation Regulations.

E.    The Partnership shall not redeem or repurchase any Partnership Interest, and no Partner shall have the right to withdraw, or receive any return of, its Capital Contribution, except as s pecifically p rovided herein. T he General P artners s hall h ave n o p ersonal l iability f or t he repayment of the Capital Contribution of any Limited Partner. Nothing in this Section 4.3 shall alter the limitation on liability of a General Partner or its Affiliates pursuant to Section 7.7.

Section 4.4    Liability of Limited Partners

No Limited Partner shall be liable for any debts, liabilities, contracts, or obligations of the Partnership. A Limited Partner shall be liable only to make payments of its Capital Contribution as and when due hereunder. After its Capital Contribution shall be fully paid, no Limited Partner shall, except as otherwise required by the Uniform Act, be required to make any further capital contributions or payments or lend any funds to the Partnership.

Section 4.5    Certain Rights of Investor Limited Partner

A.     Subject to the provisions hereinafter set forth in this Section 4.5, and to the Regulations, in addition to the other rights provided for in this Agreement, the Investor Limited Partner shall have the right:

(i)     To amend this Agreement, upon the reasonable consent of all Partners, subject to the provisions of Section 13.9 solely to conform this Agreement to the agreement and understanding of he parties; and provided that prior to a cting to effect such amendment, the I nvestor L imited Partner shall provide the G eneral Partners with written notice explaining in reasonable detail the need for such amendment and provided further that such amendment (a) shall not in any manner allow the Limited Partners to take any action which would constitute their taking part in the control of the Partnership's business within the meaning of the Uniform Act, and (b) shall not in any manner, without the consent of any General Partner affected, except in the case of a removal pursuant to Section 4.5A(iv), alter the authority, rights, powers, obligations, duties, liability, standard of care, or indemnification of the affected General Partner or alter or affect its interest in the Profits and Losses of the Partnership, Tax Credits, Cash Flow, Capital Proceeds or distributions or alter any of the provisions of Section 4.5B, (c) shall not in any manner, without the consent of the General Partners, grant to, expand or increase the Limited Partners' voting rights, authority or power, and (d) the Limited Partner shall provide the General Partner with written notice explaining in reasonable detail the reasons for such amendment and (e) shall not decrease the Limited Partner's capital contributions, unless specifically authorized to do so under this Agreement.

(ii)     To dissolve the Partnership upon the consent of the Co-Managing General Partners and Administrative General Partner, which consent may not unreasonably be withheld;

(iii)     To approve or disapprove, with the consent of the Co-Managing General Partners and the Administrative General Partner, the sale of all or substantially all of the assets of the Partnership; and

(iv)     To remove a General Partner and elect one or more new General Partners upon the occurrence of any of the following with respect to the affected General Partner:

(1)     In the event of any willful misconduct or pattern of repeated incompetence, repeated reckless disregard for the Partnership's welfare, or repeated dereliction of duty, with respect to any material matter in the discharge of its duties and obligations as General Partner which could result in material impairment or hardship upon the Project, where the affected General Partner has received prior written notification of the misconduct or failure and has been given an opportunity to cure within a time reasonable time (but not more than 60 days) in light of the nature of the alleged misconduct or failure;

(2)     The General Partner shall have violated any material provisions of or the Loan Agreement, or the Extended Use Agreement, or any material provisions of any other Project Document or Bond Documents, or any material provisions of the Lender and/or Agency regulations applicable to the Apartment

Complex, in each case upon written notice after disclosure to the Limited Partner by a General Partner of such event, or discovery without such disclosure, and failure to cure within thirty (30) days of such notice; or failure to disclose to the Limited Partner of a known material violation hereunder within thirty (30) days of actual knowledge of such material violation by the General Partner; or an event sufficient for a Purchase Obligation to arise under the Purchase Agreement shall have occurred (other than Lender or Agency disapproval); or

(3)     The General Partners, or any of them, shall have violated any material rights, powers, duties, representations or warranties as set forth in Article VII herein or shall have violated any material provision of this Agreement, defaulted on a guarantee herein or the timely payment of an Adjustment Payment or violated any material provision of applicable law, in each case upon written notice after disclosure to the Limited Partner by a General Partner of such event, or the discovery without such disclosure, and failure to cure within thirty (30) days of such notice or failure to disclose to the Limited Partner of a known violation hereunder within thirty (30) days of knowledge of such violation by the General Partner; or

(4)     The General Partners, or any of them, shall have caused the Construction Loan or the Permanent Mortgage Loan to go into default and shall have failed to cure prior to the initiation of foreclosure or collection actions; or

(5)     The General Partners, or any of them, shall have conducted their own affairs or the affairs of the Partnership in such manner as would cause the termination of the Partnership for federal income tax purposes; or cause the Partnership to be treated for federal income tax purposes as an association, taxable as a corporation or shall have effected a Change of Control in the Partnership without the Consent of the Investment Partner Manager;

(6)     After Permanent Mortgage Commencement, failure to maintain a debt coverage ratio (as calculated in the definition of Debt Coverage Date) of at least 1.05 over any consecutive six (6) month period (exclusive of deferred Development Fees, Asset Management Fee, and all other fees payable to the General Partners); or

(7)     Repeated failure to furnish reports as required in Section 12.1, and failure to cure within thirty (30) days after notice is given from the Investor Limited Partner; or

(8)     Any penalty or amount assessed against the Partnership or the General Partners for the benefit of the Investor Limited Partner, or any amount otherwise due the Investor Limited Partner from the General Partners or the Partnership, is not paid within thirty (30) days after notice, or any operating deficits are not funded and paid by the General Partners within the earlier or thirty (30) days when due or when necessary for the continuation of the Project without delay; or

(9)     After the first nine (9) months following the Initial 95% Occupancy Date the occupancy of the Project for any three (3) consecutive months, and/or the average occupancy for any calendar year, falls below 85% unless such occupancy level is related to a condition or event occurring at the property which is beyond the control of the General Partners or the Property Manager (special situations such as fire damage, or other catastrophes to be considered);

(10)    After the Initial 95% Occupancy Date, the qualified Low Income Units of the Project fall below ninety percent (90%) of the total Low Income Units;

Provided however that any removal under this Section 4.5(iv) shall only be exercisable by the Investor Limited Partner by giving a written notice of removal ("Notice of Removal") to the affected General Partner which states in reasonable detail the nature of the alleged events giving rise to the removal (including any required prior notices and opportunity to cure) and the proposed effective date for the removal. Within ten (10) business days of receipt of the Notice of Removal, the affected General Partner shall have the right to contest any proposed removal if it in good faith believes that such removal is not warranted. The right to contest shall be exercised by the affected General Partner by giving written notice ("Contest Notice") of such contest to the Investor Limited Partner within ten (10) Business Days of the General Partner's receipt of the Notice of Removal. In such event the affected General Partner shall, within 15 Business Days of the date of the Contest Notice, institute an action to resolve said dispute through the arbitration procedures provided for in this Agreement.   Failure to timely commence an arbitration proceeding shall result in the affected General Partner being removed without any further act of any Partner upon the expiration of said 15 Business Days. The removal of the affected General Partner shall not be effective, if at all, until there has been a final decision or adjudication in any such arbitration action.

B.     The Interest of any General Partner removed pursuant to this Section 4.5 shall be valued and sold pursuant to Section 8.4.

C.     Upon written request to the Co-Managing General Partners and to the Administrative General Partner by the Investor Limited Partner, the Co-Managing General Partners shall call a meeting of the Partners for any matters for which the Partners may vote, as set forth herein. Upon receipt of a written request either in person or by certified mail stating the purpose(s) of the meeting, the Co-Managing General Partners shall provide all Partners within ten days after receipt of said request, written notice (either in person or by certified mail) of a meeting and the purpose of such meeting to be held on a date not less than 15 nor more than 60 days after receipt of said request, at a time and place convenient to the Partners.

D.     In the event a General Partner is validly removed pursuant to this Section 4.5, and despite the validity of such removal which is known, or should have reasonably been known, to such General Partner, opposes such removal after a reasonable period of time to effect the removal, substantial cost and expense will be incurred by the Partnership in effecting the removal, arranging for a suitable replacement and completing the orderly transfer of records and management. It is understood and agreed by, between and among the parties that in view of the

reasons for removal as set forth in subparagraph (A)(iv) therein, the validly removed General Partner, and not the Partnership nor the Investor Limited Partner, should be charged with these costs and expenses. The parties agree that in the event the removal is valid, and despite its validity the General Partner does not voluntarily remove within fifteen (15) Business Days of the Contest Notice, then liquidated damages for these costs and expenses (only and not in lieu of other amounts owed by such General Partner nor other losses incurred due to such General Partner) in the amount of $25,000 shall be paid by such removed General Partner to the Partnership upon such removal and that the Partnership shall be entitled to immediately collect, offset or otherwise initiate any actions authorized under the law to recover such liquidated damages from such removed General Partner or its assets and receivables. The General Partner shall be free to contest the validity of these liquidated damages in any forum in which the removal itself is, or would have been contested.

## ARTICLE 5

### Capital Contributions of Investor Limited Partner

Section 5.1    Installments of Capital Contributions

A.    The Investor Limited Partner shall contribute as its Capital Contribution the sum of $16,695,627 payable in the following installments:

(1)    $4,883,494 upon the latest to occur of (i) Tax Credit Reservation or equivalent Code Section 42(m)(2)(D) determination or valid commitment letter to issue the 42(m)(2)(D) commitment or, (ii) the closing of Construction Loan, with the proceeds of this installment to be placed into a construction escrow account held by the Bond Trustee or by the Construction Lender and disbursed pursuant to standard AIA documents G702 for draw requests or such other procedures as are reasonably acceptable to the Construction Lender and the Investor Limited Partner. The Investor Limited Partner shall also receive all draw requests submitted and invoices, lien waivers and certification by an inspecting architect approved by the Investment Partner, or (iii) receipt of a commitment acceptable to the Investment Partner for the Permanent Mortgage Loan, (iv) Admission, (v) the completion of 75% of the construction of the Project as determined by the Inspecting Architect, (vi) disbursement of 100% of the proceeds of the Construction Loan, City Loan and City Grant, less holdbacks for retention (the "First Installment"). Notwithstanding the foregoing, $100,000 of this First Installment shall be funded into an escrow account held by the Construction Lender at Admission. Such funds shall not be disbursed until conditions (i) through (iv) of the First Installment are satisfied unless otherwise required at the Construction Lender.

Bridge Loan. A bsent a n u ncured d efault o f a m aterial o bligation h ereunder o r under any Partnership loan by the Partnership or the General Partners, the Investor Limited Partner shall provide a bridge loan in the amount of the Second Installment as specified herein (the "Bridge Loan"). The Bridge Loan shall be converted to equity upon the requirements being met for release of the Second Installment. The Bridge Loan will be provided by the Investor Limited Partner upon written request and verification at the time of disbursement that such Bridge Loan is reasonably necessary for the Project and

that there are sufficient sources of funds in the Project to complete all Projects Costs including the funding of reserves. The Bridge Loan will have a maturity of the earlier of (i) December 31, 2005, or (ii) upon earning of the Second Installment described in Section 5.1A(2). The Bridge Loan will be guaranteed by the General Partners and Mr. James S. Morley. The interest rate and fees for the Bridge Loan are as follows:

|      |                          |                          |
|------|--------------------------|--------------------------|
| (I)  | Rate:   30 day Libor plus 525 basis points, adjusted monthly, calculated on a 360 day year. | |
| (II) | Origination Fee:         | 1.75 basis points        |
| (III)| Legal Fee Reimbursement: | .5 basis points          |
| (IV) | Other Fees:              | Actual recording costs   |

(2)     $1,221,133 on the latest to occur of the (i) the Completion Date, (ii) Cost Certification, or (iii) satisfaction of all of the conditions to the payment of the First Installment (the "Second Installment");

(3)     $10,491,000 on the latest to occur of (i) initial 90% Occupancy Date, (ii) receipt of forms 8609 for all buildings in the Project (iii) the occurrence of Breakeven, (iv) Final Closing, (v) attestation by Partnership Accountant providing a detailed analysis of the depreciable assets including personal property, land improvement, and the building, or (vi) satisfaction of all the conditions to the payment of the First and Second Installments (the "Third Installment").

(4)     $100,000 on the latest to occur of (i) 3 consecutive months of 1.15 debt coverage achieving the Debt Coverage Date, (ii) initial 95% Occupancy Date and 100% of the units are Tax Credit qualified, or (iii) satisfaction of all of the conditions of the payment of the First, Second and Third Installments (the "Fourth Installment").

B.     The obligation of the Investor Limited Partner to make each Installment (except as otherwise provided) is subject to each of the following conditions:

(i)     The Co-Managing General Partners shall have executed and delivered to the Investor Limited Partner a certificate (the "Payment Certificate"), in the form attached hereto as Exhibit 1, dated the date such Installment is to be paid to the Partnership and attaching the Title Policy endorsement referred to therein.

(ii)     In the case of the First Installment, all Requisite Approvals to the admission of AMTAX as Investor Limited Partner pursuant to this Agreement shall have been obtained.

(iii)     Each of the material representations and warranties set forth in Section 7.5 which are capable of being satisfied as of such time shall in all material respects be true and correct.

(iv)     No event shall have occurred which would permit AMTAX to give an Election Notice under the Purchase Agreement.

C.    Notwithstanding the foregoing, if an Installment has not become due because of a failure to satisfy any condition to the payment thereof, but such condition can be satisfied by the payment of money, then in the discretion of the Investor Limited Partner such Installment may be collected notwithstanding the failure to satisfy such condition, provided that when such Installment is paid (1) the amount required to satisfy such condition is disbursed directly to the requisite parties for the purpose of satisfying such condition, and (2) any acceleration of maturity of indebtedness and any other default and any action or proceeding which was the basis of the failure to satisfy such condition or which resulted from such failure has been effectively waived and, in the case of any such action or proceeding, terminated with prejudice.

D.    Security Agreement

a.    The Investor Limited Partner hereby pledges to the Partnership and grants the Partnership a security interest in its Partnership Interest as further security for its obligation to make Capital Contributions hereunder and agrees that the Partnership shall have, in addition to the rights provided for herein, all of the rights and remedies of secured party under the Uniform Commercial Code of the Project State with respect to the Partnership Interest in the event of the failure of the Limited Partner to make its Capital Contributions when and as provided herein, in whole or in part.  In furtherance of the foregoing pledge, the Investor Limited Partner shall execute and deliver to the Partnership one or more Uniform Commercial Code Financing Statements, to be filed in the State of California and, if requested by the Managing General Partner, the Project State.

b.    Upon failure by the Limited Partner to make its Capital Contributions when validly due, in whole or in part, after fifteen (15) days of written notice of default and opportunity to cure, the Partnership may, but shall not be required to, realize upon such collateral by disposing of the Partnership Interest of such defaulting Limited Partner at a public or private sale, at which the Partnership, any Partner, including the Investor Limited Partner, or any third party may appear and bid. The Investor Limited Partner shall be entitled to no less than ten (10) days prior written notice of any public or private sale.

c.    The proceeds of any sale shall be applied in the following order of priority:

(i)    to the payment of reasonable out-of-pocket costs and expenses of such sale, or resale of the Partnership Interest if the Partnership was successful bidder at such sale, and of admission of the purchaser to the Partnership;

(ii)    to the payment of the Capital Contribution in respect to which the default occurred and any other past-due obligations of the defaulting Limited Partner to the Partnership which have either been admitted in writing by the Investor Limited Partner or which are evidenced by a written opinion of the Partnership's Accountants; and

(iii)    to the defaulting Limited Partner as to any excess.

d.    In the event the Investor Limited Partner disputes the payment of an Installment of Capital Contribution, or any part of a Capital Contribution, it may seek Arbitration

29

in accordance with Section 13.14 herein, upon the depositing of the Installment or Installments of Capital Contribution in dispute in an escrow account. The Arbitrator shall be given power and authority over the escrow funds to act in accordance with Section 13.14 herein and to rule direct, or order as to their disposition.

      e.    The defaulting Limited Partner shall not obtain any interest in the profits or losses, cash flow, proceeds of capital transactions, or other operating or capital items of the Partnership after the foreclosure sale of the Interest by virtue of any of any subsequent payments made to the Partnership, as aforesaid.

### Section 5.2    Adjustments to Capital Contributions

The Capital Contribution of the Investor Limited Partner shall be subject to increase or decrease in the manner provided in this Section 5.2.

A.    If, as of the Completion Date and based upon the Cost Certification, it is determined that the amount of Tax Credits for which the Project will be eligible (as evidenced by applicable documentation including Forms 8609) is less than the Maximum Annual Credit, such difference being hereinafter referred to as a "Credit Shortfall", then there shall be a reduction in the Investor Limited Partner's Capital Contribution in an amount equal to the product of (i) the Credit Shortfall and (ii) 8.75 (referred to as the "Credit Shortfall Adjustment"). Such reduction shall be applied by decreasing the amount of the next Installment due, and, if necessary, further Installments (reducing the earlier ones first) by the amount of the Credit Shortfall Adjustment. If all Installments of Capital Contribution have been paid at the time of a Credit Shortfall, or the aggregate amount of Installments remaining at the time of the Credit Shortfall is less than the amount of the Credit Shortfall Adjustment, then the Credit Shortfall Adjustment, or any balance of the Credit Shortfall Adjustment over the amount of the remaining Installments, as the case may be, shall be immediately distributed, in cash, to the Investor Limited Partner.

In the event that the amount of Tax Credit for which the Project will be eligible is more than the Maximum Annual Credit, then the Investor Limited Partner's Capital Contribution shall be increased at a rate of \$.875 per each additional \$1.00 of Tax Credits provided that there is the same ratio of additional Tax Credits to additional losses set forth on Schedule B, hereto. Such additional amount shall be payable at the time of the Third Installment.

B.    In the event there is Credit Deficiency or any Recapture Event, within sixty (60) months after the Completion Date, then the Investor Limited Partner shall be entitled to an adjustment payment from the General Partners (the "Adjustment Payment"). For these purposes, any event which causes a Credit Deficiency during the first sixty (60) months that also results in or creates a Credit Deficiency that extends into the last sixty (60) months, will be penalized and adjustments made as if the Credit Deficiency had occurred entirely during the first sixty (60) months. The Adjustment Payment will be in a total amount equal to the sum of: (i) the product of (a) the total of the Credit Deficiency for each of the years of Projected Credit and (b) 1.012 and (ii) and any additional interest and/or penalty that may be assessed by the Service for any year as a result of the Recapture Event. The amount of Credit Deficiency in this Section 5.2B will be reduced by the fair market value of any Tax Credits deferred beyond the dates of Projected Credit as set forth in Article I. Fair market value is to be determined using a discount

rate of 8.0%. The Adjustment Payment shall be paid by the General Partners to the Investor Limited Partner within thirty (30) days of written notice from the Investor Limited Partner. The General Partners shall pledge their Partnership Interest to secure such payment. In the event the General Partners fails to fund any Adjustment Payment when due, the Investor Limited Partner may, at its sole discretion, pursue one or more remedies including any of the following remedies: (i) attach or otherwise seize any amount otherwise distributable to the General Partners from Cash Flow of the Partnership; (ii) recover the funds from the General Partners; (iii) assert its rights under the Uniform Commercial Code or other applicable law either against the General Partner's Partnership Interest or other assets of the General Partners; and (iv) remove the General Partners pursuant to Section 4.5.

C.     If an event which causes a Credit Deficiency or a Recapture Event initially occurs at any time after the fifth anniversary of completion of construction, except as set forth in subparagraph B above, then the Investor Limited Partner shall be deemed to have made a loan (a "Credit Recovery Loan") to the Partnership in an amount equal to the sum of (i) the product of (a) the Credit Deficiency and (b) 1.012, and (ii) any additional interest and/or penalty that may be assessed by the Service for any year as a result of the Recapture Event. Credit Recovery Loans shall bear simple interest at 9% per annum and shall be repaid only as provided in Section 6.2. The General Partners and the Developer shall pledge and collaterally assign their interest and all their Partnership distributions, all amounts due to them for Subordinated Loan repayments, and all fees due to them to secure payment of such Credit Recovery Loans.

D.     Attached as Schedule B is a schedule of Specified Tax Benefits that were calculated based upon projections provided by the General Partners and which constitute a substantial portion of the Investor Limited Partner's expected return. If, prior to funding the First Installment and once again prior to funding the Third Installment, the Investor Limited Partner determines that the Specified Tax Benefits are not achievable due to inaccuracies contained within or modifications to the underlying assumptions contained within the projections provided by the General Partners, the parties to this Agreement agree to amend the Investor Limited Partner's Capital Contribution to provide the Investor Limited Partner with a return that is consistent with the return contemplated by the Specified Tax Benefits.

E.     After admission of the Investor Limited Partner, the General Partners shall be entitled to a return of capital in an amount equal to their respective capital contributions made prior to Admission, subject to the General Partners maintaining an aggregate Capital Contribution of no more than .1% of the Capital Contributions of all Partners. This return of capital will be funded from the proceeds of the Investor Limited Partner's Capital Contribution.

## ARTICLE 6

### Distributions of Cash; Allocations of Profits, Losses and Tax Credits

Section 6.1     Profits and Losses and Tax Credits

A.     After giving effect to the special allocation provisions of Section 6.4, Profits or Losses and Tax Credits for any Partnership Fiscal Year shall be allocated .0045% to the Co-

Managing General Partners, .0045% to the Administrative General Partner, .001% to Protech and 99.99% to the Investor Limited Partner.

B. After giving effect to the special allocation provisions of Section 6.4, Profits or Losses from a Capital Transaction in any Partnership Fiscal Year shall be allocated to and among the Partners as follows:

As to Profits:

First, an amount of Profits equal to the aggregate negative balances (if any) in the Capital Accounts of all Partners having negative balance Capital Accounts shall be allocated to such Partners in proportion to their negative Capital Account balances until all such Capital Accounts have zero balances; and

Second, an amount of Profits shall be allocated to each of the Partners until the positive balance in the Capital Account of each Partner equals the amount of cash which would be distributed to such Partner in accordance with the provisions of Clauses Ninth through Eleventh of Section 6.2B(ii).

As to Losses:

First, an amount of Losses equal to the aggregate positive balances (if any) in the Capital Accounts of all Partners having positive balance Capital Accounts shall be allocated to such Partners in proportion to their positive Capital Account balances until all such Capital Accounts have zero balances; provided, however, that if the amount of Losses so to be allocated is less than the sum of the positive balances in the Capital Accounts of those Partners having positive balances in their Capital Accounts, then such Losses shall be allocated to the Partners in such proportions and in such amounts so that the Capital Account balances of each Partner shall equal, as nearly as possible, the amount of cash such Partner would receive if an amount equal to the excess of (i) the sum of all Partner's balances in their Capital Accounts computed prior to the allocation of Losses under this Clause First or (ii) the aggregate amount of Losses to be allocated to the Partners pursuant to this Clause First were distributed to the Partners in accordance with the provisions of Clauses Ninth through Eleventh of Section 6.2B(ii); and

Second, the balance, if any, of such Losses shall be allocated .0045% to the Co-Managing General Partners and .0045% to Administrative General Partner, .001% to Protech and 99.99% to the Investor Limited Partner.

Section 6.2    Application and Distributions Prior to Dissolution

Notwithstanding any other provision of this Agreement, Distributions shall at all times comply with the requirements and conditions and limitations of the Permanent Mortgage Loan.

A.    Application and Distribution of Cash Flow

32

(i)     Except as otherwise provided below, the General Partners shall determine, as of the end of each calendar quarter, the amount of Cash Flow that is available as of the end of such period to be applied as provided in Section 6.2A(ii).  Cash Flow that is so determined as available for distribution as of the end of any period shall be deemed Cash Flow for such period even if distributed after such period.

(ii)     The amount of Cash Flow shall be distributed as follows:

First, to the maintenance of Operating Reserves as set forth in Section 7.8B herein;

Second, to the payment to the Investor Limited Partner of any current and accrued Asset Management Fee;

Third, to the payment of the Deferred Developer Fee;

Fourth, to the repayment of any Subordinated Loans of the General Partners;

Fifth, to the payment of any current and accrued the Partnership Management Fee;

Sixth, after the Completion Date, to the payment of the CHBA Loan;

Seventh, to the payment of the Supervisory and Incentive Management Fee to the Administrative General Partner as set forth in Section 7.10;

Eight, a priority distribution to the Investor Limited Partner in an amount equal to 10% of the remaining balance;

Ninth, to the payment of any current and accrued Operating Deficit Management Fee to the General Partners, as set forth in Section 7.10;

Tenth, the balance, 99.99% to the Investor Limited Partner .0045% to the Co-Managing General Partners, and .0045% to the Administrative General Partner and .001% to Protech.

(iii)     Cash flow shall be applied as provided in Section 6.2A(ii) within thirty (30) days of the end of each calendar quarter.

B.     Distributions of Capital Proceeds

(i)     The General Partners shall determine, within 45 days after the Partnership's receipt thereof, the amount of Capital Proceeds available to be applied as provided in Section 6.2B(ii).

(ii)     Subject to the provisions of Section 5.2 with respect to any Credit Deficiency or Recapture Amount or other amounts due the Investor Limited Partner,

including Penalty Payments, and further subject to the provisions of Section 6.3 below, any Capital Proceeds shall be distributed to and among the Partners in the following amounts and order of priority:

First, to the payment of all debts and liabilities of the Partnership, but excluding liabilities owed to Partners, and to the establishment of any required reserves;

Second, to the payment of the Asset Management Fee of such year and for previous year as to which the Asset Management fee has not been paid in full;

Third, to the repayment of any Credit Recovery Loans of the Investor Limited Partner, and any interest thereon;

Fourth, in the event of a sale of the Project, a priority distribution to the Investor Limited Partner (the "Exit Tax Distribution") equal to its net tax liability incurred by the sale and subsequent liquidation, plus the amount of any tax liability incurred by the Exit Tax Distribution with net tax liability determined by taking into account losses as well as income or gain;

Fifth, to the payment of any portion of the Deferred Developer Fee owing under Section 7.10;

Sixth, to the repayment of any Subordinated Loans of the General Partners;

Seventh, to the General Partners payment of any current or accrued Partnership Management Fee and then to the payment of any outstanding balance of the CHBA Loan;

Eighth, except in the case of a refinancing, to each Partner in an amount equal to the positive balance in its capital account, after all prior distributions;

Ninth, a priority distribution to the Investor Limited Partner in an amount equal to 10% of the remaining balance;

Tenth, to the payment of any current and accrued Operating Deficit Management Fee to the General Partners, as set forth in Section 7.10;

Eleventh, the balance, 99.99% to the Investor Limited Partner, .001% to Protech, .0045% to the Co-Managing General Partners and .0045% to the Administrative General Partner.

Section 6.3   Liquidation

A.   Upon the liquidation and dissolution of the Partnership, unless the business of the Partnership is continued pursuant to the provisions of Sections 8.2 or 8.3 hereof, the General Partners shall liquidate the assets of the Partnership and cause the business of the Partnership to

be wound up in accordance with the Uniform Act and cause the Certificate to be cancelled in accordance with the provisions of Section 2.5B.

B.      Subject to the provisions of Section 6.3C below, any Capital Proceeds from a Terminating Capital Transaction remaining after payment of, or adequate provision for, the debts and obligations of the Partnership shall be distributed to those Partners with positive Capital Account balances (after first taking into account all Capital Account adjustments including under Section 6.1.B, for the Partnership taxable year) in proportion to said Capital Account balances.

C.      Except to the extent of his or its Share of Partnership Minimum Gain or Partner Nonrecourse Debt Minimum Gain, if any, no Partner shall have a Deficit Restoration Obligation nor shall any Partner otherwise be required to restore any deficit balance in his or its Capital Account at any time.

D.      The parties intend that, as a result of the application of the allocation and distribution provisions contained in this Article VI, any Capital Proceeds from a Terminating Capital Transaction under Section 6.3B will be distributed in the same manner as Capital Proceeds are distributed under the provisions of Section 6.2B.  If the Partnership is advised at any time by the Accountants or counsel that an actual distribution of Capital Proceeds at the end of any Fiscal Year in accordance with the provisions of Section 6.3B would not result in each Partner receiving the amount that it would have received if Section 6.2B rather than Section 6.3B applied to such distribution, the General Partner shall so notify the Limited Partners and, with the Consent of the Investor Limited Partner, are authorized and empowered to amend the provisions of this Article VI relating to the allocation of Profits or Losses (other than the Regulatory Allocations) for such Fiscal Year (and for subsequent Fiscal Years if necessary) to cure such defect consistent with the principles set forth in the first sentence of this Section 6.3(d).

Section 6.4      Special Allocation Provisions

Notwithstanding anything to the contrary contained herein:

A.      Nonrecourse Deductions shall be allocated 99.99% to the Investor Limited Partner, .001% to the Special Limited Partner, .0045% to the Co-Managing General Partners and .0045% to the Administrative General Partner.

B.      Partner Nonrecourse Deductions shall be allocated to and among the Partners in the manner provided in the Allocation Regulations.

C.      Subject to the provisions of Section 6.4P, if there is a net decrease in Partnership Minimum Gain for a Partnership Fiscal Year, the Partners shall be allocated items of Partnership income and gain in accordance with the provisions of Section 1.704-2(f) of the Allocation Regulations.

D.      Subject to the provisions of Section 6.4P, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain for a Partnership Fiscal Year, then any Partner with a Share of such Partner Nonrecourse Debt Minimum Gain shall be allocated items of Partnership income and gain in accordance with the provisions of Section 1.704-2(i)(4) of the Allocation Regulations.

E.      Subject to the provisions of Sections 6.4A through 6.4D above, in the event that any Partner unexpectedly receives any adjustments, allocations or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Allocation Regulations, items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Allocation Regulations, the Adjusted Capital Account Deficit of such Partner as quickly as possible.  This Section 6.4E is intended to constitute a "qualified income offset" provision within the meaning of the Allocation Regulations and shall be interpreted consistently therewith.

F.      Subject to the provisions of Sections 6.4A through 6.4E above, in no event shall any Limited Partner be allocated Losses that would cause it to have an Adjusted Capital Account Deficit as of the end of any Partnership Fiscal Year.  Any Losses that are not allocated to a Limited Partner by reason of the application of the provisions of this Section 6.4F shall be allocated to the Administrative General Partner.

G.      Subject to the provisions of Sections 6.4A through 6.4F above, in the event that any Limited Partner (who is not also a General Partner) has an Adjusted Capital Account Deficit at the end of any Partnership Fiscal Year, items of Partnership income and gain shall be specially allocated to each such Limited Partner in the amount of such Adjusted Capital Account Deficit as quickly as possible.

H.      Without limiting the generality of Section 6.4B above, (i) if the Partnership incurs recourse obligations to fund the payment of deductible items which are not anticipated to be paid in the ordinary course of business or (ii) if the Partnership incurs losses from extraordinary events which are not recovered from insurance or otherwise and which are not anticipated to be paid in the ordinary course of business (the obligations and losses under clauses (i) and (ii) being referred to herein collectively as "Excess Expenses") in respect of any Fiscal Year, then the calculation and allocation of Losses shall be adjusted as follows: first, an amount of deductions equal to such Excess Expenses for the Fiscal Year in question shall be allocated to the Administrative General Partner; and second, the balance of such deductions and all gross income shall be allocated as provided in Section 6.1A. For purposes of this Section 6.4H, extraordinary events include casualty losses, losses resulting from liability to third parties for tortious injury, losses resulting from a breach of a legal duty by the Partnership or by the General Partners, and deductions resulting from other liabilities which are not incurred in the ordinary course of business.  Nothing in this Section 6.4H shall prevent the Partnership from recovering an extraordinary loss from a General Partner who is liable therefor by law or under this Agreement. If any Excess Expenses shall be repaid from Cash Flow generated in respect of any Fiscal Year, then the allocation of Profits and Losses under Section 6.1A for such Fiscal Year shall be adjusted as follows: first, the General Partner shall be allocated an amount of the gross income of the Partnership equal to the amount of the Excess Expenses repaid in such Fiscal Year; and second, the balance of such gross income and all deductions shall be allocated as provided in Section 6.1(a).

I.      In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income

tax purposes and its initial Gross Asset Value.  In the event that the Gross Asset Value of any Partnership Property is adjusted pursuant to the terms of this Agreement, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder.  Any elections or other decisions relating to such allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intention of this Agreement.  Allocations pursuant to this Section 6.4I are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

J.      Syndication expenses, if any, for any Fiscal Year or other period shall be specially allocated to the Investor Limited Partner.

K.      For purposes of determining the Profits, Losses, Tax Credits or any other items allocable to any period, Profits, Losses, Tax Credits and any such other items shall be determined on a daily, monthly, or other basis, as determined by the General Partners using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

L.      To the extent that interest on loans (or other advances which are deemed to be loans) m ade b y any G eneral P artner t o t he P artnership i s d etermined t o b e d eductible b y the Partnership in excess of the amount of interest actually paid by the Partnership, such additional interest deduction(s) shall be allocated solely to such General Partner.

M.      If the Service successfully disallows the deduction of all or any part of any fee paid by the Partnership to either General Partner or its Affiliates by recharacterizing such fee as a distribution to such General Partner, there shall be, to the extent permitted by the Code, a special allocation of gross income to such Administrative General Partner for the Fiscal Year with respect to which such disallowed deduction w as claimed by the Partnership in the amount of such disallowed deduction.

N.      For purposes of determining each Partner's proportionate share of the excess Nonrecourse Liabilities o f t he P artnership p ursuant t o S ection 1 .752-3(a)(3) o f the A llocation Regulations, the Investor Limited Partner shall be deemed to have a 99.99% interest in Profits, the Special Limited Partner shall be deemed to have a .001% interest in Profits, the Co-Managing General Partners shall be deemed to have a .0045% interest in Profits, and the Administrative General Partner shall be deemed to have a .045% interest in Profits.

O.      In accordance with Treasury Regulation Section 1.704-1(b)(4)(ii), all expenditures giving rise to the allowance of any Tax Credits, including credits under Section 42, shall be allocated .0045% to the Co-Managing General Partners, .0045% to the Administrative General Partner, .001% to the Special Limited Partner, and 99.99% to the Investor Limited Partner for the relevant taxable year, It being the intention that Federal Housing Tax Credits be allocated .0045% to the Co-Managing General Partners, .0045% to the Administrative General Partner, .001% to the Special Limited Partner, and 99.90% to the Investor Limited Partner.

P.   Any recapture of any Tax Credits shall be allocated among the Limited Partners, as a class, and the General Partners, as a class, in the same manner in which such classes shared the Tax Credits

Q.   If for any Fiscal Year the application of the minimum gain chargeback provisions of Section 6.4C or Section 6.4D would cause a distortion in the economic arrangement among the Partners and it is not expected that the Partnership will have sufficient other income to correct that distortion, the General Partners may request a waiver from the Commissioner of the Service of the application in whole or in part of Section 6.4C or Section 6.4D in accordance with Section 1.704-2(f)(4) of the Allocation Regulations. Furthermore, if additional exceptions to the minimum gain chargeback requirements of the Allocation Regulations have been provided through revenue rulings or other Service pronouncements, the General Partners are authorized to cause the Partnership to take advantage of such exceptions if to do so would be in the best interest of a majority in interest of the Partners.

R.   In the event that the loss or deduction associated with a fee payable to any Partner under Section 7.10 is disallowed, there shall be specially allocated to such Partner an amount of gross income equal to the amount of the disallowed loss or deduction provided however that any such special allocation that would otherwise be made to the Co-Managing General Partners shall instead be made to the Administrative General Partner.

S.   In no event shall the Co-Managing General Partners receive an allocation of Profits and Losses other than .0045%.

T.   All interest income of the Partnership prior to the Completion Date shall be allocated to the Administrative General Partner.

Section 6.5    Order of Application

The provisions of this Article VI shall be applied in the order required by the applicable provisions of the Allocation Regulations or if no such order is specified, in the manner determined by the Accountants.

## ARTICLE 7

### Rights, Powers and Duties of the General Partners

Section 7.1    Restrictions on Authority

A.   Notwithstanding any other provisions of this Agreement, the General Partners shall have no authority to perform any act in respect of the Partnership or the Project in violation of (i) any applicable law or regulation, or (ii) any agreement between the Partnership and any Lender or Agency.

B.   The General Partners shall not have any authority to do any of the following acts, without the Consent of the Investor Limited Partner and any Requisite Approvals:

(i)      incur indebtedness for money borrowed on the general credit of the Partnership, except as specifically permitted by Article III or Article X, or

(ii)     Following completion of construction of and rehabilitation of the Improvements, to construct any new capital improvements, or to replace any existing capital improvements if construction or replacement would substantially alter the use of the Property, or

(iii)    To acquire any real property in addition to the Property (other than easements or similar rights necessary or convenient for the operation of the Project), or

(iv)     To bear, or cause or permit any Related Person to bear, the economic risk of loss with respect to all or any portion of any Permanent Mortgage Loan or the indebtedness secured thereby, or

(v)      To cause the Partnership to make any loan or advance to any Person (for purposes of this clause 7.1B(v), accounts receivable in the ordinary course of business from Persons other than the General Partners or their Affiliates shall not be deemed to be advances or loans), or

(vi)     To lease any Low Income Unit in the Project to other than Qualified Tenants or otherwise operate the Project in such a manner or take any action which could cause any Low Income Unit in the Project to fail to be treated as a qualified low-income housing unit under Section 42(i)(3) of the Code or which would cause a Recapture Event, or

(vii)    To amend any Project Document, or to permit any party thereunder to waive any provision thereof, to the extent that the effect of such amendment or waiver would be to eliminate, diminish or defer any obligation or undertaking of the Partnership, the General Partners or their Affiliates which accrues, directly or indirectly, to the benefit of, or provides additional security or protection to, the Investor Limited Partner (notwithstanding that the Investor Limited Partner is neither a party to nor express beneficiary of such provision or was not a Partner when such provision became effective), or

(viii)   To increase or refinance any Mortgage or to sell or convey the Property, except as provided in Article IIIC, and except that the General Partners may cause the Partnership to grant easements and similar rights affecting the Land to obtain utility services for the Project or for other purposes necessary or convenient for the operation of the Project, or

(ix)     To cause the Partnership to commence a proceeding seeking any decree, relief, order or appointment in respect to the Partnership under the federal bankruptcy laws, as now or hereafter constituted, or under any other federal or state bankruptcy, insolvency or similar law, or the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) for the Partnership or for any substantial part of the Partnership's business or property, or to cause the Partnership to

consent to any such decree, relief, order or appointment initiated by any Person other than the Partnership, or

(x)    To pledge or assign any of the Capital Contribution of the Investor Limited Partner or the proceeds thereof, except as may be required by the Bank of America in connection with Construction Loan; or

(xi)    To amend any of the Related Agreements; or

(xii)    To approve any changes to the plans and specifications for the Project which w ould r esult, e ither i ndividually or i n t he a ggregate, i n a n o verall d evelopment cost increase in excess of $25,000.00 or to make material modifications to the Approved Tax Credit Application (provided, however, that any Consent of the Investor Limited Partner required under this clause (xii) shall not be unreasonably withheld.).

C.    The General Partners shall not (a) cause the Partnership to utilize Cash Flow to acquire interests in other Limited Partnership's or (b) cause the Partnership to invest or reinvest the proceeds of any sale or refinancing of the Project.

Section 7.2    <u>Independent Activities</u>

Any Partner may engage independently or with others in other business ventures of every nature and description including, without limitation, the ownership, operation, management, and development of real estate, regardless of whether such real estate directly competes with the Project, and neither the Partnership nor any Partner shall have any rights by reason of this Agreement in and to such independent ventures or the income or profits derived therefrom.

Section 7.3    <u>Business Management and Control; Designation of Co-Managing General Partners</u>

A.    Except as otherwise set forth in this Agreement, the Co-Managing General Partners, within the authority granted to it under this Agreement, shall have full, complete and exclusive discretion to manage and control the business of the Partnership for the purposes stated in Article III, shall make all decisions affecting the business of the Partnership and shall manage and control the affairs of the Partnership to the best of its ability and use best efforts to carry out the purpose of the Partnership. In so doing, the Co-Managing General Partners shall take all actions necessary or appropriate to protect the interests of the Limited Partners and of the Partnership. The Co-Managing General Partners shall devote such time as is necessary to the affairs of the Partnership. The Co-Managing General Partners may, in the proper and reasonable exercise of its management authority, delegate certain of it powers, rights and obligations hereunder and may appoint, employ, contract or otherwise deal with any person for the transaction of business of the Partnership, which person may under the supervision of the Co-Managing General Partners perform any acts or services for the Partnership which the Co-Managing General Partners may approve, provided however, that such delegation shall not excuse the Co-Managing General Partners from overseeing and supervisory on an ongoing basis the activities delegated.

B.      Except as otherwise set forth in this Agreement and subject to the applicable Lender and/or Agency rules and regulations and the provisions of the Project Documents, as to those matters not reserved to the Co-Managing General Partners under this Agreement, the General Partners acting unanimously (acting for and on behalf of the Partnership), in extension and not in limitation of the rights and powers given by law or by the other provisions of this Agreement, shall, in their sole discretion, have the full and entire right, power and authority in the management of the Partnership business to do any and all acts and things necessary, proper, convenient or advisable to effectuate the purpose of the Partnership. In furtherance and not in limitation of the foregoing provisions, any one of the General Partners are specifically authorized and empowered to execute and deliver, on behalf of the Partnership, any reimbursement agreement, multifamily note, acknowledgment, acceptance and agreement to intercreditor agreement, agreement to amend or comply, assignment of management agreement, exceptions to nonrecourse guaranty, amended and restated financing agreement, interest rate hedge assignment and security agreement, interest rate hedge reserve agreement, pledge, security and custody agreement, regulatory agreement and declaration of restrictive covenants, amended and restated remarketing agreement, multifamily deed of trust, assignment of rents, security agreement and fixture filing (California), extended use agreement, special rider to security instrument, UCC-1 financing statement, environmental indemnity agreement, letter agreements/confirmations re interest rate cap/ISDA master agreements, tax certificate, reliance certificate, borrower certificate(s), and any and all other agreements, certificates, documents and instruments to be executed, acknowledged or delivered by the Partnership relating to the Bonds, the Extended Use Agreement, the Mortgage, and the other Project Documents, and to execute any and all other instruments and documents, and amendments thereto, as shall be required in connection with the Construction Loan and the Mortgage Loan, including, but not limited to, executing any mortgage, note, contract, building loan agreement, bank resolution and signature card, release, discharge, or any other document or instrument in any way related thereto or necessary or appropriate in connection therewith, and to execute all contracts, conveyances of title, loan documents, deeds of trust, agreements and any or all other matters and documents affecting or relating to the business of the Partnership, all without the signature of the other General Partner(s), so long as all required approvals of the General Partners are obtained prior to execution of said documents.  Except as otherwise set forth in this Agreement, all decisions made for and on behalf of the Partnership by the General Partners acting unanimously shall be binding upon the Partnership.  No person dealing with the General Partners shall be required to determine its or their authority to make any undertaking on behalf of the Partnership, nor to determine any facts or circumstances bearing upon the existence of such authority. Notwithstanding anything to the contrary herein, in the event that at any time there is appointed a Substitute General Partner such Person shall have the right, acting alone and without the Consent or approval of any other General Partner, to take any action or make any decision authorized under this Agreement to be taken or made by a General Partner and no other General Partner shall have any power or right to act alone.

C.      The Co-Managing General Partners shall provide regular, continuous and substantial services to the Partnership and shall materially participate (within the meaning of Section 469 of the Code) in the development of the Apartment Complex and the operations of the Partnership.  In addition to any other duties and obligations specifically assigned or reserved to the Co-Managing General Partners under this Agreement, the Co-Managing General Partners shall perform the following services on behalf of the Partnership; (i) determine the particular

requirements of low-income families and the manner in which the Apartment Complex can be developed in a cost-effective manner best to serve such needs including sizes and configurations of apartment units, furnishings and appliances, recreational needs, security, rules and regulations essential to the development of the Apartment Complex; (ii) coordinate the development and operation of the Apartment Complex; (iii) coordinate with local service agencies, including housing authorities, welfare and social services department, churches and other organizations operating for the purpose of assisting the needy, regarding the availability of the Apartment Complex as desirable housing for low-income families, and facilitate the referral of potential tenants to the Apartment Complex; (iv) oversee and supervise the Management Agent; (v) select the services which will be provided to such tenants by the Partnership; (vi) select, coordinate, and implement social and educational services from the community which will be provided to tenants at the Apartment Complex; (vii) use its best efforts to effect and monitor compliance of the Partnership and the Apartment Complex with all governmental regulations applicable thereto (including without limitation making appropriate administrative filings); (viii) inspect the Apartment Complex to determine if the Apartment Complex is being properly maintained and that necessary repairs are being made thereto and if such repairs are needed, authorize such repairs; and (ix) obtain information from and interface with low-income tenants regarding their needs and the services to be provided by the Partnership. In addition, the Co-Managing General Partners shall be responsible for ensuring that the Apartment Complex and the operation thereof at all times comply and are in conformance with Section 4(b) and 5 of Article XIII of the Constitution of the State of California and Sections 214, 254.5 and 259.5 of the California Revenue and Taxation Code, as amended.

D.     CTCAC Matters.  The Co-Managing General Partners shall cause to be prepared and processed the Tax Credit application with the Agency and shall supervise and conduct all activities reasonably necessary to secure Tax Credits for the Apartment Complex.

E.     Governmental Compliance.  The Co-Managing General Partners shall effect and monitor the compliance of the Partnership and the Apartment Complex with the governmental regulations applicable thereto.  Those efforts shall include making appropriate administrative filings and monitoring the income and other qualifications of tenants.

F.     Property Management.  The Co-Managing General Partners on behalf of the Partnership will diligently enforce all of the obligations of the Management Agreement.  The day-to-day operational management of the Property shall be carried out by the Management Agent supervised by the Co-Managing General Partners and approved by the Partnership.

G.     Rehabilitation.  Subject to the continued oversight and supervision of the Co-Managing General Partners, the Administrative General Partner shall be responsible for the rehabilitation of the Project and for its timely completion, and shall be responsible for overseeing the Contractor pursuant to the Construction Contract.

H.     Limit on Liability of Co-Managing General Partners.  Notwithstanding anything to the contrary set forth in this Agreement or any related or ancillary agreements between the parties, written or oral, the liability of a Co-Managing General Partner to the Partners, the Partnership or to any third person, in all instances hereunder, shall be limited solely to the interest of the Co-Managing General Partner in the Partnership including any interest that the

Co-Managing General Partner may now have or in the future may have or any right to payment (now or in the future) of any fees, distributions or any other items of compensation under this Agreement or the Property Documents (the "Co-Managing General Partner Interest"). The liability of a Co-Managing General Partner hereunder shall not, in any event, extend to, or be enforceable against, any other assets of the Co-Managing General Partner or any other officers, directors, employees, or representative of the Co-Managing General Partner. To the full extent allowed under applicable law, no Co-Managing General Partner shall be either jointly or severally liable for the acts or omissions at any other Co-Managing General Partner or any other Partner.

Section 7.4    Duties and Obligations of the General Partners

A.    The General Partners shall use their best efforts to carry out the purposes, business and objectives of the Partnership referred to in Section 2.3, and shall devote to Partnership business such time and effort as may be necessary to subject to the provisions of Section 7.3 above, (i) supervise the activities of the Management Agent, (ii) make inspections of the Project to determine if the Project is being properly maintained and that necessary repairs are being made thereto, (iii) prepare or cause to be prepared all reports of operations which are to be furnished to the Partners or which are required by any Lender or Agency, (iv) elect to defer the commencement of the Credit Period for all or any portion of the Federal Housing Tax Credit allowable to the Partners under Section 42(g) of the Code, to the extent that any such deferral may be in the best economic interest of the Investor Limited Partner or shall otherwise be requested by the Investor Limited Partner, (however, such deferral shall not serve to reduce any Credit Deficiency) (v) cause the Project to be insured against fire and other risks covered by such insurance in the maximum amount required by any Lender and/or the Agency or, following termination of the Regulatory Agreement, good management practices, in any event in an amount equal to the full replacement value of the Improvements, (vi) obtain and keep in force during the term of the Partnership adequate business or rental interruption and workmen's compensation insurance satisfactory to each Lender and Agency, (vii) obtain and keep in force during the term of the Partnership public liability insurance for the benefit of the Partnership and its Partners in amounts from time to time reasonably acceptable to the Agency and the Lenders, (viii) enforce all contracts entered into for the benefit of the Partnership, (ix) rehabilitate and operate the Property in compliance with all applicable Hazardous Waste Laws, and (x) do all other things which may be reasonably necessary to manage the affairs and business of the Partnership. Further, in the event of any casualty and provided that the insurance proceeds shall be made available therefor, the General Partners shall repair any damage to the Project which was caused by such event, so as to restore the Project (as nearly as possible) to the condition and status thereof immediately prior to such occurrence. All of the insurance policies required by this Section 7.4A shall (a) be written by insurance companies rated A or better by Best's, (b) include AMTAX as a named insured, and (c) include a provision requiring the insurance company to notify AMTAX in writing 30 days prior to the cancellation of any such policy. In addition, the General Partners shall promptly provide AMTAX or its representatives with copies of such insurance policies upon request from time to time. The General Partners shall review regularly all of the Partnership and Project insurance coverage to insure that it is adequate. In particular, the General Partners shall review at least annually the insurance coverage required by Section 7.4A(v) to insure that it is in an amount at least equal to the then current full replacement value of the Improvements.

B.      Subject to the purposes of the Partnership in Section 2.3 the terms of the Project Documents and to the requirements of Section 42 of the Code, the General Partners shall use reasonable efforts consistent with sound management practice to cause the Project to maximize income produced by the Project, including, if necessary, seeking any necessary approvals of, and implementing, appropriate adjustments in the rent schedule of the Property.

C.      The General Partners shall hold for occupancy such percentage of the apartments in the Project in such a manner as to qualify the apartment units comprising the Project as a "qualified low income housing project" under Section 42(g) of the Code as interpreted from time to time in regulations and rulings promulgated thereunder.  The General Partners shall not take any action which would cause the termination or discontinuance of the qualification of the Project as a "qualified low income housing project" under Section 42(g) of the Code or which would cause the recapture of any Federal Housing Tax Credit without the Consent of the Investor Limited Partner.

D.      The Co-Managing General Partners shall prepare and submit, or cause to be prepared and submitted, to the Secretary of the Treasury (or any other Agency designated for such purpose), on a timely basis, any and all annual reports, information returns and other certifications and information and shall take any and all other action required (i) to insure that the Partnership (and its Partners) will continue to qualify for the Federal Housing Tax Credit for all Low Income Units in the Project and (ii) unless the Consent of the Investor Limited Partner is received to act otherwise in a particular instance, to avoid a Recapture Event.

E.      The General Partners agree that, except as provided in or contemplated by the Commitments, neither they nor any Related Person will at any time bear the economic risk of loss for payment of any Permanent Mortgage Loan.  The General Partners agree that they will not cause any Limited Partner at any time to be personally liable for payment or performance under any Note or Mortgage; provided, however, that the Limited Partners shall be liable for the performance of their obligations set forth in this Agreement.  Each Limited Partner agrees not to take any action which would cause it to bear the economic risk of loss for payment of any Mortgage Loan.

F.      The General Partners shall have fiduciary responsibility for the safekeeping and use of all funds and assets of the Partnership, whether or not in their immediate possession or control.  The General Partners shall not employ, or permit another to employ, such funds or assets in any manner except for the exclusive benefit of the Partnership.  In addition, the Co-Managing General Partners will insure that adequate insurance coverage is maintained at all times including liability insurance of not less than $3,000,000.00 per occurrence including fire, theft, hazard and liability insurance for replacement costs, all such policies shall have the Investor Limited Partner named as an additional Insured.  The Investor Limited Partner may require earthquake insurance pending review of a seismic report with a PML rating based upon a 10% probability of exceedance during a 50-year time interval.  If required, the policy shall cover at least 22% of the replacement cost of the Apartment Complex and shall have a maximum deductible equal to five percent (5%) of the policy.  The General Partners further guarantee to keep a policy acceptable to the Investor Limited Partner in place during the entire Compliance Period as defined by the Code.  Failure to do so may be grounds for removal of the General Partners.  The General Partners shall purchase and maintain an insurance policy reasonably

44

acceptable to the Investor Limited Partner covering acts of terrorism, provided that: (a) terrorism insurance coverage is reasonably available for the Project, and (b) the cost of such insurance policy is commercially reasonable. If terrorism insurance meets these criteria, the terrorism insurance policy shall be obtained by the General Partners on behalf of the Partnership, and shall remain in place throughout the Compliance Period (as defined by the Code) as long as its continues to meet these criteria. The General Partners shall make inquiry no less than once per calendar year as to the commercially reasonable cost and availability of such terrorism insurance. The failure of the General Partners to obtain and maintain terrorism insurance in accordance with this paragraph, shall be deemed by the parties as sufficient grounds for removal pursuant to Section 4.5(iv).

G.      No General Partner shall contract away the fiduciary duty owed at common law to the Limited Partners.

H.      The General Partners shall (i) not knowingly store (except in compliance with applicable Hazardous Waste Laws) or dispose of any Hazardous Material at the Project; (ii) neither directly nor indirectly knowingly transport or arrange for the transport of any Hazardous Material (except in compliance with applicable Hazardous Waste Laws); (iii) provide the Limited Partners with written notice (x) upon any General Partner's obtaining knowledge of any potential or known release, or threat of release, of any Hazardous Material at or from the Project or any other Facility or Vessel owned, occupied, or operated by any General Partner, any Affiliate of a General Partner or any Person for whose conduct any General Partner or Affiliate of a General Partner is or was responsible or whose liability may result in a lien on the Project; (y) upon any General Partner's receipt of any notice to such effect from any Federal, state, or other governmental authority; and (z) upon any General Partner's obtaining knowledge of any incurrence of any expense or loss by any such governmental authority in connection with the assessment, containment, or removal of any Hazardous Material for which expense or loss any General Partner may be liable or for which expense or loss a lien may be imposed on the Project only to the extent such action does not violate any restriction covenants applicable to the Project.

I.      If requested to do so by the Investor Limited Partner at any time after the completion of the fourteenth year of the compliance period (as defined in Section 42(i)(1) of the Code), the General Partner shall submit a written request to the Credit Agency to find a Person to acquire the Partnership's interest in the low-income portion of the Project and/or take such other action permitted or required by the Code as the Investor Limited Partner may reasonably request to effect a sale of the Project or to terminate the extended use commitment of Section 42(h)(6)(B) of the Code to the extent such action is not violative of any restrictive covenants applicable to the Project.

J.      Subject to compliance with Section 42 of the Code and the rules of the Agency, upon completion of the Compliance Period, the General Partners shall have the option (the "Option") to purchase the interest of the Investor Limited Partner in the real estate, fixtures and personal property of the Partnership (the "Interest") for a period of twenty-four (24) months. The General Partner may exercise the Option upon written notice to the Investor Limited Partner at any time after the end of the Compliance Period (the "Option Period"). In the event the General Partners exercise the Option, their must pay to the Investor Limited Partner the Option Price (as defined herein) in cash. The Option Price shall equal the greater of (i) the fair market

value of the Interest, without offset for any lack of control or inability to control management of the Investor Limited Partner, (fair market value shall be determined by two independent MAI appraisers: one selected by the General Partners and one by the Investor Limited Partner. If such appraisers are unable to agree on the value, they shall jointly appoint a third independent MAI appraiser whose determination shall be final and binding), or (ii) an amount determined by the Partnership Accountants, which is sufficient to pay (a) all outstanding indebtedness secured by the Apartment Complex and (b) distribute to the Investor Limited Partner cash proceeds sufficient to enable the Investor Limited Partner to pay, on an after tax basis, any taxes projected to be imposed on the Investor Limited Partner as a result of the sale pursuant to the Option. However, in no event shall the Option Price be at an amount less than the Exit Tax Distribution.

K.     Subject to the Option in Section 7.4J above, the Limited Partner shall have the option to force a sale of its interest in the real estate, fixtures and personal property comprising the Apartment Complex (the "Limited Partnership Option") for a period of twenty-four (24) months following the close of the Compliance Period as determined by the Code. Such sale shall be executed at fair market value, as determined under Section 7.4J. In the event that the Investor Limited Partner exercises the Limited Partnership Option, the General Partners shall have a "Right of First Refusal" to purchase the Partnership Interest.

Section 7.5     Representations and Warranties; Certain Indemnities

A.     The Co-Managing General Partners, to the extent of their actual knowledge, and Administrative General Partner hereby, severally but not jointly, represent and warrant to the Investor Limited Partner that the following are true as of the date hereof and will be true on the due date for each Installment:

(i)     The Partnership is a duly organized limited partnership validly existing under the laws of the State and has complied with all recording requirements with each proper governmental authority necessary to establish the limited liability of the Limited Partners as provided herein.

(ii)     Except as may have been previously disclosed in writing to the Investor Limited Partner, no litigation or proceeding against the Partnership, any General Partner, the Builder or the Developer, nor any other litigation or proceeding directly affecting the Project, is to its knowledge pending before any court, administrative agency or other governmental authority which would, if adversely determined, have a material adverse effect on the Partnership, any General Partner, the Builder, the Developer or their respective businesses or operations, except for such matters as to which the likelihood of such a determination adverse to the Partnership is, in the opinion of Partnership Counsel or other counsel acceptable to the Investor Limited Partner, remote.

(iii)     (a)     No default by any General Partner, any Affiliate thereof having any relationship with the Project, or the Partnership, in any material respect has occurred or is continuing (nor has there occurred any continuing event which, with the giving of notice or the passage of time or both, would constitute such a default in any material respect) under any of the Project Documents.

(b)     The Project Documents are in full force and effect (except to the extent fully performed in accordance with their respective terms).

(c)     All operating and replacement reserves are fully funded to the extent required by the Project Documents and this Agreement.

(d)     No default under the Bond Documents has occurred or is continuing.

(iv)     No Partner or Related Person bears the economic risk of loss with respect to the indebtedness evidenced by any Note secured by any Permanent Mortgage Loan, except as permitted by Article IIIA.

(v)     All building, zoning and other applicable certificates, permits and licenses necessary to permit the construction, rehabilitation, repair, use, occupancy and operation of the Project have been obtained (other than prior to construction commencement or completion of the Project or a specified portion thereof, such as will be issued only after the commencement of construction or completion of the Project or such specified portion thereof) and neither the Partnership nor the General Partners have received any notice or has any knowledge of any violation with respect to the Project of any law, rule, regulation, order or decree of any governmental authority having jurisdiction which would have a material adverse effect on the Project or the construction, rehabilitation, use or occupancy thereof, except for violations which have been, or will be, cured and notices or citations which have been withdrawn or set aside by the issuing agency or by an order of a court of competent jurisdiction. It is specifically acknowledged that as of the date of this Agreement that construction of the Project has not commenced, and working drawings are in process

(vi)     The Partnership will as of the commencement of the Construction Mortgage Loan, own the fee simple interest in the Property and have good and marketable title thereto, free and clear of any liens, charges or encumbrances other than the Mortgage[s], matters set forth in the Title Policy delivered at Investment Closing, encumbrances the Partnership is permitted to create under Sections 2.4 and 7.1, and mechanics' or other liens which have been bonded or insured or reserved against in such a manner as to preclude the holder of such lien or such surety or insurer from having any recourse to the Property or the Partnership for payment of any debt secured thereby. None of the liens, charges, encumbrances or exceptions set forth in the Title Policy delivered at Investment Closing has or will have a material adverse effect upon the construction or operation of the Project.

(vii)     The execution and delivery of all instruments and the performance of all acts heretofore or hereafter made or taken or to be made or taken, pertaining to the Partnership or the Property by any General Partner or Affiliate thereof which is a corporation have been or will be duly authorized by all necessary corporate or other action, and the consummation of any such transactions with or on behalf of the Partnership will not constitute a breach or violation of, or a default under, the charter or by-laws of any such corporation or any agreement by which any such corporation or any

of its properties is bound, nor constitute a violation of any law, administrative regulation or court decree. Each such corporation is duly organized and validly existing under the law of the state of its incorporation.

(viii)   Neither the  Co-Managing General Partners nor Administrative General Partner is in default in any material respect in the observance or performance of any provision of this Agreement to be observed or performed by such General Partner.

(ix)    The Related Agreements are in full force and effect and no default by any party thereto (other than AMTAX or its Affiliates) has occurred or is continuing thereunder (nor has there occurred any event which, with the giving of notice or the passage of time, or both, would constitute such a default in any material respect thereunder).

(x)    No Event of Bankruptcy has occurred and is continuing with respect to the Partnership, any General Partner, its Affiliates, the Developer or its Affiliates or the Purchaser.

(xi)    The entire Project will qualify, or on and after the Completion Date qualifies, as a "qualified low-income housing project" under Section 42(g) of the Code and all Units in the Project will qualify as Low-Income Units as defined under Section 42 of the Code.

(xii)   The General Partners are not insolvent as defined in the Uniform Fraudulent Transfer Act or such other fraudulent conveyance law as may be applicable under the laws of the State.

(xiii)   All tax returns, financial statements, Schedules K-1 and reports due under Article XII have been properly filed and/or transmitted, as applicable.

(xiv)   The General Partners have not: (i) knowingly stored (except in compliance with applicable Hazardous Waste Laws) or disposed of any Hazardous Material at the Project; (ii) directly nor indirectly knowingly transported or arranged for the transport of any Hazardous Material (except in compliance with applicable Hazardous Waste Laws).

(xv)    To the best of the General Partners' knowledge, no Hazardous Material was ever or is now stored on, transported or disposed of on the Land (except to the extent any such storage, transport or disposition was at all times in compliance with all Hazardous Waste Laws).

(xvi)   To the best of the General Partners' present knowledge, and subject to the final allocation, Cost Certification and compliance with Section 42 of the Code, the amount of the Maximum Annual Credit to the Partnership is anticipated to be approximately $1,908,190.

(xvii)  Bonds will as of the bond issuance date have been properly issued for the benefit of the Project in accordance with Section 142 (d) of the Code and the Project is or will be financed in accordance with Section 42(h)(4) of the Code.  The Partnership will

comply with the requirements of the Bond Documents, including owning and operating the Project as a "qualified residential rental project" within the meaning of Section 142(d) of the Code for the required period.

(xviii)  At least 50% or more of the sum of (i) the aggregate basis of the land and (ii) the aggregate basis of the building is financed with tax-exempt bond proceeds, and the entire project is eligible for Credits under Section 42(h)(4)(B).

B.      The Administrative General Partner agrees to promptly indemnify, defend and hold harmless the Partnership and the Limited Partners from and against any and all claims, losses, damages and liabilities (as well as from and against any and all attorneys' fees and other costs and expenses incurred in connection therewith) which the Partnership and the Limited Partners may incur by reason of any liabilities to which either the Partnership or the Project is subject at the Admission Date; provided, however, that the foregoing indemnification shall not apply to any Mortgage, necessary contractual obligations normally incurred pursuant to the Commitments in connection with the operation of the Property, or to acts for which the General Partners are entitled to indemnification under Section 7.6.

C.      The Administrative General Partner agrees promptly to indemnify, defend, and hold harmless the Partnership and the Limited Partners from and against any claim, loss, damage or liability (as well as from and against any and all attorneys' fees and other costs and expenses incurred in connection therewith) on account of the presence or escape of any Hazardous Material at or from the Property (or at any other location). Any claim, loss, damage or liability described in the immediately preceding sentence may be defended, compromised, settled, or pursued by the Limited Partners with counsel of the Limited Partners' selection, but at the expense of the Administrative General Partner.  Notwithstanding anything else set forth in this Agreement, this indemnification shall survive the withdrawal of any Administrative General Partner and/or the termination of this Agreement.

Section 7.6      Indemnification

Each General Partner (including any Co-Managing General Partner or Retired General Partner) shall be indemnified by the Partnership against any losses, judgments, liabilities, costs and expenses (including reasonable attorneys' fees)and amounts paid in settlement of any claims sustained by him or it in connection with the Partnership from parties other than the Partnership or the Investor Limited Partner, provided that the same were not the result of: (x) willful misconduct, (y) reckless disregard for the Partnership's welfare, (z) or gross dereliction of duty, on the part of the General Partner or any of its "Designated Affiliates" (as such term is defined in Section 7.7B.) and were the result of a course of conduct which the General Partner, in good faith, believed to be in the best interest of the Partnership. The Partnership shall advance costs, and expenses (including reasonable attorneys' fees) to be incurred in defending any such action upon receipt of an undertaking by such General Partner to reply such amount if it is ultimately determined that such General Partner is not entitled to indemnification by the Partnership.  Any indemnity under this Section 7.6 shall be provided out of and to the extent of Partnership assets only, and no Limited Partner shall have any personal liability on account thereof; provided, however, that no indemnification shall be provided for any losses, liabilities or expenses arising from or out of any alleged violation of federal or state securities laws unless (1) there has been a

successful adjudication on the merits of each count involving alleged securities law violations as to the particular indemnitee and the court approves indemnification of litigation costs; (2) such claims have been dismissed with prejudice on the merits by a court of competent jurisdiction as to the particular indemnitee and the court approves indemnification of litigation costs; or (3) a court of competent jurisdiction approves a settlement of the claims against a particular indemnitee and finds that indemnification of the settlement and related costs should be made. In any claim for indemnification in connection with a settlement which was so approved, the party seeking indemnification shall place before the court the position of the Securities and Exchange Commission and the relevant State Securities Commission and any state securities administrator whose rules or published policies require such disclosure with respect to the issue of indemnification for securities law violations.

The Partnership shall not incur the cost of that portion of any insurance which insures any party against any liability as to which such party is herein prohibited from being indemnified.

Section 7.7    Liability of General Partners to Limited Partners

A.    No General Partner or Designated Affiliate (as defined in Section 7.7B) shall be liable, responsible or accountable for damages or otherwise to the Partnership or to any Limited Partner for any loss suffered by the Partnership which arises out of any action or inaction of such General Partner or Designated Affiliate if that General Partner or Designated Affiliate, in good faith, believed that such course of conduct was in the best interests of the Partnership and such course of conduct did not constitute willful misconduct, reckless disregard for the Partnership's welfare or gross dereliction of duty on the part of that General Partner or Designated Affiliate.

B.    As used in Sections 7.6 and 7.7, a "Designated Affiliate" is any Person performing services on behalf of the Partnership who: (1) directly or indirectly controls, is controlled by, or is under common control with any General Partner, (2) owns or controls 10% or more of the outstanding voting securities of any General Partner, (3) is an officer, director, partner or trustee of any General Partner, or (4) if any General Partner is an officer, director, partner or trustee, of any company for which the General Partner acts in any such capacity.

Section 7.8    Reserves

A.    The General Partner shall establish all reserves required by any of the Project Documents and maintain them in accordance with the terms thereof.

B.    Additionally, the General Partner shall establish an initial operating reserve account (at a date no later than that of the Second Installment as set forth in Section 5.1A) in the amount of $164,500, to provide for operating deficits. In the event that the General Partner must fund any amount of this reserve, the amount funded by the General Partner is to be treated as a "Subordinated Loan", except that any maximum annual repayment amount may not exceed 25% of the initial amount funded with the Subordinate Loan and repayment will not begin until after tax returns and audits for one full year of operations are completed. The initial amount must be maintained annually with the minimum balance to be funded by operations cash flow or additional "Subordinated Loans" if necessary. If the Permanent Lender requires additional operating and/or debt service reserves, the required Operating Reserve Account may be used to

50

fund all or part of lenders requirements only upon the Investment Limited Partner's reasonable approval. The required amount of Operating Reserves will be reduced by one-half (50%) of the initial reserve amount upon three (3) consecutive calendar years of the Property operating at a 1.15 debt coverage ratio. The released amount will be applied towards Cash Flow. Upon the Property obtaining an average of 1.15 debt coverage ratio for one (1) additional year thereafter, the balance of Operating Reserves may be released towards Cash Flow and an Operating Reserve shall no longer be required.

C.    Additionally, the General Partners shall establish a reserve account for capital replacements, which account shall be funded by annual deposits of $200 per apartment, and which shall be funded on a monthly basis beginning at the time of the Third Installment as set forth in section 5.1A increasing to $250 per apartment unit in year six and to $300 per apartment unit in year eleven, or as otherwise required by the Permanent Lender. Withdrawals from such reserve shall be utilized solely to fund capital repairs and improvements, or scheduled maintenance or turnover costs, deemed necessary by the Co-Managing General Partners and, except in the case of withdrawals of $5,000 or less, may be made only with the Consent of the Investor Limited Partner, which such Consent or ratification shall not unreasonably be withheld. All withdrawals must be disclosed in writing to the Investor Limited Partner within 14 days thereof. Such withdrawals may be expensed or capitalized as determined by the General Partners in consultation with the Investor Limited Partner.

Section 7.9    Obligation To Provide for Project Expenses

A.    The General Partners agree that if the Partnership requires funds beyond that available from Cash Flow or any amounts released from reserves under Section 7.8, to (i) discharge Project Expenses (other than to make payments to Partners, debt service on the City of San Jose Loan, payments of any outstanding Subordinated Loans or other obligations herein provided to be payable solely out of Cash Flow or distributions of Capital Proceeds) during or in respect of the period commencing on the Admission Date or to comply with Tax Credit rules or regulations, (ii) pay the Asset Management Fee or (iii) assure maintenance by the Partnership of Surplus Cash of at least $1.00 at all times during such period (other than for the payment of items prohibited in (i) above), the General Partners shall furnish to the Partnership the funds required (items (i) through (iii) above are collectively referred to as the "Expense Obligations"). The General Partners shall not be obligated to fund operating deficits in excess of an aggregate amount equal to $600,000 in three (3) years of operations immediately following the Third Installment of Capital Contributions of the Investor Limited Partner. The obligation to fund operating deficits for the next three year period after such initial three year period shall be capped at an aggregate maximum amount $300,000. For each consecutive three-year period thereafter, the maximum aggregate operating deficit obligation shall be reduced by $100,000 per subsequent three-year period. Amounts so furnished shall constitute Subordinated Loans. Any such Subordinated Loan shall not be interest-bearing and shall be repayable only as provided in Article VI. Failure to timely pay any Expense Obligations, at any time, shall be ground for removal of the General Partners from the Partnership. However, if the removal is initiated against General Partners after the termination of the funding periods stated above (the "Release Date") for failure to timely pay any Expense Obligations, the General Partners shall not be liable for any accrued but unpaid Expense Obligations initially arising after the Release Date, such

subsequent amount to be forgiven upon the uncontested removal of the General Partner from the Partnership.

Section 7.10    Certain Payments to the General Partners and Affiliates

A.      For its services in connection with the development of the Property and the supervision to completion of the construction of the Improvements and as reimbursement for Development Advances, the Developer shall be entitled to receive the amounts set forth in the Development Agreement.

B.      All of the Partnership's expenses shall be billed directly to, and paid by, the Partnership to the extent practicable. Subject to the terms of this Agreement, reimbursements to a General Partner or any of its Affiliates by the Partnership shall be made subject to the following conditions:

(i)      such goods or services must be necessary for the prudent formation, development, organization or operation of the Partnership;

(ii)     reimbursement for goods or services provided by Persons who are not affiliated with a General Partner shall not exceed the cost to a General Partner or its Affiliates of obtaining such goods or services; and

(iii)    reimbursement for goods and services obtained directly from a General Partner or its Affiliates shall not exceed the amount the Partnership would be required to pay independent parties for comparable goods and services in the same geographic location.

C.      The Partnership shall pay to the Investment General Partner a cumulative Asset Management Fee in an amount equal to $15,000 (as adjusted annually by the C.P.I) prorated from the date of 75% of construction completion.. The Asset Management Fee shall be payable from Cash Flow or Capital Proceeds as provided in Section 6.2.

D.      The Partnership shall pay to Affordable Housing Access, Inc. a cumulative Partnership Management Fee in an amount equal to $500/month during construction and $2,800/month after 90% occupancy, adjusted annually for actual rent increases, from Cash Flow or Capital Proceeds as provided in Section 6.2.

E.      The Partnership shall pay:

(i)      A non-cumulative Annual Supervisory and Incentive Management Fee to the General Partners from "Distributions of Cash Flow" in an amount equal to 6.5% of the total Gross Revenues of the Partnership. The Supervisory and Incentive Management Fee shall be payable solely from Cash Flow as provided in Section 6.2A.

(ii)     An Operating Deficit Management Fee to the General Partners from Distributions of Cash Flow and Distributions of Capital Proceeds in an amount equal to

25% of the total Gross Revenues of the Partnership, as provided in Sections 6.2A and 6.2B.

F.      Neither the General Partners nor any of their Affiliates shall be entitled to any other compensation, fees or profits from the Partnership in connection with the acquisition, construction, development or rent-up of the Land or Improvements or for the administration of the Partnership's business or otherwise, except for (i) payments provided for or referred to in Sections 2.4(v) or 7.10, (ii) payments of the Management Fee referred to in Article XI or the Supervisory and Incentive Management Fee and Development Fee set forth in the Development Agreement, (iii) fees and distributions under Article VI and (iv) such other fees and distributions as otherwise stated herein, or as negotiated with the Limited Partner or as may be permitted to be paid by the Lenders or the Agency out of the proceeds of any Mortgage Loan.

Section 7.11    [INTENTIONALLY OMITTED]

Section 7.12    Grant of Security Interest

In order to secure the performance by the General Partners and the Developer of their obligations to the Investor Limited Partner under this Agreement and all other agreements or instruments delivered concurrently herewith, the General Partners and the Developer hereby collaterally assign to the Investor Limited Partner all amounts otherwise payable to the General Partners and the Developer under this Agreement and the Development Agreement (as fees, distributions or otherwise), which assignment shall be deemed a grant of a security interest. The General Partners and the Developer hereby represent and warrant to the Investor Limited Partner that the security interest granted hereunder is and shall remain a perfected first security interest in the collateral herein described subject and subordinate, if applicable, to the Bond Documents, the Construction Loan and the Permanent Mortgage Loan.  At the request of the Investor Limited Partner, the General Partners and the Developer shall execute such documents and take such other actions as may be necessary or appropriate in the discretion of the Investor Limited Partner to further evidence and perfect the security interest granted hereby.

Notwithstanding any of the foregoing, unless and until there occurs an event of default of a material obligation of the General Partners, or Developer hereunder which remains uncured after expiration of the applicable cure period, the Investor Limited Partner agrees to forebear exercising its right to Developer Fees payable to Developer or the General Partners, and the Developer or the General Partners shall have the right to receive all Developer Fees and retain and enjoy the same not otherwise needed to complete the development of the project.

Section 7.13    Tax Matters Partner

A.      The Tax Matters Partner ("TMP") for the Partnership shall be the Administrative General Partner serving in such capacity from time to time.

B.      The TMP shall have the right to resign as the TMP by giving thirty (30) days written notice to each Partner, provided there is another General Partner willing to serve in such capacity.  Upon the resignation, death, legal incompetency or Event of Bankruptcy of the Person serving as the TMP, any successor to the interest of the TMP pursuant to the applicable provisions of this Section 7.9 shall be designated as the successor TMP, but such designee shall

not become the TMP until the designation of such Person has been approved by the Consent of the Investor Limited Partner, which consent shall not be unreasonably withheld or delayed.

C.      The TMP shall employ experienced tax counsel to represent the Partnership in connection with any audit or investigation of the Partnership by the Service, and in connection with all subsequent administrative and judicial proceedings arising out of such audit.   The fees and expenses of such counsel shall be a Partnership expense and shall be paid by the Partnership. Such counsel shall be responsible for representing the Partnership; it shall be the responsibility of the General Partners and of the Investor Limited Partner, at their expense, to employ tax counsel to represent their respective separate interests.

D.      The TMP shall keep the Partners informed of all administrative and judicial proceedings, as required by Section 6623(g) of the Code, and shall furnish to each Partner who so requests in writing, a copy of each notice or other communication received by the TMP from the Service (except such notices or communications as are sent directly to such requesting Partner by the Service).  All third party costs and expenses incurred by the TMP in serving as the TMP shall be Partnership expenses and shall be paid by the Partnership.

E.      The TMP shall not have the authority, unless such action has been approved by the Consent of the Investor Limited Partner, to do all or any of the following:

        (i)      To enter into a settlement agreement with the Service which purports to bind partners other than the TMP,

        (ii)     To file a petition as contemplated in Section 6226(a) or 6228 of the Code,

        (iii)    To intervene in any action as contemplated in Section 6226(b) of the Code,

        (iv)     To file any request contemplated in Section 6227(b) of the Code, or,

        (v)      To enter into an agreement extending the period of limitations as contemplated in Section 6229(b)(1)(B) of the Code.

F.      The relationship of the TMP to the Investor Limited Partner is that of a fiduciary, and the TMP has a fiduciary obligation to perform its duties in such manner as will serve the best interests of the Partnership and the Investor Limited Partner.

G.      The Partnership shall indemnify the TMP (including the officers and directors of a corporate TMP) from and against judgments, fines, amounts paid in settlement, and expenses (including attorneys' fees) reasonably incurred by them in any civil, criminal or investigative proceeding in which they are involved or threatened to be involved by reason of being the TMP, provided that the TMP acted in good faith, within what is reasonably believed to be the scope of its authority and for a purpose which it reasonably believed to be in the best interests of the Partnership or the Partners. The TMP shall not be indemnified under this provision against any liability to the Partnership or its Partners to any greater extent than the indemnification allowed by Section 7.6 of this Agreement.  The indemnification provided hereunder shall not be deemed

to be exclusive of any other rights to which those indemnified may be entitled under any applicable statute, agreement, vote of the Partners, or otherwise.

Section 7.14    Special Limited Partner

Unless the General Partners are lawfully and validly removed in accordance with the provisions of Section 4.5, the Special Limited Partner shall have no right or authority to act in any capacity on behalf of the Partnership or to represent or bind the Partnership in any capacity or in any manner.    A Co-Managing General Partner shall become unable to serve as Co-Managing General Partners or if there is a Change in Control of the Co-Managing General Partners, Protech, or a non-profit entity designated by Protech, shall be admitted to the Partnership as a General Partner and designated as the Co-Managing General Partners subject to the consent of the Investment Partner Manager.    If the Administrative General Partner  shall become unable to serve as Administrative General Partner or if there is a Change in Control of the Administrative General Partner, Protech shall be admitted as the Administrative General Partner subject to the consent of the Investment Partner Manager.

## ARTICLE 8

### Withdrawal of a General Partner; New General Partners

Section 8.1    Voluntary Withdrawal

A.    No General Partner shall have the right to withdraw or retire voluntarily from the Partnership or sell, assign or encumber his or its Interest without the Consent of the Investor Limited Partner and, if required, any Requisite Approvals, provided, that subject to any necessary consent by the Authority and the Lenders, CHBA may withdraw prior to the Completion Date, in which event AHAI shall be the Sole Managing General Partner.

B.    Notwithstanding the foregoing, a General Partner may at any time propose to the Investor Limited Partner a Person to serve as his or its successor, or if at such time there be more than one General Partner, to serve as a successor to one or more of the General Partners desiring to withdraw.    If the Consent of the Investor Limited Partner is obtained, and all Requisite Approvals are obtained to such withdrawal and the admission of such successor, all Partners hereby agree that this Agreement and the Certificate shall be appropriately amended to effect such withdrawal and admission.

Section 8.2    Right To Continue

In the event of the occurrence of a Terminating Event with respect to any General Partner, the remaining General Partners, if any, and any successor General Partner, shall have the right to elect to continue the business of the Partnership employing its assets and name, all as contemplated by the laws of the State.    Within ten (10) days after the occurrence of such Terminating Event, the remaining General Partners, if any, shall notify the Investor Limited Partner thereof and of their decision whether or not to continue the business of the Partnership.

Section 8.3    Successor General Partner

A.      Upon the occurrence of any Terminating Event referred to in Section 8.2, the remaining General Partners may (but are not required to) designate a Person to become a successor General Partner to the General Partner as to whom such event shall have occurred. Any Person so designated, subject to the Consent of the Investor Limited Partner (and, if required by the Act or any other applicable law, the consent of any other Partner so required), shall become a successor General Partner upon its written agreement to be bound by the Project Documents and by the provisions of this Agreement.

B.      If any Terminating Event referred to in Section 8.2 shall occur at a time when there is no remaining General Partner and no successor becomes a successor General Partner pursuant to the preceding provisions of this Section 8.3 or if the remaining General Partners do not elect to continue the business of the Partnership (in which case such Partners shall also be considered "Retired General Partners" for purposes of this Article VIII), then the Investor Limited Partner shall have the right to designate a Person to become a successor General Partner upon his or its written agreement to be bound by the Project Documents and by the provisions of this Agreement.

C.      If the Investor Limited Partner elects to reconstitute the Partnership pursuant to this Section 8.3 and admit a successor General Partner pursuant to this Section 8.3, the relationship of the parties in the reconstituted Partnership shall be governed by this Agreement.

Section 8.4    Interest of Predecessor General Partner

A.      Except as provided in Section 8.3, no assignee or transferee of all or any part of the Partnership Interest of a General Partner shall have any automatic right to become a General Partner. Upon the designation of a successor General Partner (if any) pursuant to Section 8.3, such Partner shall have the option to acquire the predecessor General Partner's Partnership Interest by paying to such General Partner or its representatives the fair market value of such Partnership Interest (provided that if the predecessor General Partner is in violation of any of the covenants or undertakings contained in this Agreement, or has violated any representation or warranty contained herein, the designated successor General Partner may pay such amount into escrow until such violation has been corrected). Any dispute as to such fair market value or as to the final disposition of such amount shall be settled by Arbitration.

B.      If no successor General Partner is designated or if the designated successor General Partner of the predecessor General Partner does not desire to purchase the Partnership Interest of the predecessor General Partner, such Partnership Interest of the predecessor General Partner shall be deemed to be that of a Special Class Limited Partner and the holder thereof shall be entitled only to such rights as the assignee of a Limited Partnership Interest may have as such under the provisions of Section 9.4 hereof, the Uniform Act and other applicable laws of the State.

C.      Upon the occurrence of a Terminating Event as to any General Partner (other than the initial withdrawal of CHBA prior to the Completion Date), such General Partner (the "Retired General Partner") shall be deemed to have automatically transferred to the remaining General Partners, in proportion to their respective General Partnership interests, or, if there shall be no remaining General Partners, then to the Partnership for the benefit of the remaining

Partners, all or such portion of the General Partnership Interest of such Retired General Partner which, when aggregated with the existing General Partnership Interests of all such remaining General Partners, if any, will be sufficient to assure such remaining General Partners and any successor General Partner a .0045% interest in all Profits, Losses, Tax Credits and distributions of the Partnership under Article VI hereof. No documentation shall be necessary to effectuate such transfer, which shall be automatic. That portion of the General Partnership Interest of the Retired General Partner which shall not have been transferred pursuant to this Section 8.4C shall be retained by such Retired General Partner (or pass to legal representatives of a deceased General Partner) who or which shall have the status of a Special Limited Partner, with no right to receive a share of the Profits, Losses, Tax Credits, and distributions of the Partnership to which the Retired General Partner as such, would have been entitled had such Terminating Event not occurred, and such Retired General Partner (or his legal representatives in the case of a deceased General Partner) shall not be considered to be a Limited Partner for the purpose of sharing the benefits allocated to the Limited Partners under Article VI hereof and shall not participate in the votes or consents of the Limited Partners hereunder. No consideration shall be paid to such Retired General Partner by the remaining General Partners or the Partnership in the event of a Transfer pursuant to this Section 8.4C.

D.  For the purposes of Article VI hereof, the effective date of the transfer pursuant to the provisions of Section 8.4C of the General Partnership Interest of a Retired General Partner shall be deemed to be the date on which such Terminating Event occurs.

E.  Anything herein contained to the contrary notwithstanding, any General Partner who withdraws voluntarily in violation of Section 8.1 or is removed shall remain liable for all of its obligations under this Agreement, for its obligations under the Related Agreements and the Project Documents, for all its other obligations and liabilities hereunder incurred or accrued prior to the date of its withdrawal and for any loss or damage which the Partnership or any of its Partners may incur as a result of such withdrawal, except for any loss or damage attributable to the activities of the remaining and/or successor General Partners subsequent to such withdrawal or removal. Notwithstanding anything herein to the contrary, the Co-Managing General Partner's liability on withdrawal or removal is limited to the loss of its Partnership interest.

F.  The estate (which term, for purposes of this Section 8.4F, shall include the heirs, distributees, estate, executors, administrators, guardian, committee, trustee or other personal representative) of a General Partner who is a natural person as to whom a Terminating Event has occurred shall be and remain liable for all his liabilities and obligations hereunder, except as provided in this Section 8.4F. In the event of the death, insanity or incompetency of a General Partner who is a natural person, his estate shall remain liable for all his obligations and liabilities hereunder incurred or accrued prior to the date of such event, and for any damages arising out of any breach of this Agreement by him, but his estate shall not have any obligation or liability on account of the business of the Partnership or the activities of the other General Partners after his death, insanity or incompetency unless it elects to become a General Partner pursuant to Section 8.3A.

Section 8.5  Designation of New General Partners

A.     A General Partner may, with the written consent of all Partners, at any time designate one or more new General Partners with such General Partnership Interest(s) as the General Partner may specify.

B.     Any new General Partner shall, as a condition of receiving any interest in Partnership Property, agree to comply with the terms of the Project Documents and by the provisions of this Agreement to the same extent and on the same terms as any other General Partner.

Section 8.6     Amendment of Certificate; Approval of Certain Events

A.     Upon the admission of a new General Partner, pursuant to the preceding provisions of this Article VIII, the Schedule shall be amended to reflect such admission and an amendment to the Certificate, also reflecting such admission, shall be filed in the manner and to the extent required by the Uniform Act.

B.     Each Partner hereby consents to and authorizes any admission or substitution of a General Partner or any other transaction, including, without limitation, the continuation of the Partnership business, which has been authorized by the requisite percentage of Partners under the provisions of this Agreement, subject to the provisions of Section 8.7, and hereby ratifies and confirms each amendment of this Agreement and/or the Certificate necessary or appropriate to give effect to any such transaction.

Section 8.7     Admission of a General Partner

Notwithstanding any other provisions of this Agreement, no Person shall be admitted as an additional or successor General Partner without the written approval of all Partners and, unless prior to consummation of such transaction, the Limited Partners shall have received an opinion of Special Counsel to the effect that the consummation of such transaction will not cause (i) the Partnership to be treated as an "association" for federal income tax purposes, or (ii) the Limited Partners to be deemed to be taking part in the control of the business of the Partnership within the meaning of the Uniform Act.

## ARTICLE 9

### Transfer of Limited Partner Interests; Additional Limited Partners

Section 9.1     Right To Assign

The Investor Limited Partner may not make a voluntary assignment of the whole or any portion of its Partnership Interest without the written consent of the General Partners, which said consent may be withheld with respect to any assignment by the Investor Limited Partner in the reasonable discretion of the General Partners.  Consent to assignments of the Investor Limited Partner Interest shall be withheld to the extent necessary to preserve the Partnership's tax status and attributes and to comply with securities laws.  Notwithstanding the foregoing, in no event shall any assignee of a Limited Partner have any right to become a Substitute Limited Partner without compliance with all applicable provisions of this Article IX.

Section 9.2    Restrictions

A.     No sale or exchange of the Interest of any Person as a Limited Partner shall be made if such sale or exchange would violate the Regulations, except a sale pursuant to the Purchase Agreement.

B.     In no event shall all or any part of a Limited Partner's Interest be assigned or transferred to a minor or to an incompetent.

C.     The General Partners may require as a condition of any assignment of any Interest that the assignor assume all costs incurred by the Partnership in connection therewith.

D.     Any assignment in contravention of any of the provisions of Section 9.1 or this Section 9.2 shall be void and ineffectual and shall not bind, or be recognized by, the Partnership.

Section 9.3    Substitute Limited Partners

A.     No Limited Partner shall have the right to substitute an assignee as a Limited Partner in his place.  The General Partners, however, shall in their reasonable discretion permit any such assignee to become a Substitute Limited Partner and any such permission by the General Partners shall be binding and conclusive without the consent or approval of any other Person, except, if required, any Requisite Approvals.  Any Substitute Limited Partner shall, as a condition of receiving any interest in the Partnership assets, agree to be bound (to the same extent as his assignor was bound) by the Project Documents and by the provisions of this Agreement.

B.     Upon the admission of a Substitute Limited Partner, the Schedule shall be amended to reflect the name and address of such Substitute Limited Partner and to eliminate the name and address of his assignor and, if necessary, an amendment to the Certificate reflecting such admission shall be filed in accordance with the Uniform Act at least once each calendar quarter during which a Substitute Limited Partner is admitted, in order to effect the substitution thereof.  Each Substitute Limited Partner shall execute such instrument or instruments as shall be required by the General Partners to signify its agreement to be bound by all the provisions of this Agreement.

Section 9.4    Assignees

A.     In the event of the death or incapacity or dissolution of any Limited Partner, his or its legal representatives shall have such rights as are afforded them by the Uniform Act.  The death or dissolution of a Limited Partner shall not dissolve the Partnership.

B.     An assignee of a Limited Partner who does not become a Substitute Limited Partner in accordance with Section 9.3 shall, if such assignment is in compliance with the terms of this Agreement, have the right to receive the same share of profits, losses and distributions of the Partnership to which the assigning Limited Partner would have been entitled if no such assignment had been made by such Limited Partner.

C.     Any Limited Partner who shall assign all its Interest shall cease to be a Limited Partner of the Partnership, and shall no longer have any rights or privileges or obligations of a Limited Partner except that, unless and until the assignee of such Limited Partner is admitted to the Partnership as a Substitute Limited Partner in accordance with Section 9.3, said assigning Limited Partner shall retain the statutory rights and be subject to the statutory obligations of an assignor limited partner under the Uniform Act as well as the obligation to make the Capital Contributions attributable to the Interest in question, if any portion thereof remains unpaid.

D.     In the event of any assignment of a Limited Partner's Interest as a Limited Partner, there shall be filed with the Partnership a duly executed and acknowledged counterpart of the instrument making such assignment; such instrument must evidence the written acceptance of the assignee to all the terms and provisions of this Agreement; and if such an instrument is not so filed, the Partnership need not recognize any such assignment for any purpose.

E.     In the case of any assignment of a Limited Partner's Interest as a Limited Partner, where the assignee does not become a Substitute Limited Partner, the Partnership shall recognize the assignment not later than the last day of the calendar month following receipt of notice of assignment and required documentation.

F.     An assignee of a Limited Partner's Interest as a Limited Partner who does not become a Substitute Limited Partner as provided in Section 9.3 and who desires to make a further assignment of his Interest shall be subject to the provisions of this Article IX to the same extent and in the same manner as any Limited Partner desiring to make an assignment of its Interest.

G.     Notwithstanding any other provisions in this Partnership Agreement, Administrative General Partner may, with the consent of the Investor Limited Partner (such consent not to be unreasonably withheld) remove the Co-Managing General Partners for any of the following reasons upon prior written notice to the Co-Managing General Partners of the Administrative General Partner's election to remove the Co-Managing General Partners pursuant to this section and a reasonable opportunity to cure (not to exceed thirty days):

(1)     for any intentional misconduct or failure to exercise reasonable care by the Co-Managing General Partners with respect to any material matter in the discharge of its duties and obligations as Co-Managing General Partners (provided that such violation results in, or is likely to result in, a material detriment to or an impairment of the Property or assets of the Partnership);

(2)     the Co-Managing General Partners shall have violated any material provisions of any agreements binding on or applicable to the Property or the Partnership or any applicable laws;

(3)     the Co-Managing General Partners shall have conducted its own affairs or the affairs of the Partnership in such manner as would be likely, in the opinion of counsel to the Partnership to: (a) cause the termination of the Partnership for federal income tax purposes; or (b) cause the Partnership to be treated for federal income tax purposes as an association, taxable

as a corporation; or (c) an Event of Insolvency has occurred with respect to such Co-Managing General Partners;

(4)     the Co-Managing General Partners has ceased to qualify as an eligible nonprofit corporation under Section 214(g) of the California Revenue and Taxation Code or the Internal Revenue Service has determined that Co-Managing General Partners is no longer exempt from federal income taxation under Sections 501(c)(3) or 501(c)(4) of the Code and the loss of the real estate tax exemption creates an Operating Deficit;

A copy of any such notice delivered to the Co-Managing General Partners shall be delivered concurrently to the Limited Partner.  Upon such removal, the interest of the Co-Managing General Partners shall be purchased by the Partnership, or, at the election of the Administrative General Partner, be purchased by the Administrative General Partner or its designee.  The purchase price of the Co-Managing General Partner's interest shall be its Capital Account balance at such time.  Upon the purchase of its interest pursuant to this section, and without further action, the Co-Managing General Partners shall cease to have any rights or obligations under this Partnership Agreement

Section 9.5     Additional Limited Partners

A.     The General Partners may admit additional Limited Partners only with the Consent of the Investor Limited Partner.

B.     Any incoming Limited Partner shall, by his or its execution of this Agreement and as a condition to receiving any interest in the Partnership property, agree to be bound by the Project Documents to the same extent and in the same terms as the other Limited Partners.

C.     Upon the admission of any additional Limited Partners, an amendment to this Agreement and, if necessary or appropriate, the Certificate reflecting such admission shall be filed with each appropriate governmental authority.  Such amendment shall amend the Schedule to reflect the names, addresses and Capital Contributions of such additional Limited Partners, and shall set forth the agreement of such additional Limited Partners to be bound by all the provisions of this Agreement.

## ARTICLE 10

### Loans

A.     All Partnership borrowings shall be subject to the restrictions of Section 7.1, this Article, the Project Documents and the Regulations.  To the extent borrowings are permitted, they may be made from any source, including Partners and Affiliates.  The Partnership may issue instruments evidencing Subordinated Loans pursuant to Section 7.9.

B.     If any Partner shall lend any monies to the Partnership, such loan shall be unsecured and the amount of any such loan shall not be an increase of its Capital Contribution. Until such time as the General Partners and the Developer shall have performed fully their obligations to furnish funds pursuant to Section 7.9 hereof and pursuant to the Development Agreement, any loan from a General Partner or an Affiliate of a General Partner shall be an

obligation of the Partnership to the Partner or Affiliate only if it constitutes a borrowing permitted by Section 7.9 or pursuant to the Development Agreement and shall be repayable as therein provided. Subject to the preceding, any loans to the Partnership by a General Partner or an Affiliate of a General Partner may be made on such terms and conditions as may be agreed on by the Partnership, consistent with good business practices.

<div align="center">

ARTICLE 11

Management Agent

</div>

**A.** Subject to the consent of the Investment Partner Manager, the General Partners shall have responsibility for obtaining a Management Agent acceptable to each Lender and Agency to manage the Project in accordance with the requirements of each Lender and Agency. The General Partners shall cause the Partnership to enter into the Management Agreement with the Management Agent, which may be an Affiliate of a General Partner. Subject to the Regulations, the Management Agent shall be entitled to receive a reasonable and competitive Management Fee (determined by reference to arm's-length property management arrangements for comparable properties in force in the general locality of the Project) not to exceed the lesser of 5% of net rental income or the maximum amount permitted by each Agency or Lender.

B. If at any time after the Completion Date:

(i) The Project shall be subject to a substantial building code violation or violations which shall not have been cured within 90 days after notice from the applicable governmental agency or department or unless such violation(s) is (are) being validly contested by the General Partner by proceedings which operate to prevent any fines or criminal penalties from being levied against the Partnership or unless in the case of any such violation not susceptible of cure within such 90-day period, the General Partners is diligently making reasonable efforts to cure the same,

(ii) Operating revenues of the Project in respect of any period of 24 consecutive calendar months after the Completion Date shall be insufficient to permit the Partnership to pay when due on a current basis all Partnership obligations in respect of such 24-month period,

(iii) The representation and warranty set forth in Section 7.5A(xi) cannot be accurately made or a Recapture Event shall have occurred,

(iv) The Management Agent or its agents or employees have demonstrated incompetence or malfeasance in the management of the Project,

(v) The Management Agent shall fail to provide the required information to the General Partners in a timely manner to permit the General Partners to make all reports required by Article XII when due,

(vi) An Event of Bankruptcy shall occur with respect to the Management Agent,

(vii)   The Management Agent shall take any action or omit to take any action which violates in any material respect the terms of the Project Documents or any local, state or federal law applicable to the Project, or

(viii)   The Management Agent is an Affiliate of a General Partner and the General Partner is removed as such under the terms of this Agreement.

Then, in any such event, the General Partners shall forthwith give to the Partners notice of such event, and thereafter the Partnership shall, subject to any Requisite Approvals, forthwith terminate its management agreement with the Management Agent, unless the approval of the Investor Limited Partner is obtained to the retention of the Management Agent as the manager of the Property. If such approval is not so obtained, the General Partners shall immediately proceed to select a qualified Person (which, in the event the terminated Management Agent was an Affiliate of the General Partners, shall be unaffiliated with any General Partner) as the new Management Agent for the Property, which selection shall be subject to any Requisite Approvals including approval of the Investment Partner Manager; and, after such selection, no Management Fee shall be payable to any Person which is an Affiliate of a General Partner unless the management contract with any such Person shall provide for the right of the Partnership to terminate the same upon the occurrence of the circumstance described in this Article XI.

## ARTICLE 12

### Books and Reporting, Accounting, Tax Elections, Etc.

Section 12.1   Books, Records and Reporting

A.   The General Partners shall keep or cause to be kept:

(i)   A complete and accurate set of books and supporting documentation of transactions with respect to the conduct of the Partnership's business. The books of the Partnership shall be kept on the accrual basis. The books and records of the Partnership (including all records required to be maintained under the Uniform Act) shall at all times be maintained at the principal office of the Partnership. Each of the Partners and their duly authorized representatives shall have the right to examine the books of the Partnership and all other records and information concerning the operation of the Property at reasonable times.

(ii)   Prior to Final Closing, and within five (5) days of submission to the Lender, the General Partners shall cause to be distributed to the Limited Partner copies of the monthly draws of the Construction Loan along with copies of all change orders prior to each such draw, copy of the Certificate of Occupancy, if any is required to be obtained by the governmental authority having jurisdiction, copy of the Architect's Certificate of Compliance and a copy of an Insurance Binder listing the Limited Partner as an additional party to be notified as to any changes to the policy. Within fifteen (15) days of the closing thereto, the Co-Managing General Partners shall also provide to the Investor Limited Partner copies of all documents for the Permanent Mortgage Loan.

B.     The General Partners shall cause to be prepared and distributed to all persons who were Partners at any time during a fiscal year of the Partnership:

(i)     Within thirty (30) days of the Completion Date, a credit basis worksheet for each building of the Apartment Complex, in a form as specified by the Investment Partner Manager.

(ii)     By March 15 of each calendar year, and with respect to the previous fiscal year of the Partnership an audited financial statement that includes (A) a balance sheet as of the end of such fiscal year and statements of income, Partners' equity, and changes in financial position and a Cash Flow statement, for the year then ended, all of which, shall be prepared in accordance with generally accepted accounting principles and accompanied by an auditor's report containing an opinion of the Accountants (however, no audit shall be necessary if there is less than one quarter in which the Project has occupancy for such year), and (B) a report of the activities of the Partnership during the period covered by the report. Such report shall set forth distributions to Limited Partners for the period covered thereby and shall separately identify distributions from: (1) Cash Flow from operations during the periods, (2) Cash flow from operations during a prior period which had been held as reserves, (3) proceeds from disposition of the Apartment Complex or any other investments of the Partnership, (4) lease payments on net leases with builders and sellers, (5) costs reimbursed to any General Partner and its Affiliates verified by an accountant's review of time records and the specific nature of the work, (6) reserves, (7) borrowed monies, loans and additional contributions and (8) transactions outside of the ordinary course of business with a description thereof.

(iii)     By February 15 of each calendar year, and with respect to the previous fiscal year of the Partnership, (A) all information necessary for the preparation of the Limited Partners' federal income tax returns, (B) a qualifying occupancy summary in a format acceptable to the Investment Partner Manager.

(iv)     Within fifteen (15) days of the end of each month for the first year and each quarter thereafter, low income housing credit monitoring form, rent rolls, statement of income and expenses, operating statement and occupancy/rental report, all in the form specified or approved by the Investment Partner Manager. Copies of the bank statements for all Reserve and Escrow accounts are also to be provided at these times.

(v)     Within thirty (30) days after the end of each quarter of each fiscal year of the Partnership, a report containing:

(1)     A balance sheet, which may be unaudited;

(2)     A statement of income for the quarter then ended, which may be unaudited;

(3)     A statement of cash flows, which may be unaudited;

(4)     The certification by the General Partners that the Apartment Complex and all tenants thereof are in compliance with all requirements and

regulations applicable to Federal Housing Tax Credits. This certification shall be made on a monthly basis for the first twelve (12) months and quarterly thereafter; and

(5)     Other pertinent information regarding the Partnership and its activities during the quarter covered by the report.

(vi)     By November 1 of each calendar year, an annual operating budget incorporating all replacement and capital expenditures for the upcoming fiscal of the partnership, in the form reasonably specified by the Investor Limited Partner

(vii)     Immediately upon being informed thereof, written notice of any IRS, Tax Credit Agency, or local municipality audits, investigations, official inquiries, or notices relating to, or arising from, alleged non-compliance or alleged violations of law, regulations, rules or codes.

(viii)     As soon as practicable, copies of all correspondence between the General Partners, and/or Management Company, and either the Agency or the Service, with regard to this Project.

C.     Within sixty (60) days after the end of each fiscal year of the Partnership the General Partners shall cause to be provided to the Investment Partner :

(i)     A statement by the General Partners, to the best of their knowledge, that (A) all Construction Loan and/or Mortgage Loan payments and taxes and insurance payments with respect to the Apartment Complex are current as of the date thereof, or if there is any default, a description thereof, and (B) there is no building, health or fire code violation or similar violation of a governmental law, ordinance or regulation against the Apartment Complex or of which the General Partners have received notice or have actual knowledge, if there is any violation received, a description thereof;

(ii)     [Intentionally Omitted];

(iii)     A descriptive statement of all material transactions during the fiscal year between the Partnership and each General Partner and/or any Affiliate, including the nature of the transaction and the payments involved; and

(iv)     A copy of the annual report to be filed with the United States Treasury concerning the status of the Apartment Complex as low-income housing and, if required, a certificate to the Credit Agency concerning the same.

D.     Upon the reasonable written request of the Investment Partner for further information with respect to any matter covered in items B or C above, the General Partners shall cause to be furnished such reasonable information within thirty (30) days of receipt of such request. The General Partners, on behalf of the Partnership, shall cause to be sent to the Investment Partner, copies of complete first year tenant files within thirty (30) days of each tenant's initial occupancy date or within thirty (30) days form the placed-in-service date in the case of an occupied unit with rehabilitated property and on each anniversary date, 20% of all

tenant files randomly identified by the Investor Limited Partner.  The General Partners shall provide the Investment Partner with current photographs and/or slides of the apartment complex upon request.  The General Partners shall provide the Investor Limited Partner with such other reports as may be required by federal or state agencies or by the Investor Limited Partner.

E.      The General Partners, on behalf of the Partnership, shall case to be sent to the Investment Partner , on or before July 31 in each year, a report which shall state:

(i)      The then occupancy level of the Apartment Complex;

(ii)     If there are any operating deficits or anticipated operating deficits, the manner in which such deficits will be funded; and

(iii)    Such other matters as shall be material to the operation of the Partnership, including, without limitation, any building, health governmental law, ordinance or regulation by the Apartment Complex of which the General Partners, or any of them, is (are) aware.

F.      Prior to November 15 of each year, the General Partners, on behalf of the Partnership, shall cause to be sent to the Investment Partner a current nine (9) month balance sheet, an estimate of the Investment Partner 's share of the Tax Credits by each building of the Property, estimate of total Tax Credits, and estimates of Profits and Losses for tax purposes of the fiscal year in a form as specified by the Investment Partner Manager.  Such estimate shall be prepared by the General Partners and the Accountants.

G.      Within 15 days after the end of any calendar quarter during which:

(i)      There is a material default by the Partnership under the Project Documents or in payment of any mortgage, taxes, interest or other obligation on secured or unsecured debt,

(ii)     Any reserve (to the extent required under Section 7.8) has been reduced or terminated by application of funds therein for purposes materially different from those for which such reserves was established,

(iii)    The General Partners, or any of them, has (have) received any notice of a material fact which may substantially affect further distributions, or

(iv)     Any Partner has pledged or collateralized his or its Interest in the Partnership,

Then, the General Partners shall cause to be sent the Investment Partner  a detailed report of such event.

H.      After the Admission Date, the General Partners, on behalf of the Partnership, shall send to the Investment Partner a copy of all applicable periodic reports covering the status of project operations from the previous period, as may be required by any Lender and/or Agency, as applicable.

I.      Failure to provide the reports required under Section 12.1 within the time requirements set forth therein shall result in the assessment of a $100 per day penalty due and payable to the Investor Limited Partner until the tax information and/or reports are received. These penalties (the "Report Penalties") will be waived if the required information is received within three (3) business days after receipt of a written notice of demand from the Investor Limited Partner (including a notice sent by facsimile).

J.      Special Report. Unless otherwise fully reported to the Investment Limited Partner pursuant to this Section 12.1, a special report must be issued within sixty (60) days after the end of each quarter for real property acquisitions. The report shall contain a description of properties acquired, the present or proposed use of such properties, lease terms, financing terms, title insurance and bonding information.

K.      Every Limited Partner shall at all times have access to the records of the Partnership and may inspect and copy any of them. A list of the names and addresses of all of the Limited Partners shall be maintained as part of the books and records of the Partnership and shall be mailed to any Limited Partner upon request. A reasonable charge for copy work may be charged by the Partnership.

Section 12.2    Bank Accounts

The bank accounts of the Partnership shall be maintained in such banking institutions as the General Partners shall determine with the approval of each Lender and Agency, and withdrawals shall be made only in the regular course of Partnership business on such signature or signatures as the General Partners shall determine.

Section 12.3    Elections

Subject to the provisions of Section 12.4, all elections required or permitted to be made by the Partnership under the Code shall be made by the Co-Managing General Partners in such manner as it considers to be most advantageous to the Limited Partners. [Notwithstanding the foregoing, however, unless the Consent of the Investor Limited Partner is obtained permitting a different cost recovery schedule, the Partnership shall depreciate its personal and real property utilizing the alternative depreciation system of Section 168(g)(2) of the Code.].

Section 12.4    Special Adjustments

In the event of a transfer of all or any part of the interest of any Partner or in the event an election pursuant to Section 754 of the Code (or corresponding provisions of succeeding law) is made by the Investment Partner, the Partnership shall elect, if requested by the transferee or by the Investment Partner   (as the case may be), pursuant to Section 754 of the Code (or corresponding provisions of succeeding law) to adjust the basis of Partnership assets. Notwithstanding anything to the contrary contained in Article X, any adjustments made pursuant to said Section 754 shall affect only the successor in interest to the transferring Partner. Each Partner will furnish the Partnership with all information necessary to give effect to such election.

Section 12.5    Fiscal Year

The Fiscal Year of the Partnership shall be the calendar year unless some other year is required by the Code.

## ARTICLE 13

### General Provisions

### Section 13.1    Notices

Except as otherwise specifically provided herein, all notices, demands or other communications hereunder shall be in writing and shall be deemed to have been given when the same are (i) deposited in the United States mail and sent by certified or registered mail, postage prepaid, (ii) deposited with Federal Express or similar overnight delivery service, (iii) transmitted by telecopier or other facsimile transmission, answerback requested, or (iv) delivered personally, in each case, to the parties at the addresses set forth below or at such other addresses as such parties may designate by notice to the Partnership:

A.    If to the Partnership, at the principal office of the Partnership set forth in Section 2.2.

B.    If to a Partner, at his or its address set forth in the Schedule.

### Section 13.2    Word Meanings

The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires. Any references to "Sections" or "Articles" are to Sections or Articles of this Agreement, unless reference is expressly made to a different document.

### Section 13.3    Binding Provisions

The covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the heirs, legal representatives, successors and assignees of the respective parties hereto, except in each case as expressly provided to the contrary in this Agreement.

### Section 13.4    Applicable Law

This Agreement shall be construed and enforced in accordance with the internal laws of the State.

### Section 13.5    Counterparts

This Agreement may be executed in several counterparts and all so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties have not signed the original or the same counterpart.

Section 13.6    Paragraph Titles

Paragraph titles and any table of contents herein are for descriptive purposes only, and shall not control or alter the meaning of this Agreement as set forth in the text.

Section 13.7    Separability of Provisions; Rights and Remedies

A.    Each provision of this Agreement shall be considered separable and (i) if for any reason any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid, or (ii) if for any reason any provision or provisions herein would cause the Limited Partners to be bound by the obligations of the Partnership under the laws of the State as the same may now or hereafter exist, such provision or provisions shall be deemed void and of no effect.

B.    Each of the parties hereto irrevocably waives during the term of the Partnership (including any periods during which the business of the Partnership is continued under Article VIII) any right (i) that such party may have to maintain any action for partition with respect to the property of the Partnership, and (ii) any right to commence an action seeking dissolution of the Partnership (unless the Consent of the Investor Limited Partner has been obtained).

C.    The rights and remedies of any of the parties hereunder shall not be mutually exclusive, and the exercise of one or more of the provisions hereof shall not preclude the exercise of any other provisions hereof. Each of the parties confirms that damages at law may be an inadequate remedy for breach or threat of breach of any provisions hereof. The respective rights and obligations hereunder shall be enforceable by specific performance, injunction, or other equitable remedy, but nothing herein contained is intended to limit or affect any rights at law or by statute or otherwise of any party aggrieved as against the other parties for a breach or threat of breach of any provision hereof, it being the intention by this paragraph to make clear that under this Agreement the respective rights and obligations of the Partners shall be enforceable in equity as well as at law or otherwise.

D.    Each Partner irrevocably:

(i)    Agrees that any suit, action or other legal proceeding arising out of this Agreement, any of the Related Agreements or any of the transactions contemplated hereby or thereby shall be brought in the courts of record of Los Angeles County of the State of California or the courts of the United States located in the Southern District of California;

(ii)    Consents to the jurisdiction of each such court in any such suit, action or proceeding; and

(iii)    Waives any objection, which he or it may have to the laying of venue of any such suit, action or proceeding in any of such courts.

Section 13.8    Effective Date of Admission

Any Partner admitted to the Partnership during any calendar month shall be deemed to have been admitted as of the first day of such calendar month for all purposes of this Agreement including the allocation of Profits, Losses and Tax Credits under Article VI; provided, however, that if regulations are issued by the Service or an amendment to the Code is adopted which would require, in the opinion of the Accountants, that a Partner be deemed admitted on a date other than as of the first day of such month, then the General Partners shall select a permitted admission date which is most favorable to the Partner.

Section 13.9   <u>Amendment Procedure</u>

This Agreement may be amended by the written consent of each of the General Partners, and with the Consent of the Investor Limited Partner or in the manner provided in Section 4.5, subject to the following:

(i)     The term of the Partnership shall not be extended beyond December 31, 2057 without the written approval of all Partners.

(ii)    This Section 13.9 shall not be amended without the written approval of all Partners.

(iii)   This Agreement shall not be modified or amended in such a manner as to increase the amount of Capital Contributions or reduce the interest of any Partner in Profits, Losses, Tax Credits, Cash Flow or Capital Proceeds of the Partnership or otherwise increase the liability of any Partner without the written approval of each Partner affected thereby.

(iv)    Without the written approval of all Partners, no amendment hereof may reduce the percentage in interest of Partners required hereunder for the taking or omission of any action or for the consent to any action proposed to be taken or omitted.

(v)     Notwithstanding any agreement to the contrary contained in this Agreement, no amendment will be made to this Agreement which will affect the rights of any Lender or Agency under the terms of any Project Document without the prior written approval of such Lender or Agency.

Section 13.10   <u>Delivery of Certificate</u>

Promptly upon the filing of the Certificate and each amendment thereto in the Filing Office, the General Partners shall deliver or mail a copy thereof to each Limited Partner.

Section 13.11   <u>Requirements of the Lender and the Agency</u>

A.     For as long as any Mortgage from the Partnership held by the Lender shall be outstanding:

(i)     Each of the provisions of this Agreement shall be subject to, and the General Partners covenant to act in accordance with the Regulations and the

Commitments, but in no event shall any Partner be personally liable for the performance of this covenant;

      (ii)    The Regulations and the Commitments shall be binding upon and shall govern the rights and obligations of the Partners, their heirs, executors, administrators, successors and assigns, but only to the extent expressly provided therein;

      (iii)    Any Partner hereafter shall, as a condition of receiving an interest in the Partnership property, agree to be bound by the Commitments and other documents required in connection with the Mortgage Loan to the same extent and on the same terms as the other parties;

      (iv)    Upon any dissolution of the Partnership or any transfer of the Property, no title to or right to the possession and control of the Property, and no right to collect the rent therefrom shall pass to any Person who is not or does not become bound by the Commitments (including, without limitation, the Regulatory Agreement) in a manner satisfactory to the Lender;

      (v)    No amendment of this Agreement which would affect the rights of the Lenders under any of the documents referred to in this Section 13.11 shall be made without the prior written consent of the Lender;

      (vi)    Any other provisions of this Agreement to the contrary notwithstanding, if any provisions of this Agreement shall be in conflict with any provisions of the Commitments (including, without limitation, the Regulatory Agreement), the provisions of the Commitments shall control;

      (vii)    No distributions (as that term is defined in the Regulatory Agreement) shall be made except as permitted by the terms of the Regulatory Agreement;

      (viii)    The Partnership shall not be voluntarily dissolved without the prior written consent of the Lender; and

      B.    In the event the Partnership elects to (a) pay off any loan that has been insured or coinsured and (b) refinance the Property with the proceeds of a new loan from a lender to be insured or coinsured, this provision shall remain operative unless modified at the request of said secretary or such lender.

Section 13.12 <u>Entire Agreement</u>

      This Agreement, and the Related Agreements referred to herein sets forth all (and is intended by all parties to be an integration of all) of the representations, warranties, promises, agreements, and understandings of the parties hereto with respect to the Partnership, its Partners, its business and its properties; and there are no representations, warranties, promises, agreements or understandings, oral or written, express or implied, among them other than as set forth or incorporated by reference herein.

Section 13.13 <u>Partition</u>

No Partner nor any successor or assignee of any Partner has the right to partition the Project or any part thereof or interest therein, or file a complaint or institute an action or proceeding at law or in equity to partition the Project or any part thereof or interest therein. Each Partner for itself and its successor and assigns waives any such rights. The Partners intend that during the term of this Agreement, the rights of the Partners and their successors in interest, as among themselves, are governed solely by the Agreement and the Uniform Act.

Section 13.14   Arbitration

A..    General; Appointment of Arbitrators; and Discovery.

(i)    Except as otherwise specifically provided in this sub-paragraph (i), if any controversy or dispute between the parties hereto arises under, out of, or in relation to any of the provisions hereof, and this Agreement expressly provides for the arbitration of said controversy or dispute, which cannot be settled by the parties within fifteen (15) days after a party hereto gives written notice of the existence of such dispute, either party, within thirty (30) days of the expiration of the foregoing fifteen (15) day period, may submit such controversy or dispute for arbitration to, and in accordance with the Rules of Practice and Procedure for the Arbitration of Judicial Disputes of Judicial Arbitration & Mediation Services, Inc. ("J.A.M.S.") (J.A.M.S. and its agents are referred to herein as the "Arbitrators"), as then in effect, except as otherwise provided by the provisions of this Paragraph 13.14A(i).

(ii)    The provisions of this Paragraph 13.14A(ii) shall not be construed to deny any party the right to seek provisional remedies available to said party before a court of law. For the purposes of this Agreement, the parties, by submitting the controversy or dispute to the Arbitrators, do not waive or relinquish their rights to seek provisional remedies before a court of law and said parties expressly agree that each party shall have the right to seek provisional remedies before a court of law.

(iii)    If neither party elects to submit a controversy to arbitration within the aforesaid thirty (30) day period, then either party shall have the right to commence legal proceedings to resolve the controversy; provided, however, such party must first give written notice to the other party of its intent to commence litigation and the party receiving such notice shall have fifteen (15) days following the date of receipt of such notice to submit the controversy to arbitration in accordance with the foregoing provisions of this Paragraph 13.15A(iii). If the party, after receiving such notice, does not submit the controversy to arbitration within such fifteen (15) day period, the right to arbitrate such noticed dispute shall be waived and then the party giving the notice shall have the right to commence legal proceedings to resolve the controversy without further notice or further obligation to comply with the provisions of this Paragraph 13.14A(iii) with respect to that particular controversy. For the purposes of this Agreement, the time within which any arbitration proceedings can be instituted with respect to any matter or dispute shall be deemed to have elapsed only upon the expiration of the aforesaid fifteen (15) day period following the receipt of such a notice of intent to commence legal proceedings. If either party refuses to submit to arbitration after duly given notice of the other parties exercise of his/her right to arbitrate, the other party shall be entitled to an order from the appropriate

court compelling arbitration. If either party commences legal proceedings (and the other party does not successfully compel arbitration) to resolve the controversy as specifically provided in this Paragraph 13.14A(iii), the parties hereto shall stipulate immediately upon the setting of a trial date, pursuant to California Rule of Court 244, or any successor amended statute or law containing similar provisions, that the proceeding be tried by a temporary judge.

(iv)     The provisions of California Code of Civil Procedure governing discovery in civil litigation, or any successor amended statute or law containing similar provisions, are incorporated by reference herein and shall apply in any such arbitration; specifically, the parties shall have the right to engage in all pre-hearing discovery as that which would be permitted in a civil litigation action to resolve their dispute. The Arbitrator shall rule upon motions to compel or limit discovery and shall have the authority to impose sanctions, including attorneys' fees and costs, to the same extent as a court of law, should the Arbitrator determine that discovery was sought without substantial justification or that discovery was refused o r o bjected t o w ithout s ubstantial j ustification. The p arties shall have a certified court reporter make a record of the hearing. The arbitration shall proceed in accordance with the laws relating to arbitration then in effect in the State of California, including, but not limited to Sections 1280 through 1294.2 of the California Code of Civil Procedure, as the same may be amended or superseded from time to time.

B.     Final Judgment, Findings of Fact and Conclusions.

(i)     The Arbitrator shall apply California law as though he/she was bound by applicable statutes and precedents and case law, including the admissibility of evidence and shall endeavor to decide the controversy as though he/she were a judge in a California court of law. The Arbitrator shall have the power to issue any award, judgment, decree or order of relief that a court of law or equity could issue under California law, including, but not limited to, money damages, specific performance, or injunctive relief; and for such purposes, it is hereby expressly acknowledged and agreed that damages at law will be an inadequate remedy for a breach or threatened breach of any provision of this Agreement, it being the intention of this sentence to make clear the agreement of the parties that the respective rights and obligations of the parties hereunder shall be enforceable in any arbitration proceedings in accordance with principles of equity as well as law.

(ii)     The Arbitrator shall prepare a written decision that shall be supported by written findings of fact and conclusions which adequately set forth the basis of his/her decision a nd w hich c ite t he statutes and precedents applied and relied upon in r eaching his/her decision. The award, judgment, decree or order, and the findings of the Arbitrator shall be final, conclusive and binding upon the parties, and judgment upon the award and enforcement of any other judgment, decree or order of relief granted by the Arbitrator may be entered or obtained in any court of competent jurisdiction upon the application of any party. This agreement to arbitrate shall be self-executing without the necessity of filing any action in a ny c ourt a nd s hall be specifically e nforceable under the prevailing a rbitration law.

C.    Costs and Expenses.  Except as otherwise provided in Paragraph 13.14A(iv) in the provisions related to discovery, all c osts a nd expenses of any a rbitration proceeding h ereunder, excluding attorneys' fees, shall be shared equally by the parties.  Each party shall bear its own attorneys' fees.  Notwithstanding the foregoing, however, in the event the Arbitrator shall determine that a party acted without substantial justification in submitting to a dispute to arbitration, the party who is so determined to be acting without substantial justification shall bear all costs and expenses of the other party in the proceeding including, but not limited to, the reasonable attorneys' fees of such other party.  The parties hereto expressly agree that the provisions of California Code of Civil Procedure, including, but not limited to, Section 998 et seq., as t he s ame m ay b e a mended o r s uperseded f rom t ime t o t ime, g overning o ffers b y a p arty t o compromise shall not apply to any arbitration proceeding hereunder.

Section 13.15  Requirements for Bonds.

A.    Notwithstanding any other provision of this Agreement to the contrary, so long as any Bonds shall be outstanding, the Partnership shall not, and the General Partners shall have no authority in respect of the Partnership or the Project to, perform any act or permit any act to be taken on its behalf which:

(i)    Is contrary to or would result in a breach or violation of or a default under any requirement, covenant or other obligation of the Partnership set forth in any Bond document or;

(ii)    Would adversely affect the exemption from taxation under the Code of the interest paid on the Bonds.

B.    Not withstanding any other provision in the Agreement to the contrary, for so long as any Bonds shall be outstanding:

(i)    Each of the provisions of this Agreement shall be subject to, and the General Partners covenant to act in accordance with, the Bond Documents but in no event shall any Partner be personally liable for the performance of this covenant.

(ii)    No amendment of this Agreement which would materially and adversely affect the rights of any party to any Bond Document (other than the Partnership) shall be made without the prior written consent of such party and without prior compliance with the conditions for amending such Bond Document;

(iii)    If any provision if this Agreement shall be in conflict with any provision of any Bond Document, such conflicting provision of this Agreement shall be suspended and the provisions of the Bond Document shall control;

(iv)    No part of the Project will be sold or otherwise disposed of or leased and no change in the use of the Project shall be made, except in accordance with the terms and conditions of the Bond Documents;

(v)    The Partnership shall not change or permit any change in its identity or ownership (except for admitting additional limited partners), undertake any other

obligations, directly or indirectly, or take or permit any other actions which would impair or prevent performance of its obligations, except as permitted thereby, without obtaining the requisite approvals under the Bond Documents;

(vi)    To the extent reasonably possible, the Partners shall take all actions necessary to amend this Agreement to comply with any amendments to the Code or the Treasury Regulations effective retroactive to the date of such changes that are applicable to the exemptions of federal taxation under the Code of the interest paid on the Bonds; and

Section 13.16  Special Power of Attorney.

Solely for the purpose of effecting the admission of the Special Limited Partner as a General Partner, if the General Partners are validly and lawfully removed under Section 4.5 of this Agreement, the General Partners constitute and appoint the Manager of the Investor Limited Partner as their true and lawful attorney-in-fact, with full power and authority to act in its name, place and stead, to make, execute, sign, certify, acknowledge, deliver, file and record on its behalf any certificate, document or instrument, necessary or helpful, to effect the admission of the Special Limited Partner as a General Partner and as Co-Managing General Partners, if authorized in accordance with Section 7.14 herein.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**EVANS LANE APARTMENTS L.P.**

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP SIGNATURE PAGE

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**CO-MANAGING GENERAL PARTNERS:**
Community Home Builders and Associates,
a California non profit public benefit corporation

By: _____
Name: Mark D. Lazzarini, its President

Affordable Housing Access, Inc., a California
non profit corporation

By: _____
William W. Hirsh, its President

**ADMINISTRATIVE GENERAL PARTNER:**
Montalvo Associates LLC
a California limited liability Company

By: _____
James S. Morley, its Manager

**INVESTOR LIMITED PARTNER:**
AMTAX HOLDINGS 123, LLC
an Ohio limited liability company

By:    Paramount Properties, Inc. its manager

    By: _____
    Name: _____
    Its: _____

**SPECIAL LIMITED PARTNER:**
PROTECH 2002-C LLC,
an Ohio limited liability company

By:    Protech Development Corp.
its Manager

By: _____
    Its: _____

**ORIGINAL (AND WITHDRAWING) LIMITED PARTNER:**
BUILDERS AFFORDABLE HOUSING DEVELOPMENT COMPANY, LLC

By: Community Home Builders & Associates, Member-Manager

    By: _____
    Mark D. Lazzarini, President

**EVANS LANE APARTMENTS L.P.**

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP SIGNATURE PAGE

       IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**CO-MANAGING GENERAL PARTNERS:**
Community Home Builders and Associates,
a California non profit public benefit corporation

By:_____
Name: Mark D. Lazzarini, its President

Affordable Housing Access, Inc., a California
non profit corporation

By: _____
       William W. Hirsh, its President

**ADMINISTRATIVE GENERAL PARTNER:**
Montalvo Associates LLC
a California limited liability Company

By: _____
       James S. Morley, its Manager

**INVESTOR LIMITED PARTNER:**
AMTAX HOLDINGS 123, LLC
an Ohio limited liability company

By:    Paramount Properties, Inc. its manager

    By:_____
    Name: Michael J. Menzer
    Its: President

**ORIGINAL (AND WITHDRAWING) LIMITED PARTNER:**
BUILDERS AFFORDABLE HOUSING DEVELOPMENT COMPANY, LLC

By: Community Home Builders & Associates, Member-Manager

    By: _____
       Mark D. Lazzarini, President

**SPECIAL LIMITED PARTNER:**
PROTECH 2002-C LLC,
an Ohio limited liability company

By:    Protech Development Corp.
its Manager

By:_____
   Its: President

# EVANS LANE APARTMENTS L.P.

## SCHEDULE A

| Name and Business Address | | Original Initial Capital Contributions | Percentage Interests |
|---|---|---|---|
| **GENERAL PARTNERS:** | | | |
| Community Home Builders and Associates 657 N. 1st Street, Suite 610 San Jose, CA 95112 | $ | 1000[1] | .00225% |
| Affordable Housing Access, Inc. 4029 Westerly Place Suite 101 Newport Beach, CA 92660 | $ | 1,000[1] | .00225% |
| Montalvo Associates LLC 1777 Saratoga Ave, Suite 210 San Jose, CA 95129 | $ | 1,000[1] | .0045% |
| **SPECIAL LIMITED PARTNER** Protech 2002-C, LLC 4009 Columbus Rd., S.W. Granville, OH 18423 | $ | 1,000 | .001% |
| **INVESTOR LIMITED PARTNER:** | | | |
| AMTAX Holdings 123, LLC 4009 Columbus Rd., S.W. Granville, OH 43023 | | $16,695,627[2] | 99.99% |
| TOTAL | $ | 16,698,627 | 100% |

---

[1]  In the event any deferred portion of the Developer Fee is still outstanding prior to the end of ten (10) years of the placed-in-service of the first building in the Project, the General Partners shall make an additional Capital Contribution to the Partnership in an amount equal to such outstanding amount, prior to the end of such tenth year. Such additional Capital Contribution shall be used solely to pay the outstanding deferred Developer Fee. Such Capital Contribution shall be returned to the General Partners out of Distributions of Cash Flow or proceeds from a Sale or Refinancing in the same priority, but prior to, the repayment of Subordinated Loans of the General Partners.

[2]  $100,000 has been paid in as of the date of the Investment Closing; An additional $16,595,627 to be paid pursuant to Article V, subject to an adjustment and conditions to payments provided herein.

**EVANS LANE APARTMENTS L.P.**

**Exhibit B**
**Schedule of annual (Tax Losses)**
**to the Investment Limited Partner**

| | YEAR | ANNUAL TAX CREDITS | ANNUAL TAX LOSSES |
|---|---|---|---|
| 1 | 2003 | 0 | (566,581) |
| 2 | 2004 | 95,799 | (3,235,469) |
| 3 | 2005 | 1,329,213 | (2,788,229) |
| 4 | 2006 | 1,907,999 | (1,346,055) |
| 5 | 2007 | 1,907,999 | (1,159,546) |
| 6 | 2008 | 1,907,999 | (1,201,749) |
| 7 | 2009 | 1,907,999 | (1,076,529) |
| 8 | 2010 | 1,907,999 | (1,117,538) |
| 9 | 2011 | 1,907,999 | (1,029,269) |
| 10 | 2012 | 1,907,999 | (950,000) |
| 11 | 2013 | 1,907,999 | (881,732) |
| 12 | 2014 | 1,907,999 | (863,014) |
| 13 | 2015 | 1,907,999 | (393,259) |
| 14 | 2016 | 1,812,200 | (124,461) |
| 15 | 2017 | 578,786 | (600,997) |
| 16 | 2018 | | (318,617) |
| 17 | 2019 | | (450,470) |

**EVANS LANE APARTMENTS L.P.**

**FORM OF**

**INSTALLMENT PAYMENT CERTIFICATE**

The undersigned, constituting of the Administrative General Partner (the "Administrative General Partner") of EVANS LANE APARTMENTS L.P., a California limited partnership (the "Partnership"), does hereby certify to AMTAX HOLDINGS 174, LLC, a Ohio limited liability company ("AMTAX"), pursuant to Section 5.1B(i) of the Amended and Restated Agreement of limited partnership of the Partnership, dated effective as of October 1, 2002 (the "Partnership Agreement"), that:

1.      All preconditions, representations, warranties and agreements set forth in the Partnership and applicable to the First Installment(s) have been satisfied.

2.      As set forth in Section 5.1A of the Partnership Agreement, the amount of the [First, Second, Third] Installment is $_____.

3.      All of the events listed in Section 5.1A (1) have occurred.

4.      Each of the representations and warranties set forth the Partnership Agreement, including those set forth in Section 7.5, is in all material respects true and correct.

5.      No event has occurred which would permit AMTAX to give an Election Notice under the Purchase Agreement

6.      No event has occurred which suspends or terminates the obligations of the Investment Limited Partner to pay Installments under the Partnership Agreement, which has not been cured as therein provided.

7.      In the case of the First Installment(s), attached hereto is a true copy of the Title Policy, including all endorsements thereto (the most recent of which is dated within 10 days of the date hereof), evidencing the accuracy of the representation contained in Section 7.5A (vi) of the Partnership Agreement. [In the case of any other Installment] Attached hereto is a copy of the date-down endorsement (or title update) to the Title Policy, which such endorsement (or update) is dated within fifteen (15) days of the date hereof.

Capitalized terms not defined herein shall have the meanings given to them in the Partnership Agreement.

**EVANS LANE APARTMENTS LP**

**INSTALLMENT PAYMENT CERTIFICATE**
**SIGNATURE PAGE**
(for each Installment of Capital Contribution)

IN WITNESS WHEREOF, the undersigned has executed this Installment Payment Certificate effective as of _____, 200__.

**CO-MANAGING GENERAL PARTNERS:**

Community Home Builders and Associates,
a California non profit public benefit corporation

By:_____
            Mark D. Lazzarini
            its President

Affordable Housing Access, Inc.,
a California non profit corporation
its Co-Managing General Partner

By:_____
        William W. Hirsh
        its President

**ADMINISTRATIVE GENERAL PARTNER:**

Montalvo Associates LLC
a California limited liability Company
its Administrative General Partner

By:_____
        James S. Morley
        its Manager

STATE OF _____}

: ss.:

COUNTY OF _____}

On this ____day of _____, 200__ before me personally came _____ on behalf of _____, known to me to be the person described in and who executed the foregoing instrument, and he duly acknowledged to me he executed the same.

_____

Notary Public

STATE OF _____}

: ss.:

COUNTY OF _____}

On this ___day of _____, 200__ before me personally came _____ on behalf of _____, known to me to be the person described in and who executed the foregoing instrument, and he duly acknowledged to me he executed the same.

_____

Notary Public

STATE OF _____}

: ss.:

COUNTY OF _____}

On this ___day of _____, 200__ before me personally came _____ on behalf of _____, known to me to be the person described in and who executed the foregoing instrument, and he duly acknowledged to me he executed the same.

_____

Notary Public

**EVANS LANE APARTMENTS L.P.**

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP SIGNATURE PAGE

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**CO-MANAGING GENERAL PARTNERS:**
Community Home Builders and Associates,
a California non-profit public benefit corporation

By: _____
Name: Mark D. Lazzarini, its President

Affordable Housing Access, Inc., a California
non profit corporation

By: _____
William W. Hirsh, its President

**ADMINISTRATIVE GENERAL PARTNER:**
Montalvo Associates LLC
a California limited liability Company

By: _____
James S. Morley, its Manager

**INVESTOR LIMITED PARTNER:**
AMTAX HOLDINGS 123, LLC
an Ohio limited liability company

By:     Paramount Properties, Inc. its manager

By: _____
Name: _____
Its: _____

**ORIGINAL (AND WITHDRAWING) LIMITED PARTNER:**
BUILDERS AFFORDABLE HOUSING DEVELOPMENT COMPANY, LLC

By: Community Home Builders & Associates, Member-Manager

By: _____
Mark D. Lazzarini, President

**SPECIAL LIMITED PARTNER:**
PROTECH 2002-C LLC,
an Ohio limited liability company

By:     Protech Development Corp.
its Manager

By: _____
Its: _____

## EVANS LANE APARTMENTS L.P.

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP SIGNATURE PAGE

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**CO-MANAGING GENERAL PARTNERS:**
Community Home Builders and Associates,
a California non profit public benefit corporation

By:_____
Name: Mark D. Lazzarini, its President

Affordable Housing Access, Inc., a California
non profit corporation

By: _____
         William W. Hirsh, its President

**ADMINISTRATIVE GENERAL PARTNER:**
Montalvo Associates LLC
a California limited liability Company

By: _____
         James S. Morley, its Manager

**INVESTOR LIMITED PARTNER:**
AMTAX HOLDINGS 123, LLC
an Ohio limited liability company

By:     Paramount Properties, Inc. its manager

     By:_____
     Name: Michael J. Menzer
     Its:  President

**SPECIAL LIMITED PARTNER:**
PROTECH 2002-C LLC,
an Ohio limited liability company

By:     Protech Development Corp.
its Manager

By:_____
     Its: President

**ORIGINAL (AND WITHDRAWING) LIMITED PARTNER:**
BUILDERS AFFORDABLE HOUSING DEVELOPMENT COMPANY, LLC

By: Community Home Builders & Associates, Member-Manager

     By: _____-
         Mark D. Lazzarini, President

**SECOND AMENDMENT**
TO
**AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
OF
**Evans Lane Apartments, L.P.**
**(a California limited partnership)**
**d/b/a Las Ventanas**

The undersigned, COMMUNITY HOME BUILDERS AND ASSOCIATES, a Co-Managing General Partner, AFFORDABLE HOUSING ACCESS, INC., a Co-Managing General Partner, MONTALVO ASSOCIATES LLC, the Administrative General Partner, PROTECH 2002-C, LLC, as Special Limited Partner, and AMTAX HOLDINGS 123, LLC, as Investor Limited Partner being all the Partners, hereby amend the Amended and Restated Agreement of Limited Partnership of Evans Lane Apartments, L.P., a California limited partnership, dated as of October 1, 2002, as amended from time to time (the "Partnership Agreement"), and state as follows:

## W I T N E S S E T H

**WHEREAS**, Evans Lane Apartments, L.P. (the "Partnership"), a California limited partnership, was created and evidenced by a Certificate of Limited Partnership filed with the Secretary of State of the State of California on February, 19, 2002 and by an Agreement of Limited Partnership executed shortly thereafter; and amended by an Amended and Restated Agreement of Limited Partnership among COMMUNITY HOME BUILDERS AND ASSOCIATES, a California non-profit public benefit corporation as a Co-Managing General Partner ("CHBA"), AFFORDABLE HOUSING ACCESS, INC., a California non-profit public benefit corporation as a Co-Managing General Partner ("Affordable"), MONTALVO ASSOCIATES LLC, a California limited liability company as the Administrative General Partner ("Montalvo"), PROTECH 2002-C, LLC, an Ohio limited liability company as Special Limited Partner ("Protech"), and AMTAX HOLDINGS 123, LLC, an Ohio limited liability company as Investor Limited Partner ("AMTAX") (hereinafter collectively referred to as the "Partners"), dated as of October 1, 2002; and further Amended by the First Amendment to Amended and Restated Agreement of Limited Partnership November 3, 2005  (the "First Amendment");

**WHEREAS**, CHBA as a- Co-Managing General Partner is the owner of a 0.00225% ownership interest in the Partnership and is hereby assigning and conveying to Affordable, pursuant to an Assignment of Partnership Interest and Other Rights of even date herewith (the "Assignment") all of said ownership interest in the Partnership together with all right, title and interest in and to the business, properties and assets of the Partnership represented by such ownership interest in the Partnership;

**WHEREAS,** pursuant to the JOINDER OF GUARANTOR of the Assignment (the "Joinder"), James S. Morley (the "Guarantor") joined in the Assignment for the purpose of (i) acknowledging and consenting to the Assignment, and (ii) ratifying and confirming that notwithstanding such assignment, his Guaranty dated October 1, 2002, in favor of AMTAX, remains in full force and effect; and

**WHEREAS,** the Partners desire to amend certain provisions of the Partnership Agreement setting forth the duties of the Managing General Partner in order to remain in compliance with proposed regulations of the California State Board of Equalization ("BOE Regulations") relating to the Project's eligibility to receive an exemption from property taxation under Section 214(g) of the California Revenue and Taxation Code.

**NOW THEREFORE,** in consideration of the mutual promises of the undersigned, and for other good and valuable consideration, **IT IS AGREED THAT**:

1.      Pursuant to Section 13.9 of the Partnership Agreement, this Amendment changes, amends and modifies the Partnership Agreement as of the date hereof as set forth herein and incorporates all prior changes to the terms, conditions and provisions of the Partnership Agreement.  Terms used herein that were previously defined in the Partnership Agreement shall have the meaning stated therein, unless otherwise indicated herein. All other provisions of the Partnership Agreement not changed herein, remain the same.

2.      In accordance with Article VIII of the Partnership Agreement, CHBA hereby withdraws as a Co-Managing General Partner of the Partnership and Affordable acknowledges that it is the sole Managing General Partner.

3.      All references to Co-Managing General Partner in the Partnership Agreement henceforth shall be deemed to refer solely to Affordable.

4.      Schedule A, "Name and Business Address", is amended to delete CHBA, and reflect the transfer of CHBA's Interest to Affordable.  Schedule A is amended in its entirety.  The amended Schedule A is attached hereto and made part hereof.

5.      Section 7.3C of the Partnership Agreement is hereby amended and restated in its entirety as follows:

"The Managing General Partner shall materially participate in the control, management and direction of the Partnership's business. The Managing General Partner shall: (a) have the right to vote on all Major Decisions of the  Partnership; (b) directly or indirectly under its supervision, manage the Partnership; (c) conduct annual physical inspections of the Project to ensure that the Project is being used as low-income housing and meets all of the requirements set forth in

2

applicable BOE Regulations; and (d) annually submit a certification to the county assessor for the county in which the Project is located that the Project meets all of the requirements set forth in the applicable BOE Regulations. As used in this Agreement, "Major Decisions" means any act of the Partnership that requires a vote of a majority interest of the General Partners of the Partnership. Among its substantial management duties to the Partnership, the Managing General Partner shall:

> (i)    rent, maintain and repair the Project, or if such duties are delegated to a property management agent, participate in hiring and overseeing the work of the property management agent;

> (ii)    participate in hiring and overseeing the work of all persons necessary to provide services for the management and operation of the Partnership's business;

> (iii)   execute and enforce all contracts executed by the Partnership;

> (iv)   execute and deliver all partnership documents on behalf of the Partnership; and

> (v)    prepare or cause to be prepared all reports to be provided to the Partners or lenders on a monthly, quarterly or annual basis consistent with the requirements of this Agreement."

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

3

**Evans Lane Apartments, L.P.**

## SECOND AMENDMENT
## SIGNATURE PAGES

**IN WITNESS WHEREOF**, the parties hereto have executed this Amendment to the Partnership Agreement of Evans Lane Apartments, L.P. to be effective as of the 2nd day of March, 2006.

**CHBA:**
Community Home Builders and Associates.
   a California non-profit public benefit corporation

By:_____
   Name: Ralph Walker
   Title: President

**AFFORDABLE:**
Affordable Housing Access, Inc. a California nonprofit benefit corporation

By: _____
   Name: William H. Hirsch
   Title: President

**MONTALVO:**
Montalvo Associates LLC
a California limited liability company

By: _____
   Name: James S. Morley,
   Title: Manager

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

4

**Evans Lane Apartments, L.P.**

**SECOND AMENDMENT**
**SIGNATURE PAGES**

     **IN WITNESS WHEREOF**, the parties hereto have executed this Amendment to the Partnership Agreement of Evans Lane Apartments, L.P. to be effective as of the 2nd day of March, 2006.

**CHBA:**
Community Home Builders and Associates.
   a California non-profit public benefit corporation

By:_____
    Name: Ralph Walker
    Title: President

**AFFORDABLE:**
Affordable Housing Access, Inc. a California nonprofit benefit corporation

By: _____
    Name: William W. Hirsch
    Title: President

**MONTALVO:**
Montalvo Associates LLC
a California limited liability company

By: _____
    Name: James S. Morley,
    Title: Manager

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

4

**Evans Lane Apartments, L.P.**

**SECOND AMENDMENT**
**SIGNATURE PAGES**

**IN WITNESS WHEREOF**, the parties hereto have executed this Amendment to the Partnership Agreement of Evans Lane Apartments, L.P. to be effective as of the 2nd day of March, 2006.

**CHBA:**
Community Home Builders and Associates.
a California non-profit public benefit corporation

By:_____

Name: Ralph Walker
Title: President

**AFFORDABLE:**
Affordable Housing Access, Inc. a California nonprofit benefit corporation

By: _____

Name: William H. Hirsch
Title: President

**MONTALVO:**
Montalvo Associates LLC
a California limited liability company

By: _____
Name: James S. Morley,
Title: Manager

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

**PROTECH:**
PROTECH 2002-C LLC, an Ohio limited liability company

By: Protech Development Corp., a Tennessee corporation, its Manager

By: _____
Name: Dain C. Akin
Title: Senior Vice President & General Counsel

**AMTAX:**
AMTAX HOLDINGS 123, LLC
an Ohio limited liability company

By: Paramount Properties, Inc., a Delaware corporation its Manager

By: _____
Name: Dain C. Akin
Title: Senior Vice President & General Counsel

*[REMAINER OF PAGE INTENTIONALLY LEFT BLANK]*

### EVANS LANE APARTMENTS, L.P.
**d/b/a Las Ventanas**

### Second Amendment
### SCHEDULE A

| Name and Business Address | Amended Capital Contributions | Amended Percentage Interests |
|---|---|---|
| ADMINISTRATIVE GENERAL PARTNER:<br>Montalvo Associates, LLC<br>1600 West Campbell, Suite 211<br>San Jose, CA 95008 | $100[1] | .0045% |
| MANAGING GENERAL PARTNER:<br>AFFORDABLE HOUSING ACCESS, INC.<br>4029 Westerly Place, Suite 101<br>Newport Beach, CA 92660 | $100[1] | .0045% |
| SPECIAL LIMITED PARTNER:<br>PROTECH 2002-C LLC<br>4009 Columbus Road, S.W.<br>Granville, OH  43023 | $1,000 | .001% |
| INVESTOR LIMITED PARTNER:<br>AMTAX HOLDINGS 123, LLC<br>4009 Columbus Road, S.W.<br>Granville, OH  43023 | $16,695,627[2] | 99.99% |
| TOTAL | $16,698,627 | 100.00% |

[1] In the event any deferred portion of the Developer Fee is still outstanding prior to the end of ten (10) years of the Placed in Service Date of the first building in the Project, the Administrative General Partner shall make an additional Capital Contribution to the Partnership in an amount equal to such outstanding amount, prior to the end of such tenth (10th) year.  Such additional Capital Contribution shall be used solely to pay the outstanding deferred Developer Fee.  Such Capital Contribution shall be returned to the Administrative General Partner out of Distributions of Cash Flow or proceeds from a Sale or Refinancing in the same priority, but prior to, the repayment of Subordinated Loans of the Administrative General Partners.

(2)     $100,000 has been paid in as of the date of the Investment Closing; An additional $16,595,627 is to be paid in pursuant to Article V, subject to adjustment and conditions to payment as provided herein.

## ASSIGNMENT OF PARTNERSHIP INTEREST AND OTHER RIGHTS
### (Evans Lane Apartments, L.P.
### d/b/a Las Ventanas)

This Assignment of Partnership Interest and Other Rights (this "Assignment") is made and entered into as of the ____ day of March, 2006 (the "Effective Date") by and between Community Home Builders and Associates, a California non-profit public benefit corporation ("Assignor"), and Affordable Housing Access, Inc., a California nonprofit public benefit corporation ("Assignee") and is acknowledged and agreed to by JSM Enterprises, Inc., a California corporation ("JSM").

### RECITALS AND REFERENCES:

**WHEREAS**, Evans Lane Apartments, L.P. (the "Partnership"), a California limited partnership, was created and evidenced by a Certificate of Limited Partnership filed with the Secretary of State of the State of California on February 19, 2002 and by an Agreement of Limited Partnership executed shortly thereafter; and amended by an Amended and Restated Agreement of Limited Partnership among Assignor, as a Co-Managing General Partner, Assignee, as a Co-Managing General Partner. MONTALVO ASSOCIATES LLC, the Administrative General Partner, PROTECH 2002-C, LLC, as Special Limited Partner, and AMTAX HOLDINGS 123, LLC, as Investor Limited Partner (hereinafter collectively referred to as the "Partners"), dated as of October 1, 2002; and further Amended by the First Amendment to Amended and Restated Agreement of Limited Partnership on November 3 2005;

**WHEREAS,** Assignor is a co-managing general partner of the Partnership;

**WHEREAS**, pursuant to the Purchase and Sale Agreement between Assignor and JSM effective as of October 11, 2005 (the "PSA"), Assignor agreed (subject to all of the terms and conditions of the PSA) to assign its interest in the Partnership to JSM or its designee;

**WHEREAS**, Assignee is JSM's designee within the meaning of Section 2.2 of the PSA; and

**WHEREAS**, Assignor is the owner of a 0.00225% ownership interest in the Partnership and is hereby assigning and conveying to Assignee all of said ownership interest in the Partnership.

NOW, THEREFORE, for and in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration paid by Assignee to Assignor, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee do hereby agree as follows:

Assignment of Partnership Interest and Other Rights Ver 2

1

1.    <u>Assignment</u>.  Assignor does hereby GIVE, ASSIGN, TRANSFER, SET OVER and DELIVER to Assignee, its successors and assigns, all of its ownership interest in the Partnership, together with all right, title and interest in and to the business, properties and assets of the Partnership represented by such ownership interest in the Partnership, including, but not limited to, the capital, assets, profits and losses of the Partnership; and Assignor hereby grants to Assignee, its successors and assigns, full power and authority to collect, receive and give acquittance of any sum or sums due or to become due to him by virtue of the interest in the Partnership hereby assigned.

2.    <u>Assumption of Obligations</u>.  Assignee hereby assumes all obligations, if any, of Assignor under the Partnership Agreement with respect to the Co-Managing General Partner interest assigned pursuant to Section 1, accruing after the Effective Date, if any.

3.    <u>Distributions</u>.  All distributions made by the Partnership to Assignor with respect to its interests in the Partnership as hereinabove described from and after the Effective Date shall be distributed by Assignor to Assignee.

4.    <u>Future Cooperation on Subsequent Documents</u>.  Assignor and Assignee agree to cooperate at all times from and after the date hereof with respect to the supplying of any information requested by the other regarding any of the matters described in this Assignment, and agree to execute such further bills of sale, assignments, partnership agreement amendments, releases or other documents as may be reasonably requested for the purpose of giving effect to, evidencing or giving notice of the transaction described herein.

5.    <u>Successors and Assigns</u>.  This Assignment shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective heirs, successors and assigns.

6.    <u>Counterparts</u>.  This Assignment may be executed by the parties in one or more counterparts, including facsimile counterparts, each of which shall constitute one document, binding on all parties, even though all parties are not signatory to the same counterpart.

Executed to be effective as of the Effective Date.


ASSIGNOR:               COMMUNITY HOME BUILDERS AND ASSOCIATES, a California non-profit public benefit corporation

By: _____
Ralph Walker, President


Assignment of Partnership Interest and Other Rights Ver 2

2

ASSIGNEE:                          Affordable Housing Access, Inc. a California nonprofit
                                   public benefit corporation

                                   By:    _____

                                          William W. Hirsch, President

JSM:                               JSM Enterprises, Inc., a California corporation

                                   By:    _____

                                          James S. Morley, President

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

Assignment of Partnership Interest and Other Rights Ver 2

3

ASSIGNEE:                          Affordable Housing Access, Inc. a California nonprofit
                                   public benefit corporation

                                   By:    _____
                                          William W. Hirsch, President

JSM:                               JSM Enterprises, Inc., a California corporation

                                   By:    _____
                                          James S. Morley, President

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

Assignment of Partnership Interest and Other Rights Ver 2

## JOINDER OF GUARANTOR

Intending to be legally bound hereby, the undersigned, James S. Morley ("Guarantor") hereby joins in this Assignment for the purpose of (i) acknowledging and consenting to the assignment by Assignor of its ownership interest in the Partnership to Assignee, and Assignee's assumption of all obligations, if any, of Assignor under the Partnership Agreement with respect to a Co-Managing General Partner interest being assigned (.00225%), and (ii) ratifying and confirming that notwithstanding such assignment, his Guaranty dated October 1, 2002 remains in full force and effect.

James S. Morley

3/1/2006
Date Signed

## CONSENT OF THE SPECIAL LIMITED PARTNER AND
## OF THE INVESTOR LIMITED PARTNER
## OF
## EVANS LANE APARTMENTS, L.P.
### d/b/a Las Ventanas

This **Consent** of the Special Limited Partner and of the Investor Limited Partner, dated as of March 2, 2006 (the "Consent") is made by **AMTAX Holdings 123, LLC,** an Ohio limited liability company, and by **Protech 2002-C, LLC,** an Ohio limited liability company (collectively, the "Undersigned"), as the Investor Limited Partner and the Special Limited Partner, respectively, in **Evans Lane Apartments, L.P.,** a California limited partnership (the "Partnership").

In accordance with the terms and provisions of the Amended and Restated Agreement of Limited Partnership dated as of October 1, 2002 (and as further amended by the First Amendment to the Amended and Restated Agreement of Limited Partnership, collectively, the "Partnership Agreement"), the Undersigned desire to consent to the withdrawal of a co-Managing General Partner, and as a condition to the sale/ assignment of a Co-General Partnership interest in the Partnership by Community Home Builders and Associates, a California non-profit public benefit corporation ("Assignor") to Affordable Housing Access, a California nonprofit public benefit corporation ("Assignee").

The Undersigned consents, pursuant to Article VIII of the Partnership Agreement to:

(a) the assignment of partnership interest and other rights by ("Assignor") to ("Assignee"), whereby Assignor assigns to Assignee all ownership interest in the Partnership, together with all right, title and interest in and to the business, properties and assets of the Partnership represented by such ownership interest in the Partnership, including, but not limited to, the capital, assets, profits and losses of the Partnership;

(b) Assignee becoming sole Managing General Partner of the Partnership; and

(c) Assignee agreeing to comply with the terms and assume all obligations of Assignor under the Project Documents, and under the provisions of the Partnership Agreement, to the same extent and on the same terms as any other General Partner (provided that Assignee assumes no obligations of Assignor arising prior to the date of said assignment).

Capitalized terms used herein and not otherwise defined in this Consent shall have the meanings ascribed to such terms in the Partnership Agreement.

1

*signature page to Consent of the Special Limited Partner and of the Investor Limited Partner*

**SPECIAL LIMITED PARTNER:**

PROTECH 2002-C, LLC, an Ohio limited liability company

By: Protech Development Corp., a Tennessee corporation, its Manager

By: _____

Name: Dain C. Akin

Title: Senior Vice President and General Counsel


**INVESTOR LIMITED PARTNER:**

AMTAX HOLDINGS 123, LLC, an Ohio limited liability company

By: Paramount Properties, Inc., a Delaware corporation its Manager

By: _____

Name: Dain C. Akin

Title: Senior Vice President and General Counsel


Consent SLP & ILP Ver 2

## CONSENT TO ASSIGNMENT AND ASSUMPTION

This Consent to Assignment and Assumption (this "Consent") is dated as of January 6, 2006, by and among the City of San Jose, a municipal corporation (the "City"), Community Home Builders and Associates, a California nonprofit public benefit corporation ("Assignor"), Affordable Housing Access, Inc., a California nonprofit public benefit corporation ("Assignee") and Evans Lane Apartments, L.P., a California limited partnership (the "Partnership") with reference to the following facts:

A.      The Partnership is the owner of a certain multifamily residential housing project located in the city of San Jose, Santa Clara County, California, known as Evans Lane Apartments (the "Project").

B.      Assignor and Assignee are the co-managing general partners of the Partnership.  For the purpose of assisting the Partnership in its acquisition, predevelopment and development of the Project, the City made a conditional grant (the "Grant") to Assignor in the aggregate amount of Four Million Twenty-Five Thousand Dollars ($4,025,000) pursuant to the terms of a Conditional Grant Agreement between the City and Assignor dated February 27, 2002 (as amended, the "Grant Agreement").  The acquisition, predevelopment and development phases of the Project are complete; and all funds with respect to the Grant have been expended in accordance with the Budget (as defined in the Grant Agreement).

C.      The obligations under the Grant Agreement are secured by the Acquisition and Predevelopment Deed of Trust, Assignment of Rents and Fixture Filing dated February 27, 2002, and recorded with the Santa Clara County Recorder on March 5, 2002, as Series No. 16139465 as amended by the First Amendment to Acquisition and Predevelopment Deed of Trust, Assignment of Rents and Fixture Filing dated October 1, 2002, and recorded with the Santa Clara County Recorder on October 8, 2002, as Series No. 16526715, each by the Partnership for the benefit of the City (collectively, the "Deed of Trust").

D.      In consideration of the Grant, the Project is subject to the Amended and Restated 55-Year Affordability Restriction (Evans Lane Family Apartments Project) recorded as Series No. 16526713 (the "Regulatory Agreement").

E.      Assignor is withdrawing as a co-managing general partner of the Partnership, and Assignee is assuming all management responsibilities of the Partnership as its sole managing general partner.

F.      Assignor desires to assign and Assignee desires to assume all of Assignor's rights and obligations under the Grant Agreement.  The City and the Partnership are willing to consent to said assignment and assumption subject to the terms and conditions precedent contained in this Consent.

In witness of the foregoing, the parties agree as follows:

        1.      The Assignor hereby assigns to the Assignee all of its rights and delegates to the Assignee all of its obligations under the Grant Agreement accruing or arising after the effective date of this Consent; and the Assignee unconditionally agrees to assume all such obligations and

700332304v3

agrees to perform all such obligations in accordance with the terms of the Grant Agreement. The Assignee hereby represents and warrants that the performance of the Assignee's obligations under this Consent and the Grant Agreement and compliance with the terms hereof and thereof will not result in a breach of any of the terms and provisions of, or constitute a default under, any agreement to which the Assignee is a party or by which it is bound.

2.      Any notice or demand that is required or permitted to be given to Assignee or Grantee (as defined in the Grant Agreement) under this Consent or the Grant Agreement shall be in writing and shall be deemed effective when delivered to the following address:

> Affordable Housing Access, Inc.
> 4029 Westerly Place
> Newport Beach, CA  92660
> Attn: Jonathan Webb

3.      Each of the Partnership and the City consents to the assignment and assumption described in this Consent and the release of the Assignor of any obligations under the Grant Agreement arising after the effective date hereof. The written consent of the City set forth at the end of this Agreement is a condition precedent to the effectiveness of this Agreement; and this Agreement shall be of no force and effect unless and until the City has (a) duly approved and executed this Agreement and its consent hereto, (b) received an Amended and Restated Partnership Agreement and assignment documents executed by the limited partners of the Partnership to reflect the withdrawal of the Assignor as a general partner of the Partnership, and (c) received consents or waivers from: (i) Bank of America, N.A. and (ii) Fannie Mae or GMAC Commercial Mortgage Corporation.

4.      The Partnership acknowledges and agrees that neither this Consent nor the assignment and assumption contemplated hereby shall in any way affect or diminish the City's rights under the Deed of Trust or the Regulatory Agreement.

5.      This Consent shall be governed by and interpreted in accordance with the laws of the state of California.

6.      This Consent may be executed in counterparts, each of which shall be deemed an original upon execution.

<div align="center">(Signatures follow immediately.)</div>

<div align="center">2</div>

In witness of the foregoing, the parties to this Consent have caused it to be executed by their undersigned duly authorized representatives as of the date first written above.

ASSIGNEE:

AFFORDABLE HOUSING ACCESS, INC.,
a California nonprofit corporation

By: _____
Jonathan B. Webb, Executive Director

ASSIGNOR:

COMMUNITY HOME BUILDERS AND ASSOCIATES,
a California nonprofit public benefit corporation

By: _____

THE PARTNERSHIP:

EVANS LANE APARTMENTS, L.P.,
a California limited partnership

By:     AFFORDABLE HOUSING ACCESS, INC.,
        a California nonprofit public benefit corporation,
        its Managing General Partner

        By: _____
        Jonathan B. Webb, Executive Director

By:     MONTALVO ASSOCIATES, LLC,
        a California limited liability company,
        its Administrative General Partner

        By: _____
            James S. Morley, Manager

700332304v3

3

In witness of the foregoing, the parties to this Consent have caused it to be executed by their undersigned duly authorized representatives as of the date first written above.

ASSIGNEE:

AFFORDABLE HOUSING ACCESS, INC.,
a California nonprofit corporation

By: _____
       Jonathan B. Webb, Executive Director

ASSIGNOR:

COMMUNITY HOME BUILDERS AND ASSOCIATES,
a California nonprofit public benefit corporation

By: _____

THE PARTNERSHIP:

EVANS LANE APARTMENTS, L.P.,
a California limited partnership

By:    AFFORDABLE HOUSING ACCESS, INC.,
       a California nonprofit public benefit corporation,
       its Managing General Partner

    By: _____
           Jonathan B. Webb, Executive Director

By:    MONTALVO ASSOCIATES, LLC,
       a California limited liability company,
       its Administrative General Partner

    By: _____
           James S. Morley, Manager

700332304v3

In witness of the foregoing, the parties to this Consent have caused it to be executed by their undersigned duly authorized representatives as of the date first written above.

ASSIGNEE:

AFFORDABLE HOUSING ACCESS, INC.,
a California nonprofit corporation

By: _____
       Jonathan B. Webb, Executive Director

ASSIGNOR:

COMMUNITY HOME BUILDERS AND ASSOCIATES,
a California nonprofit public benefit corporation

By: _____

THE PARTNERSHIP:

EVANS LANE APARTMENTS, L.P.,
a California limited partnership

By:     AFFORDABLE HOUSING ACCESS, INC.,
        a California nonprofit public benefit corporation,
        its Managing General Partner

        By: _____
               Jonathan B. Webb, Executive Director

By:     MONTALVO ASSOCIATES, LLC,
        a California limited liability company,
        its Administrative General Partner

        By: _____
               James S. Morley, Manager

THE CITY:

CITY OF SAN JOSE,
a municipal corporation

By: _____

      Norberto L. Duenas
      Division Manager, Production, Housing Department

Approved as to form:

By:    __N/A_____

## Consent to Withdrawal of General Partner

This Consent to Withdrawal of General Partner (this "Consent"), which is effective as of January 6, 2006, relates to the Construction Deed of Trust made as of October 1, 2002 (the "Deed of Trust") by Evans Lane Apartments, L.P., a California limited partnership (the "Trustor") for the benefit of Wells Fargo Bank, National Association (the "Bond Trustee") and Bank of America, N.A. (the "Bank" and, together with the Bond Trustee, the "Beneficiary"). Capitalized terms that are used and not defined in this Consent have the meanings given such terms in the Deed of Trust.

<u>Recitals</u>

A.      The Trustor owns and is in the process of developing a multifamily housing project in the city of San Jose known as Evans Lane Apartments (the "Project").

B.      The Trustor's acquisition and development of the Project are being financed in part by a loan from the City of San Jose (the "Issuer") of the Issuer's $31,000,000 City of San Jose Variable Rate Demand Multifamily Housing Revenue Bonds (Evans Lane Apartments) 2002 Series H (the "Bonds").

C.      In accordance with the Reimbursement Agreement, the Bank has issued the Letter of Credit to the Bond Trustee in the original stated amount of $31,356,713 in order to facilitate the financing of the Project by providing credit enhancement and liquidity support for the Bonds during the construction phase of the Project.

D.      Community Home Builders and Associates, a California nonprofit public benefit corporation ("Assignor") and Affordable Housing Access, Inc., a California nonprofit public benefit corporation ("Assignee") are co-managing general partners in the Trustor.

E.      Assignor is withdrawing as a co-managing general partner of the Trustor, and Assignee is assuming all management responsibilities of the Trustor as its sole managing general partner.

F.      Assignor desires to assign and Assignee desires to assume all of Assignor's rights and obligations with respect to the Trustor and the management thereof.

G.      Pursuant to Section 6.1 of the Deed of Trust, Assignor may not withdraw from the Trustor without the consent of Beneficiary.

H.      Beneficiary is willing to provide its consent to the withdrawal of Assignor in accordance with the terms of this Consent.

In witness of the foregoing and for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

<u>Agreement</u>

1.      The Assignor hereby assigns to the Assignee all of its rights and delegates to the Assignee all of its obligations with respect to the Trustor and the management thereof accruing or arising after the effective date of this Consent; and the Assignee unconditionally agrees to assume and perform all such obligations.  The Assignee hereby represents and warrants that the performance of such obligations will not result in a breach of any of the terms and provisions of, or constitute a default under, any agreement to which the Assignee is a party or by which it is bound.

2.      Beneficiary consents to the assignment and assumption described in this Consent and the release of the Assignor from any obligations with respect to the Bonds, the Reimbursement Agreement, the Deed of Trust and any other document (collectively, the "Documents") relating to the foregoing and arising after the effective date hereof.

3.      The Trustor acknowledges and agrees that neither this Consent nor the assignment and assumption contemplated hereby shall in any way affect or diminish the rights of Beneficiary under any of the Documents.

4.      This Consent shall be governed by and interpreted in accordance with the laws of the state of California.

5.      This Consent may be executed in counterparts, each of which shall be deemed an original upon execution.

(Signatures follow immediately.)

In witness of the foregoing, the parties to this Consent have caused it to be executed by their undersigned duly authorized representatives as of the date first written above.

BENEFICIARY:

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Trustee

By: _____ , V.P.

BANK OF AMERICA, N.A.

By: Susan Bates, AVP

ASSIGNEE:

AFFORDABLE HOUSING ACCESS, INC.,
a California nonprofit corporation

By: _____
       Jonathan B. Webb, Executive Director

ASSIGNOR:

COMMUNITY HOME BUILDERS AND ASSOCIATES,
a California nonprofit public benefit corporation

By: _____

700328058v2

In witness of the foregoing, the parties to this Consent have caused it to be executed by their undersigned duly authorized representatives as of the date first written above.

BENEFICIARY:

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Trustee

By: _____

BANK OF AMERICA, N.A.

By: _____

ASSIGNEE:

AFFORDABLE HOUSING ACCESS, INC.,
a California nonprofit corporation

By: _____
Jonathan B. Webb, Executive Director

ASSIGNOR:

COMMUNITY HOME BUILDERS AND ASSOCIATES,
a California nonprofit public benefit corporation

By: _____

In witness of the foregoing, the parties to this Consent have caused it to be executed by their undersigned duly authorized representatives as of the date first written above.

BENEFICIARY:

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Trustee

By:   _____


BANK OF AMERICA, N.A.

By:   _____


ASSIGNEE:

AFFORDABLE HOUSING ACCESS, INC.,
a California nonprofit corporation

By:   _____
      Jonathan B. Webb, Executive Director


ASSIGNOR:

COMMUNITY HOME BUILDERS AND ASSOCIATES,
a California nonprofit public benefit corporation

By:   _____

THE TRUSTOR:

EVANS LANE APARTMENTS, L.P.,
a California limited partnership

By:    AFFORDABLE HOUSING ACCESS, INC.,
       a California nonprofit public benefit corporation,
       its Managing General Partner

       By:    _____
            Jonathan B. Webb, Executive Director

By:    MONTALVO ASSOCIATES, LLC,
       a California limited liability company,
       its Administrative General Partner

       By:    _____
            James S. Morley, Manager

THE TRUSTOR:

EVANS LANE APARTMENTS, L.P.,
a California limited partnership

By:    AFFORDABLE HOUSING ACCESS, INC.,
       a California nonprofit public benefit corporation,
       its Managing General Partner

       By:    _____
             Jonathan B. Webb, Executive Director

By:    MONTALVO ASSOCIATES, LLC,
       a California limited liability company,
       its Administrative General Partner

       By:    _____
             James S. Morley, Manager

**EVANS LANE APARTMENTS L.P.**
(a California limited partnership)

**THIRD AMENDMENT TO THE AMENDED AND RESTATED
AGREEMENT OF LIMITED PARTNERSHIP**

effective as of December 29, 2006

This THIRD AMENDMENT TO THE AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP (this "**Amendment**") is effective as of the date first set forth above by and among AFFORDABLE HOUSING ACCESS, INC., a California non-profit public benefit corporation, as managing general partner (the "**Managing General Partner**"), MONTALVO ASSOCIATES LLC, a California limited liability company, as the administrative general partner (the "**Administrative General Partner**"), PROTECH 2002-C, LLC, an Ohio limited liability company, as the special limited partner (the "**Special Limited Partner**"), and AMTAX HOLDINGS 123, LLC, an Ohio limited liability company, as the investor limited partner (the "**Investor Limited Partner**") (collectively the "**Partners**").

WHEREAS, the Partners are the sole partners of Evans Lane Apartments L.P., a California limited partnership (the "**Partnership**") and are parties to that certain Amended and Restated Limited Partnership Agreement dated as of October 1, 2002 (as amended prior to the date of this Amendment, the "**Partnership Agreement**").

WHEREAS, the Partners have determined to amend the Partnership Agreement in accordance with Section 13.9 of the Partnership Agreement in order to remain in compliance with the regulations governing the Partnership's eligibility for the welfare exemption from property taxation provided for in Section 214 of the California Revenue and Taxation Code (the "**Property Tax Exemption**").

NOW THEREFORE, in consideration of the mutual promises of the undersigned, and for other good and valuable consideration, IT IS HEREBY AGREED THAT:

1.     Definitions. Capitalized terms that are used and not defined in this Amendment shall have the respective meanings given such terms in the Partnership Agreement. Following are the definitions of certain other capitalized terms that are used in this Amendment and hereby incorporated by reference into the Partnership Agreement:

"**Annual Claim Form**" means, collectively, the claim forms required to be submitted annually to the County Assessor by which the Managing General Partner certifies (and, with respect to Form BOE-267-L1, the Managing General Partner and the Administrative General Partner certify) that the use of the Project meets all of the applicable requirements to qualify for the Property Tax Exemption, which forms, at the current time, include, but may not be limited to, Forms (i) BOE-267-A, (ii) BOE-267-L and (iii) BOE-267-L1.

"**BOE**" means the California Board of Equalization.

"**BOE Forms**" means the forms prescribed by the BOE, as amended and supplemented from time to time.

"**BOE Regulations**" means the Property Tax Rules of the BOE, as amended and supplemented from time to time.

"**County Assessor**" means the county assessor for the county in which the Project is located.

"**Major Decision**" means any act of the Partnership that requires a vote of a majority in interest of the general partners of the Partnership, as defined in BOE Regulation 140.1.

"**Material Participation**" or "**Materially Participate**" means, pursuant to the BOE Regulations, that the Managing General Partner (i) has a right to vote in all Major Decisions of the Partnership, (ii) performs Substantial Management Duties as set forth in this Amendment, (iii) directly, or indirectly under its supervision, manages the Partnership, (iv) annually conducts a physical inspection of the low-income housing property to ensure that the property is being used as low-income housing and meets all of the requirements of the BOE Regulations and (v) submits the Annual Claim Form for each real estate tax year, which form constitutes a certification to the County Assessor that the Project meets all of the requirements set forth in the BOE Regulations.

"**Organizational Clearance Certificate**" means the certificate issued by the BOE pursuant to which the BOE indicates that the Managing General Partner is an organization eligible for the Property Tax Exemption (currently, Form BOE-277-OC).

"**Periodic Filing Form**" means, collectively, the claim forms required to be submitted on a three-year cycle to the BOE by which the Managing General Partner demonstrates continued eligibility for its Organizational Clearance Certificate and the General Partners demonstrate that the Project continues to be eligible for its Supplemental Clearance Certificate, which forms, at the current time, include, but may not be limited to, Forms (i) BOE-277-P, and (ii) BOE-277-L1.

"**RT Code**" means the California Revenue and Taxation Code, as amended and supplemented from time to time.

"**Substantial Management Duties**" means the duties the Managing General Partner is obligated to perform pursuant to Section 6 of this Amendment.

"**Supplemental Clearance Certificate**" means the certificate issued by the BOE pursuant to which the BOE indicates that the Project meets the requirements of the RT Code and BOE Regulations for the Property Tax Exemption (currently, Form BOE-277-SCC).

2.     **NEW SECTION 2.6.**   The following new Section 2.6 is hereby added to the Partnership Agreement:

2.6.  **Use of Property Tax Savings**.   The parties acknowledge that the savings ("**Property Tax Savings**") contemplated by the Property Tax Exemption, are necessary in order for the Partnership to meet its debt underwriting and financing assumptions, and therefore to keep the Project affordable to low-income tenants.   The parties further acknowledge that the Partners would not undertake to develop the Project and provide the affordable housing created by the Project unless the Property Tax Savings were available to help underwrite the Mortgage Loans.   The Partners shall use their best efforts to maintain the Property Tax Exemption during the life of the Partnership.

3.   **AMENDMENTS TO SECTION 4.5**.   The following new clause (11) is hereby added to Section 4.5A(iv) of the Partnership Agreement:

(11)   If the Managing General Partner (1) no longer qualifies as a charitable organization under Section 501(c)(3) of the Code or under the laws of the State of California, or (2) causes the Partnership to fail to obtain or maintain the Property Tax Exemption for the Project during the Compliance Period (as defined in Section 42 of the Code) due to the Managing General Partner's gross negligence, willful misconduct or breach of this Agreement, then the other General Partner, prior to the Limited Partners exercising such rights, or the Limited Partners may effectuate the removal of the Managing General Partner as a Partner of the Partnership.

4.   **AMENDMENTS TO SECTION 7.3**.   The following clauses I, J and K are hereby added to Section 7.3 of the Partnership Agreement:

I.   Notwithstanding any provision to the contrary in the Agreement, including, without limitation, Sections 7.3A and 7.3C, the Managing General Partner shall provide regular, continuous and substantial services to the Partnership and shall be the "managing general partner" of the Partnership, as such term is used in the BOE Regulations, specifically, BOE Property Tax Rule 140.1(a)(6).   Except as otherwise set forth in this Agreement, the Managing General Partner, within the authority granted to it under this Agreement, shall Materially Participate (as such term is defined in this Agreement, as the same may be amended from time to time) in the control, management and direction of the Partnership's business for the purposes stated in Article I, and shall manage and control the affairs of the Partnership to the best of its ability and use its best efforts to carry out the purpose of the Partnership.   In so doing, the Managing General Partner shall take all actions necessary or appropriate to protect the interests of the Partners and of the Partnership.   The Managing General Partner shall devote such of its time as is reasonable to the affairs of the Partnership.

J.   Notwithstanding any provision to the contrary in the Agreement, including, without limitation, Sections 7.3A and 7.3C, the Managing General Partner shall undertake the following substantial management duties ("**Substantial Management Duties**") on behalf of the Partnership:

(i)   rent, maintain and repair the low-income housing property, or if such duties are delegated to a property management agent, participate (together with

the Administrative General Partner) in hiring and overseeing the work of the property management agent;

(ii)    participate (together with the Administrative General Partner) in hiring and overseeing the work of all persons necessary to provide services for the management and operation of the limited partnership business;

(iii)   execute and enforce all contracts executed by the Partnership;

(iv)   execute and deliver all partnership documents on behalf of the Partnership;

(v)    prepare or cause to be prepared all reports to be provided to the Partners or the Lenders on a monthly, quarterly, or annual basis consistent with the requirements of the Partnership Agreement;

In addition to the Substantial Management Duties of the Managing General Partner specifically set forth in Section 7.3I above, to the extent not already designated as duties of the Managing General Partner in the Partnership Agreement, the Managing General Partner upon the written consent of the Administrative General Partner, may also undertake any or all of the following specific management duties:

(vi)   coordinate all present and future development, construction, or rehabilitation of low-income housing property that is the subject of the Partnership Agreement;

(vii)  monitor compliance with all government regulations and filing or supervise the filing of all required documents with government agencies;

(viii) acquire, hold, assign or dispose of property or any interest in property;

(ix)   borrow money on behalf of the Partnership, encumber Partnership assets, place title in the name of a nominee to obtain financing, prepay in whole or in part, refinance, increase, modify or extend any obligation;

(x)    pay organizational expenses incurred in the creation of the Partnership and all operational expenses;

(xi)   determine the amount and timing of distributions to Partners and establish and maintain all required reserves; and

(xii)  ensure that charitable services or benefits, such as vocational training, educational programs, childcare and after-school programs, cultural activities, family counseling, transportation, meals, and linkages to health and/or social services are provided or information regarding charitable services or benefits are made available to the low-income housing tenants.

In addition to its Substantial Management Duties (and any additional specific management duties that the Managing General Partner may undertake pursuant to the foregoing), the Managing General Partner shall also (A) ensure that the Project and the operation thereof at all times comply and are in conformance with Section 4(b) and 5 of Article XIII of the Constitution of the State of California and Section 214, 254 and 259.5 of the RT Code; and (B) apply for, use best efforts to obtain and maintain the Property Tax Exemption, and any savings to the Partnership and the Project attributable to the Tax Exemption shall be used in accordance with Section 214 of the RT Code, and this Agreement.

K.   Delegation of Authority.

In accordance with the BOE Regulations, the Managing General Partner may delegate all or any of its powers, rights and obligations hereunder to the Administrative General Partner, and may appoint, employ, contract or otherwise deal with the Administrative General Partner for the transaction of the business of the Partnership. The Administrative General Partner may, under supervision of the Managing General Partner, perform any acts or services for the Partnership as the Managing General Partner may approve; provided, however, such delegation does not excuse the Managing General Partner from overseeing and supervising on an ongoing basis the activities delegated. The Managing General Partner may not delegate any of its powers, rights and obligations hereunder to a party other than the Administrative General Partner without the prior written consent of the Administrative General Partner. If the Managing General Partner elects to delegate one or more of its Substantial Management Duties, the Managing General Partner shall retain such records as are reasonably required to demonstrate that it is actually supervising the performance of the delegated duties. Such delegation shall fully authorize the Administrative General Partner to act alone without requirement of any other act or signature of the delegating Managing General Partner, to take any action of any type and to do anything and everything which the delegating Managing General Partner may be authorized to take or do hereunder except that any such delegation shall not relieve the delegating Managing General Partner of its obligations or liabilities under this Agreement.

5.   **AMENDMENTS TO SECTION 7.5**. The following clauses D and E are hereby added to Section 7.5 of the Partnership Agreement:

D.   Property Tax Exemption. The Managing General Partner shall obtain and maintain the Property Tax Exemption for so long as the Project and the Partnership are eligible for such Property Tax Exemption. Any savings to the Partnership and Project attributable to the Property Tax Exemption shall be used to maintain the affordability of, or reduce rents otherwise necessary for, the units occupied by lower income individuals or otherwise be passed onto the low income tenants of the Project in accordance with all applicable provisions of Section 214 of the RT Code.

As provided in the RT Code, the BOE Regulations, BOE Forms and elsewhere, in order to obtain and maintain the Property Tax Exemption for the Project, the Managing General Partner must file with the BOE and the County Assessor certain documents containing certifications under penalty of perjury. Among other things, the Managing General Partner will or may have to certify that: (i) the Agreement provides (subject to the rights of the other Partners) that the Managing General Partner has full and exclusive control over the business, assets and affairs of the Partnership, manages day to day operations and participates in Major Decisions; (ii) the Agreement provides that the Managing General Partner has a certain number of Substantial Management Duties; and (iii) the Managing General Partner, the Partnership and the Project meet other requirements of the BOE Regulations. The Managing General Partner shall file such certifications and related documentation in compliance with applicable procedures, for so long as the Managing General Partner deems that it has sufficient factual basis to do so.

E.     The Managing General Partner hereby represents and warrants that the officers and directors of the for-profit general partners, for-profit limited partners, or any of its for-profit affiliates, do not as individuals or collectively, have a controlling vote or majority interest in the Managing General Partner.

6.     **AMENDMENT TO SECTION 7.10.**   Section 7.10D of the Partnership Agreement is hereby deleted in its entirety and replaced with the following:

D.     **Managing General Partner Fee.**

(i)     For its services in managing the Partnership, the Managing General Partner shall receive from the Partnership, beginning January 1, 2007, an annual fee in the amount of $20,000 (the "**MGP Fee**"), which MGP Fee shall be pro-rated and paid monthly in the amount of $1,667, subject to a three percent (3%) increase annually of the then current amount.

(ii)     In the event there is insufficient Cash Flow in any year to pay the MGP Fee to the Managing General Partner, the Administrative general partner will make a loan necessary to pay such MGP Fee. Any such loan made pursuant to this Section 7.10D shall constitute a Subordinated Loan, shall not bear interest, and shall be repayable as provided in Article 6.

7.     **AMENDMENTS TO SECTION 12.1A.**   The following clause (iii) is hereby added to Section 12.1A of the Partnership Agreement:

(iii)     In accordance with the BOE Regulations, the Managing General Partner will maintain records and documents evidencing the duties performed by the Managing General Partner ("**Management Documents**"). Such records and documents may include, but are not necessarily limited to (1) accounting books and records; (2) tax returns; (3) budgets and financial reports; (4) reports required by Lenders; (5) documents related to the construction or rehabilitation of the Project; (6) legal documents such as

contracts, deeds, notes, leases and deeds of trust; (7) documents related to complying with government regulations and filings; (8) documents related to property inspections; (9) documents related to charitable services or benefits provided or the information provided regarding such services or benefits; (10) reports prepared for the Partners; (11) bank account records; (12) audited annual financial statement of the Partnership; and (13) the Management Agreement.

To the extent that any such Management Documents are not within the control or possession of the Managing General Partner, the Administrative General Partner agrees to provide or cause to be provided copies of such documents to the Managing General Partner upon written request from the Managing General Partner.  The Administrative General Partner and the Limited Partners shall have the right upon two (2) business days notice, during reasonable business hours, to inspect all records and documents maintained by the Managing General Partner.

8.      **AMENDMENTS TO SECTION 12.1**.  The following clause L is hereby added to Section 12.1 of the Partnership Agreement:

L.      <u>Property Tax Exemption Reports</u>.  The Managing General Partner shall (i) on an annual basis, within fifteen days of submission thereof, provide the other Partners a copy of the Annual Claim Form (as defined in this Agreement, as the same may be amended from time to time), (ii) every three years, within fifteen days of submission thereof, provide the other Partners a copy of the Periodic Filing Form (as defined in this Agreement, as the same may be amended from time to time) and (iii) provide the other Partners immediate notice if the Managing General Partner no longer meets the definition of "managing general partner" under the BOE Regulations.

9.      **CHANGE IN BUSINESS ADDRESSES**.  The business addresses for the Investor Limited Partner and the Special Limited Partner and references thereto are hereby deleted in their entirety and replaced with the following:

c/o Capmark Affordable Equity Inc.
1801 California Street, Suite 3700
Denver, CO  80202
Attn:  Legal Department
Fax No.:  303-296-6804

10.     **MISCELLANEOUS PROVISIONS**.

(i)      The Administrative General Partner represents and warrants to the Investor Limited Partner that all Requisite Approvals to the execution of this Amendment have been obtained.

(ii)     In the event that the BOE revises the BOE Regulations in a manner that requires another amendment to the Agreement, or the BOE or another government agency notifies the Partnership that this Amendment does not comply with any requirement for obtaining or maintaining the Property Tax Exemption, then the Partners

shall act in good faith to amend the Agreement to the extent necessary in order to obtain or maintain the Property Tax Exemption.

(iii)    Except to the extent specifically provided herein, this Amendment is not intended nor does it modify, amend or revise in any way any of the provisions of the Partnership Agreement and such Partnership Agreement remains in full force and effect as of the date hereof. Specifically, the rights, including but not limited to the voting rights of the Limited Partners, privileges and obligations of the Partners as set forth in the Partnership Agreement remain in full force and effect.

(iv)    The Managing General Partner hereby acknowledges and agrees that this Amendment does not modify the management duties of the Managing General Partner set forth in the Partnership Agreement in such a way as to cause the Managing General Partner to be unable to make the representations necessary to execute the Annual Claim Form under penalty of perjury.

(v)    This Amendment may be executed in several counterparts all of which shall constitute one amendment, binding on all parties hereto, notwithstanding that all of the parties are not signatories to the same counterpart.

(vi)    This Amendment and the rights of the Partners hereunder shall be interpreted in accordance with the laws of the State of California.

(vii)    Except as and to the extent expressly set forth in this Amendment, and any prior amendment to the Partnership Agreement, the Partners hereby affirm the terms and provisions of the Partnership Agreement.

[signatures to follow]

IN WITNESS WHEREOF, each of the parties hereto has executed this Amendment as of the date first written above.

**MANAGING GENERAL PARTNER:**

AFFORDABLE HOUSING ACCESS, INC., a California non-profit public benefit corporation

By:_____

Name:_____

Title:_____

**SPECIAL LIMITED PARTNER:**

PROTECH 2002-C, LLC, an Ohio limited liability company

By:  Protech Development Corporation, a Tennessee corporation, its Manager

    By:_____

      Alisa Burns
      Vice President

**ADMINISTRATIVE GENERAL PARTNER:**

MONTALVO ASSOCIATES LLC, a California limited liability company

By: _____

Name: _____

Title: _____

**INVESTOR LIMITED PARTNER:**

AMTAX HOLDINGS 123, LLC, an Ohio limited liability company

By:  Capmark Affordable Properties Inc., a Delaware corporation (formerly known as Paramount Properties, Inc.), its Manager

    By:_____

      Alisa Burns
      Vice President

IN WITNESS WHEREOF, each of the parties hereto has executed this Amendment as of the date first written above.

**MANAGING GENERAL PARTNER**:

AFFORDABLE HOUSING ACCESS, INC., a California non-profit public benefit corporation

By:_____
Name:_____
Title:_____

**SPECIAL LIMITED PARTNER**:

PROTECH 2002-C, LLC, an Ohio limited liability company

By: Protech Development Corporation, a Tennessee corporation, its Manager

By:_____
    Alisa Burns
    Vice President

**ADMINISTRATIVE GENERAL PARTNER**:

MONTALVO ASSOCIATES LLC, a California limited liability company

By: _James S. Morley_
Name: _James S. Morley_
Title: _Manager_

**INVESTOR LIMITED PARTNER**:

AMTAX HOLDINGS 123, LLC, an Ohio limited liability company

By: Capmark Affordable Properties Inc., a Delaware corporation (formerly known as Paramount Properties, Inc.), its Manager

By:_____
    Alisa Burns
    Vice President

IN WITNESS WHEREOF, each of the parties hereto has executed this Amendment as of the date first written above.

**MANAGING GENERAL PARTNER**:

AFFORDABLE HOUSING ACCESS, INC., a California non-profit public benefit corporation

By:_____
Name:_____
Title:_____

**SPECIAL LIMITED PARTNER**:

PROTECH 2002-C, LLC, an Ohio limited liability company

By: Protech Development Corporation, a
    Tennessee corporation, its Manager

By:_____
    Alisa Burns
    Vice President

**ADMINISTRATIVE GENERAL PARTNER**:

MONTALVO ASSOCIATES LLC, a California limited liability company

By: _____
Name: _____
Title: _____

**INVESTOR LIMITED PARTNER**:

AMTAX HOLDINGS 123, LLC, an Ohio limited liability company

By: Capmark Affordable Properties Inc., a
    Delaware corporation (formerly known as
    Paramount Properties, Inc.), its Manager

By:_____
    Alisa Burns
    Vice President

## RATIFICATION OF GUARANTY AGREEMENT

By his signature below, the undersigned (the "**Guarantor**"), hereby consents to the execution of this Amendment and acknowledges that to the extent, and only to the extent, that the Guaranty (undated) (the "**Guaranty**") continues to apply pursuant to its terms, the Guarantor's obligations remain valid and in full force and effect in accordance with the terms of the Guaranty, and that for purposes of such Guaranty, the term "Partnership Agreement" shall include all of the terms and conditions of this Amendment. Nothing herein amends, expands or otherwise alters the terms of the Guaranty.

**GUARANTOR**:

By: _____
James S. Morley, an individual

Execution Version

**FOURTH AMENDMENT TO**
**AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP OF**

**EVANS LANE APARTMENTS L.P.**

This Fourth Amendment (referred to herein as the "**Amendment**") to Amended and Restated Agreement of Limited Partnership of Evans Lane Apartments, L.P. is dated effective as of July 1, 2008, by and among AFFORDABLE HOUSING ACCESS, INC., a California non-profit public benefit corporation (the "**Managing General Partner**"), MONTALVO ASSOCIATES LLC, a California limited liability company (the "**Administrative General Partner**" and, together with the Managing General Partner, the "**General Partners**"), PROTECH 2002-C, LLC, an Ohio limited liability company (the "**Special Limited Partner**") and AMTAX HOLDINGS 123, LLC an Ohio limited liability company (the "**Investor Limited Partner**" and, together with the Special Limited Partner, the "**Limited Partners**") (collectively, the "**Partners**").

## RECITALS

A.    The Partners are the sole partners of Evans Lane Apartments L.P., a California limited partnership (the "**Partnership**") and are parties to that certain Amended and Restated Agreement of Limited Partnership dated as of October 1, 2002, as amended by that certain First Amendment to the Amended and Restated Agreement of Limited Partnership dated as of November 3, 2005, that certain Second Amendment to Amended and Restated Agreement of Limited Partnership dated to be effective as of March 2, 2006 and that certain Third Amendment to the Amended and Restated Agreement of Limited Partnership dated to be effective as of December 29, 2006 (as amended, the "**Partnership Agreement**").

B.    The General Partners have requested the Consent of the Investor Limited Partner to the (i) refinancing of the Partnership's Permanent Mortgage Loan and (ii) execution of the Swap Documents (as such terms are hereinafter defined).  The foregoing being referred to hereinafter as the "**Proposal**."

C.    As a condition to providing the Consent of the Investor Limited Partner to the Proposal, the Investor Limited Partner required that the General Partners agree to enter into this Amendment in order to reflect certain changes to the Partnership Agreement in connection with (i) the Proposal and (ii) the receipt by the Partnership of Forms 8609.  By its execution of this Amendment, the Investor Limited Partner hereby provides the Consent of the Investor Partner to the Proposal.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Amendment HEREBY AGREE AS FOLLOWS:

## AGREEMENT

1.    Defined Terms.  All capitalized terms used, but not defined, in this Amendment will have the meanings set forth in the Partnership Agreement.

Execution Version

2.      Amendments to the Partnership Agreement.  The Partners hereby agree that the Partnership Agreement is amended as follows:

2.1     Amendments to Article 1 of the Partnership Agreement.  Article 1 of the Partnership Agreement is hereby amended by (i) deleting and replacing the definitions of "Bonds," "Cash Flow," "City of San Jose Loan," "Construction Loan," "Management Agent," "Management Agreement," "Maximum Annual Credit," "Partnership Management Fee," "Permanent Lender," "Permanent Mortgage Loan," "Project Documents," "Projected Credits" and "Title Policy;" (ii) adding new definitions of "Bond Documents," "CHBA Loan," "CHBA Loan Documents," "Compliance Period," "Fourth Amendment," "Freddie Mac," "Subordinate Management Fee," "Swap Documents" and "Swap Provider;" (iii) deleting the definition of "Special Investment Partner Tax Counsel" in its entirety and replacing it with a definition of "Investment Partner Tax Counsel;" and (iv) deleting the duplicate definition of "Supervisory and Incentive Management Fee" on page 10 of the Partnership Agreement in its entirety, all as follows:

"Bonds" means City of San Jose Variable Rate Demand Multifamily Housing Refunding Revenue Bonds (Las Ventanas Apartments) Series 2008 B issued by The City of San Jose in the aggregate amount of $25,900,000.

"Bond Documents" means all documents relating to Bonds.

"Cash Flow" means, with respect to any Fiscal Year or applicable period, (a) (i) all cash receipts of the Partnership from operations, subsidy payments or rental interruption insurance recoveries received by the Partnership during such period; (ii) Surplus Cash; and (iii) any amounts from construction or lease up savings realized prior to Breakeven that are not used to pay any deferred Developer Fees; plus (b) any interest or like earnings of the Partnership and any amounts which the General Partners release upon approval of the Investment Partner from any Partnership reserve as being no longer necessary to hold as part of such reserve, less (i) cash funds used to pay Project Expenses of the Partnership during the period, including any fees and expenses paid to the Investment Partner Manager or the General Partners (excluding all fees which by their nature are payable only out of Cash Flow); (ii) all cash payments during such period to discharge Mortgage Loans (including all payments of a residual nature which shall be calculated prior to the determination of Cash Flow) or other Partnership indebtedness (other than Subordinated Loans, Deferred Developer Fee, the CHBA Loan and the City of San Jose Loan); (iii) any amounts added to Partnership reserves (other than Operating Reserves) during such period; and (iv) all costs and expenses associated with the Swap Documents or any other interest rate hedging contract or agreement obtained by the Partnership at the request of the Swap Provider or any lender, including, without limitation, the Permanent Lender; provided, however, that any amounts payable only by reference to positive cash flow or surplus cash shall be ignored for such determination of expense.

2

"CHBA Loan" means the loan provided to the Partnership by Community Home Builders and Associates ("CHBA") (and subsequently assigned by CHBA to the Managing General Partner) in the original principal amount of $4,025,000, which such loan (i) is to be repaid from Cash Flow or from the sale or refinancing of the Property in accordance with Section 6.2 of this Agreement and (ii) matures upon the earlier to occur of (a) a sale or refinancing of the Project or (b) the date that is six months following the repayment in full of the Permanent Mortgage Loan made using the proceeds of the Bonds in the amount of $25,900,000 and the City of San Jose Loan. The CHBA Loan is not secured by a Mortgage and will not be secured by a Mortgage during any period in which one or more of the Limited Partners remains a Partner in the Partnership.

"CHBA Loan Documents" means all documents relating to the CHBA Loan, including, without limitation, that certain Unsecured Promissory Note executed by the Partnership as of February 1, 2007 in the original principal amount of $4,025,000, that certain Loan Agreement executed as of February 1, 2007 by and between CHBA and the Partnership, that certain Assignment of Loan Documents executed as of February 1, 2007 by and between CHBA and the Managing General Partner and that certain First Amendment to Promissory Note executed by the Partnership as of July 1, 2008.

"City of San Jose Loan" means the Construction Loan, to be converted into a Permanent Mortgage Loan in an amount of up to $16,232,773.00.

"Compliance Period" means the compliance period (as defined in Section 42(i)(1) of the Code) applicable to the Project.

"Construction Loan" means the loan made by The City of San Jose to the Partnership in the amount of up to $19,395,949.00 of 20% Tax Increment Funds and used for development and construction costs associated with the Project located on the Property, which such loan is to be converted into a Permanent Mortgage Loan (the "Conversion") in an amount of up to $16,232,773.00.

"Fourth Amendment" means that certain Fourth Amendment to Amended and Restated Agreement of Limited Partnership dated as of July 1, 2008, entered into by and among the Limited Partners and the General Partners.

"Freddie Mac" means Federal Home Loan Mortgage Corporation, a shareholder-owned government-sponsored enterprise organized and existing under the laws of the United States.

"Investment Partner Tax Counsel" means Holland & Knight LLP, or other counsel acceptable to the Investment Partner.

"Management Agent" means Pacific West Management, Inc. or any successor thereto as the management agent for the Project.

"Management Agreement" means the management contract or agreement by and between the Partnership and the Management Agent which has received all Requisite Approvals (as amended from time to time).

"Maximum Annual Credit" shall mean $1,980,794 per year, for the Partnership for the total Credit Period.

"Partnership Management Fee" shall have the meaning set forth in Section 7.10D of this Agreement.

"Permanent Lender" means the maker of a Permanent Mortgage Loan, together with its successors and assigns in such capacity.

"Permanent Mortgage Loan" means the loan made using the proceeds of the Bonds in the amount of $25,900,000, with a minimum amortization of 30 years, a term of no less than 30 years, with an interest rate subject to the Swap Documents. The Administrative General Partner shall cause the Partnership to maintain an interest rate hedge for the full Compliance Period in accordance with the provisions of the Project Documents and this Agreement. After Conversion, the City of San Jose Loan will also be a Permanent Mortgage Loan. The City of San Jose Loan will bear interest at 4% with a term of 40 years, and will be repayable in accordance with the provisions of Section 6.2 of this Agreement. In addition to the foregoing, the CHBA Loan is a Permanent Mortgage Loan. Permanent Mortgage Loans (including, without limitation, the City of San Jose Loan following Conversion and the CHBA Loan) will be non-recourse to the Partnership and its Partners.

"Project Documents" means and includes the Construction Contract, the Mortgages, the Regulatory Agreement, the Commitments, the Management Agreement, the CHBA Loan Documents, the Swap Documents and all other documents relating to the Project, which are required by, or have been executed in connection with, any of the foregoing documents.

"Projected Credits" means Federal Housing Tax Credits on a year-by-year basis in the amount of $875,682 for year 2005, $1,873,508 for year 2006, $1,980,596 per year for each of the years 2007 through 2014 (inclusive), $1,104,914 for year 2015 and $107,088 for year 2016, which are the total amount of Federal Housing Tax Credits projected to be allocated to the Investor Limited Partner ($19,805,960), constituting 99.99% of the Tax Credits projected to be allocated to the Partnership ($19,807,940).

"Subordinate Management Fee" means, subject to the provisions of the Management Agreement and any Requisite Approvals, a fee to be paid by the Partnership to the Management Agent comprised of the following amounts: (i) 0.9% of monthly Gross Revenues and (ii) a monthly compliance fee equal to $14 per unit. The Subordinate Management Fee is payable pursuant to Section 6.2A(ii) of this Agreement.

"Swap Documents" means and includes that certain ISDA Master Agreement and related Schedule dated as of July 1, 2008 by and between the Partnership and the Swap Provider, that certain ISDA Credit Support Annex to the Schedule to the ISDA Master Agreement dated as of July 1, 2008 by and between the Partnership and the Swap Provider, that certain Swap Credit Enhancement Agreement dated as of July 1, 2008 by and between

Freddie Mac and the Swap Provider, and all other documents executed in connection with any of the foregoing documents.

"Swap Provider" means Royal Bank of Canada, or any permitted successors thereto.

"Title Policy" means the owner's policy of title insurance issued to the Partnership by First American Title Insurance Company as endorsed to increase the amount thereof to an amount equal to the appraised value of the Project, but in no event less than the sum of all Permanent Mortgage Loans and Capital Contributions of the Partners, and to update such policy to a date not earlier than 10 days prior to the date of the Investment Closing.

2.2     Amendment to Definition of "Project Expenses." In addition to the foregoing amendments to Article 1 of the Partnership Agreement, the final clauses (i) and (ii) set forth in the definition of "Project Expenses" are hereby renumbered clauses (a) and (b), respectively, with the following clauses (c) and (d) hereby added:

"or (c) payment of Subordinate Management Fee; or (d) payment of any fees set forth in Section 7.10 of this Agreement."

2.3     Amendment to Section 4.3 of the Partnership Agreement.  The following clause F is hereby added to Section 4.3 of the Partnership Agreement:

"F.     Except as hereinafter specifically provided, a Limited Partner shall have no obligation to make any contribution to the capital of the Partnership with respect to any deficit in its Capital Account, and such deficit shall not be considered to be a debt owed to the Partnership or to any other Person for any purpose whatsoever.  Notwithstanding the foregoing, any Limited Partner may elect, by written notice to the Partnership (a "DRO Notice"), on or before the last date on which such notice will create a valid Deficit Restoration Obligation for such Fiscal Year (as such Fiscal Year is set forth in Section 12.5 of this Agreement), to obligate itself to restore a negative balance in its Capital Account up to the amount specified in such DRO Notice.  A Limited Partner that delivers a DRO Notice is referred to herein a "DRO Notice Partner."  If, following the "liquidation" of the Interest of a DRO Notice Partner in the Partnership (as defined in Section 1.704-1(b)(2)(ii)(g) of the Allocation Regulations) or the dissolution of the Partnership and the distribution or liquidation of its assets in accordance with the provisions of Section 6.3 of this Agreement, such DRO Notice Partner has a negative balance in its Capital Account after adjusting such Capital Account to reflect the allocations and distributions required under Article 6 of this Agreement (including, without limitation, the allocation to such DRO Notice Partner of his or its share of Partnership Minimum Gain and/or share of Partner Nonrecourse Debt Minimum Gain), the amount of such negative balance (which in the case of a DRO Notice Partner shall not exceed the maximum amount specified in the DRO Notice) will be contributed by the DRO Notice Partner to the Partnership on the first to occur of (i) the date which is 10 days after the delivery to such DRO Notice Partner of a certificate of the Accountants, prepared in good faith and at the expense of the Partnership, setting forth the calculation of the negative Capital Account balance of the DRO Notice Partner, on (ii) the later of (a) the last day of the taxable year of the Partnership in which such liquidation occurs, or

5

(b) 90 days after the date of the liquidation.  Any such amount will be distributed to those Partners having positive Capital Account balances in proportion to, and to the extent necessary to eliminate such positive balances, or in such other manner as may be required under Section 1.704-1(b)(2)(ii)(b)(3) of the Allocation Regulations.

2.4     Amendments to Article 5 of the Partnership Agreement.   Article 5 of the Partnership Agreement is hereby amended as follows:

      2.4.1   Section 5.1A of the Partnership Agreement is hereby amended by deleting the reference to "$16,695,627" and replacing it with a reference to "$16,949,376."

      2.4.2   Section 5.1A(3) of the Partnership Agreement is hereby amended by deleting the reference to "$10,491,000" and replacing it with a reference to "$10,744,749."

      2.4.3   Section 5.2D of the Partnership Agreement is hereby deleted in its entirety and replaced with "[intentionally deleted]."

2.5     Amendment to Section 6.2A(ii) of the Partnership Agreement.  Section 6.2A(ii) of the Partnership Agreement is hereby deleted in its entirety and replaced with the following:

"(ii)   The amount of Cash Flow shall be distributed as follows:

First, to the maintenance of Operating Reserves as set forth in Section 7.8B herein;

Second, to the payment to the Investor Limited Partner of any current and accrued Asset Management Fee;

Third, until the expiration of the Compliance Period, to the payment of any current and accrued Partnership Management Fee;

Fourth, to the payment of the Deferred Developer Fee;

Fifth, (i) during the period beginning upon Conversion and ending upon the sixth anniversary thereof, 50% of the Cash Flow remaining after the application of clauses First through Fourth above to the repayment of the City of San Jose Loan; and (ii) during the period beginning upon the sixth anniversary of Conversion, 75% of the Cash Flow remaining after the application of clauses First through Fourth above to the repayment of City of San Jose Loan.

Sixth, Cash Flow remaining after the application of clauses First through Fifth above is to be applied in the following priority: (i) $25,000 to the repayment of the CHBA Loan; and then (ii) to the payment of any current and accrued Subordinate Management Fee; and then (iii) for each year following the expiration of the Compliance Period, to the payment of any current and accrued Partnership Management Fee.

Seventh, to the repayment of any Subordinated Loans of the General Partners;

Eighth, to the payment of the Supervisory and Incentive Management Fee to the Administrative General Partner as set forth in Section 7.10 herein;

Ninth, a priority distribution to the Investor Limited Partner in an amount equal to 10% of the remaining balance;

Tenth, to the payment of any current and accrued Operating Deficit Management Fee to the General Partners, as set forth in Section 7.10 herein;

Eleventh, the balance, 99.99% to the Investor Limited Partner, 0.0045% to the Administrative General Partner, 0.0045% to the Managing General Partner and 0.001% to Protech.

Notwithstanding anything to the contrary set forth in this Section 6.2A(ii), during the period the CHBA Loan remains outstanding and to the extent that Cash Flow is insufficient to make the annual payment of $25,000 to the Managing General Partner as repayment on the CHBA Loan pursuant to clause Sixth above, the Administrative General Partner shall make a Subordinated Loan to the Partnership in the amount necessary to allow such Administrative General Partner to cause the Partnership to make the annual $25,000 payment in full."

2.6      Amendments to Section 6.4 of the Partnership Agreement.  Section 6.4 of the Partnership Agreement is hereby amended as follows:

2.6.1    Section 6.4M of the Partnership Agreement is hereby deleted in its entirety and replaced with "[intentionally deleted]."

2.6.2    Section 6.4R of the Partnership Agreement is hereby deleted in its entirety and replaced with the following:

"R.      There shall be specially allocated to the Administrative General Partner each year, to the extent permitted by the Code, an amount of losses equal to the sum of (i) all fees payable to either of the General Partners pursuant to Section 7.10 of this Agreement and (ii) the Management Fee payable to the Management Agent in accordance with the provisions of the Management Agreement and this Agreement."

2.7     Amendment to Section 7.4 of the Partnership Agreement.  The following clause L is hereby added to Section 7.4 of the Partnership Agreement:

"L.     In the event that the Investor Limited Partner gives notice to the General Partners that in the reasonable judgment of the Investor Limited Partner depreciation deductions will no longer be allocated to the Investor Limited Partner as a result of the treatment of any Partnership indebtedness as Partner Nonrecourse Debt ("Related Party Financing"), then, subject to the Consent of the Investor Limited Partner, the General Partners shall take all such action as may be necessary to assure that any outstanding balance of such Related Party Financing will constitute a Partnership liability for which no Partner or Related Person bears the Economic Risk of Loss (as such term is used in Treasury Regulation Section 1.752-2), provided, however, that such action does not have any negative tax consequences for the Partnership or the Investor Limited Partner.  One such action may be the assignment of the outstanding balance of such Related Party Financing to an Entity which is not a Related Person."

2.8     Amendment to Section 7.5A of the Partnership Agreement.  Section 7.5A of the Partnership Agreement is hereby amended as follows:

2.8.1   Section 7.5A(xvi) of the Partnership Agreement is hereby amended by deleting the reference to "$1,908,190" and replacing it with a reference to "$1,980,794."

2.8.2   The following clause (xix) is hereby added to Section 7.5A of the Partnership Agreement:

"(xix) The obligations of the Partnership pursuant to the Permanent Mortgage Loan and the Swap Documents are non-recourse to the Partnership and its Partners."

2.9     Amendments to Section 7.10 of the Partnership Agreement.  Section 7.10 of the Partnership Agreement is hereby amended as follows:

2.9.1   Section 7.10C of the Partnership is hereby deleted in its entirety and replaced with the following:

"C.     The Partnership shall pay to the Investment Partner Manager, or an affiliate thereof, a cumulative Asset Management Fee in an amount equal to $15,000 (as adjusted annually from the Admission Date by the C.P.I.) prorated from the date of 75% of construction completion.  The Asset Management Fee is payable from Cash Flow or Capital Proceeds as provided in Section 6.2 of this Agreement."

2.9.2   Section 7.10D of the Partnership Agreement is hereby deleted in its entirety and replaced with the following:

"D.     (i) For its services in managing the Partnership, the Managing General Partner shall receive from the Partnership, beginning as of

Execution Version

January 1, 2007, an annual fee in the amount of $20,000 (the "Partnership Management Fee"), which such Partnership Management Fee shall be prorated and paid monthly in the amount of $1,667, subject to a three percent (3%) increase annually of the then current amount.

(ii) In the event that there is insufficient Cash Flow in any year to pay the Partnership Management Fee, the Administrative General Partner shall make a Subordinated Loan to the Partnership in the amount necessary to allow such Administrative General Partner to cause the Partnership to pay the annual Partnership Management Fee."

2.9.3    Section 7.10E(i) of the Partnership Agreement is hereby amended in order to address a scrivener's error by deleting the capitalized reference to "Annual" and replacing it with a reference to "annual."

2.10    Addition of Section 7.15.  The following Section 7.15 is hereby added to the Partnership Agreement:

"Section 7.14. Administrative General Partner's Obligations With Respect to the Swap Documents.  The Partners hereby agree as follows:

A.    The Administrative General Partner irrevocably and unconditionally guarantees and covenants that, to the extent that the Partnership has insufficient funds, the Administrative General Partner shall cause the Partnership to establish and fund the "Hedge Fee Escrow," as such term is defined in that certain Reimbursement and Security Agreement by and between Freddie Mac and the Partnership, dated as of July 1, 2008 (as amended from time to time, the "Freddie Mac Reimbursement Agreement"), and as required pursuant to Section 4.1(i) of such Freddie Mac Reimbursement Agreement.  The Administrative General Partner hereby agrees that if funds in any such Hedge Fee Escrow are insufficient to purchase a "Subsequent Hedge" (as such term is used in the Freddie Mac Reimbursement Agreement), as may required by the Project Documents, including, without limitation, the Freddie Mac Reimbursement Agreement, to the extent that the Partnership has insufficient funds, the Administrative General Partner will advance to the Partnership any and all funds required to purchase and maintain such Subsequent Hedge (including any associated fees (including attorneys' fees), costs and expenses of the Partnership or the Limited Partners incurred in connection therewith).

B.    If (i) an Early Termination Date (as such term is defined in the Swap Documents) occurs and (ii) an amount is payable to the Swap Provider pursuant to the terms of the Swap Documents, then upon such Early Termination Date, the Administrative General Partner irrevocably covenants and guarantees to advance to the Partnership any funds required to pay the amount due to the Swap Provider.  In addition, if (iii) an Early Termination Date occurs as a result of an Event of Default (as such term is defined in the Swap Documents), wherein the Partnership is the Defaulting Party (as such term is defined in the Swap Documents) and (iv) Freddie Mac exercises any of its rights against the Partnership pursuant to the Freddie Mac Reimbursement Agreement or any other document executed in connection therewith, then the Administrative General Partner

shall be responsible for any and all costs and expenses of the Partnership and the Limited Partners associated with such action taken by Freddie Mac (including, without limitation, attorneys' fees).

C.      It is hereby agreed that, except as otherwise expressly provided in this Agreement, funds advanced by the Administrative General Partner in accordance with this Section 7.15 will constitute non-interest bearing Subordinated Loans, repayable as provided in Article 6 of this Agreement."

2.11    Schedule A of the Partnership Agreement is hereby deleted in its entirety and replaced with the revised <u>Schedule A</u> attached hereto and made a part of the Partnership Agreement.

2.12    Schedule B of the Partnership Agreement is hereby deleted in its entirety and replaced with "[intentionally deleted]."

3.      <u>Miscellaneous</u>.  The Partners hereby agree as follows:

3.1     The General Partners represents and warrants to the Investor Limited Partner that all Requisite Approvals to the execution of this Amendment have been obtained.

3.2     The Administrative General Partner represents and warrants to the Investor Limited Partner that all Requisite Approvals have been obtained in connection with the (i) admission of Pacific West Management, Inc. as the "Management Agent" and (ii) execution of that certain Property Management Agreement (undated) by and between the Partnership and Pacific West Management, Inc., as amended by that certain Amendment to Management Agreement dated as of July 1, 2008.

3.3     As of the date of this Amendment, the General Partners hereby affirm that each representation, warranty and covenant set forth in Section 7.5 of the Partnership Agreement remains true and correct.

3.4     Except to the extent specifically provided herein, this Amendment is not intended to, nor does it, modify, amend or revise in any way any of the provisions of the Partnership Agreement and such Partnership Agreement remains in full force and effect as of the date hereof.

3.5     This Amendment may be executed in several counterparts all of which will constitute one agreement, binding on all the Partners, notwithstanding that all of the Partners are not signatories to the same counterpart.

3.6     Except as expressly set forth in this Amendment, and any prior amendment to the Partnership Agreement, the Partners hereby affirm the terms and provisions of the Partnership Agreement.

[signatures to follow]

IN WITNESS WHEREOF, each of the parties hereto has executed this Amendment as of the date first written above.

**MANAGING GENERAL PARTNER:**

AFFORDABLE HOUSING ACCESS, INC., a California non-profit public benefit corporation

By: _____
     Name: Jonathan B. Webb
     Title: Executive Director

**ADMINISTRATIVE GENERAL PARTNER:**

MONTALVO ASSOCIATES LLC, a California limited liability company

By: _____
     Name: James S. Morley
     Title: Manager

**SPECIAL LIMITED PARTNER:**

PROTECH 2002-C, LLC, an Ohio limited liability company

By:   Protech Development Corporation, a Tennessee corporation, its Manager

     By: _____
          Name: Alisa B. Kennedy
          Title: Senior Vice President

**INVESTOR LIMITED PARTNER:**

AMTAX HOLDINGS 123, LLC, an Ohio limited liability company

By: Capmark Affordable Properties Inc., its Manager

     By: _____
          Name: Alisa B. Kennedy
          Title: Senior Vice President

_____

IN WITNESS WHEREOF, each of the parties hereto has executed this Amendment as of the date first written above.

**MANAGING GENERAL PARTNER:**

AFFORDABLE HOUSING ACCESS, INC., a California non-profit public benefit corporation

By: _____
        Name: Jonathan B. Webb
        Title: Executive Director

**ADMINISTRATIVE GENERAL PARTNER:**

MONTALVO ASSOCIATES LLC, a California limited liability company

By: _____
        Name: James S. Morley
        Title: Manager

**SPECIAL LIMITED PARTNER:**

PROTECH 2002-C, LLC, an Ohio limited liability company

By:   Protech Development Corporation, a Tennessee corporation, its Manager

        By: _____
                Name: Alisa B. Kennedy
                Title: Senior Vice President

**INVESTOR LIMITED PARTNER:**

AMTAX HOLDINGS 123, LLC, an Ohio limited liability company

By: Capmark Affordable Properties Inc., its Manager

        By: _____
                Name: Alisa B. Kennedy
                Title: Senior Vice President

_____

IN WITNESS WHEREOF, each of the parties hereto has executed this Amendment as of the date first written above.

**MANAGING GENERAL PARTNER:**

AFFORDABLE HOUSING ACCESS, INC., a California non-profit public benefit corporation

By: _____
      Name: Jonathan B. Webb
      Title: Executive Director

**ADMINISTRATIVE GENERAL PARTNER:**

MONTALVO ASSOCIATES LLC, a California limited liability company

By: _____
      Name: James S. Morley
      Title: Manager

**SPECIAL LIMITED PARTNER:**

PROTECH 2002-C, LLC, an Ohio limited liability company

By:    Protech Development Corporation, a Tennessee corporation, its Manager

      By: _____
          Name: Alisa B. Kennedy
          Title: Senior Vice President

**INVESTOR LIMITED PARTNER:**

AMTAX HOLDINGS 123, LLC, an Ohio limited liability company

By: Capmark Affordable Properties Inc., its Manager

      By: _____
          Name: Alisa B. Kennedy
          Title: Senior Vice President

## Schedule A

| Name and Business Address: | Capital Contributions | Percentage Interests |
|---|---|---|
| **GENERAL PARTNERS**: | | |
| Montalvo Associates, LLC<br>1600 West Campbell, Suite 211<br>San Jose, CA  95008 | $100 [1] | 0.0045% |
| Affordable Housing Access, Inc.<br>4029 Westerly Place, Suite 101<br>Newport Beach, CA  92660 | $100 | 0.0045% |
| **LIMITED PARTNERS**: | | |
| AMTAX Holdings 123, LLC<br>c/o Capmark Affordable Properties Inc.<br>1801 California Street, Suite 3900<br>Denver, CO  80202<br>Attention:  Legal Department<br>Facsimile:  (303) 296-6804 | $16,949,376 [2] | 99.99% |
| with a copy to: | | |
| Holland & Knight LLP<br>10 St. James Avenue, 12th Floor<br>Boston, MA  02116<br>Attention:  Edward R. Hickey, Esq.<br>Facsimile:  (617) 523-6850 | | |
| Protech 2002-C, LLC | $1,000 | 0.001% |
| (same address as provided immediately above) | | |
| **TOTAL:** | $16,950,576 | 100% |

(1)  In the event any deferred portion of the Developer Fee is still outstanding prior to the end of 10 years of the Placed in Service Date of the first Building in the Project, the Administrative General Partner will make an additional Capital Contribution to the Partnership in an amount equal to such outstanding amount, prior to the end of such 10th year.  Such additional Capital Contribution will be used solely to pay the outstanding deferred Developer Fee.  Such Capital Contribution will be returned to the Administrative General Partner out of Distributions of Cash Flow or proceeds from a Sale or Refinancing in the same priority, but prior to, the repayment of Subordinated Loans of the Administrative General Partner.

(2)  To be paid in accordance with the provisions of Article 5 of this Agreement, subject to adjustments and conditions to payment as provided herein.

## RATIFICATION OF GUARANTY

The undersigned (the "**Guarantor**") hereby acknowledges and agrees that his obligations as Guarantor remain valid and in full force and effect in accordance with the provisions of that certain Guaranty of James S. Morley made effective as of October 1, 2002 (the "**Guaranty**"), and that for all purposes of such Guaranty, the term "Partnership Agreement" will include all of the terms and conditions of that certain Fourth Amendment to Amended and Restated Agreement of Limited Partnership of Evans Lane Apartments L.P., dated to be effective as of July 1, 2008.

**GUARANTOR:**

By: _____

JAMES S. MORLEY, an individual

## EVANS LANE APARTMENTS L.P.
### (a California limited partnership)

### DRO NOTICE

This DRO Notice (this "**Notice**") is made this 10th day of April, 2008 and effective for a period beginning as of January 1, 2007 and terminating immediately following December 31, 2007 (the "**Effective Period**").  Reference is hereby made to that certain Amended and Restated Agreement of Limited Partnership of Evans Lane Apartments L.P., a California limited partnership (the "**Partnership**") dated as of October 1, 2002 and amended by that certain First Amendment to the Amended and Restated Agreement of Limited Partnership (undated), that certain Second Amendment to Amended and Restated Agreement of Limited Partnership dated to be effective as of March 2, 2006 and that certain Third Amendment to the Amended and Restated Agreement of Limited Partnership dated to be effective as of December 29, 2006 (as amended, the "**Partnership Agreement**").  Capitalized terms used, and not otherwise defined, in this Notice will have the meanings set forth in the Partnership Agreement.

In accordance with the provisions of the Partnership Agreement, the undersigned hereby agrees to undertake a Deficit Restoration Obligation (as such term is defined in the Partnership Agreement) in an amount not to exceed $1,500,000.  This Notice may be deemed to be fully incorporated with and a part of the Partnership Agreement.

IN WITNESS WHEREOF, the undersigned has caused this Notice to be duly executed as of the day and year first written above and effective for the Effective Period.

AMTAX HOLDINGS 123, LLC, an Ohio limited liability company

By:   Capmark Affordable Properties Inc. (formerly known as Paramount Properties, Inc.), a Delaware corporation, its Manager

By:   _Robert Watts_____
      Name:  Robert Watts
      Title:  Senior Vice President

# 5257298_v1

**EVANS LANE APARTMENTS L.P.**
**A CALIFORNIA LIMITED PARTNERSHIP**

**FIFTH AMENDMENT TO THE**
**AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP**

THIS FIFTH AMENDMENT TO THE AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP ("**Amendment**") of EVANS LANE APARTMENTS L.P., a California limited partnership (the "**Partnership**"), is made effective as of **August 18**, 2011, by and among Affordable Housing Access, Inc., a California nonprofit public benefit corporation and Montalvo Associates LLC, a California limited liability company (collectively the "**General Partners**"), AMTAX Holdings 123, LLC, an Ohio limited liability company (the "**Investor Limited Partner**"), Protech 2002-C, LLC, an Ohio limited liability company, as withdrawing Special Limited Partner ("**Protech**"), and Tax Credit Holdings III, LLC, a Delaware limited liability company, as the successor Special Limited Partner ("**TCH III**").

**Recitals:**

A.  The General Partners, Investor Limited Partner and Protech have entered into that certain Amended and Restated Agreement of Limited Partnership of the Partnership, dated as of October 1, 2002, as amended by that certain FIRST AMENDMENT dated as of June 17, 2005, that certain SECOND AMENDMENT dated as of March 2, 2006, that certain THIRD AMENDMENT dated as of December 29, 2006, and as amended by that certain FOURTH AMENDMENT dated as of July 1, 2008 (the "**Agreement**");

B.  As of the date hereof, Protech has assigned all of its right, title and interest in the Agreement to TCH III.

C.  The purposes of this Amendment are (i) to effectuate the withdrawal of Protech as the Special Limited Partner of the Partnership; and (ii) to admit TCH III as the successor Special Limited Partner of the Partnership.  Unless otherwise defined herein, terms used herein with initial capital letters shall have the same meanings assigned to such terms in the Agreement.

**Agreement:**

In consideration of the foregoing and the mutual promises and covenants hereinafter contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Amendment, intending to be legally bound, hereby agree as follows:

1.      Protech hereby withdraws as the Special Limited Partner of the Partnership and shall have no further rights or obligations with respect to the Partnership from and after the date hereof.  By its execution of this Amendment, and in accordance with 9.2 and 9.3 of the Agreement, the General Partners hereby consent to (i) the withdrawal of Protech as the Special

Limited Partner of the Partnership and (ii) the admission and appointment of TCH III as the successor Special Limited Partner of the Partnership.  TCH III shall have, from and after the date of this Amendment, solely and exclusively, all of the rights and obligations as Special Limited Partner under the Agreement.  Upon execution of this Amendment, any references to the "Special Limited Partner" of the Partnership in the Agreement shall mean and refer solely to TCH III and shall specifically exclude Protech.

2.      The Agreement is hereby amended by replacing Protech with TCH III in <u>Schedule A</u> of the Agreement and TCH III shall succeed to the Capital Contributions made by Protech.

3.      All the provisions of this Amendment shall be deemed to be incorporated in, and made part of, the Agreement, as further amended by this Amendment, and the Agreement and this Amendment shall be read, taken and construed as one and the same instrument.  Except as expressly set forth herein, this Amendment shall not by implication or otherwise limit, impair, constitute a waiver of, or otherwise affect the rights and remedies of any of the parties hereto under the Agreement, nor alter, modify, amend or in any way affect the terms, conditions, covenants or agreements contained in the Agreement, all of which are hereby ratified and affirmed in all respects by each of the parties hereto and shall continue in full force and effect.  This Amendment shall apply and be effective only with respect to the provisions of the Agreement specifically referred to herein and any references in the Agreement to the provisions of the Agreement specifically referred to herein shall be to such provisions as amended by this Amendment.

4.      Each of the parties covenants that it will execute all documents and take such other actions as may be reasonably required or appropriate to effect the withdrawal of Protech as Special Limited Partner of the Partnership and the admission of TCH III as the successor Special Limited Partner, and to otherwise carry out the intent and purposes of this Amendment.

5.      This Amendment may be executed by the parties hereto in separate counterparts and any single counterpart or set of counterparts executed and delivered by all the parties shall together constitute one and the same instrument.  The parties hereto may execute this Amendment by signing any such counterpart and any such signed counterpart of this Amendment may be delivered by telecopy with the same force and effect as if it were physically delivered.

**[THE REMAINDER OF THIS PAGE INTENTIONALLY BLANK]**

**IN WITNESS WHEREOF**, the parties have duly executed this Amendment as of the day and year set forth above.

**MANAGING GENERAL PARTNER:**

AFFORDABLE HOUSING ACCESS, INC.

By: _____

Name: Jonathan B. Webb

Title: President

**ADMINISTRATIVE GENERAL PARTNER:**

MONTALVO ASSOCIATES LLC

By: _____

Name: James S. Morley

Title: Manager

**PROTECH:**

PROTECH 2002-C, LLC
By: Protech Development Corporation, its Manager

By: _____

Name:

Title:

**TCH III:**

TAX CREDIT HOLDINGS  III, LLC

By: Capmark Affordable Equity Inc., Debtor and
Debtor in Possession, its Managing Member

By: _____

Name:

Title:

**<u>INVESTOR LIMITED PARTNER:</u>**

AMTAX HOLDINGS 123, LLC
By:  Tax Credit Holdings III, LLC, its Manager

By: Capmark Affordable Equity Inc., Debtor and
Debtor in Possession, its Managing Member

By:
Name:
Title:

# EXHIBIT 3

**ALDEN**
**TORCH**
**FINANCIAL**

January 8, 2020

*Via Federal Express*

Affordable Housing Access, Inc.
4029 Westerly Place, Suite 101
Newport Beach, CA 92660

Montalvo Associates LLC
c/o JSM Enterprises Inc.
1600 West Campbell, Suite 211
San Jose, CA 95008

Montalvo Associates LLC
3190 S. Bascom Avenue, #220
San Jose, CA 95124

RE:    Lucretia Avenue Partners, L.P. (the "Partnership")

Dear General Partners,

Reference is made to that certain Amended and Restated Agreement of Limited Partnership dated as of December 9, 2002, as amended by that certain First Amendment to Amended and Restated Agreement of Limited Partnership, dated as of December 11, 2002, that certain Second Amendment to Amended and Restated Agreement of Limited Partnership, dated as of December 12, 2005, that certain Third Amendment to the Amended and Restated Agreement of Limited Partnership, dated as of July 27, 2006, that certain Fourth Amendment to Amended and Restated Agreement of Limited Partnership, dated as of December 29, 2006, and that certain Fifth Amendment to Amended and Restated Agreement of Limited Partnership, dated as of September 30, 2012 (as amended, the "Partnership Agreement"). Capitalized terms not otherwise defined herein shall have the meanings given to such terms in the Partnership Agreement.

You are hereby notified that, pursuant to Section 7.4(K) of the Partnership Agreement, the Limited Partner hereby exercises the Limited Partnership Option. The Investor Limited Partner hereby requests that the General Partners promptly use their best efforts to obtain a buyer for the Project on the most favorable terms available. Within thirty (30) days of the date of this letter, please provide the Investor Limited Partner with a detailed plan for the sale of the Project, which would allow for the closing of the sale of the Project no later than six (6) months following the date of this letter. The buyer and the terms of any proposed sale shall remain subject in all respects to the consent of the Investor Limited Partner, as provided in the Partnership Agreement.

If you have any questions please feel free to contact Erik Aukland at (312) 520-8837 or erik.aukland@aldentorch.com.

Sincerely,

AMTAX Holdings 279, LLC, an Ohio limited liability company

By: Alden Pacific Asset Management, LLC, its manager
By: Alden Torch Financial LLC, its sole member


By: _____
Name: Jill Brooks-Garnett
Title: Chief Operating Officer




cc:     Erik Aukland (via Email)

# EXHIBIT 4

ALDEN
TORCH
FINANCIAL

March 30, 2020

*Via E-mail (AGrant@jsmenterprises.com):*

Affordable Housing Access, Inc.
4029 Westerly Place, Suite 101
Newport Beach, CA 92660

Montalvo Associates LLC
c/o JSM Enterprises Inc.
1600 West Campbell, Suite 211
San Jose, CA 95008

Montalvo Associates LLC
3190 S. Bascom Avenue, #220
San Jose, CA 95124

RE:    Lucretia Avenue Partners, L.P. (the "Partnership")

Dear General Partners,

You previously received a letter dated January 8, 2020 (the "Prior Letter") pursuant to which the Investor Limited Partner exercised the Limited Partnership Option.  As required under the Partnership Agreement and as requested by the Investor Limited Partner in the Prior Letter, General Partners were to promptly use their best efforts to obtain a buyer for the Project on the most favorable terms available (the "Sale Process").  The Investor Limited Partner further requested that, within thirty (30) days after the date of the Prior Letter, General Partners provide the Investor Limited Partner with a detailed plan for the Sale Process.

Since the Prior Letter was received, there have been sporadic and non-substantive communications from General Partners concerning the Limited Partnership Option and the Sale Process.  The Investor Limited Partner is sending this letter to remind General Partners of their obligations under Section 7.4(K) and to request that General Partners contact Erik Aukland at (312) 520-8837 or erik.aukland@aldentorch.com as soon as they are able to discuss the Sale Process.

All capitalized terms not otherwise defined herein have the meanings ascribed to them in the Prior Letter.

1225 17th Street, Suite 1400  •  Denver, CO 80202  •  (303) 927-5000  •  aldentorch.com

Sincerely,

AMTAX Holdings 279, LLC, an Ohio limited liability company

By: Alden Pacific Asset Management, LLC, its manager
By: Alden Torch Financial LLC, its sole member


By: _____
Name: Jill Brooks-Garnett
Title: Chief Operating Officer



cc:      Erik Aukland (via Email)

# EXHIBIT 5



**ALDEN**
**TORCH**
FINANCIAL

May 29, 2020

***Via Email***

Montalvo Associates LLC
c/o JSM Enterprises, Inc.
1600 West Campbell, Suite 21
San Jose, CA 95008
Attn: Alexis Grant (AGrant@jsmenterprises.com)

Re:     Lucretia Avenue Partners, L.P. (the "Partnership")

Ms. Grant,

The General Partners previously received letters dated January 8, 2020 and March 30, 2020 from the Investor Limited Partner relating to the Limited Partnership Option (capitalized terms not otherwise defined herein shall have the meanings set forth in the referenced letters).  On April 14, 2020, you communicated to Mr. Aukland that you were not interested in selling the Project and, instead, wanted to purchase the Interests of the Limited Partners.  On the same date, you provided an appraisal.  Since that time, you have noted that you would like to have your appraisal updated.

Prior to engaging our appraisal under Section 7.4J, and in order to bring structure to this transaction, we wanted to confirm that you are exercising the Option under Section 7.4J and agree on a timeline related thereto.  Once you provide confirmation of the exercise of the Option, we believe that we can obtain an appraisal within thirty (30) days, which should also provide you with sufficient time to update your appraisal.  Accordingly, we believe the following is a reasonable timeline:

July 1, 2020: Appraisals are exchanged and appraisers attempt to agree on a value
July 10, 2020:  In the event the appraisers are unable to agree on the value, they jointly appoint a third independent appraisal whose determination shall be final and binding.
August 10, 2020:  Third appraisal, if required, is provided and Option Price under Section 7.4J is determined based on the value established by the third appraisal.  In the event a third appraisal is not required, the following dates will each be moved up by 30 days.
August 20, 2020:  Draft of a purchase and sale agreement is provided by the Limited Partner for the General Partners' review and comment.
September 1, 2020:  Purchase and sale agreement is finalized and executed.
November 1, 2020:  Closing occurs.

In the event you are represented by counsel in this matter, please provide contact information for your counsel and I will direct this correspondence to them.  Going forward, you and/or your counsel can work with me and Adam Stein, copied on this letter, on this matter.

We look forward to working with you on this transaction.

Sincerely,

AMTAX Holdings 279, LLC

By: Alden Pacific Asset Management, LLC, its manager
By: Alden Torch Financial LLC, its sole member

By: _____
    Alison Wadle, EVP and General Counsel


cc:    Adam Stein, via email (adam.stein@aldentorch.com)

# EXHIBIT 6



July 10, 2020

*__Via Email__*

Montalvo Associates LLC
c/o JSM Enterprises, Inc.
1600 West Campbell, Suite 21
San Jose, CA 95008
Attn: Alexis Grant (AGrant@jsmenterprises.com)

Re:   Lucretia Avenue Partners, L.P. (the "Lucretia Partnership"); Amended and Restated
      Agreement of Limited Partnership, dated as of December 9, 2002 (as amended, the
      "Partnership Agreement") (capitalized terms not otherwise defined herein shall have the
      meanings set forth in the Partnership Agreement)

Ms. Grant,

We are writing to follow-up on our letter dated May 29, 2020 and your telephone conversation with
Adam Stein and Erik Aukland on June 25, 2020.

During the telephone conversation, you confirmed that the Administrative General Partner is
exercising its Option under Section 7.4.J. of the Partnership Agreement. Based on that confirmation,
we agreed to obtain an appraisal on behalf of the Investor Limited Partner, as required under Section
7.4.J of the Partnership Agreement. You noted that the Administrative General Partner was still
waiting for its updated appraisal. Below is a refreshed timeline for your review:

August 12, 2020: Appraisals are exchanged and appraisers attempt to agree on a value
August 20, 2020: In the event the appraisers are unable to agree on the value, they jointly appoint
a third independent appraisal whose determination shall be final and binding.
October 1, 2020: Third appraisal, if required, is provided and Option Price under Section 7.4J is
determined based on the value established by the third appraisal. In the event a third appraisal is
not required, the following dates will each be moved up by 30 days.
October 9, 2020: Draft of a purchase and sale agreement is provided by the Limited Partner for
the General Partners' review and comment.
October 23, 2020: Purchase and sale agreement is finalized and executed.
November 30, 2020: Closing occurs.

Please confirm that you believe the above is a reasonable timeline or provide your specific thoughts
on dates that may require adjustment.

We look forward to working with you.

Nothing contained herein shall waive any of the Limited Partners' rights or remedies relating to the Lucretia Partnership, all of which are expressly reserved.

Sincerely,

AMTAX Holdings 279, LLC

By:  Alden Pacific Asset Management, LLC, its manager
By:  Alden Torch Financial LLC, its sole member

By:  _____
        Alison Wadle, EVP and General Counsel


cc:     Adam Stein, via email (adam.stein@aldentorch.com)
        Erik Aukland, via email (erik.aukland@aldentorch.com)

# EXHIBIT 7

Montalvo Associates LLC
3190 S Bascom Avenue, Suite 220
San Jose, CA 95124

July 27, 2020

**VIA OVERNIGHT CARRIER AND E-MAIL**

**LISTED NOTICE PARTY:**

AMTAX Holdings 279, LLC
c/o Capmark Affordable Equity Inc.
1801 California Street, Suite 3700
Attn: Legal Department

**ADDITIONAL NOTICE PARTY:**

Alison Wadle, EVP & General Counsel
Alden Torch Financial LLC
1225 17TH Street, Suite 1400
Denver, CO 80202

Re:   Lucretia Avenue Partners, L.P. (the "Partnership")

Ladies and Gentlemen:

Reference is hereby made to that certain Amended and Restated Agreement of Limited Partnership of the Partnership dated as of December 9, 2002 by and among Montalvo Associates LLC, a California limited liability company (the "Administrative General Partner"), Affordable Housing Access, Inc., a California nonprofit public benefit corporation (the "Managing General Partner"), AMTAX Holdings 279, LLC, an Ohio limited liability company (the "Investor Limited Partner"), and TCH II Pledge Pool, LLC, a Delaware limited liability company (the "Special Limited Partner") (as amended, the "Partnership Agreement"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Partnership Agreement.

Pursuant to Section 7.4.J of the Partnership Agreement, this letter constitutes Administrative General Partner's notice to the Investor Limited Partner that Administrative General Partner is exercising its option to purchase the Investor Limited Partner's Interest.

*[remainder of page intentionally left blank]*

075397\11822956v1

Sincerely,

MONTALVO ASSOCIATES LLC,
a California limited liability company

By: _____

James S. Morley, its Manager

cc via email: Stephen C. Ryan
Alexis Grant
Adam Stein
Erik Auckland

075397\11822956v1

# EXHIBIT 8

Montalvo Associates LLC
3190 S Bascom Avenue, Suite 220
San Jose, CA 95124

July 27, 2020

VIA OVERNIGHT CARRIER AND E-MAIL

LISTED NOTICE PARTIES:

AMTAX Holdings 123, LLC                    Holland & Knight LLP
c/o Capmark Affordable Equity Inc.         10 St. James Avenue, 12th Floor
1801 California Street, Suite 3700         Boston, MA 02116
Denver, CO 80202                           Attn: Edward R. Hickey, Esq.
Attn: Legal Department

ADDITIONAL NOTICE PARTY:

Alison Wadle, EVP & General Counsel
Alden Torch Financial LLC
1225 17TH Street, Suite 1400
Denver, CO 80202

> Re:    Evans Lane Apartments L.P. (the "Partnership")

Ladies and Gentlemen:

Reference is hereby made to that certain Amended and Restated Agreement of Limited Partnership of the Partnership dated as of October 1, 2002 by and among Montalvo Associates LLC, a California limited liability company (the "Administrative General Partner"), Affordable Housing Access, Inc., a California nonprofit public benefit corporation ("Managing General Partner"), AMTAX Holdings 123, LLC, an Ohio limited liability company (the "Investor Limited Partner"), and Protech 2002-C, LLC, an Ohio limited liability company (the "Special Limited Partner) (as amended, the "Partnership Agreement"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Partnership Agreement.

Pursuant to Section 7.4.J of the Partnership Agreement, this letter constitutes Administrative General Partner's notice to the Investor Limited Partner that Administrative General Partner is exercising its option to purchase the Investor Limited Partner's Interest.

*[remainder of page intentionally left blank]*

075397.11822814v1

Sincerely,

MONTALVO ASSOCIATES LLC,
a California limited liability company

By _____

James S. Morley, its Manager

cc via email: Stephen C. Ryan
              Alexis Grant
              Adam Stein
              Erik Auckland

# EXHIBIT 9



ALDEN
TORCH
FINANCIAL

August 21, 2020

*Via Email*

Montalvo Associates LLC
c/o JSM Enterprises, Inc.
1600 West Campbell, Suite 21
San Jose, CA 95008
Attn: Alexis Grant (AGrant@jsmenterprises.com)

Re:   Lucretia Avenue Partners, L.P. (the "Partnership"); Amended and Restated Agreement of
      Limited Partnership, dated as of December 9, 2002 (as amended, the "Partnership Agreement")
      (capitalized terms not otherwise defined herein shall have the meanings set forth in the
      Partnership Agreement)

Ms. Grant,

We are in receipt of a letter from Administrative General Partner, dated July 27, 2020, relating to
the exercise of its Option pursuant to Section 7.4.J of the Partnership Agreement.  Accordingly,
we are hereby delivering our appraisal and are requesting that you send the Administrative General
Partner's appraisal as soon as possible.  We would also request that we agree on a reasonable
timeline pursuant to our earlier letters.

We are also in receipt of a letter from Administrative General Partner, dated July 27, 2020, relating
to the purported exercise of its option related to Evans Lane Apartments L.P.  Because the
completion of the Compliance Period has not occurred with respect to Evans Lane Apartments,
L.P., the Administrate General Partner's option with respect to that partnership is not operative at
this time.  However, as mentioned in prior discussions, we are amenable to discussing the Evans
Lane partnership.

Sincerely,

AMTAX Holdings 279, LLC

By:  Alden Pacific Asset Management, LLC, its manager
By:  Alden Torch Financial LLC, its sole member

By:  _Alison Wadle_
     Alison Wadle, EVP and General Counsel


cc:   Adam Stein, via email (adam.stein@aldentorch.com)
      Stephen Ryan, via email (sryan@coxcastle.com)

# EXHIBIT 10



**ALDEN**
**TORCH**
FINANCIAL

November 25, 2020

*Via Email and Federal Express*

Montalvo Associates LLC
c/o JSM Enterprises, Inc.
1600 West Campbell, Suite 21
San Jose, CA 95008
Attn: Alexis Grant
(AGrant@jsmenterprises.com)

Affordable Housing Access, Inc.
4029 Westerly Place, Suite 101
Newport Beach, CA 92660

Re:     Lucretia Avenue Partners, L.P. (the "Partnership"); Amended and Restated Agreement of
        Limited Partnership, dated as of December 9, 2002 (as amended, the "Partnership Agreement")
        (capitalized terms not otherwise defined herein shall have the meanings set forth in the
        Partnership Agreement)

Ms. Grant,

I am writing to follow up on my letter of October 30, 2020, to which you never responded.  Based on
the General Partner's continuing refusal to comply with the contractual appraisal process that
it initiated, the Investor Limited Partner's designated appraiser reached out to the General Partner's
designated appraiser directly to propose an independent third appraiser as required under Section
7.4J of the Partnership Agreement.  However, despite the fact that my prior letter specifically stated
that the Investor Limited Partner's appraiser would be reaching out directly if we did not hear back
from you, the General Partner's appraiser replied that he "ha[d] not yet been asked to participate
in the selection of a third appraiser[,]" and refused to engage on that basis.

It has now been four months since the General Partner exercised its Option pursuant to Section
7.4J of the Partnership Agreement, and three months since the parties exchanged their appraisals.
Yet, ignoring repeated requests from the Investor Limited Partner, the General Partner has
continued the delay and obstruction tactics that preceded its exercise by refusing to complete the
process required under Section 7.4J to determine the purchase price.  The General Partner's
intentional obstruction of the contractual appraisal process constitutes a clear breach of the
Partnership Agreement and intentional relinquishment of its purchase right.

**In light of the above, the Investor Limited Partner is electing to exercise its right under
Section 7.4I of the Partnership Agreement to require that the General Partner "take such
other action permitted or required by the Code as the Investor Limited Partner may
reasonably request to effect a sale of the Project...." More specifically, the Investor Limited
Partner requests that the General Partner list the Project for sale with a mutually acceptable
LIHTC broker no later than ten days from today (i.e., Friday, December 4, 2020).** The
Investor Limited Partner's invocation of its sale right under Section 7.4I should come as no surprise

to the General Partner, as I specifically stated in my letter dated July 23, 2020 that the Investor Limited Partner would "exercise its [sale] right under Section 7.4.I" if the General Partner persisted in obstructing the disposition of the Investor Limited Partner's interests.  The Partnership Agreement, moreover, affords the General Partner with no discretion over whether to accommodate this reasonable request.  *See* Partnership Agreement § 7.4I (stating that the "General Partner *shall*…take such other action…as the Investor Limited Partner may reasonably request to effect a sale of the Project") (emphasis added).

Please confirm immediately whether the General Partner will comply with its obligations under Section 7.4I of the Partnership Agreement so that the parties can work together to identify a mutually acceptable LIHTC broker.  Please also be advised that the Investor Limited Partner will not hesitate to retain outside counsel and bring an action against the General Partner for, *inter alia*, breach of contract, breach of fiduciary duty, and specific performance should the General Partner refuse to comply with its contractual obligations under Section 7.4I.

This letter is not intended to and does not waive any of the Investor Limited Partner's rights or remedies, including but not limited to the right under Section 4.5A(iv) of the Partnership Agreement "[t]o remove a General Partner and elect one or more new General Partners upon the occurrence of" any one of a number of prohibited actions.

Sincerely,

AMTAX Holdings 279, LLC

By:  Alden Pacific Asset Management, LLC, its manager
By:  Alden Torch Financial LLC, its sole member

By: _____
    Alison Wadle, EVP and General Counsel

cc:     Stephen Ryan, via email (sryan@coxcastle.com)

# EXHIBIT 11



November 25, 2020

*Via Email and Federal Express*

Montalvo Associates LLC
c/o JSM Enterprises, Inc.
1600 West Campbell, Suite 21
San Jose, CA 95008
Attn: Alexis Grant (AGrant@jsmenterprises.com)

Affordable Housing Access, Inc.
4029 Westerly Place, Suite 101
Newport Beach, CA 92660

Re:   Evans Lane Apartments, L.P. (the "Partnership"); Amended and Restated Agreement of Limited
Partnership, dated as of October 1, 2002 (as amended, the "Partnership Agreement") (capitalized
terms not otherwise defined herein shall have the meanings set forth in the Partnership Agreement)

Ms. Grant,

The Investor Limited Partner is hereby electing to exercise its right under Section 7.4I of the Partnership
Agreement to require, at any time after the completion of the fourteenth year of the compliance period, that
the General Partner "take such other action permitted or required by the Code as the Investor Limited
Partner may reasonably request to effect a sale of the Project…."  More specifically, the Investor Limited
Partner requests that the General Partner list the Project for sale with a mutually acceptable LIHTC broker
no later than ten days from today (i.e., Friday, December 4, 2020).  The Partnership Agreement affords the
General Partner with no discretion over whether to accommodate this reasonable request.  *See* Partnership
Agreement § 7.4I (stating that the "General Partner *shall*…take such other action…as the Investor Limited
Partner may reasonably request to effect a sale of the Project") (emphasis added).

Please confirm whether the General Partner will comply with its obligations under Section 7.4I of the
Partnership Agreement so that the parties can work together to identify a mutually acceptable LIHTC
broker.

Sincerely,

AMTAX Holdings 123, LLC
By:  Tax Credit Holdings III, LLC, its manager
By:  Alden Pacific Asset Management, LLC, its manager
By:  Alden Torch Financial LLC, its sole member

By:  _____
      Alison Wadle, EVP and General Counsel

cc:     Stephen Ryan, via email (sryan@coxcastle.com)

# EXHIBIT 12



**Cox, Castle & Nicholson LLP**
50 California Street, Suite 3200
San Francisco, California  94111-4710
**P:** 415.262.5100    **F:** 415.262.5199

Stephen C. Ryan
415.262.5150
sryan@coxcastle.com

December 3, 2020

**VIA E-MAIL AND U.S. MAIL**

AMTAX Holdings 279, LLC
Alden Torch Financial
1225 17th Street, Suite 1400
Denver, Colorado  80202
Attention: Alison Wadle, Executive Vice President and Senior Counsel

     Re:    Lucretia Avenue Partners, L.P.

Dear Ms. Wadle:

     I am writing in response to your letter that was sent on Thanksgiving Eve, November 25, 2020, copy attached. You were notified of the Administrative General Partner's exercise of its buy-out rights under Section 7.4.J of the partnership agreement on July 27, 2020, copy attached. The Limited Partners confirmed that exercise in your letter of August 21, 2020, copy attached. The Administrative General Partner is simply exercising its rights under Section 7.4.J and expects the Limited Partners to honor their obligations under Section 7.4.J.

     The Administrative General Partner is interested in acquiring the Limited Partners' interests, as evidenced by its notice of July 27, 2020. Presumably, the Limited Partners are interested in the same thing as confirmed in their letter of August 21, 2020. Accordingly, it would be more productive for the parties to continue working towards that end. It has been three short months since your confirmation of the buy-out as evidenced by your letter of August 21, 2020, during which time the parties have exchanged valuations and are considering suitable neutral evaluators; not an unreasonably time in the Stay-At-Home world that everyone now operates in.

     The Administrative General Partner stands ready to move the process forward.

     Sincerely yours,

Stephen C. Ryan

# EXHIBIT 13



**COX CASTLE NICHOLSON**

**Cox, Castle & Nicholson LLP**
50 California Street, Suite 3200
San Francisco, California 94111-4710
**P:** 415.262.5100   **F:** 415.262.5199

Stephen C. Ryan
415.262.5150
sryan@coxcastle.com

December 3, 2020

**VIA E-MAIL AND U.S. MAIL**

AMTAX Holdings 123, LLC
Alden Torch Financial
1225 17th Street, Suite 1400
Denver, Colorado 80202
Attention: Alison Wadle, Executive Vice President and Senior Counsel

   Re: Evans Lane Apartments, L.P. (the "Partnership")

Dear Ms. Wadle:

   I am writing in response to your letter that was sent on Thanksgiving Eve, November 25, 2020, copy attached, which purports to exercise certain rights to cause the Partnership's property to be sold.

   The Limited Partners were previously notified of the Administrative General Partner's exercise of its buy-out rights under Section 7.4.J of the partnership agreement on July 27, 2020, copy attached. The Limited Partners confirmed receipt of such notification in your letter of August 21, 2020, copy attached. Accordingly, the November 25th notice from you is inapplicable in light of the Administrative General Partner's pending buy-out of the Limited Partners' positions.

   The Administrative General Partner is interested in acquiring the Limited Partners' interests, as evidenced by its notice of July 27, 2020. Presumably, the Limited Partners' November 25th letter evidences a similar interest to dispose of their interests in this venture. Accordingly, the parties should move towards accomplishing that end with the Administrative General Partner's acquisition of the Limited Partners' interests pursuant to Section 7.4.J. I propose that we set up a time to discuss the mechanics of doing so.

       Sincerely yours,

       Stephen C. Ryan

SCR/pml
cc: James Morley
   Alexis Grant

074271\12074956v1

# EXHIBIT 14

# KING & SPALDING

King & Spalding LLP
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071
Tel: +1 213 443 4335
Fax: +1 213 443 4310
www.kslaw.com

Eric S. Pettit
Partner
Direct Dial: +1 213 218 4006
Direct Fax: +1 213 443 4310
epettit@kslaw.com

December 10, 2020

*VIA E-MAIL*

Stephen C. Ryan
Cox, Castle & Nicholson LLP
50 California Street, Suite 3200
San Francisco, CA 94111-4710

Re:      *Lucretia Avenue Partners, L.P. (the "Partnership")*

Dear Mr. Ryan:

I write in response to your letter to Alison Wadle dated December 3, 2020 concerning the Partnership. Although your letter purports to respond to Ms. Wadle's letter of November 25, 2020, it completely fails to address the issues raised in that letter.

First, your letter fails to address, let alone remedy, the General Partner's complete abandonment of the process triggered more than four months ago by the General Partner's exercise of its purchase option pursuant to Section 7.4J of the Partnership's limited partnership agreement (the "Partnership Agreement"). As Ms. Wadle noted in her most recent letter—which followed an earlier letter dated October 30, 2020 to which your client failed to respond—it has been more than three months since the parties exchanged their appraisals, yet the General Partner has ignored repeated requests by the Investor Limited Partner to complete the process required under Section 7.4J to determine the purchase price. Your letter, unfortunately, continues the pattern of intentional obstruction your client began even before it formally exercised its purchase option. Indeed, your letter does nothing to move the process forward, but instead claims falsely that the parties "are considering suitable neutral evaluators[,]" and preposterously attempts to blame the General Partner's delay on "the Stay-At-Home world that everyone now operates in." You fail, however, to explain how safety precautions related to COVID-19 have any impact on the ability of the two appraisers to discuss whether they can agree on a value and, if they cannot agree, to jointly appoint a third appraiser. As Ms. Wadle stated in her November 25, 2020 letter, the General Partner's "intentional obstruction of the contractual appraisal process constitutes a clear breach of the Partnership Agreement and intentional relinquishment of its purchase right."

December 10, 2020
Page 2

Second, your letter completely ignores the Investor Limited Partner's exercise of its right under Section 7.4I of the Partnership Agreement and request that the General Partner list the Project for sale with a mutually acceptable LIHTC broker no later than December 4, 2020. As Ms. Wadle noted in the exercise letter, the Partnership Agreement affords the General Partner no discretion over whether to accommodate the Investor Limited Partner's request to sell the Project, yet your letter does not even reference, let alone respond to, the Investor Limited Partner's request to agree on a mutually acceptable broker to list the Project for sale. The Investor Limited Partner accordingly reaffirms its exercise and reiterates its instruction to the General Partner to list the Project for sale.

The Investor Limited Partner requests that you confirm no later than next Wednesday, December 16, 2020, whether the General Partner will comply with its obligations under Section 7.4I of the Partnership Agreement so that the parties can work together to identify a mutually acceptable LIHTC broker. Please be advised that if your client persists in its refusal to comply with its contractual obligations, the Investor Limited Partner will bring an action against the General Partner and pursue all available remedies based on the General Partner's improper conduct. Please be further advised that any effort by the General Partner to attempt belatedly to revive the appraisal process under Section 7.4J will neither cure the General Partner's breach of that provision nor excuse the General Partner from performing its separate obligations under Section 7.4I. This letter is not intended to be, and is not, a waiver of any of the Investor Limited Partner's rights or remedies, all of which are expressly preserved.

Very truly yours,

Eric. S. Pettit

cc: Alison Wadle

# EXHIBIT 15

# KING & SPALDING

King & Spalding LLP
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071
Tel: +1 213 443 4335
Fax: +1 213 443 4310
www.kslaw.com

Eric S. Pettit
Partner
Direct Dial: +1 213 218 4006
Direct Fax: +1 213 443 4310
epettit@kslaw.com

December 10, 2020

*__VIA E-MAIL__*

Stephen C. Ryan
Cox, Castle & Nicholson LLP
50 California Street, Suite 3200
San Francisco, CA 94111-4710

Re:     *Evans Lane Apartments, L.P. (the "Partnership")*

Dear Mr. Ryan:

I write in response to your letter to Alison Wadle dated December 3, 2020, which purports to respond to Ms. Wadle's letter of November 25, 2020 concerning the Partnership. Your letter references a prior letter sent by the Partnership's General Partner on July 27, 2020 purporting to exercise its purchase option pursuant to Section 7.4J of the Partnership's limited partnership agreement (the "Partnership Agreement"). However, as Ms. Wadle noted in her prior letter to the General Partner on August 21, 2020—which you attach to your December 3, 2020 letter but appear not to have read—the General Partner's purported exercise is invalid and ineffective because the exercise period applicable to its purchase option under Section 7.4J has not yet commenced, and will not begin until the fifteen-year compliance period has ended.

By contrast, As Ms. Wadle noted in her letter, the Investor Limited Partner has the right at any time after the *fourteenth* year of the compliance period to exercise its right under Section 7.4I of the Partnership Agreement to request that the General Partner to "take such other action permitted or required by the Code as the Investor Limited Partner may reasonably request to effect a sale of the Project...." The Investor Limited Partner has now exercised that right, and the Partnership Agreement affords the General Partner no discretion over whether to accommodate the Investor Limited Partner's request to sell the Project.

The Investor Limited Partner reiterates its request that the General Partner confirm whether it will comply with its obligations under Section 7.4I so that the parties can work together to identify a mutually acceptable LIHTC broker, and requests a response from the General Partner no later than next Wednesday, December 16, 2020. Please be advised that if your client persists in its refusal to

December 10, 2020
Page 2

comply with its contractual obligations, the Investor Limited Partner will bring an action against the General Partner and pursue all available remedies based on the General Partner's improper conduct. This letter is not intended to be, and is not, a waiver of any of the Investor Limited Partner's rights or remedies, all of which are expressly preserved.

Very truly yours,

Eric. S. Pettit

cc: Alison Wadle